William J. Brown, Jr. (SBN 192950)
    bill@brownwegner.com
Kyle J. Berry (SBN 355393)
    kberry@brownwegner.com
BROWN WEGNER LLP
2010 Main Street, Suite 1260
Irvine, California 92614
Telephone: 949.705.0080

Thomas R. McCarthy (DC Bar No. 48965)*
Zachary P. Grouev (FL Bar No. 10386291)*
Julius Kairey (NY Bar No. 5668249)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (NY Bar No. 1663830)*
Omer Wiczyk (NY Bar No. 4321600)*
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

* Application for admission
pro hac vice forthcoming

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW WEINBERG, RABBI DOVID GUREVICH, NIR HOFTMAN, ELI TSIVES,<br><br>      *Plaintiffs,*<br><br>v.<br><br>NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, JOHN DOE #1, PRESIDENT OF THE UCLA CHAPTER OF SJP, | **Case No. 2: 25-cv-03714**<br><br>**COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND** |

1

AJP EDUCATIONAL FOUNDATION,
INC., D/B/A AMERICAN MUSLIMS FOR
PALESTINE,
OSAMA ABURSHAID,
HATEM AL-BAZIAN,
FACULTY FOR JUSTICE IN PALESTINE
NETWORK,
UC DIVEST COALITION,
WESPAC FOUNDATION,
PEOPLE'S CITY COUNCIL,

 *Defendants.*

1.    On October 7, 2023, the foreign terrorist organization Hamas launched a brutal attack on Israel that "resulted in the murder of nearly 1,200 people," including "more than 40 American citizens." Staff of H. Comm. on Educ. and the Workforce, 118th Cong., *Antisemitism on College Campuses Exposed* 1, (Comm. Print 2024), perma.cc/6Y4U-52HG.

2.    "In the aftermath of that horrific event, American institutions of higher education were upended by an epidemic of hate, violence, and harassment targeting Jewish students." *Id.* Students, faculty, and other members of campus Jewish communities "faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." Exec. Order No. 14188, *Additional Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847, 8847 (Feb. 3, 2025); *see also* Louis D. Brandeis Center for Human Rights Under Law, *Public Interest Law Firm Launched to Specialize in Anti-Semitism Litigation* (Feb. 6, 2025), perma.cc/AQ83-PNKS (describing a surge in antisemitic incidents after October 7).

3.    Every branch of government has recognized the ongoing campus antisemitism crisis. *See* Staff of H. Comms., 118th Cong., *House Antisemitism Staff Report* (Dec. 18, 2024), perma.cc/9NWV-2VWJ (collecting six House committees' findings); Exec. Order No. 14188, 90 Fed. Reg. 8847-48 (reiterating President Trump's commitment to combatting antisemitism on college campuses); *Frankel v. Regents of the Univ. of Cal.*, 744 F. Supp. 3d 1015, 1025-26 (C.D. Cal. 2024) (ruling that UCLA's failure to protect Jewish students' equal access to campus likely violated the Constitution).

4.    Consistent with these findings, the Department of Justice recently launched a "multi-agency Task Force to Combat Anti-Semitism."

*Justice Department Announces Formation of Task Force to Combat Anti-Semitism*, Dep't of Just. (Feb. 3, 2025), perma.cc/5RG9-T54U. The Task Force's first objective is "to eradicate antisemitic harassment in schools and on college campuses." *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism*, Dep't of Just. (Feb. 28, 2025), perma.cc/6YAR-FZRA. Perhaps unsurprisingly, the Task Force is investigating whether UCLA engaged in a "pattern or practice" of unlawful discrimination "by allowing an Antisemitic hostile work environment to exist on its campuses." *U.S. Justice Department Launches Investigation of University of California Under Title VII of the Civil Rights Act of 1964*, Dep't of Just. (Mar. 5, 2025), perma.cc/Z58G-9AGN.

## NATURE OF THE ACTION

5.    This case is about a particularly shocking chapter of America's campus antisemitism epidemic—a coordinated campaign of egregious acts of racial exclusion, intimidation, and assault conducted by a web of organizations and individuals working in concert to intimidate Jewish students, faculty, and staff.

6.    The radicals behind this campaign (often styled as a movement to "globalize the student intifada") designed, promoted, and executed a plan to prevent Jewish communities on college campuses from enjoying equal access to public spaces by means of racialized violence.

7.    The conspiracy's calling card is the so-called "autonomous zone" or campus encampment. These fortified camps are organized by a core of virulently antisemitic radicals and leftist paramilitary groups. The radical core constructs and supplies the encampment, recruits volunteers to join and defend it, and provides those recruits with the equipment and training necessary to exert physical control over "occupied" public spaces. The

result is that wherever such an encampment appears, a "Jew exclusion zone" enforced by threats, intimidation, and violence is not far behind. *See, e.g., Frankel*, 744 F. Supp. 3d at 1020, 1025.

8.    UCLA has been the repeated target of these terroristic tactics, which have proven sadly effective in rendering campus a hostile environment for Jews. Last year, large majorities of the UCLA Jewish community reported that antisemitism had worsened or significantly worsened since October 7. *See* Task Force to Combat Antisemitism and Anti-Israeli Bias, *Antisemitism and Anti-Israeli Bias at UCLA* 23 (Oct. 16, 2024), perma.cc/2CED-UAJ6. A major source of this increased fear and apprehension was the presence, between April 25 and May 2, 2024, of a "violent, antisemitic encampment" centered on Dickson Plaza/Royce Quad. *Antisemitism on College Campuses Exposed* at 1; *see also id.* at 24-30, 32, 68-69; *Antisemitism and Anti-Israeli Bias at UCLA* at 25-27.

9.    The UCLA encampment, like its contemporaries on college campuses around the country, was a festering sore of antisemitism and racial exclusion. Members of the encampment "occupied" a university building and restyled it "Intifada Hall":



10.    The encampment also established "checkpoints" and "human phalanxes" that "denied Jewish students access to areas of campus," including Powell Library and Royce Hall. *See Antisemitism on College Campuses Exposed* at 1, 24-30, 32, 68-69; *Antisemitism and Anti-Israeli Bias at UCLA* at 53-54, 56; *Frankel*, 744 F. Supp. 3d at 1020, 1025-27.

11.    Together, these measures amounted to a "Jew exclusion zone" backed by the concrete threat of physical violence. *E.g.*, Compl. ¶6 (Dkt. 1), *Frankel*, No. 2:24-cv-04702-MCS-PD (C.D. Cal.). To "defend" the zone, members of the encampment organized into teams of "security" personnel armed with wooden planks, makeshift shields, pepper spray, tasers, and even a sword. *See Antisemitism and Anti-Israeli Bias at UCLA* at 58. The primary purpose of these teams was to intimidate members of the Jewish community and deny them access to "occupied" territory using "checkpoints" and "human phalanxes." *Id.* at 53, 58.

12.    Over time, threats of violence escalated into actual violence. *See id.* at 53 & n.105, 57-58 (describing the child of a holocaust survivor who was sprayed with pepper spray, a Native American Jewish woman who was assaulted with a stick, and a Jewish student who was knocked unconscious, suffering a serious head wound); *This is Total Lawlessness and Anarchy*, Fox News (Apr. 29, 2024), perma.cc/7M2C-FF6X (interview with Plaintiff Nir Hoftman, a Jewish UCLA professor who was tackled and robbed by a member of the encampment). First-hand accounts also reported large, organized groups of violent nonstudents who would emerge from the encampment to chase out anyone who waived an Israeli flag or otherwise showed support for Jews and Israel.

13.    Based on these events, this Court recently found that "Jewish students were excluded from portions of the UCLA campus" that were

"occupied" by the encampment. *Frankel*, 744 F. Supp. 3d at 1020-21. *Frankel* was about UCLA's woefully inadequate response to a coordinated campaign of violent racial exclusion. In that case, UCLA has contended that this campaign of racial exclusion was "engineered by third-party protestors." *Frankel*, 744 F. Supp. 3d at 1020.

14.    This case is about those third parties—organizations and individuals responsible for prosecuting that campaign in the first place. Defendants planned, constructed, supplied, recruited for, and "defended" the encampment knowing that it was based on class-based animus and that its purpose and effect was to exclude Jewish students, faculty, and staff from public spaces using violence and the threat of violence.

15.    The sad truth is that Defendants created and maintained a weeklong "Jew exclusion zone" on a public university campus. But even after UCLA finally cleared the encampment, Defendants continued their campaign of harassment and exclusion, attempting to establish new encampments, targeting buildings named after prominent Jews, and blocking access to graduate school facilities.

16.    For example, on May 6, 2024, more than 40 people (including several who had been arrested at the encampment) were taken into custody after UCLA police discovered them massing in a garage with metal pipes, bolt cutters, chains and padlocks, and a "Do-It-Yourself Occupation Guide." *Statement Regarding the Incidents on Monday, May 6, 2024*, UCLA Police Dep't (May 8, 2024), perma.cc/3DFJ-WKXG.

Photos



Metal pipes (left), epoxy adhesive and super glue (top center), padlocks (top center),
bolt cutters (bottom center), heavy duty chains (top right),
documentation encouraging violence and vandalism (bottom right)

17.    Police later determined that the group was planning to "occupy" and vandalize Moore Hall, which Defendant Students for Justice in Palestine (echoing its tactics at the encampment the previous week) had urged its supporters to "mobilize" to that morning:

18.    A month later, Defendants tried again. A group of around 100 people "marched to the walkway at the top of the Janss Steps and set up an unauthorized and unlawful encampment with tents, canopies, wooden

shields, and water-filled barriers." *Statement Regarding the Unlawful Encampments and Subsequent Arrests on Monday, June 10, 2024*, UCLA Police Dep't (June 10, 2024), perma.cc/V5KA-G83L. The group "restricted access to the general public in violation of University policy" and "disrupted nearby final exams." *Id.* After police dispersed the encampment at the steps, the group marched first to Kerckhoff Patio and then to the courtyard between Dodd Hall and UCLA Law School. At each location, the group "set up another unauthorized and unlawful encampment" that improperly restricted access to the public and disrupted nearby final exams. *Id.* Later that day, members of the group assaulted and threatened to kill Plaintiff Dovid Gurevich, a Chabad rabbi who was at the scene to support Jewish students. *See* Bandler, *UCLA Chabad Rabbi Assaulted by Pro-Palestinian Protesters*, Jewish Journal (June 11, 2024), perma.cc/KL93-4GJB.

19.    On February 12, 2025, the UCLA chapter of SJP was suspended after a university investigation concluded that the organization had been involved in a similarly threatening campaign at the home of UC Regent Jay Sures. Echoing their tactics at the various encampments, individuals affiliated with SJP surrounded the vehicle of a Sures family member and prevented that family member's free movement. UCLA officials recently recommended indefinitely revoking campus organization status for SJP's undergraduate arm and imposing serious sanctions on its graduate-student arm.

20.    Throughout, UCLA's Jewish community has been left to bear the lasting pain of having been harassed, assaulted, and excluded from campus merely because they are Jews. *See, e.g.*, *Antisemitism and Anti-Israeli Bias at UCLA* at 23, 25-27.

21. In sum, Defendants have engaged in a long-running antisemitic conspiracy to deny Jews equal access to UCLA's campus. And for roughly a week in Spring 2024, Defendants succeeded in doing so by enforcing a "Jew exclusion zone" centered on an encampment "occupying" the area around Dickson Plaza/Royce Quad.

22. After UCLA belatedly cleared the encampment, Defendants conspired to reestablish it and unabashedly renewed their efforts to ensure that UCLA's campus would be unsafe for any member of the UCLA Jewish community. By denying Jews equal access to public spaces on campus and subjecting them to racialized violence, Defendants violated federal and California law. Plaintiffs are entitled to relief.

## **JURISDICTION AND VENUE**

23. This Court has subject-matter jurisdiction. *See* 28 U.S.C. §§1331, 1343, 1367. The Court has jurisdiction over Plaintiffs' federal claims because Plaintiffs seek to recover for violations of their civil rights that "aris[e] under the Constitution [and the] laws ... of the United States." *Id.* §1331; *see also id.* §1343 (granting district courts original jurisdiction over §1985 claims). And the Court has supplemental jurisdiction over Plaintiffs' state-law claims because they arise out of the same events and thus "form part of the same case or controversy." *Id.* §1367(a).

24. Venue is proper under 28 U.S.C. §1391(b)(2) because "a substantial part of the events or omissions giving rise to [Plaintiffs' claims] occurred" in the Central District of California, specifically in and around the City of Los Angeles and on UCLA's campus. *See, e.g., Frankel*, No. 2:24-cv-04702-MCS-PD (C.D. Cal.).

# **THE PARTIES**

**Plaintiffs**

25.     Plaintiff Nir Hoftman is a doctor at UCLA who has taught at the university's medical school for over 22 years. Hoftman is a Jew.

26.     On April 28, 2024, Hoftman was assaulted by several members of the encampment's "security" team for the offense of being a Jew walking in an "occupied" area. As Hoftman conducted an interview while walking towards the encampment, two or three individuals affiliated with the encampment moved to block his path. Though he initially tried to ignore them, one individual stood directly in front of Hoftman and told him that he could not keep walking in that direction. When Hoftman attempted to walk around, he was tackled, causing one of his earbuds to fly out of his ear. Dazed, Hoftman returned to his feet and briefly searched for his earbud. When he couldn't locate the earbud quickly, Hoftman left the area to report the assault to police, thinking that it must have been lost in nearby foliage.

27.     Later that day, after Hoftman had called 911 and reported the incident to UCLA police, he used an app on his phone to track the lost earbud. Based on the tracking information, Hoftman determined that the earbud was moving around inside the encampment and that, rather than having been lost, it had been stolen by one of his attackers.

28.     The attack left Hoftman deeply disturbed and afraid to go anywhere near the encampment. He was saddened to learn that, to members of the encampment, giving an interview that made clear he was Jewish and supported Israel was sufficient grounds to deny him access to an "occupied" public space. And he was shocked that the encampment's "security" personnel were ready and willing to use violence to deny Jews like himself access to the encampment and nearby public spaces.

29.    After the attack, Hoftman stayed away from the encampment until police finally cleared it on May 2. Although he would have preferred to continue to show up in support UCLA's Jewish community, Hoftman's experience with the encampment's "security teams" proved that Jews were unwelcome and unsafe in areas that Defendants had "occupied" and that these "security" personnel were willing to range far afield from the core of the encampment to deny access to and attack perceived enemies. The prospect of a replay of the assault, or worse, created an unacceptable risk to Hoftman's safety.

30.    In short, Hoftman was injured, both physically and materially, because he sought to exercise his right as a member of the university's Jewish community to visit a public space on campus. And he was excluded, on threat of violence, from a public space on campus that he would otherwise have visited. Hoftman was shocked, appalled, and frustrated that all this happened simply because he is a Jew.

31.    Plaintiff Matthew Weinberg is a second-year law student at UCLA. Weinberg is a Jew.

32.    Between April 25 and May 2, Defendants conspired to (and did) severely curtail Weinberg's ability to access the "occupied" territory near Dickson Plaza/Royce Quad because of his status as a Jew. Weinberg knew from press coverage and conversations with friends that members of the encampment were willing to use violence to enforce their control over the area. And he knew that, because he is a Jew and supports Israel, members of the encampment would consider him an enemy and prevent him from passing through any space (public or otherwise) that they controlled.

33.    Based on this knowledge, Weinberg feared that appearing at or traveling through the part of campus over which Defendants had conspired to exercise control would threaten his physical safety. That reaction was

natural and correct: The encampment was a fortified camp at the center of a vortex of radical antisemitism (including "occupied" "intifada hall," antisemitic graffiti, and chants of eliminationist slogans like "kill all the Jews" and "From the River to the Sea"). And it was "defended" by a large group of "security" personnel which had shown no qualms about using violence against those they perceived as enemies (i.e., Jews and law enforcement).

34.    Weinberg feared that if he tried to go to any of the UCLA facilities near the encampment (including Powell Library, which students often use to study) members of the encampment would physically deny him entry. And he rightly feared that they would threaten him with violence for even attempting to enter. If those threats did not dissuade him, Weinberg knew that members of the encampment were willing to engage in violence towards Jews, including Jewish students, who came nearby or attempted to bypass their "checkpoints" and "human phalanxes." Based on the reasonable fear that the same thing would happen to him, Weinberg stayed away from the entire area while the encampment was "occupying" it.

35.    Weinberg was also forced to take a different route around Royce Quad on his way to other parts of campus. Prior to Defendants' establishment of their antisemitic encampment, Weinberg often would walk through the Quad. But after Defendants erected the encampment in the middle of the Quad, Weinberg felt obliged to avoid that area out of concern for his safety. And he in fact specifically avoided the "occupied" parts of Royce Quad for the duration of the encampment. In other words, Weinberg was denied access to the Quad because he is a Jew.

36.    Weinberg was shocked, appalled, and frustrated that he was excluded from a public space at his own university simply because he is a

Jew. No institution of higher learning (or any other institution) would tolerate such blatant racial exclusion targeted at any other group. Likewise, it would ordinarily be clear to all that perpetrating such exclusion denies members of the targeted group their civil rights. Weinberg is frustrated that Defendants' conspiracy rendered Jewish students at UCLA second-class citizens—forced to avoid pockets of "occupied" territory and to always be on the lookout for the next encampment, the next checkpoint, or the next chant of "beat that f—king Jew!"

37.     Plaintiff Dovid Gurevich is the Rabbi of Chabad House at UCLA. Rabbi Gurevich is a Jew.

38.     When Defendants attempted to reestablish an encampment near the UCLA law school on June 10, Rabbi Gurevich came out to support Jewish students and make a record of what was happening. Defendants greeted Rabbi Gurevich with threats of violence and assault. *See* Bandler, *UCLA Chabad Rabbi Assaulted by Pro-Palestinian Protesters*. A member of Defendants' "security team" slapped Rabbi Gurevich's phone out of his hand. *Id.* Rabbi Gurevich's screen protector was damaged, and if not for the protector, his phone would have been damaged too. Soon after, the situation escalated to death threats when a member of the group told Rabbi Gurevich that he would beat him unconscious and another explained that, if the individual showed the Rabbi his face, he would "have to f—king kill you." *Id.* These actions were plainly intended to prevent Rabbi Gurevich, by force and threat of force, from exercising his right to be present in a public space on campus as a member of UCLA's Jewish community.

39.     Rabbi Gurevich was shocked, appalled, and frustrated that he had been threatened with violence and attacked simply because he is a

Jew who exercised his right to express support for UCLA's Jewish students.

40.     Plaintiff Eli Tsives is an undergraduate student at UCLA. Tsives is a Jew.

41.     Tsives attended every day of Defendants' April 25-to-May 2 encampment, during which time he observed the encampment substantially expand in size and sophistication. For example, as early as Sunday, April 28, Tsives noticed that Defendants had erected large wooden barricades around the perimeter of the encampment. And as Defendants pushed out the encampment's borders day-by-day, Tsives observed members of the encampment's "security teams" becoming more and more aggressive in their efforts to deny Jews access to the area. Tsives also observed that the encampment had a well-organized supply system supported by outside actors, who would drop off supplies at designated points for Defendants to collect and distribute.

42.     Each day at the encampment, Tsives dressed in a manner that made clear that he was Jewish, including wearing a visible Star of David necklace. Thus, whenever Tsives attempted to pass through one of the "checkpoints" surrounding the encampment, he was either physically rebuffed by uniformed members of the encampment's "security teams" at point of entry or surrounded and forced out of the area by a "human phalanx" shortly after. For example, on Monday, April 29, Tsives attempted to pass through the checkpoints and was denied entry after the "security team" saw his Star of David necklace.

43.     By the final few days of the encampment, Tsives was forced to take a different, slower route to his regular class in Kaplan Hall because the encampment and its enforcers had "occupied" the entrance he ordinarily used to enter the building. This caused Tsives to be late to class

several times before the encampment was cleared. Tsives was shocked, appalled, and frustrated that he had been excluded from public spaces at his own university (including Dickson Plaza/Royce Quad and his usual route to class) simply because he is a Jew.

**Defendants**

44.    Defendant National Students for Justice in Palestine is a nationwide membership association that aims to "develop a connected, disciplined movement" to "take colleges and universities across North America by storm." It is often referred to as National SJP or simply SJP. SJP has built an "ideologically, politically, and organizationally unified" network of over 350 campus "solidarity organizations," including a (now largely indefinitely suspended) UCLA chapter. That chapter was the primary organizer for the UCLA encampment at Dickson Plaza/Royce Quad. Together with its UCLA chapter, SJP was concededly responsible for coordinating between SJP elements and other Defendants to plan, construct, supply, promote, recruit for, and "defend" the encampment. For example, members of the UCLA chapter organized a call with Defendant Faculty for Justice in Palestine Network (FJP) to request that FJP members sign up for shifts to "support" the encampment. The UCLA chapter was also the encampment's public face, with several of its members serving as designated "spokespersons," (i.e., the only members of the encampment permitted to speak to the press).

45.    Defendant John Doe #1 was a student at UCLA in 2024, where he served as President of the UCLA chapter. Because SJP instructs its members to engage in tactics designed to prevent the identification of high-ranking chapter officials, Doe cannot yet be identified:



46.    On information and belief, as President, and in collaboration with other Defendants, Doe #1 directed SJP's planning and execution of the UCLA encampment at Dickson Plaza and Royce Quad, as well as SJP's subsequent efforts to reestablish the encampment and "occupy" other university facilities like Moore Hall and UCLA Law School.

47.    On information and belief, Doe's responsibilities included securing funding and planning materials from National SJP (and thus from its fiscal sponsor, Defendant Westchester People's Action Coalition (WESPAC)), approving the ultimate decision to move forward with the encampment, and executing the initial construction project on April 25. Doe also coordinated with other Defendants to promote the encampment on social media with the goal of recruiting additional personnel to "defend" against law enforcement and other perceived enemies.

48.    These recruitment efforts were especially effective at bringing nonstudents to the encampment to support it and grow its ranks. Both organizers and participants told friendly press outlets that an influx of protesters who were not students came to support the encampment shortly before it was dissolved, resulting in the encampment growing three times as large from the day prior.

49. On information and belief, Doe engaged in similar coordination and direction regarding SJP's subsequent efforts to reestablish encampments elsewhere on campus, including the failed takeovers of Moore Hall and UCLA Law School.

50. Defendant AJP Educational Foundation, Inc. (d/b/a American Muslims for Palestine) is a California nonprofit that provides financial support and organizational capacity to groups like SJP. AJP/AMP is under investigation for potential terrorist fundraising. *See Attorney General's Office Opens Investigation into American Muslims for Palestine Nonprofit*, Off. of the Va. Att'y Gen. (Oct. 31, 2023), perma.cc/H9FJ-7CNH; *NJSP: Antisemitism, Anti-Americanism, Violent Extremism, and the Threat to North American Universities*, The Inst. for the Study of Global Antisemitism & Pol'y 43-44 (2024), perma.cc/NQ5J-LH9E.

51. That is unsurprising, given that AJP/AMP "frequently engages in rhetoric that promotes antisemitic tropes and support for violence against Israel, such as praising Hamas for the October 7, 2023, attack." *American Muslims for Palestine (AMP)*, Anti-Defamation League, perma.cc/6S2M-JPBT (archived Mar. 18, 2025). The same is true for many of the organizations AJP/AMP supports. *See id.* AMP works in broad-based coalitions and supports campus activism through SJP and Muslim Student Associations.

52. Defendant Osama Aburshaid is AMP's Executive Director. On information and belief, in that capacity, Aburshaid exercised control over AMP's ultimate decision to conspire with SJP and other Defendants to plan, construct, supply, promote, and recruit for the UCLA encampment.

53. Defendant Hatem Al-Bazian is Chairman of AMP's Board of Directors. On information and belief, in that capacity, Al-Bazian exercised control over AMP's ultimate decision to conspire with SJP and other

Defendants to plan, construct, supply, promote, and recruit for the UCLA encampment.

54.   Defendant Faculty for Justice in Palestine Network is a nationwide membership association comprised of chapters at various universities, including UCLA. FJP supports and amplifies SJP's efforts on college campuses around the country to make public spaces unsafe for Jews. FJP encourages its members to "support and join" SJP's efforts on campus and claims that members have "played a frontline role, physically and materially," in supporting SJP's endeavors, including the campus encampment initiative.

55.   Defendant UC Divest Coalition is a California-based unincorporated association made up of individuals and entities that seek to pressure the UC system into divesting from, among other things, the State of Israel. As of June 2023, the Coalition's membership included, among other entities, five California-based SJP chapters (including the now largely indefinitely suspended UCLA chapter) and the Palestinian Youth Movement.

56.   On April 25, 2024, the Coalition conspired with SJP and other member organizations to construct a fortified camp near Dickson Plaza and Royce Quad that would become the core of the UCLA encampment:





57. Defendant WESPAC Foundation is a New York nonprofit organization that acts as "fiscal sponsor" for SJP, PYM, and similar organizations, which means that WESPAC receives and administers donations on behalf of such organizations for use on "projects in the United States." *See* Hobbs et al., *Activist Groups Trained Students for Months Before Campus Protests*, Wall St. Journal (May 3, 2024), bit.ly/4lO5wUs; *WESPAC*, Anti-Defamation League, perma.cc/TK7M-LFRL (archived Mar. 18, 2025).

58. Defendant People's City Council is a Los Angeles-based unincorporated association that describes itself as an "abolitionist, anti-capitalist, and anti-imperialist collective." People's City Council made extensive use of social media to promote and recruit for the UCLA encampment. It also issued a list of "urgent" "supply needs" geared towards equipping the encampment's security teams, with requests that included shields, airsoft goggles, gas masks, helmets, wood for barricades, and umbrellas.



## **LEGAL BACKGROUND**

59.    Section 1985(3) provides that "[i]f two or more persons in any State or Territory conspire … for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws" then "if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. §1985(3).

60.    Though this language is sometimes referred to collectively as the "equal protection clause," it is in fact made up of two separate clauses—the "deprivation clause" and the "hindrance clause." "There is a significant distinction between the clauses." *Nat'l Abortions Fed'n v. Operation*

*Rescue*, 8 F.3d 680, 685 (9th Cir. 1993). "The deprivation clause concerns conspiracies of some private persons to commit tortious actions against other private persons." *Id.* "The hindrance clause, on the other hand, concerns conspiracies to thwart state law enforcement from protecting against such tortious activity." *Id.*

61.   To allege a violation of the deprivation clause, a person must show "(1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action, and (2) that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-68 (1993) (cleaned up).

62.   The Supreme Court has recognized that the Thirteenth Amendment protects rights guaranteed against private encroachment, *Bray*, 506 U.S. at 278, and courts around the country have recognized that the Thirteenth Amendment protects both "an underlying right to be free from racial violence," *Sines v. Kessler*, 324 F. Supp. 3d 765, 781-82 (W.D. Va. 2018); *see also Vietnamese Fishermen's Ass'n v. Knights of Klu Klux Klan*, 518 F. Supp. 993, 1016 (S.D. Tex. 1981), and "the right to enjoy a public accommodation" free from "racially motivated deprivation," *Sealed Plaintiff 1 v. Front*, 2024 WL 1395477, at *24 (E.D. Va. Mar. 31); *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) ("[W]e hold that a racially motivated conspiracy to interfere with one's enjoyment of a place of public accommodation constitutes a badge of slavery which is a deprivation of equal privileges and immunities under [§1985(3)]."); *Lowden v. William M. Mercer, Inc.*, 903 F. Supp. 212, 220-21 (D. Mass. 1995) (similar).

63.   Hindrance clause claims require a different conspiratorial object (hindering state officials' efforts to protect the civil rights of a

protected class) and can be based on rights that are only protected against state interference. *Operation Rescue*, 8 F.3d at 684-86.

64.    More generally, a §1985(3) claim under either clause requires "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *United Brotherhood of Carpenters and Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983).

65.    Jews are a protected class for purposes of §1985(3). *See St. Francis College v. Al-Khazraji*, 481 U.S. 604 (1987) (adopting expansive interpretation of race in 42 U.S.C. §1981 to permit claims based on the plaintiff's status as an Arab); *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987) (holding that Jews can bring claims under 42 U.S.C. §1982).

## FACTUAL BACKGROUND

### A.    The web of organizations coordinating and funding antisemitism across the country.

66.    Defendants coordinated, funded, planned, promoted, and otherwise fueled the fires of a campaign of antisemitism and racial exclusion centered on the area around Dickson Plaza/Royce Quad "occupied" by the UCLA encampment.

67.    Sadly, the "student intifada" at UCLA and the resulting denial of civil rights to Jews was nothing new for Defendants. Several Defendants who were critical to the effort to establish the UCLA encampment have a common origin, including links to the terrorist organization Hamas, and

have spent years spreading pro-Hamas and antisemitic propaganda in the United States to the detriment of American Jews.

68.    Hamas is a deeply antisemitic movement, and it understands its *jihad* against Israel in antisemitic terms. Hamas's founding charter emphasizes that its "struggle against the Jews is very great and very serious."[1] Indeed, that struggle is existential: "The Day of Judgement will not come about until Moslems fight the Jews (killing the Jews), when the Jew will hide behind stones and trees. The stones and trees will say O Moslems, O Abdulla, there is a Jew behind me, come and kill him. Only the Gharkad tree, ([evidently a certain kind of tree understood to be affiliated with the Jewish people]) would not do that because it is one of the trees of the Jews."[2]

69.    The Hamas Charter also refers to the organization as "one of the wings of Moslem Brotherhood in Palestine."[3] The Moslem Brotherhood (also known as the Muslim Brotherhood) is a Sunni Islamist movement founded in Egypt nearly a century ago, with a long history of antisemitism.[4]

70.    In 1988, the Muslim Brotherhood established the "Palestine Committee" as a terrorist funding enterprise for Hamas in the United States.[5] The Palestine Committee was a small network of organizations controlled by activists with no regard or care for corporate form or legal requirements.

---

[1] The Avalon Project, *The Covenant of the Islamic Resistance Movement*, Yale L. Sch., perma.cc/7ZD2-RKBL (Aug. 18, 1988).

[2] *Id.*

[3] *Id.*

[4] *See* Qutb, *Our Struggle with the Jews* (circa 1950) (written by Sayyid Qutb, a radical Islamist and leading member of the Muslim Brotherhood).

[5] Vidino, *The Hamas Networks in America: A Short History*, Geo Wash. Program on Extremism 5, 7–8 (Oct. 2023), perma.cc/P2Q3-U87L.

71.    The Palestine Committee was made up of several constituent organizations. The most relevant here are the Holy Land Foundation for Relief and Development ("HLF"), the Islamic Association for Palestine ("IAP"), and IAP's many alter egos, including the American Muslim Society ("AMS"). HLF served as Hamas's fundraising arm in the United States. IAP's "primary function was to serve as the public voice of Hamas in the United States."[6] And although AMS was originally incorporated as a separate organization, it later merged with IAP and operated as one of its many alter egos.[7]

72.    Both HLF and IAP were founded and controlled by members of Hamas's senior leadership. For example, Khaled Meshaal, the former head of Hamas's Political Bureau until 2017 and current leader of Hamas's diaspora office,[8] founded IAP. And Mousa Abu Marzook, a "Specially Designated Global Terrorist," helped to finance the organization."[9] Meshaal described IAP as one of the "first pillars" of Hamas's terrorist superstructure.[10]

73.    Hamas did not simply create HLF and IAP and then leave them to their own devices. Instead, both organizations actively fundraised for Hamas and collaborated on public relations strategies to promote Hamas's efforts. HLF, IAP, and their affiliate organizations were ultimately

---

[6] Levitt, *Hamas: Politics, Charity, And Terrorism in The Service of Jihad* 151 (2006).
[7] *See, e.g., Boim v. Am. Muslims for Palestine*, 9 F.4th 545, 548 (7th Cir. 2021) (recognizing that IAP "also went by the name 'American Muslim Society'").
[8] *See Justice Department Announces Terrorism Charges Against Senior Leaders of Hamas*, Dep't of Just. (Sept. 3, 2024), perma.cc/T95R-D573 (explaining that Meshaal is "effectively responsible for Hamas' official presence outside of the Gaza Strip and the West Bank").
[9] Office of Foreign Asset Control Sanctions List Search: Mousa Abu Marzook a/k/a Abu Omar, Abu Umae, Abu Rizq, perma.cc/5ABZ-UGP2.
[10] *See* Garry M. Servold, *The Muslim Brotherhood and Islamic Radicalism*, in *Know Thy Enemy: Profiles of Adversary Leaders and Their Strategic Cultures* 61–62, bit.ly/4lsUeoK (Barry R. Schneider & Jerrold M. Post eds., 2003).

discovered: their complicity in Hamas's terror regime was exposed, and they (and related individuals) were found criminally and civilly liable for their actions.[11]

74.    In 2001, the United States Office of Foreign Asset Control designated HLF as a "Specially Designated Global Terrorist."[12] A few years later, HLF and five of its leaders were convicted of providing material support to Hamas, with the individuals sentenced to prison.[13]

75.    In December 2004, after IAP and AMS were found civilly liable for providing material support to Hamas through their propaganda efforts, IAP (and AMS as its alter ego) dissolved.[14] IAP had fundraised on behalf of HLF—evidence presented at the HLF trial revealed that "numerous donation checks … made payable to … IAP" were "deposited into HLF's bank account," in certain instances with the memo line, "for Palestinian Mujahidden [martyrs] only."[15]

76.    This pattern consistently recurred. For example, the KindHearts for Charitable Humanitarian Development, Inc., an organization founded by Hamas and the Muslim Brotherhood, was also disbanded following a settlement agreement with the U.S. Treasury

---

[11] *See United States v. Holy Land Found.*, No. 3:04-cr-240-G (N.D. Tex. 2008); *Federal Jury in Dallas Convicts Holy Land Foundation and its Leaders for Providing Material Support to Hamas Terrorist Organization*, Dep't of Just. (Nov. 24, 2008), perma.cc/KZD4-B5ZU; Judgment, *Boim v. Quranic Literary Inst.*, No. 1:00-cv-02905, Dkt. 668 (N.D. Ill. Dec. 8, 2004).

[12] Office of Foreign Asset Control Sanctions List Search: Holy Land Foundation for Relief and Development, perma.cc/5BWY-4YKE.

[13] *See Federal Judge Hands Down Sentences in Holy Land Foundation Case*, Dep't of Justice (May 27, 2009), perma.cc/B6L4-HV6V.

[14] *See Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 701 (7th Cir. 2008).

[15] Schanzer, *From Ivory Towers to Dark Corners: Investigating the Nexus between Antisemitism, Tax-Exempt Universities, and Terror Financing*, Hearing before the House Comm. on Ways and Means, 118 Cong. (Nov. 15, 2023), at 8, perma.cc/6PZM-8TWY ("Schanzer 2023 Congressional Testimony").

Department that ended six years of litigation over whether the entity was an arm of Hamas.

77.     Shortly after Hamas's original material support apparatus—including IAP, HLF, and KindHearts—was exposed and many of its organizations were shut down, its architects worked to resurrect the enterprise in a manner better suited to avoiding accountability for Hamas's actions. In 2006, several of the original enterprise's key members founded AMP to fill the gap left by the loss of IAP and to restore Hamas's access to an effective propaganda arm in the United States.

78.     There is "significant overlap between AMP and people who worked for or on behalf of organizations that were designated, dissolved, or held civilly liable by federal authorities for supporting Hamas."[16] Indeed, six members of AMP's core leadership team were IAP board members or active in HLF and/or IAP, two are family members of IAP board members, and one was a frequent collaborator and fundraiser for IAP and KindHearts.[17] Many of its staff are similarly holdovers from that enterprise.

79.     AMP is a collection of individuals who have, for decades, dedicated their lives to promoting the interests of antisemitic international terrorist organizations and nation-state proxies in the United States. While these individuals have adopted AMP as their new corporate form, they retain the same mission they always have: to promote Hamas's antisemitic platform in the United States.

---

[16] Schanzer, *Israel Imperiled: Threats to the Jewish State*, Joint Hearing before the House Foreign Affairs Comm., Subcomm. on Terrorism, Nonproliferation, and Trade & the Subcomm. on the Middle East and North Africa, 114 Cong. (Apr. 19, 2016), perma.cc/Q54G-PALR (Schanzer 2016 Congressional Testimony).

[17] *See generally* Schanzer 2023 Congressional Testimony; Schanzer 2016 Congressional Testimony at 8; *see also Boim* FAC ¶ 78.

80.    Defendant Hatem Bazian, a founder of AMP and the Current Chairman of the AMP National Board, was a speaker and fundraiser for the Palestine Committee.

81.    Defendant Osama Abuirshaid, the former Chief Spokesperson, Current Executive Director, and Member of AMP's National Board, is also a former Board Member of IAP/AMS.

82.    Abuirshaid specializes in creating and publishing propaganda for Hamas and its allies. He has interviewed Hamas leadership[18] and been featured on the website of al-Qassam Brigades, the self-declared military wing of Hamas.

83.    Abuirshaid also regularly travels to Turkey, where he meets with Sami Al-Arian, who was convicted in the United States in 2006 for providing material support to Palestinian Islamic Jihad, another terrorist group operating in Gaza.[19] In 2021, Abuirshaid spoke at a conference in Jordan titled, "Towards Features of a New Arab Strategy to Deal with the Arab-Israel Conflict," where he sat on a panel with PFLP convicted airplane hijacker Leila Khaled.[20] The speaker lineup also included Al-Arian, Sami Khater (a co-founder of Hamas), and Hamas senior official Mohammad Nazzal.[21]

84.    Abuirshaid publicly supports Hamas and the Muslim Brotherhood and often promotes Hamas and its affiliates' terrorist goals

---

[18] Osama Abuirshaid, *The Dialectic of Religion and Politics in Hamas's Thought and Practice* (March 22, 2013) (Ph.D. thesis, Loughboro University).

[19] *See* @JSchanzer, X (formerly Twitter) (May 5, 2024), perma.cc/MAF8-U6C3; Press Release, *Sami Al-Arian Pleads Guilty to Conspiracy to Provide Services to Palestinian Islamic Jihad*, U.S. Dep't of Justice (Apr. 17, 2006), perma.cc/6W83-8Z8G.

[20] *Head of Palestinian American lobby group joins conference with terror-group members,* Jewish News Syndicate, bit.ly/3RE991p (Dec. 3, 2021).

[21] *Id.*

in Arab media by castigating Jews and spreading antisemitic conspiracy theories.[22]

85. Defendant Hatam al-Bazian is AMP's founder and current Chairman of AMP's National Board. He was a member of two Muslim Brotherhood-affiliated organizations, the General Union of Palestine Studies ("GUPS") and Defendant Muslim Students Association ("MSA"). Then, as a professor at the University of California at Berkeley, he founded the first chapter of Students for Justice in Palestine ("SJP").[23] Bazian created SJP in the image of GUPS and MSA.[24] Bazian also collaborated with IAP and fundraised for KindHearts.[25]

86. Bazian has a long history of promoting antisemitism. He believes that it is "about time we have an intifada in [the United States]," echoing Hamas' rhetoric.[26] Denigrating Jews, he has declared that "The 'Jewish nation' is the central myth of Zionism. It needs to be dismantled."[27] In that same vein, Bazian supports convicted terrorists, including (1) Marwan Barghouti, who murdered five Israelis during the Second Intifada and financed the Sbarro Café massacre in which 15 Israelis died and more than 130 were injured, and (2) Rasmea Odeh, who was convicted of placing two bombs at a Jerusalem supermarket in 1969 and killing two people.

---

[22] *See, e.g., id.*
[23] Fischberger, *The Long March of Radicalization*, City Journal, perma.cc/2C9E-2873 (Oct. 16, 2023); Mael, *On Many Campuses, Hate is Spelled SJP*, The Tower, bit.ly/3YnpzyS (Oct. 2014).
[24] *See SJP's Founding—Based in Terror*, Zionist Org. of Am., perma.cc/ZW4U-FU3G (archived Mar. 23, 2025).
[25] *See* Schanzer, *Following the Money: Examining Current Terrorist Financing and the Threat to the Homeland*, Hearing before House Homeland Sec. Comm., Subcomm. on Counterterrorism and Intel., at 13-14 (May 12, 2016).
[26] @HamasOnCampus, *Radical Hatem Bazian calls for Intifada (armed uprising) in the USA!!,* YouTube, perma.cc/V4X4-SSLD (Mar. 23, 2015).
[27] *@HatemBazian,* X (formerly Twitter), perma.cc/NBH5-H8NM (Apr. 19, 2018).

87.    AMP openly provides propaganda services for Hamas through its campus arm, SJP. Just last November, AMP held its annual conference, which featured a "Youth Program" that included an "SJP Workshop." The conference also included separate programming specifically for students referred to as the "Campus Activism Track," designed to increase "solidarity between SJP chapters."

88.    AMP is, in all material respects, a reincarnation of IAP and AMS. It continues to operate with the same core personnel, taking ultimate orders and directions from the same FTOs and nation-state proxies, and endeavors to achieve the same goal: supporting Hamas's war against the Jews by acting as its propaganda and recruiting division in the United States.

89.    For these Defendants, past is prologue. The virulent (and often violent) strain of antisemitism that they have nurtured, both at UCLA and on other campuses around the country, is neither coincidence nor merely the organic output of deeply misguided activists. Rather, it is the product of a carefully orchestrated campaign by career supporters of Hamas who have dedicated their lives to fomenting hatred of Jews and the Jewish State of Israel.

90.    Although AMP ostensibly operates as its own organization, it relies on the corporate status of its fiscal sponsor, AJP. AMP founded AJP in 2008. And both organizations have identical leadership structures and share the same principal place of business in Falls Church, Virginia. AMP's website advertises that it is funded exclusively by domestic donations, but upon information and belief, AMP can do so only because those funds first pass through AJP, a U.S.-based non-profit.

91.    Indeed, AMP is now regarded as a "doing business as" name for AJP by the Commonwealth of Virginia, which in October 2023 began to

investigate "AJP Educational Foundation, Inc., also known as "American Muslims for Palestine" for "potential violations of Virginia's charitable solicitation laws," including "benefiting from or providing support to terrorist organizations."[28]

92.  Defendant WESPAC is the New York-based fiscal sponsor of SJP, which means that it receives and administers donations on behalf of SJP and similar organizations. WESPAC keeps a percentage of any donations it receives and then remits the rest to the groups that it fiscally sponsors. This arrangement enables SJP to collect and distribute funds without transparency.

93.  The financial interactions between WESPAC and the anti-Israel and pro-Hamas clientele it fiscally sponsors are intentionally opaque, and operate to largely shield the flow of funds between sponsoring and sponsored organizations from public view.

94.  For instance, WESPAC reported $2.4 million in revenue in 2022-2023 but spent nearly $1.5 million solely on "office expenses," a category that, according to the IRS, should include only basic costs to keep the physical office operational, such as computers, software, office cleaning, services, and postage.[29]

95.  By contrast, WESPAC reported no fundraising expenses in 2022, nor did it report a *single* dollar on travel, information technology, legal services, insurance, rent, or mortgage payments. It also did not report a *single* dollar of salary to its board members or executive leadership in 2022. Instead, WESPAC reported the salary of one lone part-

---

[28] *See Attorney General's Office Opens Investigation into American Muslims for Palestine Nonprofit*, Off. of the Va. Att'y Gen. (Oct. 31, 2023), perma.cc/H9FJ-7CNH.

[29] Simonson, *Is This Suburban New York Charity a Terrorist Front Group?*, Wash. Free Beacon, perma.cc/A9U9-PHC7 (May 20, 2024); Form 990, WESPAC Foundation Inc. (2022), perma.cc/2KSE-6UMC?type=standard.

time employee in the entire organization. That individual makes less than $100,000 and receives neither health care nor retirement benefits.

96.    As SJP's fiscal sponsor, WESPAC receives tax-exempt donations and grants on behalf of SJP, since SJP itself lacks tax exempt status.

97.    The IRS stipulates that fiscal sponsors must retain "control and discretion over use of the funds."[30] Thus, as the fiscal sponsor of SJP, WESPAC is responsible for how SJP uses the funds it receives from WESPAC, which includes ensuring that the funds are used for charitable purposes. Conduit-like arrangements where a nominal fiscal sponsor simply funnels money without maintaining discretion are prohibited.

98.    WESPAC's financial reporting demonstrates that it has served as SJP's fiscal sponsor since at least 2016, if not earlier.[31]

99.    Much of the antisemitic advocacy on college campuses today is controlled by SJP.

100.    In 2010, AMP sponsored the first SJP National Convention, at which it announced the creation of AMP's new on-campus sub-brand. SJP's role would be to control the management, financing, and messaging of SJP chapters across the country.[32] Though some SJP chapters chose to remain unaffiliated on paper, they receive aid and supporting materials from SJP, particularly as it relates to campus messaging.

101.    SJP has no formal corporate structure of its own but operates as AMP's college campus brand, which WESPAC funds. AMP maintains

[30] *National Foundation v. United States*, 13 Cl. Ct. 486 (1987); *see also* Rev. Rul. 68-489, 1968-2 C.B. 210.
[31] Stoll, *'Mysterious' Westchester Foundation Collecting the Cash for This Weekend's National Campus BDS Convention*, Algemeiner, perma.cc/2HH4-92M7 (Nov. 3, 2016).
[32] Small et al., *Antisemitism Violent Extremism & the Threat to North American Universities: The Contextualization of the National Students for Justice in Palestine (NSJP)*, Inst. for the Study of Glob. Antisemitism & Pol'y 12 (Oct. 2019), perma.cc/NML7-M8G6 ("ISGAP 2019").

organizational management and control of SJP. To that end, in 2023, SJP established a centralized structure to exert more control over individual chapters.

102.    SJP, through its leadership and grassroots supporters, has regularly (1) identified itself as a supporter of, and sometimes even a part of, Hamas and its affiliates' movement; (2) disseminated instructions from Hamas and other FTOs; (3) hosted speakers that are (or are affiliated with) Specially Designated Global Terrorists; and (4) provided direct aid to the same.

103.    AMP's message to college campuses through SJP is unambiguous: violent attacks are a justified response to Zionism as an idea, to Israel as an entity, and to Jews as a people.[33] The purpose of this messaging is to normalize Hamas's terrorism within Western academic institutions like UCLA, and to generate support for Hamas's eliminationist aims for the Jewish People and the State of Israel among college students. Ultimately, AMP seeks an academic environment on American college campuses where Jews are *persona non grata* and violence against them (along with anyone else who respects Israel's right to exist) is not only accepted and justified, but promoted and celebrated.

## B.    Antisemitism surges across the United States after the brutal terrorist attack on Israel on October 7, 2023.

104.    Sadly, antisemitism is as old as the Jewish People. It ebbs and flows, but never dies, and sometimes explodes in an inferno of malice. It is, as the late Rabbi Lord Jonathan Sacks explained, a mutating virus. Sacks, *Keynote Speech in the European Parliament: The Mutating Virus: Understanding Antisemitism* (Sept. 27, 2016), perma.cc/Q6W4-TWJS. Jews have been hated "because of their religion," "because of their race,"

---

[33] *See, e.g.*, ISGAP 2019, *supra* note 32, at 11-15.

and "because of their nation state, the State of Israel." Antisemitism "takes different forms but it remains the same thing: the view that Jews have no right to exist as free and equal human beings." *Id.*

105. The United States is unique in world history—a country founded on a set of universal values and the tolerance of all faiths and peoples regardless of their race, religion, or national origin. As our first President proclaimed shortly after the Constitution was ratified: "May the Children of the Stock of Abraham who dwell in this land continue to merit and enjoy the good will of the other Inhabitants; while everyone shall sit in safety under his own vine and figtree, and there shall be none to make him afraid." Washington, *Letter to the Hebrew Congregation in Newport, Rhode Island*, Founders Online, Nat'l Archives (Aug. 18, 1790), perma.cc/FRJ8-247Z.

106. This commitment to protecting the rights of all to equality before the law, though imperfectly realized, has drawn Jews from throughout the world to the United States. Not that the United States has been immune from the scourge of antisemitism. *See, e.g.*, *SFFA v. Harvard*, 600 U.S. 181, 257 (2023) (Thomas, J., concurring) (describing elite colleges' efforts to exclude Jews). But the United States has done more than any other nation, other than the State of Israel, to protect the rights and dignity of Jews.

107. Today, that commitment is under existential threat.

108. On October 7, Hamas orchestrated a barbaric terror attack on Israel during a Jewish religious holiday that "resulted in the murder of nearly 1,200 people[,]" "including more than 40 American citizens." *Antisemitism on College Campuses Exposed* at 1. More than 250 people were also taken hostage, many of whom Hamas has since murdered, some of whom Hamas has committed grievous acts of sexual violence against,

and all of whom Hamas has tortured physically and psychologically. *See, e.g.*, *What Is Known About Israeli Hostages Taken by Hamas*, Am. Jewish Comm. (Jan. 14, 2025), perma.cc/U4S9-QT4W; Gettleman, et al., *'Screams Without Words': How Hamas Weaponized Sexual Violence on Oct. 7*, N.Y. Times (Mar. 25, 2024), bit.ly/4jPchn5.

109.   October 7 marked the beginning of a new worldwide campaign of Jew hatred and perhaps the worst wave of antisemitism in American history. *See Antisemitism on College Campuses Exposed* at 1, 5; *ADL Records Dramatic Increase in U.S. Antisemitic Incidents Following Oct. 7 Hamas Massacre*, Anti-Defamation League (Oct. 24, 2023), perma.cc/FX5Y-HL52.

110.   Jews have been denied entry to public facilities, threatened with eliminationist rhetoric, and even barricaded inside a school library while a would-be pogrom banged on locked doors and shouted antisemitic chants. *See, e.g.*, Donlevy, & Vago, *Cooper Union Barricades Jewish Students Inside Library as Pro-Palestinian Protesters Bang on Doors*, N.Y. Post (Oct. 25, 2023), perma.cc/62GF-ERB7; *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, No. 24 CIV. 2669 (JPC), 2025 WL 401109, at *16 (S.D.N.Y. Feb. 5) (denying Cooper Union's motion to dismiss in relevant part, and expressing "disma[y]" at "Cooper Union's suggestion that the Jewish students should have hidden upstairs or left the building").

111.   The worst of this wave of hatred has been focused on university campuses. *See generally Antisemitism and Anti-Israeli Bias at UCLA*; *Antisemitism on College Campuses Exposed*. Jewish students and community members around the country have faced a disproportionate increase in campus hostility, often linked to openly antisemitic encampments.

**C.     The climate of antisemitism and intimidation at UCLA in Spring 2024.**

112.    Since October 7, and especially since antisemitic protestors occupied Dickson Plaza and Royce Quad, UCLA has been a haven for Jew-hatred.

113.    Two days after the massacre, "an official statement issued by the Undergraduate Student Association Council (USAC) Cultural Affairs Commissioner" praised Hamas, stating that the Commissioner "honor[ed] the Palestinians on the frontlines taking their land and sovereignty back! From the River to The Sea." *Antisemitism and Anti-Israeli Bias at UCLA* at 47 & n.66.

114.    A month later, protesters on UCLA's campus screamed "beat that f****ing Jew" during an anti-Israel parade as they slammed bats into an effigy of Israeli Prime Minister Benjamin Netanyahu. *See* @NewYorkPost, *UCLA students batter Bibi piñata to chants of 'beat that f–g Jew'*, YouTube (Nov. 10, 2023), perma.cc/Z9Q3-QCBA.

115.    Anti-Israel marches and rallies at UCLA regularly feature chants of antisemitic "slogans, including 'Intifada,' 'from the river to the sea, Palestine will be free,' and 'kill the Jews.'" *Antisemitism and Anti-Israeli Bias at UCLA* at 46 & nn.54-56.

116.    Throughout, protestors have sought to avoid accountability and to paralyze Jewish students with fear by concealing their faces in violation of university rules. *Id.* at 50 & nn.79-81.

117.    There have also been "multiple reports of graffiti and drawings … that [are] blatantly antisemitic and anti-Israeli." *Id.* at 63 (discussing examples of swastikas and a Star of David accompanied by the phrase "step here").

118.   Campus climate worsened when SJP announced the "Popular University for Gaza," a "coordinated pressure campaign against university administrations and trustees" linked to a nationwide effort to "establis[h] autonomous zones on several university campuses" (including UCLA). Less than a week after SJP launched the campaign, the UCLA chapter (in collaboration with a coalition of on- and off-campus entities), established a fortified encampment near Dickson Plaza and Royce Quad.

119.   "Violence was documented at the encampment and the surrounding area as early as April 25, 2024, with some Jews, Israelis, and pro-Israel protestors assaulted." *Antisemitism and Anti-Israeli Bias at UCLA* at 57.

120.   The antisemitic rhetoric and imagery on campus intensified after Defendants conspired to launch the encampment. For example, a van festooned with Swastikas and other anti-Jewish imagery was parked outside the encampment, blaring antisemitic propaganda from a bullhorn and speaker system.

121.   All this violence and fearmongering had a point—to support the encampment's "human phalanxes" and "checkpoints," which made sure that Jewish students were denied access to public spaces "occupied" by the encampment. *Antisemitism and Anti-Israeli Bias at UCLA* at 53-54, 56.

122.   An internal report commissioned by UCLA called out the university's deep dysfunction in (failing to) address these disturbing acts, which violated California law and university policy. *See generally Antisemitism and Anti-Israeli Bias at UCLA*. In short, the university's response was too little and too late. And it failed to materialize at all until the situation had deteriorated to just short of open warfare.

123.   This Court's recent ruling that UCLA's response was so deficient as to violate the Constitution confirms the point. *See generally*

*Frankel*, 744 F. Supp. 3d at 1025-27. There, this Court found as a matter of fact that "*Jewish students were excluded from portions of the UCLA campus because they refused to denounce their faith.*" *Id.* at 1020. That exclusion, as a practical matter, was premised on the plaintiffs' reasonable fear that traversing the area occupied by the encampment "carried a risk of violence." *Id.* at 1022.

**D.7  The individuals and organizations funding and coordinating antisemitism at UCLA.**

124.  Defendants used electronic communications platforms including Instagram, Twitter, Bluesky, Substack, and Google Docs as part of a coordinated and concerted effort to plan, fund, execute, supply, reinforce, and "defend" the UCLA encampment. These efforts were fueled by antisemitic animus and undertaken with the knowledge that their purpose and effect was to deny Jewish students access to Dickson Plaza/Royce Quad, and the surrounding public buildings, including Royce Hall and Powell Library.

125.  That Defendants agreed to support the encampment is evidenced by the tightly coordinated mass media campaign, involving almost every Defendant, that called on Defendants' social-media followers to show up to UCLA's campus uninvited to "defend" the encampment and the "student intifada." That this coordination not only continued but increased once the university finally permitted law enforcement to step in proves the point.

126.  Defendants' coordination is also evidenced by the speed and efficiency with which the encampment was built, erecting a fortified camp out of the dust using construction materials and barricades less than a week after SJP announced a national pressure campaign focused on "autonomous zones" within university campuses and before university

officials could react. First-hand accounts explained that the encampment was "surrounded by barricades" constructed by members drilling through layers of pallets to build makeshift fortifications. This was not the work of an uncoordinated rabble caught up in the heat of the moment, it was a well-planned, coordinated, and executed operation.

127.   A key element of Defendants' plan was recruiting manpower and requisitioning supplies from outside the UCLA community to sustain and grow the encampment, thus increasing the pressure on university officials to negotiate and make concessions. Large, organized contingents of "crewed up" non-students arrived later in the encampment's life in anticipation of violence and many members of the encampment wore Keffiyehs, googles, helmets, and gloves. The encampment also boasted substantial stores of supplies and an enormous "gear depot." Again, Defendants turned to a coordinated social media campaign that was clearly part of a broader national strategy targeted at the campus encampment movement writ large.

128.   Defendants committed overt acts in furtherance of their conspiracy.

129.   Defendants helped SJP and the UCLA chapter develop a plan to springboard the encampment consistent with the recently launched "Popular University for Gaza" campaign, provided funding to buy supplies for the encampment, and coordinated between on- and off-campus Defendants to implement the plan before university officials could react.

130.   After the encampment was established, Defendants solicited and received additional donations of money and material to aid the encampment, funneling these contributions back to the UCLA chapter, which distributed them on site.

131. Defendants engaged in a massive training and recruitment effort to grow the encampment, including a joint social media campaign, agreements to host live speaking events at the encampment that were then advertised to Defendants' followers, and participating in media hits promoting the encampment.

132. Finally, Defendants armed and trained "human phalanxes" and "organized self-defense teams" that were deployed at the "front lines" of the encampment to threaten counter-protesters and unfriendly press, deny access (sometimes violently) to Jewish students, expand and maintain the encampment's control over nearby buildings, and confront law enforcement when it was finally deployed to restore order. These "front line" troops, often not affiliated with UCLA at all, were recruited from Defendants' social media followings as part of a concerted campaign to "defend" the "student intifada."

## CLAIMS FOR RELIEF

### Count I

### 42 U.S.C. §1985(3)

### Conspiracy to Interfere with Civil Rights

### (Against National Students for Justice in Palestine, John Doe #1, President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a American Muslims For Palestine, Faculty For Justice In Palestine Network, UC Divest Coalition, WESPAC Foundation, People's City Council)

133. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

134. Section 1985 of the Ku Klux Klan Act provides that "[i]f two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either

directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws … the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." 42 U.S.C. §1985(3).

135.   Defendants plotted, coordinated, and executed a common plan to deprive Plaintiffs and other Jews at UCLA of their rights. Defendants agreed to conspire among themselves and with other entities and individuals for the purpose of depriving Plaintiffs of their constitutional rights and equal protection of the laws. Defendants conspired among themselves and with other individuals and entities to deprive Plaintiffs of their right to equal access to all parts of UCLA's campus (and specifically the area around Dickson Plaza/Royce Quad), their right to free exercise of religion, and their right to free speech. Defendants also conspired among themselves and with other individuals to subject Plaintiffs to racial intimidation and violence and to stir up racial hatred at UCLA.

136.   As Jews, Plaintiffs are members of a suspect class protected by 42 U.S.C. §1985(3). *See Shaare Tefila Congregation*, 481 U.S. at 617-18.

137.   Defendants' agreement manifested through their substantial coordination in marshalling support for the encampment on social media and other electronic communications platforms. The level of coordination on display suggests, at minimum, that the encampment was the result of a common plan rather than the actions of independent actors.

138.   Defendants engaged in numerous overt acts in furtherance of this conspiracy, such as:

> a. Planning the initial phase of the encampment using materials and funds received from National SJP (and thus from WESPAC, SJP's fiscal sponsor).

b. Obtaining the equipment used to build the initial encampment, including construction materials, wooden pallets, drills, and large amounts of prefabricated tents.

c. Coordinating between on- and off-campus groups to execute the initial phase of the encampment and to erect a fortified camp on Dickson Plaza/Royce Quad.

d. Holding scheduled speaking events at the encampment headlined by Defendants' high-ranking officials and then using those events as recruiting pitches on social media.

e. Using social media to recruit contingents of "crewed up" individuals who were otherwise unaffiliated with UCLA to join and "defend" the encampment against law enforcement and other perceived enemies.

f. Training "human phalanxes" and "self-defense teams" to man "checkpoints" that (1) denied Jewish students entry into occupied areas and (2) threatened those who opposed the encampment with violence.

g. Soliciting continued donations to support the encampment, which were funneled to and then distributed by SJP's UCLA chapter.

139. Defendants have sought to create an atmosphere of violence and intimidation against Plaintiffs and other Jews, and to violate Plaintiffs' equal rights, including those under Section 1982.

140. Defendants, their agents, and their co-conspirators undertook the activities described above as part of an unlawful conspiracy to deprive Jews of their right to the equal protection of the laws and their right to the equal enjoyment of the privileges and immunities of citizens of the United States based on their race.

141. These actions and the conspiracy were motivated by discriminatory animus against Jews and specifically against Plaintiffs because they are Jews.

142. Plaintiffs have suffered several legal injuries because of Defendants' actions. Each Plaintiff was deprived of one or more of their rights or privileges as a citizen of the United States, including the right to equal protection of the laws, equal privileges thereunder, to use and enjoy Royce Quad, Dickson Plaza, Powell Library, Royce Hall, and Kaplan Hall, places of public accommodation open to the UCLA community, and to do so without fear or intimidation on the basis of race.

143. As a result of the conspiracy, Plaintiffs have been harmed. Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same groups attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts of Royce Quad and forced to change his ordinary routine in April and May out of concern for his safety. And Tsives was denied access to his ordinary route to class in Kaplan Hall because Defendants "occupied" the entrance he ordinarily used, causing him to be late to class. Plaintiffs knew that Jews were not welcome around Defendants' encampment (and attempted encampments), and that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territories.

144. As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including, but not limited to, compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

## Count II

### 42 U.S.C. §1986

### Failure to Prevent Conspiracy Against Rights

### (Against Defendants Doe #1, Aburshaid, Al-Bazian)

145.   Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

146.   Section 1986 of the Ku Klux Klan Act provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 … , are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." 42 U.S.C. §1986. Under Section 1986 an individual is not required to have "participated in the conspiracy or shared in the discriminatory animus with members of the conspiracy." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Rather, for liability to attach it is enough that the individual "knew of a § 1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so." *Id.*

147.   On information and belief, Defendants knew of the conspiracy to deprive Plaintiffs of their civil rights, in large part because they were high-ranking officials in the organizations that were parties to the conspiracy.

148.   On information and belief, Defendants had it in their power, acting in their capacities as high-ranking officials in the organizational Defendants, to prevent or aid in preventing the implementation of the

conspiracy by stopping outright (or at least limiting) their organizations' involvement.

149.    But rather than take steps to prevent or aid in preventing the conspiracy against Plaintiffs' civil rights, on information and belief, Defendants neglected to act in violation of Section 1986. That they did so is no surprise. After all, many have been denigrating Israel, working for the benefit of Hamas, and promoting Jew-hatred in the United States for decades. But the fact that a conspiracy against civil rights can be resilient does not make it legal. And the fact that many Defendants have been engaged in a common enterprise to promote the antisemitic hatred of Jews for many years does not absolve them of accountability for the consequences when that advocacy ripens into a violent antisemitic encampment that denies Jews equal access to campus.

150.    As a result of Defendants' actions and failure to act, Plaintiffs have been injured. Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same groups attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts of Royce Quad and forced to change his ordinary routine in April and May out of concern for his safety. And Tsives was denied access to his ordinary route to class in Kaplan Hall because Defendants "occupied" the entrance he ordinarily used, causing him to be late to class. Plaintiffs knew that Jews were not welcome around Defendants' encampment (and attempted encampments), and that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territories.

151.    As a direct and proximate result of Defendants' actions and inactions, Plaintiffs have suffered harm in the form of both general and

special damages in an amount to be determined at trial, including, but not limited to, compensatory damages, punitive damages, and prejudgment and post judgment interest.

**Count III**

**Cal. Civil Code §51.7**

**Ralph Civil Rights Act of 1976**

**(Against National Students for Justice in Palestine, John Doe #1, President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a American Muslims For Palestine, Faculty For Justice In Palestine Network, UC Divest Coalition, WESPAC Foundation, People's City Council)**

152. Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

153. The Ralph Civil Rights Act of 1976 provides that "[a]ll persons within the jurisdiction of this state have the right to be free from any violence, or intimidation by threat of violence, committed against their persons or property because of" race or ethnicity. Cal. Civ. Code §51.7(b)(1).

154. Defendants have harassed, intimidated, denied access to public places, and assaulted Plaintiffs because they are Jews or attempted, facilitated, or conspired to do the same in violation of the Ralph Civil Rights Act.

155. As a result of Defendants' actions, Plaintiffs have been injured. Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same groups attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts of Royce Quad and forced to change his ordinary

routine in April and May out of concern for his safety. And Tsives was denied access to his ordinary route to class in Kaplan Hall because Defendants "occupied" the entrance he ordinarily used, causing him to be late to class. Plaintiffs knew that Jews were not welcome around Defendants' encampments and knew that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territories.

156.    As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including, but not limited to, compensatory damages, punitive damages, and prejudgment and post judgment interest.

**Count IV**

**Cal. Civil Code §52.1**

**Tom Bane Civil Rights Act**

**(Against National Students for Justice in Palestine, John Doe #1, President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a American Muslims For Palestine, Faculty For Justice In Palestine Network, UC Divest Coalition, WESPAC Foundation, People's City Council)**

157.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

158.    The Tom Bane Civil Rights Act provides a right of action against any "person or persons, whether or not acting under color of law, [who] interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the

Constitution or laws of the United States, or of the rights secured by the Constitution or laws of [California]." Cal. Civil Code §52.1(b).

159.   Defendants interfered by threat, intimidation, or coercion with Plaintiffs' exercise or enjoyment of rights secured by the Constitution or laws of the United States. Defendants interfered with Plaintiffs' right to access public facilities on the campus they call home (whether as students, faculty, or other members of the UCLA community), because of animus towards their race, ethnicity, national origin, ancestry, and religion.

160.   Defendants interfered by threat, intimidation, or coercion with Plaintiffs' exercise or enjoyment of rights secured by the Constitution or laws of California.

161.   As a result of Defendants' actions, Plaintiffs have been injured. Again, Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same groups attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts Royce Quad and forced to change his ordinary routine in April and May out of concern for his safety. And Tsives was denied access to his ordinary route to class in Kaplan Hall because Defendants "occupied" the entrance he ordinarily used, causing him to be late to class. Plaintiffs knew that Jews were not welcome around Defendants' encampments and knew that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territories.

162.   As a direct and proximate result of Defendants' actions, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including, but not limited

to, compensatory damages, punitive damages, and prejudgment and post judgment interest.

## Count V

## California Civil Conspiracy

## (Against National Students for Justice in Palestine, John Doe #1, President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a American Muslims For Palestine, Faculty For Justice In Palestine Network, UC Divest Coalition, WESPAC Foundation, People's City Council)

163.    Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

164.    In California, "'[t]he elements of an action for civil conspiracy are the formation and operation of the conspiracy and damage resulting to plaintiff from an act or acts done in furtherance of the common design. … In such an action the major significance of the conspiracy lies in the fact that it renders each participant in the wrongful act responsible as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.'" "The sine qua non of a conspiratorial agreement is the knowledge on the part of the alleged conspirators of its unlawful objective and their intent to aid in achieving that objective." *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1581 (1995). Such "knowledge and intent 'may be inferred from the nature of the acts done, the relation of the parties, the interest of the alleged conspirators, and other circumstances." *Id.* (quoting *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785, 598 P.2d 45, 52 (1979)).

165.    Each Defendant conspired together and combined with one or more other persons to accomplish, through the concerted action described above, unlawful and tortious acts, including:

a. Subjecting Plaintiffs to violence, or intimidation by threat of violence, committed against their persons based on race in violation of the Ralph Civil Rights Act.

b. Interfering with Plaintiffs rights under the U.S. and California Constitutions by threats of intimidation or coercion in violation of the Tom Bane Civil Rights Act.

c. Subjecting Plaintiffs to civil assault and battery under California law.

166. As a result of the conspiracy, Plaintiffs have been injured. Again, Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same groups attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts Royce Quad and forced to change his ordinary routine in April and May out of concern for his safety. And Tsives was denied access to his ordinary route to class in Kaplan Hall because Defendants "occupied" the entrance he ordinarily used, causing him to be late to class. Plaintiffs knew that Jews were not welcome around Defendants' encampments and knew that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territories.

167. Each Plaintiff has suffered damages resulting from acts committed in furtherance of the conspiracy for which Defendants are civilly liable for the actions of all individuals who acted in pursuit of the conspiracy.

1

## **PRAYER FOR RELIEF**

2
 Wherefore, Plaintiffs respectfully request that the Court:

3
  A. A declaratory judgment that the actions described herein

4
   deprived Plaintiffs of their rights under state and federal law.

5
  B. Compensatory and statutory damages in an amount to be

6
   determined at trial.

7
  C. Punitive damages in an amount to be determined at trial.

8
  D. Interest, attorneys' fees, and costs, as allowed by law.

9
  E. Such other relief as the Court deems necessary and just.

10

11
DATED: April 25, 2025    BROWN WEGNER LLP

12

13
        /s/ William J. Brown, Jr.

        William J. Brown, Jr.

14

15
        Thomas R. McCarthy*

        Zachary P. Grouev*

16
        Julius Kairey*

        CONSOVOY MCCARTHY PLLC

17
        Richard A. Rosen *

18
        Omer Wiczyk *

        THE LOUIS D. BRANDEIS CENTER

19
        FOR HUMAN RIGHTS UNDER LAW

20
        *Application for admission

        pro hac vice forthcoming

21
        Attorneys for Plaintiffs

22

23

24

25

26

27

28

# **JURY DEMAND**

Plaintiffs request a trial by jury on all issues so triable.

Dated: April 25, 2025.


DATED:  April 25, 2025            BROWN WEGNER LLP

                                  /s/ William J. Brown, Jr.
                                  William J. Brown, Jr.

                                  Thomas R. McCarthy*
                                  Zachary P. Grouev*
                                  Julius Kairey*
                                  CONSOVOY MCCARTHY PLLC

                                  Richard A. Rosen *
                                  Omer Wiczyk *
                                  THE LOUIS D. BRANDEIS CENTER
                                  FOR HUMAN RIGHTS UNDER LAW

                                  *Application for admission
                                  pro hac vice forthcoming

                                  Attorneys for Plaintiffs