1   William J. Brown, Jr. (SBN 192950)
2   bill@brownwegner.com
3   Kyle J. Berry (SBN 355393)
    kberry@brownwegner.com
4   BROWN WEGNER LLP
5   2010 Main Street, Suite 1260
    Irvine, California 92614
6   Telephone: 949.705.0080
7

8           **UNITED STATES DISTRICT COURT**
9           **CENTRAL DISTRICT OF CALIFORNIA**
10

11  MATTHEW WEINBERG,                    | **Case No. 2:25-cv-03714**
    RABBI DOVID GUREVICH,
12  NIR HOFTMAN,
13  ELI TSIVES,                          | **FIRST AMENDED**
                                         | **COMPLAINT FOR**
14  *Plaintiffs,*                        | **DAMAGES AND JURY**
                                         | **TRIAL DEMAND**
15
16  v.
17
    NATIONAL STUDENTS
18  FOR JUSTICE IN PALESTINE,
    JOHN DOE #1, PRESIDENT OF THE
19  UCLA CHAPTER OF SJP,
20  AJP EDUCATIONAL FOUNDATION,
    INC., D/B/A AMERICAN MUSLIMS FOR
21  PALESTINE,
22  OSAMA ABURSHAID,
    HATEM AL-BAZIAN,
23  FACULTY FOR JUSTICE IN
24  PALESTINE NETWORK,
    UC DIVEST COALITION,
25  WESPAC FOUNDATION,
26  PEOPLE'S CITY COUNCIL,
27
28  *Defendants.*

1

[Additional Counsel Cont. from previous page]

Thomas R. McCarthy (DC Bar No. 48965)*
Zachary P. Grouev (FL Bar No. 10386291)*
Julius Kairey (NY Bar No. 5668249)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (NY Bar No. 1663830)*
Omer Wiczyk (NY Bar No. 4321600)*
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

* Pro hac vice

Attorneys for Plaintiffs

## **NATURE OF THE ACTION**

1.    After the horrific terror attack on October 7, 2023, America was plunged into a campus antisemitism crisis. *E.g.*, Staff of H. Comm. on Educ. and the Workforce, 118th Cong., *Antisemitism on College Campuses Exposed*, 1 (Comm. Print 2024), perma.cc/6Y4U-52HG.

2.    This case is about a particularly shocking chapter of that crisis—a coordinated campaign of egregious acts of racial exclusion, intimidation, and assault (often styled as the "Popular University for Gaza"[1] or the "student intifada") conducted by a web of organizations and individuals working in concert to intimidate Jewish students, faculty, and staff, and to hinder the efforts of law enforcement officials charged with protecting them.

3.    The radicals behind this nationwide campaign formulated and executed a comprehensive plan to prevent Jewish communities on college campuses from enjoying equal access to public spaces using racialized violence and area-denial tactics. When law enforcement tried to restore order and ensure the protection of equal rights for Jews, the same radicals made clear that they were more than willing to fight to maintain the ground that they had lawlessly "occupied."

4.    The calling card of the campaign is the campus encampment or "occupied zone." However you phrase it, the basic concept is the same—a fortified camp organized by a core of virulently antisemitic radicals associated with Defendant National Students for Justice in Palestine,[2] working together with a collection of equally radical faculty and union

---

[1] For more information on the "Popular University for Gaza," *see infra*, ¶¶60-66.

[2] Also referred to as "SJP National," "NSJP," or simply "SJP" throughout this complaint.

groups, nonprofits willing to provide funding and administrative support, and all manner of "militant organizer[s]" and "outside agitators," including leftist and anarchist paramilitary groups. *See e.g.*, *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, Unity of Fields (May 1, 2025), perma.cc/J5S3-V9QB (*Advancing the Line*) (discussing the militant nature of the UCLA encampment, its organizers, and its rank-and-file members). There is often significant overlap in the various groups' leadership cadres.

5.    After the radical core congeals on a college campus, it leverages various sources of funding and material support to construct and supply an encampment; recruits volunteers to join and "defend" the encampment from "Zionists" (deployed as a racist dog whistle); and provides new recruits with the equipment, training, and direction necessary to exert physical control over the "occupied" public space on which the encampment rests. Throughout, organizers foster "militancy," preparing for and often encouraging violent clashes with law enforcement.

6.    This plan often entails aggressively expanding the encampment's perimeter to maximize disruption, intimidation in the Jewish community, and the prospect of an eventual violent confrontation with law enforcement. *See, e.g.*, *id.* at 6 (UCLA encampment organizer explaining that expanding the barricades was intended to "escalate the disruptive effect of the encampment" by rendering several university buildings "non-functional for public use").

7.    The result is that wherever such an encampment appears, a growing Jew exclusion zone enforced by threats, intimidation, and violence is not far behind. *See, e.g.*, *Frankel v. Regents of the Univ. of Cal.*, 744 F. Supp. 3d 1015, 1020, 1025 (C.D. Cal. 2024). "The purpose" of these

encampments is "to cost the university money, to physically disrupt, and to express mass oppositional power." *Advancing the Line* at 5.

8.    Once formed, encampments are usually dispersed only after a "battle" with law enforcement tasked with restoring order. That is a feature, not a bug. *E.g.*, *id.* at 8 ("The truth is that there was no 'peaceful resolution' to the occupation, because the occupiers refused to allow it. It was not the administration's fault that the police were called. The outcome was forced by the students themselves."). For example, in one organizer's words "the most liberating and radicalizing part of the UCLA encampment was *fighting the Zionists and police*." *Id.* at 5 (emphasis added). Because encampment organizers believe that they are "at war" with "Zionists" and law enforcement, "a clear militant line of needing to fight the police" predominates. *Id.* at 3. This culture of "militancy" is intended to "attac[k] the legitimacy of policing" altogether (i.e., to ensure that law enforcement cannot protect the rights of Jews from those who seek to trample them). *Id.* at 6.

9.    UCLA has been the repeated target of these terroristic tactics, which have proven sadly effective in rendering campus a hostile environment for Jews. *See, e.g.*, Brown, *Notice of Findings Regarding the University of California, Los Angeles*, at 7, Dep't of Just. (July 29, 2025), perma.cc/UV66-JE2C ("Jewish and Israeli students at UCLA were subjected to severe, pervasive, and objectively offensive harassment that created a hostile environment by members of [a campus] encampment. Jewish and Israeli students were assaulted, verbally harassed, and physically prevented from accessing parts of the UCLA campus on the basis of their actual or perceived race, religion, and/or national origin.").

10.    In April 2024, during the height of the "Popular University for Gaza," UCLA Chancelor Gene Block issued a statement explaining that

students on their way to class were "physically blocked from accessing parts of the campus" and that a series of violent incidents had put "many on UCLA's campus, especially [its] Jewish students, in a state of anxiety and fear." An antisemitism task force convened by the university confirmed Block's assessment, finding that a large majority of the Jewish community at UCLA reported that antisemitism had worsened or significantly worsened since October 7, in large part because of an encampment that existed between April 25 and May 2, 2024. *Antisemitism and Anti-Israeli Bias at UCLA*, at 20-27, UCLA Task Force to Combat Antisemitism and Anti-Israeli Bias (Oct. 16, 2024), perma.cc/2CED-UAJ6.

11.    The UCLA encampment, like many of its contemporaries under the banner of SJP's "Popular University for Gaza," was a festering sore of antisemitism, racial exclusion, and violent enmity towards law enforcement.

12.    Members of the encampment "occupied" a university building and restyled it "Intifada Hall." They also used signs, barricades, and the walls of "occupied" buildings as canvasses for antisemitic graffiti, including writing "F**ck all Jews" below a crudely drawn Star of David, the phrases "Intifada" and "Death 2 Zionism," and a sign reading that "Israelis are Native 2 Hell." *See Antisemitism and Anti-Israeli Bias at UCLA* at 31, 39; Brian van der Brug, Los Angeles Times (*infra* 39-40). "[A]ntisemitic and Anti-Israeli imagery and messaging" was "everywhere" at the encampment. *E.g.*, *Antisemitism and Anti-Israeli Bias at UCLA* at 27.

13.    Encampment organizers "demarcated five zones that Zionists often tried to breach, limited entry to only two zones, and established a complex check-in, wristband, and vouching system" to keep out "Zionists." *Advancing the Line* at 4. This checkpoint system was enforced by teams of

armed members of the encampment and "human phalanxes," which were used to "block certain persons from moving freely through public areas" and "surroun[d] some other individuals to forcibly move them from areas in or adjacent to the encampment." *Antisemitism and Anti-Israeli Bias at UCLA* at 53-54, 56-58; *see also Notice of Findings Regarding the University of California, Los Angeles* at 3-5, 7. Like many Jewish students, staff, and faculty, several Plaintiffs were physically blocked from moving through the encampment and surrounding areas based on their status as Jews. One Plaintiff was attacked and robbed by a member of the encampment's "security" team when he refused to be redirected. And another Plaintiff avoided the area because he knew something similar would happen to him if he did not.

14.    After UCLA declared the encampment illegal[3] on April 30, organizers escalated preparations for the fight with police they had been angling for—stockpiling supplies and relying on a coordinated social media campaign (including Instagram "collaborations"[4] between several

---

[3] To be clear, from the beginning "[t]he encampment was in clear violation of a number of existing content-neutral time, place, and manner rules issued by UCLA and the greater UC System regarding the use of campus spaces for expressive activities." *Notice of Findings Regarding the University of California, Los Angeles* at 5; *see also Antisemitism and Anti-Israeli Bias at UCLA* at 51-55.

[4] As background, an Instagram "collaboration" occurs when the manager of an Instagram account seeks to share a post with a broader audience. The posting account chooses one or more additional accounts to request to "collaborate" with, at which point the managers of the requested accounts receive a request to participate in the "collaboration." This request includes several explanatory disclaimers that make clear agreeing to collaborate on a post means that the collaborators will be listed as authors, that the post will be shared to all collaborators' followers, and that the post will be public if any collaborator's account can be viewed by the public. If the managers of the requested accounts agree to collaborate

Defendants) to recruit additional "defenders" from across Los Angeles. Police issued an unlawful assembly order at 6:00pm the next day, marking the beginning of what organizers styled the "Battle of UCLA." After significant violent resistance, including a coordinated effort by organizers to "kettle" groups of police, law enforcement successfully swept the encampment during the early hours of May 2.

15.    In the months following the sweep, those responsible continued their campaign of harassment and exclusion by attempting to reestablish the encampment at several different locations on campus.

16.    On May 6, police arrested more than 40 people equipped with metal pipes, bolt cutters, chains and padlocks, and a "Do-It-Yourself Occupation Guide." *Statement Regarding the Incidents on May 6, 2024*, UCLA Police Dep't (May 8, 2024), perma.cc/3DFJ-WKXG.

17.    On June 10, the same radical core "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" at the top of the Janss Steps. *Statement Regarding the Unlawful Encampments and Subsequent Arrests on Monday, June 10*, 2024, UCLA Police Dep't (June 10, 2024), perma.cc/V5KA-G83L. Like the original, this new encampment "restricted access to the general public in violation of University policy" and "disrupted nearby final exams." *Id.* After police swept the new encampment, organizers relocated to Kerckhoff Patio and then to the courtyard between Dodd Hall and the UCLA law school, setting up illegal encampments at each location. *See id.* Later that day, members of the group assaulted and threatened to kill Plaintiff Dovid

---

after reading the disclaimers, the collaboration is finalized and the post issues. In short, Instagram "collaboration" necessarily involves an agreement to promote a particular post and a meeting of the minds between the managers of two or more social media accounts.

Gurevich, a Chabad rabbi who was at the scene to support Jewish students. *See* Bandler, *UCLA Chabad Rabbi Assaulted by Pro-Palestinian Protesters*, Jewish Journal (June 11, 2024), perma.cc/KL93-4GJB.

18.    The "Popular University for Gaza" and the UCLA encampment have received significant attention from every branch of government.

19.    In Congress, six House committees produced a comprehensive report detailing how campus "antagonists … engaged in antisemitic behavior, encampments, and intimidating tactics such as campus checkpoints," all with the support of "tax-exempt organizations that enabled and funded violent campus protests." Staff of H. Comms., 118th Cong., *H. Antisemitism Staff Rep.* (Dec. 18, 2024), perma.cc/9NWV-2VWJ.

20.    Legislative scrutiny has intensified in 2025, with multiple congressional committees holding hearings on the underlying causes of the campus antisemitism epidemic. E.g., *Antisemitism in Higher Education—Examining the Role of Faculty, Funding, and Ideology: Hearing Before the H. Comm. on Educ. and the Workforce*, 119th Cong. (July 15, 2025); *Antisemitic Disruptions on Campus—Ensuring Safe Learning Environments for All Students: Hearing before the S. Comm. on Health, Educ., Labor, and Pensions*, 119th Cong. (Mar. 27, 2025). The Senate HELP Committee also launched an investigation into Defendants AJP Educational Foundation (d/b/a American Muslims for Palestine), Hatem Bazian, and Osama Abuirshaid based on alleged ties to Hamas and AMP's reported "involvement in planning, organizing, and funding campus demonstrations that have posed significant threats to campus safety." Senator Cassidy, Chairman of S. Comm. on Health, Educ., Labor, and Pensions, *Letter to Hatem Bazian* (Mar. 26, 2025), perma.cc/VL9N-WVDD.

21.    In the Executive Branch, President Trump has prioritized combatting the antisemitism crisis. Exec. Order No. 14188, *Additional*

*Measures to Combat Anti-Semitism*, 90 Fed. Reg. 8847-48 (Feb. 3, 2025). And the Justice Department has formed a multi-agency task force charged with "eradicate[ing] antisemitic harassment in schools and on college campuses." *Federal Task Force to Combat Antisemitism Announces Visits to 10 College Campuses that Experienced Incidents of Antisemitism*, Dep't of Just. (Feb. 28, 2025), perma.cc/6YAR-FZRA. Hundreds of millions of dollars in federal funds have been frozen at universities that "fail[ed] to protect students from anti-Semitic harassment on campus." *E.g.*, *DOJ, HHS, ED, and GSA Announce Initial Cancelation of Grants and Contracts to Columbia University Worth $400 Million*, Joint Task Force to Combat Antisemitism (Mar. 7, 2025), perma.cc/Z39F-SDLP.

22.  DOJ's Civil Rights Division also recently concluded that UCLA's response to the encampment violated federal civil rights law, finding that senior UCLA administrators admitted that "the encampment was unlawful and periodically violent," that "demonstrators … physically prevented Jewish and Israeli students from accessing parts of campus," that members of the Jewish community were physically attacked around, blocked from entering, and forcibly removed from "the occupied area of Royce Quad," and that the encampment left Jews on campus "'in a state of anxiety and fear.'" *Notice of Findings Regarding the University of California, Los Angeles* at 3-5.

23.  Finally, this Court found at the preliminary injunction stage in *Frankel* that the UCLA encampment "was rimmed with plywood and metal barriers" and "established checkpoints" that "'directly interfered with instruction by blocking students' pathways to classrooms.'" 744 F. Supp. 3d at 1021-22. But because that case was about UCLA's woefully inadequate response to a coordinated campaign of violent racial exclusion,

it did not address the third parties that UCLA claimed had "engineered the exclusion." *Id.* at 1020.

24.    In sum, the private parties responsible for the UCLA encampments—working together to supply them with funding; planning; administrative, material and operational support; a coordinated recruitment and training campaign; and a steady supply of incendiary messages urging members to further their lawless occupation and the resulting Jew exclusion zone—have never been held accountable.

25.    Those private parties responsible for the encampment and the antisemitic violence at UCLA are the Defendants in this case.

26.    The individuals and unincorporated associations that organized the encampment on the ground—National Students for Justice in Palestine (through its UCLA chapter and aided by Doe #1 as part of the nationwide "Popular University for Gaza" initiative); Faculty for Justice in Palestine Network (through its UCLA chapter); UC Divest Coalition, and People's City Council (through Albert Corado, Jason Reedy, Ricci Sergienko and their associates).

27.    The nonprofit organizations that supported the encampment by channeling funds and providing high-level operational and organizational support to SJP—WESPAC Foundation and American Muslims for Palestine.

28.    Together with a laundry-list of third parties, these Defendants conspired to create and maintain (or to enable the creation and maintenance of) the UCLA encampment and its attempted successors knowing that they were based on class-based animus; that their purpose and effect was to exclude Jewish students, faculty, and staff from public spaces using violence and the threat of violence; and that they were

11

violently hostile to law-enforcement efforts to restore order and protect the rights of Jews.

29.    Section 1985(3) of the Klu Klux Klan Act prohibits such conspiracies. Plaintiffs are entitled to relief.

## THE PARTIES

### Plaintiffs

30.    Plaintiff Nir Hoftman is a Professor at the David Geffen School of Medicine at UCLA, where he has taught for 22 years. Hoftman is Jewish.

31.    Plaintiff Matthew Weinberg is a third-year law student at UCLA. Weinberg is Jewish.

32.    Plaintiff Dovid Gurevich is the Rabbi of Chabad House at UCLA. Rabbi Gurevich is Jewish.

33.    Plaintiff Eli Tsives is an undergraduate student at UCLA. Tsives is Jewish.

### Defendants

34.    Defendant National Students for Justice in Palestine is a nationwide membership association that aims to "develop a connected, disciplined movement" to "take colleges and universities across North America by storm." It is often referred to as "SJP National," "NSJP," or simply "SJP." SJP has built an "ideologically, politically, and organizationally unified" network of over 400 campus "solidarity organizations," including a (now largely indefinitely suspended) UCLA chapter with subcomponents for undergraduate students, graduate students, and professional schools. At the national level, SJP is led by an

anonymous steering committee that regularly cycles its membership to avoid being held accountable in court.[5]

35.    Until SJP took down the resource sometime in 2021/2022, it maintained a "National SJP Map" on its website listing the "SJP/Palestine solidarity group[s]" that make up its "ideologically, politically, and organizationally unified" network of campus "solidarity organizations." The map included a key dividing the United States and Canada into five regions: "SJP East," "SJP West," "SJP South," SJP Midwest," and "SJP Canada." The map, which designated SJP chapters at the university level



---

[5] On information and belief, Dylan Kupsh, Sean Eren, and Carrie Zaremba were members of SJP's national steering committee when it launched the "Popular University for Gaza initiative" on April 20, 2024, and between April 25, 2024, and June 11, 2024.



(i.e., reporting all SJP operations at a university under one designation rather than differentiating between undergraduate, graduate, and professional school subcomponents), identified "University of California–Los Angeles SJP" as part of "SJP West."

36.    Defendant John Doe #1 was a student at UCLA in 2024, where he served as President (or an equivalent designation) of UCLA's SJP chapter. SJP instructs its chapters to engage in tactics designed to prevent the identification of high-ranking officials.



37.    As a result of these tactics, Plaintiffs have been unable to identify Doe. On information and belief, SJP is aware of Doe's identity.

38.    Defendant AJP Educational Foundation, Inc. (d/b/a American Muslims for Palestine)[6] is a California nonprofit founded by Defendant Hatem Bazian that provides financial support and organizational capacity to various campus groups. AMP works in broad-based coalitions and supports campus activism through SJP and its chapters and Muslim Student Associations. To that end, AMP employs an "Associate Director of Outreach & Community Organizing" charged with acting as a liaison to campus activism groups across the country; helping these groups procure grants, materials and speakers and to set up programs and activities; and coordinating AMP's grassroots organizing to facilitate national coalition building.

39.    AMP was significantly involved in the creation of NSJP for the express purpose of binding campus groups around the country together into a unified and cohesive advocacy network. In a 2010 conference on Palestine organized by the U.S. Palestinian Community Network and sponsored by AMP, a full-page advert bearing AMP's logo "call[ed] on Students for Justice in Palestine Chapters to come together as SJP National." AMP explained that SJP National's purpose was to "[u]nite the work for Palestine on campuses throughout the United States," to "[o]ffer support to" and "[s]hare resources, experiences, and knowledge" with SJP chapters, to help chapters "organize events and find speakers," and to "[h]elp facilitate divestment campaigns on your campus." For those

---

[6] AJP/AMP utilizes a hybrid corporate structure to obfuscate its actions and conceal its sources of funding. *See* Testimony of Jonathan Schanzer, *From Ivory Towers to Dark Corners: Investigating the Nexus between Antisemitism, Tax-Exempt Universities, and Terror Financing, Hearing before the House Comm. on Ways and Means*, 118 Cong. (Nov. 15, 2023), at 3, perma.cc/6PZM-8TWY ("*Schanzer 2023 Congressional Testimony*").

interested in more information on the project, AMP listed an official SJP email, info@sjpnational.org, and its own phone number, (708) 598-4267.[7]





40.    AMP is under investigation for potential terrorist fundraising. *See Attorney General's Office Opens Investigation into American Muslims for Palestine Nonprofit*, Off. of the Va. Att'y Gen. (Oct. 31, 2023), perma.cc/H9FJ-7CNH; *NJSP: Antisemitism, Anti-Americanism, Violent Extremism, and the Threat to North American Universities*, The Inst. for the Study of Global Antisemitism & Pol'y 43-44 (2024), perma.cc/NQ5J-LH9E. It is also under investigation by the Senate HELP Committee for

_____

[7] AJP reported this phone number on its IRS Form 990 in publicly available filings between 2014 and 2017. *See Nonprofit Explorer: AJP Educational Foundation, Inc.*, ProPublica, perma.cc/AKL9-3X4X. On information and belief, the phone number was associated with AJP/AMP from AJP's initial incorporation in 2009 to at least 2018.

its reported "involvement in planning, organizing, and funding campus demonstrations that have posed significant threats to campus safety." *Letter to Hatem Bazian* at 4.

41. None of this is a surprise, given that AMP "frequently engages in rhetoric that promotes antisemitic tropes and support for violence against Israel, such as praising Hamas for the October 7, 2023, attack," *American Muslims for Palestine (AMP)*, Anti-Defamation League, perma.cc/6S2M-JPBT (archived Mar. 18, 2025), and has reportedly "been heavily involved in SJP's development," *Letter to Hatem Bazian* at 3. For example, AMP annual conferences feature a "Campus Activism Track" that is "designed and led by former SJPers" and intended to provide participants with "the tools and resources you need to strengthen your presence and pro-Palestinian presence on your campus."

42. Defendant Hatem Bazian is the founder of AJP/AMP[8] and the Chairman of AMP's Board of Directors. Under AJP/AMP's bylaws, the Chairman (who also serves as President) is the organization's chief executive officer and supervises and controls the organization's affairs and the activities of its officers. On information and belief, Bazian exercises these functions on AMP's behalf, together with Defendant Osama Abuirshaid. Bazian is also a professor in the University of California, Berkeley's Department of Ethnic Studies, the state where he is domiciled. *See* Bazian MTD (Dkt.71), at 1, *Parizer v. AJP Educational Found., Inc.*, No. 24-cv-724 (E.D. Va. Sept. 9, 2024).

43. Defendant Osama Abuirshaid is AMP's Executive Director. Before joining AMP, Abuirshaid worked as the editor of Al-Zaytounah, the

---

[8] Bazian also reportedly founded the first SJP chapter at Berkeley in 2001. *See Schanzer 2023 Congressional Testimony* at 4.

Islamic Association of Palestine's[9] newspaper. *See Schanzer 2023 Congressional Testimony* at 9. On information and belief, Abuirshaid works together with Bazian to exercise control over AMP's operations, including its campus activism efforts.

44.    Defendant Faculty for Justice in Palestine Network is a nationwide membership association in the image of SJP. Like SJP, FJP is made up of chapters at various universities, including UCLA, and is governed by an anonymous steering committee. FJP supports and amplifies SJP's efforts on college campuses around the country to make public spaces unsafe for Jews. FJP encourages its members to "support and join" SJP's efforts on campus and claims that members have "played a frontline role, physically and materially," in supporting SJP's endeavors, including the "Popular University for Gaza's" campus encampment initiative.[10] Today, FJP has rebranded as "Faculty and Staff for Justice in Palestine" ("NFSJP" or "FSJP") and boasts more than 130 affiliated campus chapters, including one at UCLA.

---

[9] IAP was among the entities held responsible for David Boim's death in a Hamas terrorist attack in 1996. *See Boim v. Holy Land Found. for Relief and Dev.*, 549 F.3d 685, 687-88 (7th Cir. 2008).

[10] Two professors who were instrumental in forming FJP on a series of national calls and at a joint meeting of the American Studies Association and Middle Eastern Studies Association in Montreal—Sherene Seikaly (UC Santa Barbara) and Andrew Ross (NYU)—have publicly identified themselves as holding official positions within FJP. Ross identified himself as "Secretary" and Seikaly identified herself as a "facilitator" or "moderator." In the months leading up to the SJP's launch of the "Popular University for Gaza" and the UCLA encampment, Ross and Seikaly gave several interviews on FJP. These interviews emphasized that working to support SJP was "key" to the organization's efforts and that doing so required "an organized collective voice."

45. Defendant UC Divest Coalition is a California-based unincorporated association made up of individuals and entities that seek to pressure the UC system into divesting from, among other things, the State of Israel. UC Divest maintains a spreadsheet of "Coalition Member Orgs" including several SJP chapters, the Student Labor Advocacy Project at UCLA, and Palestinian Youth Movement. In addition to the "UC" in the coalition's name appearing to stand for "University of California," the vast majority, if not all, of UC Divest's member organizations appear to be in California. For example, UCLA's SJP chapter and its graduate student subcomponent are both listed as members, as are other SJP chapters at California universities. UC Divest also has a subcomponent that calls itself "UC Divest at UCLA," which appears to be made up of the graduate student subcomponent of UCLA's SJP chapter and the "Rank and File for a Democratic Union Caucus of UAW 4811 at UCLA."

46. A website affiliated with UC Divest at UCLA titled "Unmasking UCLA" includes the following acknowledgement: "We want to thank TAHRIR Coalition for supporting the creation of this website." TAHRIR Coalition is a similarly structured organization centered around the University of Michigan that is reported to have organized the University of Michigan's campus encampment as part of SJP's "Popular University for Gaza" initiative.

47. Defendant WESPAC Foundation is a New York nonprofit organization that acts as a "fiscal sponsor" for SJP and similar organizations (for example, WESPAC fiscally sponsors Palestinian Youth Movement via another nonprofit called Honor the Earth). WESPAC's fiscal sponsorship means that it receives and administers donations on behalf of these organizations for use on "projects in the United States." *See* Hobbs et al., *Activist Groups Trained Students for Months Before Campus*

19

*Protests*, Wall St. Journal (May 3, 2024), archive.ph/6mv3B; *WESPAC*, Anti-Defamation League, perma.cc/TK7M-LFRL (archived Mar. 18, 2025).

48.    WESPAC has served as SJP's fiscal sponsor since at least 2019 and was still serving as fiscal sponsor: (1) when SJP launched the "Popular University for Gaza" on April 20, 2024; (2) during the UCLA encampment between April 25 and May 2; (3) during Kupsh's tenure as a member of SJP's national steering committee; and (4) until at least July 1, 2024. On information and belief, on July 27, 2023, WESPAC executed a letter by which it formally "agreed to serve as NSJP's fiscal sponsor." *See* Compl. (Dkt.1) ¶35, *ANI v. WESPAC Foundation*, No. 1:25-cv-1320 (S.D.N.Y. Feb. 13, 2025).

49.    On information and belief, WESPAC's relationship with SJP under the July 2023 fiscal sponsorship agreement was consistent with the following definition of the term "Fiscal Sponsor" contained in WESPAC's insurance policy: "[T]he first Named Insured's status as the entity or organization which offers its legal and tax-exempt status to another person, entity or organization pursuant to a "fiscal sponsor agreement"; who participates in the operations of that person, entity or organization by receiving assets and incurring liabilities for the mutual benefit of pursuing charitable goals; and in consideration for the benefit of that person, entity or organization *has assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs.*" *Id.* ¶40 (emphasis added).

50.    Defendant People's City Council is a Los Angeles-based unincorporated association that describes itself as an "abolitionist, anti-capitalist, and anti-imperialist collective." To the extent it has an office or headquarters, People's City Council appears to have been based out of the Robinson S.P.A.C.E., which is located at 4308 Burns Ave, Los Angeles, CA

90029, at the time of the UCLA encampment. People's City Council maintains several active social media accounts and produces a podcast called "People's City Propaganda." Jason Reedy, Albert Corado, and Ricci Sergienko are all organizers associated with People's City Council who are, on information and belief, California residents living in or around Los Angeles. Reedy and Corado produce most, if not all, episodes of People's City Propaganda. Based on statements on social media and a July 19, 2024, episode of People's City Propaganda titled "Student Intifada," Reedy, Corado, and Sergienko were all on-site at the first UCLA encampment for at least some time between April 25, 2024, and May 2, 2024.

## JURISDICTION AND VENUE

51.    This Court has subject-matter jurisdiction because Plaintiffs seek to recover for violations of their civil rights that "aris[e] under the Constitution [and the] laws ... of the United States." 28 U.S.C. §1331; *see also id.* §1343 (granting district courts original jurisdiction over §1985 claims).

52.    Venue is proper under 28 U.S.C. §1391(b)(2) because "a substantial part of the events or omissions giving rise to [Plaintiffs' claims] occurred" in the Central District of California, specifically in and around the City of Los Angeles and on UCLA's campus. *See, e.g.*, *Frankel*, No. 2:24-cv-04702-MCS-PD (C.D. Cal.).

53.    As alleged in more detail below, each Defendant is subject to either general or specific personal jurisdiction in this Court.

54.    Because Bazian is domiciled in California he is subject to general personal jurisdiction.

55.    Because AJP is incorporated in California, it and its d/b/a AMP are subject to general personal jurisdiction.

21

56.   If Doe is domiciled in California, he is likewise subject to general jurisdiction (if not, he is clearly subject to specific jurisdiction based on his and SJP's role in organizing the encampment).

57.   Although it is an unincorporated association, People's City Council appears to maintain its only physical office in Los Angeles and to be made up of California residents from in and around Los Angeles. It is thus sufficiently at home in California to be subject to general personal jurisdiction.

58.   Although it is an unincorporated association, UC Divest's focus on the University of California System and the fact that its membership appears to be made up of almost entirely California-based constituent organizations strongly suggests that it is sufficiently at home in California to be subject to general personal jurisdiction.

59.   NSJP, WESPAC, FJP, and Abuirshaid are subject to specific jurisdiction because each has sufficient minimum contacts with California and Plaintiffs' claims both arise out of and relate to those contacts.

60.   ***NSJP***. On April 20, 2024, SJP launched the nationwide "Popular University for Gaza" initiative of which the UCLA encampment was a crown jewel. The "Popular University" was a "coordinated pressure campaign against university administrations and trustees" linked to a nationwide effort to "establis[h] autonomous zones on several university campuses." SJP created a logo and mission statement for the initiative, which it would promote using national social media accounts for the next several weeks. During this period, almost every post from SJP's national social media accounts was about the initiative.

61.    On April 24, 2024, SJP's national Instagram account "collaborated"[11] with a Southern California regional chapter called SoCalSJP,[12] Palestinian Youth Movement, and a regional Palestinian Youth Movement chapter covering Los Angeles, Orange County, and the Inland Empire area. The collaboration urged students in Southern California to "reclaim [their] universities" and included the following rallying cry: "Join us! Find an encampment, protest, walkout, or other mobilization happening near you and stand alongside encampments across the country in solidarity with Gaza!"

62.    The same day it collaborated with SoCalSJP, SJP's national social media account also collaborated with Defendant People's City Council on an Instagram post announcing a "Popular University for Gaza" encampment at USC that encouraged non-students from around Los Angeles to join the encampment.

63.    On April 25, UCLA's SJP chapter organized a campus encampment together with UC Divest (which included several more SJP chapters under its umbrella), People's City Council, and additional third parties.

64.    SJP promoted the encampment using its national social media accounts and encouraged its followers to join and support the encampment, including by "collaborating" on an Instagram post with its

---

[11] *See supra*, note 4.

[12] "SoCalSJP" describes itself as a "regional coalition of 21 SJP chapters and allied organizations across Southern California, representing undergraduate, graduate, and law students" at several universities and colleges. The list of member-chapters includes an undifferentiated "University of California, Los Angeles" entry as well as several chapters or other entities affiliated with UC Divest.

UCLA chapter, UC Divest at UCLA, and People's City Council featuring a statement from the encampment and an exhortation to "Join Us!"

65.    After the encampment was declared illegal on April 30, SJP's national Instagram account again collaborated with Palestinian Youth Movement and SoCalSJP. The May 1 collaboration identified a "moment of escalation" and exhorted "🇵🇸✊WE ARE ALL SJP! SHOW UP TO THE ENCAMPMENTS ✊🇵🇸."

66.    Later that day, SJP's national Instagram account authored or collaborated on the following posts (generally with some combination of Palestinian Youth Movement, SJP chapters, and UC Divest elements):





67.    At the same time all this was happening, Kupsh was domiciled in California and serving in leadership positions with UC Divest, several of its constituent organizations, the graduate student subcomponent of UCLA's SJP chapter, and SJP's national steering committee.[13] Kupsh attended the UCLA encampment and on information and belief helped

_____

[13] At some point in 2024, Dylan Kupsh ran for a statewide union position while affiliated with the Rank and File for a Democratic Union. Kupsh's campaign announcement identified himself as an "organizing member" for the Student Labor Advocacy Project; an "organizing member" for the graduate student subcomponent of UCLA's SJP chapter; a member of SJP's national steering committee; and a "Founding UC Divest Steering Committee Member." *Dylan Kupsh for ASE Statewide Chair*, RFDU (archived Nov. 16, 2024), perma.cc/5PYF-LL8Q. On information and belief, Kupsh was a member of all of these organizations when SJP launched the "Popular University for Gaza" on April 20, 2024, during the UCLA encampment, and until his resignation from SJP's national steering committee sometime in January 2025.

organize it, all from California (more specifically, UCLA's campus and the surrounding area). On information and belief, Kupsh's work on the "Popular University for Gaza" initiative for SJP, including any vote to issue SJP's April 20, 2024, statement launching the initiative, occurred in California.

68.    Based on SJP's official social media engagement and Kupsh's cross-cutting affiliations, on information and belief, SJP's national steering committee was aware of the UCLA encampment.

69.    **WESPAC**. WESPAC served as SJP's fiscal sponsor (on information and belief under the July 2023 fiscal sponsor agreement discussed in *ANI v. WESPAC*) before, during, and after the launch of the "Popular University for Gaza" initiative and the UCLA encampment.

70.    There are six known viable models of fiscal sponsorship, including several (*e.g.*, the "Direct Project" and "Contractor" models) that are characteristic of a common-law agency relationship and thus typically result in the sponsor being partially or completely liable to third parties for the sponsored project's acts. *See* Adler & Colvin, *Fiscal Sponsorship—6 Ways To Do It Right*, 8 (3d ed. 2019). Several other models require the sponsored project to have secured its own status as a 501(c)(3) nonprofit or to receive grants from the fiscal sponsor that are then reportable on the sponsor's Form 990. *See Id.* No matter the arrangement, the IRS's longstanding position is that fiscal sponsors must "retai[n] control and discretion over use of the funds" collected for a sponsored project to comply with the law.[14]

_____

[14] IRS Rev. Rul. 68-489, perma.cc/7YP7-LQGJ; *see also* IRS Rev. Rul. 63-252, bit.ly/3JEW0V5 (explaining that "contributions received by [a] domestic organization" and then distributed to a non-exempt foreign organization are exempt if they are not "earmarked in any manner" and "the use of such contributions will be subject to control by the domestic

71.    Although WESPAC's most recent Form 990 reports significant grants to Palestinian Youth Movement via Honor the Earth, it has not identified any funding streams or grants directed specifically towards SJP. Because WESPAC has not, to Plaintiffs' knowledge, ever reported a grant to SJP, and SJP does not appear to have its own 501(c)(3) status, Plaintiffs have reason to believe that discovery will reveal that SJP was, at least for some purposes, functioning as WESPAC's agent under the fiscal sponsorship agreement at the time the former launched the "Popular University for Gaza" initiative and the UCLA encampment.

72.    On information and belief (and consistent with its failure to report any grants to SJP on its Forms 990 during the relevant period) WESPAC's fiscal sponsorship relationship with SJP required WESPAC to exercise discretion and ultimate control over the use of all funds donated to SJP through the donation portal on SJP's website until at least when the donation portal was taken down sometime in late 2024.

73.    On information and belief (and consistent with its reported surveillance of social media accounts related to grant projects reported to the IRS on its Forms 990), WESPAC monitored at least SJP's national social media accounts, which promoted the "Popular University for Gaza" and the UCLA encampment, for the duration of its fiscal sponsorship.

---

organization"); IRS Rev. Rul. 66-79, bit.ly/429jech ("The test in each case is whether the organization has full control of the donated funds, and discretion as to their use, so as to insure that they will be used to carry out its functions and purposes."); *Letter to Rep. Ken Buck*, IRS 2019-0007 (June 28, 2019), perma.cc/56B8-HCQ6 (confirming that exempt organizations must retain "control and discretion as to the use of the funds," maintain "records establishing the funds were used for Section 501(c)(3) purposes," and limit "distributions to specific projects that further its own exempt purposes").

74. On information and belief, at least some of the donations WESPAC collected on SJP's behalf under the fiscal sponsorship agreement were used to support either the "Popular University for Gaza," of which the UCLA encampment was part, or the "Campus Support Coalition," which is "a collective of organizations managed by National SJP that work together to support students fighting for Palestinian liberation on university campuses."

75. On information and belief, UCLA's SJP chapter, UC Divest (including through its constituent organizations), and other organizations involved in the UCLA encampment requested and received at least some support from the Campus Support Coalition.

76. ***FJP***. FJP was created with the primary objective of coordinating faculty support for university SJP chapters across the country shortly before SJP launched the "Popular University for Gaza" initiative. Consistent with FJP's "Principles of Unity," UCLA's FJP chapter actively coordinated with its SJP chapter to support the encampment. Two members of UCLA's FJP chapter, Graeme Blair and Gina Viola Peake, alleged in a recent state-court lawsuit that they were present at the encampment in supporting roles. The same lawsuit alleged that FJP and SJP hosted a joint call on April 30, 2024, that resulted in some FJP members signing up to an SJP list of "faculty representatives." It appears that several of these faculty representatives ended up serving on the encampment's "security" teams. The UCLA FJP Instagram account also encouraged members to excuse the absences of students who missed class to attend the encampment.

77. ***Abuirshaid***. Abuirshaid served as executive director of AJP/AMP (a California corporation) before, during, and after the launch of SJP's "Popular University for Gaza" initiative and the UCLA

28

encampment. On information and belief Abuirshaid exercised significant control over the organization's operations, including its operations in support of SJP, together with Bazian, a California resident. On information and belief, AMP provided at least some support to both SJP's national steering committee and individual SJP chapters in California that were either involved in the UCLA encampment or constituent organizations within UC Divest.

## BACKGROUND

78.    The "Popular University for Gaza" did not occur in a vacuum. Neither did the original UCLA encampment or subsequent efforts to reestablish the encampment after it was dispersed by law enforcement. To borrow a phrase familiar to Defendants, these events were merely an "escalation" in the ongoing campus antisemitism crisis at UCLA and around the country.

**A.    The October 7 attack and the subsequent surge of antisemitism in the United States.**

79.    On October 7, 2023, the foreign terrorist organization Hamas launched a brutal attack on Israel that "resulted in the murder of nearly 1,200 people," including "more than 40 American citizens." *Antisemitism on College Campuses Exposed* at 1. Almost two years later, 48 men and women, including two Americans, are still being held hostage by Hamas and its terrorist allies. *Who Are the Hostages Still Held By Hamas?*, Am. Jewish Comm. (Sept. 2, 2025), perma.cc/5SZJ-KQ6J.

80.    "In the aftermath of [this] horrific event, American institutions of higher education were upended by an epidemic of hate, violence, and harassment targeting Jewish students." *Antisemitism on College Campuses Exposed* at 1; *see also* Louis D. Brandeis Center for Human Rights Under Law, *Public Interest Law Firm Launched to Specialize in*

*Anti-Semitism Litigation* (Feb. 6, 2025), perma.cc/AQ83-PNKS (describing the surge in antisemitic incidents after October 7).

81.    Students, faculty, staff, and other members of campus Jewish communities "faced an unrelenting barrage of discrimination; denial of access to campus common areas and facilities, including libraries and classrooms; and intimidation, harassment, and physical threats and assault." Exec. Order No. 14188, 90 Fed. Reg. 8847-48.

82.    One obvious aggravator has been SJP's promulgation of Hamas's blueprint for antisemitic conduct. Immediately following October 7, NSJP distributed a "Day of Resistance Toolkit" that called for a "national day of resistance on college campuses" just days after the attack. The toolkit characterized a murderous terrorist attack as "surprise operation against the Zionist enemy" that was a "historic win." The toolkit also exhorted SJP "chapters to host demonstrations on campus/in their community"—an effort SJP promised to support by teaching chapters "'how to organize a protest,' including roles, security, media training, and more, on [SJP's next] National Call-in meeting." It also included a survey designed to "better coordinate and unify nationally as a student movement," and offered "additional help organizing or planning your protest" to anyone who needed it.

83.    Tragically, the wave of antisemitic violence that began on October 7 and metastasized to college campuses has continued well into 2025.

84.    In April 2025, Pennsylvania Governor Josh Shapiro was the victim of an arson attack on the first night of Passover. *See Conference of Presidents Condemns Antisemitic Arson Attack Targeting Governor Josh Shapiro*, Conf. of Presidents of Major Am. Jewish Orgs. (Apr. 17, 2025), perma.cc/AQ83-PNKS.

85.    In May 2025, two staffers at the Israeli embassy in D.C. were murdered in cold blood outside the Capital Jewish Museum by a gunman who allegedly shouted "Free Palestine" during the shooting. *See* Indictment ¶7 (Dkt.27), *United States v. Rodriguez*, No. 25-cr-224 (D.D.C. Aug. 6, 2025).

86.    And in June 2025, an attacker motivated by hatred of "Zionist[s]" threw two Molotov cocktails at a Jewish event calling attention to hostages held in Gaza, resulting in multiple serious injuries. *See* Indictment ¶8 (Dkt.20), *United States v. Soliman*, No. 25-cr-194 (D. Colo. June 24, 2025). One victim, an 82-year-old woman, later "died tragically as a result of the severe injuries that she suffered in the attack." *Press Release—Pearl Street—Amended and Added Charges*, Boulder Cnty. (June 30, 2025), perma.cc/PP9F-YUMA (explaining that prosecutors filed an amended criminal complaint alleging two counts of first-degree murder).

## B.    Antisemitism and intimidation at UCLA following October 7.

87.    Like college campuses around the country, UCLA was ground zero for the post-attack surge in antisemitism.

88.    Two days after the massacre, "an official statement issued by the Undergraduate Student Association Council (USAC) Cultural Affairs Commissioner" praised Hamas, stating that the Commissioner "honor[ed] the Palestinians on the frontlines taking their land and sovereignty back! From the River to The Sea." *Antisemitism and Anti-Israeli Bias at UCLA* at 47 & n.66.[15]

---

[15] A tent with the Cultural Affairs Commission's official branding was set up at the UCLA encampment on the day the encampment was established. The Cultural Affairs Commission's Instagram account released a "collaboration" with UCLA SJP's chapter the same day showcasing the tent and encouraging the account's followers to "Join our liberation zone."

89.    A month later, protesters on UCLA's campus screamed "beat
that f**cking Jew" during an anti-Israel parade as they slammed bats into
an effigy of Israeli Prime Minister Benjamin Netanyahu. *See*
@NewYorkPost, *UCLA students batter Bibi piñata to chants of 'beat that
f–g Jew'*, YouTube (Nov. 10, 2023), perma.cc/Z9Q3-QCBA.

90.    Anti-Israel marches and rallies at UCLA regularly featured
chants of antisemitic "slogans, including 'Intifada,' 'from the river to the
sea, Palestine will be free,' and 'kill the Jews.'" *Antisemitism and Anti-
Israeli Bias at UCLA* at 46 & nn.54-56. Throughout, protestors have
sought to avoid accountability and to paralyze Jewish students with fear
by concealing their faces in violation of university rules. *Id.* at 50 & nn.79-
81.

91.    There have also been "multiple reports of graffiti and drawings
… that [are] blatantly antisemitic and anti-Israeli." *Id.* at 63 (discussing
examples of swastikas and a Star of David accompanied by the phrase
"step here").

**C.    The Popular University for Gaza and the UCLA Encampment.**

92.    Things only got worse when SJP announced the "Popular
University for Gaza," a "coordinated pressure campaign against university
administrations and trustees" based on "establis[hing] autonomous zones
on … university campuses" like UCLA. On information and belief, UCLA
graduate student Dylan Kupsh had a substantial role in the decision to
launch this nationwide initiative in his role as a member of SJP's national
steering committee.

93.    Less than a week after SJP kicked off the Popular University
for Gaza, UCLA's SJP chapter established a fortified encampment near
Royce Quad in collaboration with UC Divest (of which Kupsh was also a
leading member), People's City Council, and a host of other similar

organizations. UC Divest and UCLA's SJP chapter took public credit for organizing the encampment.

94.    An anonymous organizer who authored an article on the UCLA encampment for a militant leftist publication called Unity of Fields has provided a detailed timeline of the encampment's creation and expansion, including the following observations:

     a. That organizers "chose a strategic hilltop location to avoid taking the low ground beneath Zionists and police." Then, "[i]n the 48 hours prior to the morning of 4/25/24, [they] crept onto Royce Quad to set up, organizers amassed a large quantity of scrap wood and pallets to assemble barricades immediately."

     b. That the "encampment required a logistics team for food, water, barricades, and medical supplies, a medic team to administer care, a media team to interface with journalists, and a security team to prevent the university, the police, and local fascists from harming the community" and was sustained by an "effort to maintain a militant, disciplined movement."

     c. That members of the encampment were "a militant, confrontational force of students and community members committed to risking and sacrificing in solidarity with Palestine," in large part because "[m]ilitancy was pushed and nurtured by leadership that treated the encampment like the war zone it was." Thus, after the first day "[t]hose who were not serious about defending the camp saw themselves out, and those who stayed despite the risks were radicalized and became heavily invested."

     d. That the encampment was "radicaliz[ed] to the point of fighting the pigs for 6 hours [when law enforcement attempted to clear

33

the encampment on May 1 and May 2]" by "a combination of strong leadership and collective buy-in that disciplined and empowered the right people to become militants." Put differently, "initiating and building support for disciplined, courageous, and controlled counter offensives was the essential role of militant leadership."

e. That "[o]n April 28th, encampment leaders sketched a plan on how to expand the barricades," creating an "expanded perimeter" that "would use the walls of the adjacent buildings to [their] advantage, limiting Zionist access to two sides" while also "escalat[ing] the disruptive effect of the encampment, since Royce Hall and Powell would become non-functional for public use when absorbed into the perimeter."

f. That the encampment included contributions from "non-direct actionist community support, mostly non-student, and often from cultural groups or organizations focused on housing, education," including "local Arabs and Muslims that didn't organize but would show up for Palestine" plus "autonomous anarchists and direct actionists, as well as from the progressive, non-activist student body who did not belong to any organizations or affinity groups."

g. That "[t]he makeup of encampment leads was also varied, though mostly affiliated with undergraduate and graduate Students for Justice in Palestine and the Rank-and-File Caucus for a Democratic Union, UAW 4811."

h. That some members of the encampment "were adults who had lived in L.A for years and had organized for even longer, with experience in direct action and connections to local non-student

34

organizations and/or autonomous action networks." *See
Advancing the Line.*

95.    The Unity of Fields article continued in a section titled "Beyond
Free Speech—Forcing Confrontation with the Pigs":

a. That "[a]s militants we must sharpen contradictions and not
   allow facades of legitimacy to obfuscate our struggle; at UCLA
   this meant abandoning the spectacle of protest which the
   administration was friendly to and provoking them into open
   conflict with us."

b. That "the act of expanding [the encampment's] barricades"
   "served as an escalatory tactic" and "a form of fighting back
   attackers" that "demonstrat[ed] that [members of the
   encampment] effectively kept each other safe through
   nonpeaceful methods."

c. That the encampment was "escalating in calculated steps due
   to the militant leadership that kept pushing the camp to be
   bolder."

d. That members of the encampment "caused [their] confrontation
   with the pigs."

e. That, after UCLA police announced their intent to clear the
   encampment on May 1, 2025, members "collected gas masks,
   handed out goggles and helmets, and prepared to hold our
   ground while the pigs slowly staged."

f. That "[c]ommunity members from all over Los Angeles were
   "still flooding into Westwood to support the camp defense"
   around 1:00am on May 2.

g. That, after a group of police breach the encampment around
   2:00am, "[s]upporters outside the encampment [made] it

difficult for more cops to follow the first contingent, and energy build[t] as it bec[ame] clear that the pigs [were] kettled by protestors who vastly outnumber them."

h. That the organizer "remember[ed] the fear in the eyes of 30 LAPD officers when [members of the encampment] kettled them and drove them from the encampment."

i. That "[t]he militancy of the UCLA encampment attacked the legitimacy of policing."

j. That "[m]edia strategy has a different function and orientation in a movement than ideological line or political education, and there was some value in publicly describing" members of the encampment as peaceful protesters "in mainstream outlets to gain popular support." And that "certain strategies of the movement like lawsuits must preserve the logic of certain narratives in order to make a coherent claim."

k. And finally, that "the purpose of the encampments was never to indulge in new social models. *The purpose was to cost the university money, to physically disrupt, and to express mass oppositional power.* To that end I would emphasize, explicitly and repeatedly, that the most liberating and radicalizing part of the UCLA encampment was *fighting the Zionists and police.*" *See Advancing the Line* (emphasis added).

96.    The article also included a series of maps illustrating of the encampment's progression:







\*16

97.    These maps, together with the organizer's detailed account, show that members of the encampment were well organized; well supplied; in constant communication with numerous third-party groups (student and non-student) that were determined to aid the encampment; ready and

___

16 *See Advancing the Line*, perma.cc/E39G-RP9N?type=image (version of the article with maps).

able to use violence against their perceived enemies; and above all else, eager to "figh[t] the Zionists and the police."

98.    Consistent with this account, "[v]iolence was documented at the encampment and the surrounding area as early as April 25, 2024, with some Jews, Israelis, and pro-Israel protestors assaulted." *Antisemitism and Anti-Israeli Bias at UCLA* at 57.

99.    Antisemitic rhetoric and imagery on campus also intensified during the encampment. Each of these images was captured in or around the "occupied" area of Royce Quad:











100.   A van festooned with Swastikas and other anti-Jewish imagery also parked outside the encampment, blaring antisemitic propaganda from a bullhorn and speaker system.

101.   All this violence and fearmongering had a point—to support the encampment's "human phalanxes" and "checkpoints," which made sure that Jewish students were denied access to public spaces "occupied" by the encampment. *Antisemitism and Anti-Israeli Bias at UCLA* at 53-54, 56.

102.   An internal report commissioned by UCLA called out the university's deep dysfunction in (failing to) address these disturbing acts, which violated California law and university policy. *See Antisemitism and Anti-Israeli Bias at UCLA*. In short, the university's response was too little and too late. *See generally Notice of Findings Regarding the University of California, Los Angeles*. And it failed to materialize at all until the situation had deteriorated to just short of open warfare.

**D.    The individuals and organizations funding and coordinating antisemitism at UCLA.**

103.   SJP (through its national social media account, its regional SoCalSJP social media account, and its UCLA chapter's social media accounts), UC Divest (through its constituent organizations and UC Divest at UCLA), People's City Council, Doe, and FJP used electronic communications platforms including, on information and belief, Instagram, Twitter/X, Bluesky, and Google Docs as part of a coordinated effort to plan, execute, supply, reinforce, and "defend" the encampment against "Zionists and the police."

104.   For example, SJP, People's City Council, UC Divest, and FJP—alongside other student and non-student organizations supporting the encampment—frequently        posted        Instagram        "collaborations"[17]

---

[17] *See supra*, note 4.

encouraging their followers to show up at the encampment, often with the strong implication that new arrivals should be ready for a fight with "Zionists," "the police," or both.

105. These efforts were fueled by antisemitic animus and undertaken with the knowledge that the purpose and effect of surging more people into the unlawful encampment would be to deny Jewish students access to an ever-growing area around Royce Quad, including the occupied buildings at Royce Hall and Powell Library. As law enforcement moved closer to declaring the encampment illegal, the posts took on an even more militant tone. By the morning of May 1st, it was clear that continued efforts to recruit to the encampment were about building a sufficiently large mass of violent rioters to physically and forcibly resist attempts by police to restore order and protect the civil rights of Jews that had been, sometimes literally, trampled on over the past week.

106. The close coordination between these Defendants is also evidenced by the speed and efficiency with which the encampment was built, erecting a fortified camp out of the dust using construction materials and barricades less than a week after SJP announced a national pressure campaign focused on "autonomous zones" on university campuses and before university officials could react. Of course, it is no surprise that UCLA would be among the first to respond to this call, as Dylan Kupsh— a member of SJP's national steering committee—was simultaneously a leader in no fewer than four of the organizations that worked together to create the encampment. First-hand accounts (later confirmed by the organizer's article for Unity of Fields) explained that the encampment was "surrounded by barricades" constructed by members drilling through layers of pallets to build makeshift fortifications. This was not the work of

an uncoordinated rabble caught up in the heat of the moment, it was a well-planned, coordinated, and executed operation.

107. A key element of the plan was recruiting manpower and requisitioning supplies from outside the UCLA community to sustain and grow the encampment, thus increasing the pressure on university officials to negotiate and make concessions and heightening the threat to Jewish students, staff, and faculty. Large, organized contingents of "crewed up" non-students arrived later in the encampment's life in anticipation of violence, and many members of the encampment wore Keffiyehs, goggles, helmets, and gloves. The encampment also boasted substantial stores of supplies and an enormous "gear depot." Again, SJP, People's City Council, UC Divest, and FJP turned to a coordinated social media campaign that was clearly part of a broader national strategy derived from the "Popular University for Gaza" playbook.

108. SJP (along with Doe) and UC Divest worked together to launch the UCLA encampment shortly after SJP's reveal of the "Popular University for Gaza." Organizers planned the encampment and individual members carried that plan out from start to finish. The common link between all these entities was Kupsh, who on information and belief played a significant coordinating and mediating role between the various groups.

109. Immediately after the encampment was constructed, People's City Counsel and FJP joined in. Both groups made social media posts, including collaborations with some of the above Defendants, urging their followers to join the encampment.

110. FJP members offered excused absences to students who joined the encampment, providing an incentive to participate in conduct that likely violated university policy. FJP also met with SJP and provided

several "faculty advisors" that ended up working on the encampment's "security teams."

111. People's City Council published lists of supplies (including supplies like goggles and shields likely to be used by the encampment's "security teams") and issued statements purporting to be from the encampment on its official letterhead and using its official logo. People's City Council also had at least three affiliated organizers (Corado, Sergienko, and Reedy) on the ground for at least part of the encampment.

112. WESPAC served as SJP's fiscal sponsor before, during, and after it launched the "Popular University for Gaza" initiative of which the UCLA encampment was part. As discussed above, on information and belief, WESPAC's fiscal sponsorship arrangement with SJP (1) established at least some form of agency relationship during the relevant period and (2) involved channeling at least some funds to the "Popular University for Gaza" or the "Campus Support Coalition" that then made their way to one or more of the other associational Defendants or their constituent organizations.

113. On information and belief, WESPAC would have known about the UCLA encampment, including its violent and antisemitic nature, by either surveilling SJP's national social media accounts or by communicating with SJP's national steering committee. Again, Kupsh is the most obvious throughline.

114. Through its campus activism operations, AMP provided material and operational support to SJP's national steering committee and individual SJP chapters before, during, and after SJP launched the "Popular University for Gaza" initiative of which the UCLA encampment was part. On information and belief, at least some of that support related

to the broader "Popular University for Gaza" and/or the UCLA
encampment in particular.

115.  SJP, FJP, Doe, UC Divest, and People's City Council engaged
in a massive recruitment effort to grow the encampment, including a joint
social media campaign, press statements, and participating in media hits.
Once recruits arrived, the same groups equipped and trained "human
phalanxes" and "organized self-defense teams" that were deployed at the
"front lines" of the encampment to threaten counter-protesters and
unfriendly press; deny access (often violently) to Jewish students, faculty,
and staff; expand and maintain the encampment's control over nearby
buildings; and engage in a violent clash with law enforcement when police
finally stepped in to restore order. These "front line" troops, often not
affiliated with UCLA at all, were recruited from the associational
Defendants' social media followings as part of a campaign to "defend" the
"student intifada" against "Zionists" and the police.

116.  Over time, the encampment's threats of violence escalated into
actual violence. *See Antisemitism and Anti-Israeli Bias at UCLA* at 53 &
n.105, 57-58 (describing the child of a holocaust survivor who was sprayed
with pepper spray, a Native American Jewish woman who was assaulted
with a stick, and a Jewish student who was knocked unconscious, suffering
a serious head wound); *This is Total Lawlessness and Anarchy*, Fox News
(Apr. 29, 2024), perma.cc/7M2C-FF6X (interview with Plaintiff Nir
Hoftman, a Jewish UCLA professor who was tackled and robbed by a
member of the encampment).

117.  First-hand accounts also reported large, organized groups of
violent nonstudents who would emerge from the encampment to chase out
anyone who waived an Israeli flag or otherwise showed support for Jews
and Israel.

45

118. Together, these measures amounted to a Jew exclusion zone backed by the concrete threat of physical violence. *E.g.*, Compl. ¶6 (Dkt.1), *Frankel*, No. 2:24-cv-04702-MCS-PD (C.D. Cal.). To "defend" the zone, members of the encampment organized into teams of "security" personnel armed with wooden planks, makeshift shields, pepper spray, tasers, and even a sword. *See Antisemitism and Anti-Israeli Bias at UCLA* at 58. The purpose of these teams was to intimidate members of the Jewish community and deny them access to "occupied" territory using "checkpoints" and "human phalanxes." *Id.* at 53, 58.

119. Based on these events, this Court found in *Frankel* that "Jewish students were excluded" from the "portions of the UCLA campus" controlled by the encampment. 744 F. Supp. 3d at 1020-21. UCLA's antisemitism task force and DOJ's Civil Rights Division have both concurred in that assessment.

120. Despite cynical efforts to propagandize otherwise, the encampment was clearly never peaceful. The organizer who wrote for Unity of Fields (and whose account Defendant People's City Council endorsed on social media) praised the encampment's violent resistance of state and local law enforcement's efforts to clear the encampment, restore order, and protect the rights of Jewish students as "the Battle of UCLA." *Advancing the Line* at 3.

121. In a social media thread on the anniversary of law enforcement's clearing of the encampment, People's City Council remarked that the "militant resistance of the camp [was] rarely uplifted because it contradicts the image of non-threatening peaceful protesters" and applauded the "activat[ion]" of "community self defense … on campus and across the city" for the purpose of fighting the police.

122. Later in the same thread, People's City Council quoted a portion of the article citing an organizer's "joy mixed with hate" as the encampment's front line "reappropriate[d] barricades as shields to form a quasi-barricade enclosing the pigs" while "[s]upporters outside the encampment" cut off law enforcement from the engagement. People's City Council's contemporaneous response to this development on May 1, 2024 was to tweet "KETTLE THE COPS CHALLENGE—LAPD F**CK OFF." Its retrospective a year later was to celebrate the encampment's "kettl[ing]" of law enforcement officers and to state that the "most beautiful moments of a protest is [sic] when the cops are scared and/or on the run."

123.  Even after UCLA finally cleared the encampment, SJP, Doe, UC Divest, People's City Council, and FJP continued the campaign of harassment and exclusion that began on April 25, attempting to establish new encampments, targeting buildings named after prominent Jews, and blocking access to graduate school facilities.



**Images from the Battle of UCLA**

124.  On May 6, 2024, more than 40 people (including several who had been arrested at the initial encampment) were taken into custody after UCLA police discovered them massing in a garage with metal pipes, bolt cutters, chains and padlocks, and a "Do-It-Yourself Occupation Guide." *Statement Regarding the Incidents on May 6, 2024.*

Photos



Metal pipes (left), epoxy adhesive and super glue (top center), padlocks (top center),
bolt cutters (bottom center), heavy duty chains (top right),
documentation encouraging violence and vandalism (bottom right)

125. Police later determined that the group was planning to "occupy" and vandalize Moore Hall, which Defendant Students for Justice in Palestine (echoing its tactics at the encampment the previous week) had urged its supporters to "mobilize" to that morning:



126. A month later, the same groups tried again when around 100 people "marched to the walkway at the top of the Janss Steps and set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers." *Statement Regarding the Unlawful Encampments and Subsequent Arrests on Monday, June 10, 2024.* Just like at the original encampment, this group "restricted access to the general

public in violation of University policy" and "disrupted nearby final exams." *Id.*

127.  After police dispersed the new encampment at the steps, the group marched first to Kerckhoff Patio and then to the courtyard between Dodd Hall and the UCLA law school. At each location, they "set up another unauthorized and unlawful encampment" that improperly restricted access to the public and disrupted nearby final exams. *Id.* Later that day, members of the group assaulted and threatened to kill Plaintiff Dovid Gurevich for the offense of being onsite to support Jewish students and asking why one the encampment-members needed to conceal his face. *See* Bandler, *UCLA Chabad Rabbi Assaulted by Pro-Palestinian Protesters.*

128.  On February 12, 2025, SJP's UCLA chapter was suspended after a university investigation concluded that the organization had been involved in a similarly threatening campaign at the home of UC Regent Jay Sures.  Echoing their tactics at the encampment once again, individuals affiliated with SJP "surrounded the vehicle of a Sures family member and prevented that family member's free movement."

129.  Later, UCLA officials recommended revoking campus organization status for SJP's undergraduate subcomponent indefinitely and imposing serious sanctions on its graduate-student subcomponent.

130.  In sum, the associational Defendants and Doe engaged in a long-running antisemitic conspiracy to deny Jews equal access to UCLA's campus. And for roughly a week in Spring 2024, they succeeded in doing so by enforcing a Jew exclusion zone centered on an encampment "occupying" the area around Royce Quad. After UCLA belatedly cleared the encampment, the associational Defendants and Doe conspired to reestablish it and unabashedly renewed their efforts to ensure that UCLA's campus would be unsafe for Jews. By denying Jews equal access

to public spaces on campus, subjecting them to racialized violence, and taking steps to hinder law enforcement's efforts to protect Jews on campus, Defendants violated federal law.

**E.    Plaintiffs' Injuries.**

131.  Plaintiffs have suffered legal injuries because of these actions. Generally, each Plaintiff was deprived of one or more of their rights or privileges as a citizen of the United States, including the right to equal protection of the laws and equal privileges thereunder, including the right to use and enjoy Royce Quad, Dickson Plaza, Powell Library, Royce Hall, and Kaplan Hall (places of public accommodation open to the UCLA community) without fear of race-based violence of area denial.

132. **Hoftman:** On April 29, 2024, Hoftman was assaulted by several members of the encampment's "security team" for the offense of being a Jew walking in an "occupied" area. As Hoftman conducted an interview while walking towards the encampment, two or three individuals affiliated with the encampment moved to block his path. Though he initially tried to ignore them, one individual stood directly in front of Hoftman and told him that he could not keep walking in that direction. When Hoftman attempted to walk around, he was tackled, causing one of his earbuds to fly out of his ear. Dazed, Hoftman returned to his feet and briefly searched for the earbud. When he couldn't locate it quickly, Hoftman left the area to try to report the assault to police, thinking that it must have been lost in nearby foliage.

133.  Later that day, after Hoftman had called 911 and reported the incident to UCLA police, he used an app on his phone to track the lost earbud. Based on the tracking information, Hoftman determined that the earbud was moving around inside the encampment and that, rather than having been lost, it had been stolen by one of his attackers.

134.  The attack left Hoftman deeply disturbed and afraid to go anywhere near the encampment. He was saddened to learn that, to members of the encampment, giving an interview that made clear he was Jewish and supported Israel was sufficient grounds to deny him access to an "occupied" public space. And he was shocked that the encampment's "security" personnel were ready and willing to use violence to deny Jews like himself access to the encampment and the public spaces surrounding it.

135.  After the attack, Hoftman stayed away from the encampment until long after police finally cleared it on May 2. Although he would have preferred to continue to show up in support UCLA's Jewish community, Hoftman's experience with the encampment's "security teams" proved that Jews were unwelcome and unsafe in areas that Defendants "occupied" and that these "security" personnel were willing to range far afield from the core of the encampment to deny access to and attack perceived enemies. The prospect of a replay of the assault, or worse, created an unacceptable risk to Hoftman's safety.

136.  In short, Hoftman was injured, both physically and materially, because he sought to exercise his right as a member of the university's Jewish community to visit a public space on campus. And he was excluded, on threat of violence, from a public space on campus that he would otherwise have visited. Hoftman was shocked, appalled, and frustrated that all this happened simply because he is Jewish.

137.  **Weinberg:** Between April 25 and May 2, the encampment severely curtailed Weinberg's ability to access the "occupied" territory near Royce Quad because of his status as a Jew. Weinberg knew from press coverage and conversations with friends that members of the encampment were willing to use violence to enforce their control over the area. And he

knew that, because he is Jewish and supports Israel, members of the encampment would consider him an enemy and prevent him from passing through any space (public or otherwise) that they controlled on pain of physical force.

138.  Based on this knowledge, Weinberg feared that appearing at or traveling through the part of campus over which Defendants had conspired to exercise control would threaten his physical safety. That reaction was natural and correct: The encampment was a fortified camp at the center of a vortex of radical antisemitism (including "occupied" "intifada hall," antisemitic graffiti, and chants of eliminationist slogans like "kill all the Jews" and "From the River to the Sea"). And it was "defended" by a large group of "security" personnel that had shown no qualms about using violence against those they perceived as enemies (i.e., Jews and law enforcement).

139.  Weinberg feared that if he tried to go to any of the UCLA facilities near the encampment (including Powell Library, which students often use to study) members of the encampment would physically deny him entry. And he rightly feared that they would threaten him with violence for even attempting to enter. If those threats did not dissuade him, Weinberg knew that members of the encampment were willing to engage in violence towards Jews, including Jewish students, who came nearby or attempted to bypass their "checkpoints" and "human phalanxes." Based on the reasonable fear that the same thing would happen to him, Weinberg stayed away from the entire area while the encampment was "occupying" it.

140.  Weinberg was also forced to take a different route around Royce Quad on his way to other parts of campus. Prior to the establishment of the encampment, Weinberg often would walk through the Quad. But after

the Defendants worked together to erect the encampment in the middle of the Quad, Weinberg felt obliged to avoid that area out of concern for his safety. And he in fact specifically avoided the "occupied" parts of Royce Quad for the duration of the encampment. In other words, Weinberg was denied access to the Quad because he is Jewish.

141. Weinberg was shocked, appalled, and frustrated that he was excluded from a public space at his own university simply because he is Jewish. No institution of higher learning (or any other institution) would tolerate such blatant racial exclusion targeted at any other group. And it would ordinarily be clear to all that perpetrating such exclusion denies members of the targeted group their civil rights. Weinberg is frustrated that Defendants' conspiracy rendered Jewish students at UCLA second-class citizens—forced to avoid pockets of "occupied" territory and to always be on the lookout for the next encampment, the next checkpoint, or the next chant of "beat that f\*\*cking Jew!"

142. **Gurevitch:** When the same radical core of organizers attempted to reestablish an encampment near the UCLA law school on June 10, Rabbi Gurevich came out to support Jewish students and make a record of what was happening. Members of this new encampment greeted Rabbi Gurevich with threats of violence and assault. *See* Bandler, *UCLA Chabad Rabbi Assaulted by Pro-Palestinian Protesters*. A member of the new encampment's "security team" slapped Rabbi Gurevich's phone out of his hand. *Id.* Rabbi Gurevich's screen protector was damaged, and if not for the protector, his phone would have been damaged too. Soon after, the situation escalated to death threats when a member of the group told Rabbi Gurevich that he would beat him unconscious and another explained that, if the individual showed the Rabbi his face, he would "have to f\*\*cking kill you." These actions were plainly intended to intimidate

54

Rabbi Gurevich and to prevent him, by force and threat of force, from exercising his right to be present in a public space on campus as a member of UCLA's Jewish community without threat of racialized violence.

143. Rabbi Gurevich was shocked, appalled, and frustrated that he had been threatened with violence and attacked simply because he is a Jew who exercised his right to express support for UCLA's Jewish students and to appear in public at a public space.

144. **Tsives:** Tsives attended every day of the initial UCLA encampment, during which time he observed the encampment substantially expand in size and sophistication. For example, as early as Sunday, April 28, Tsives noticed that members of the encampment had erected large wooden barricades around the perimeter. And as organizers pushed out the encampment's borders day-by-day, Tsives observed members of the encampment's "security teams" becoming more and more aggressive in their efforts to deny Jews access to the area. Tsives also observed that the encampment had a well-organized supply system supported by outside actors, who would drop off supplies at designated points for members of the encampment to collect and distribute.

145. Each day at the encampment, Tsives dressed in a manner that made clear that he was Jewish, including wearing a visible Star of David necklace. Thus, whenever Tsives attempted to pass through one of the "checkpoints" surrounding the encampment, he was either physically blocked by uniformed members of the encampment's "security teams" at point of entry or surrounded and forced out of the area by a "human phalanx" shortly after. For example, on Monday, April 29, Tsives attempted to pass through the checkpoints and was denied entry after the "security team" saw his Star of David necklace.

146.  By the final few days of the encampment, Tsives was forced to take a different, slower route to his regular class in Kaplan Hall because the encampment and its enforcers had expanded the perimeter to "occupy" the entrance he ordinarily used to enter the building. This caused Tsives to be late to class several times before the encampment was cleared. Tsives was shocked, appalled, and frustrated that he had been excluded from public spaces at his own university (including Dickson Plaza/Royce Quad and his usual route to class) simply because he is Jewish.

147. In short, Plaintiffs have all been harmed because of the conspiracy. Hoftman was assaulted and robbed by members of the encampment's "security" team. Rabbi Gurevich was assaulted and subjected to death threats in June when the same core of radicals attempted to reestablish an encampment near the UCLA law school. Weinberg was denied access to the "occupied" parts of Royce Quad and forced to change his ordinary routine in April and May out of concern for his safety. And Tsives was physically denied access to his ordinary route to class in Kaplan Hall because the encampment had "occupied" the entrance he ordinarily used, causing him to be late to class. Each knew that Jews were not welcome around the encampment (and subsequent attempted encampments), and that this lack of fellow feeling would inevitably result in violence were they to assert their right to exist as Jews in "occupied" territory.

148. As a direct and proximate result of the encampment and subsequent attempts to reestablish it, Plaintiffs have suffered harm in the form of both general and special damages in an amount to be determined at trial, including, but not limited to, compensatory damages, punitive damages, and pre-judgment and post-judgment interest.

## CLAIMS FOR RELIEF

**Count I**
**42 U.S.C. §1985(3)**
**Civil Rights Conspiracy**
**Deprivation Clause & Hindrance Clause**
**(Against National Students for Justice in Palestine, John Doe #1,**
**President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a**
**American Muslims for Palestine, Faculty for Justice in Palestine**
**Network, UC Divest Coalition, WESPAC Foundation, and**
**People's City Council)**

149.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

**A.    Section 1985(3)'s deprivation and hindrance clauses.**

150.  Section 1985 of the Ku Klux Klan Act prohibits conspiracies "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws." 42 U.S.C. §1985(3).

151.  If a member of a prohibited conspiracy "do[es], or cause[s] to be done, any act in furtherance of the object of such conspiracy" whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators." *Id.*

152.  Though this language is sometimes referred to collectively, it is made up of two separate clauses—a "deprivation clause" and a "hindrance

clause." *Nat'l Abortions Fed'n v. Operation Rescue*, 8 F.3d 680, 682 (9th Cir. 1993). "There is a significant distinction between the clauses." *Id.* at 685. "The deprivation clause concerns conspiracies of some private persons to commit tortious actions against other private persons." *Id.* "The hindrance clause, on the other hand, concerns conspiracies to thwart state law enforcement from protecting against such tortious activity." *Id.*

153.  Plaintiffs can pursue deprivation clause claims against private conspirators if the conspiracy was animated by "racial, or perhaps otherwise class-based, invidiously discriminatory animus" and "aimed at interfering with rights that are protected against private, as well as official, encroachment." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993) (cleaned up). Two such rights are the right to be free from racial violence and the right to be free from racially motivated deprivation of the use of public amenities. *See, e.g.*, *Griffin v. Breckenridge*, 403 U.S. 88, 105 (1971); *Sines v. Kessler*, 324 F. Supp. 3d 765, 782 (E.D. Va. 2018); *Sealed Plaintiff 1 v. Front*, 2024 WL1395477, at *19, *23-*25 (E.D. Va. Mar. 31).

154.  Plaintiffs can pursue hindrance clause claims against private conspirators if the purpose of the conspiracy was to "interfere with state law enforcement" and that hindrance was "directed at a protected class exercising a constitutional right." *Operation Rescue*, 8 F.3d at 685. But because "a conspiracy with the purpose of curtailing state activity necessarily implicates the state," *Lesley v. Bennett*, 778 F. Supp. 3d 1201, 1220 (D. Wyo. 2025), and "'[t]he hindrance clause … implicates the ability of the State to ensure and safeguard rights protected against any infringement, … claims brought under the hindrance clause … do not require that the right allegedly infringed be one guaranteed against

private encroachment,'" *id.* (quoting *Libertad v. Welch*, 53 F.3d 428, 450 (1st Cir. 1995)); *see also Operation Rescue*, 8 F.3d at 685-86.

155. The private conspiracy behind the April 2024 campus encampment at UCLA implicates §1985(3) liability under both clauses.

**B.    The conspiracy is actionable under the deprivation clause.**

156. Under the deprivation clause, the conspiracy (i.e., the UCLA encampment and subsequent efforts to reestablish it as part of the "Popular University for Gaza") was driven by racial and ethnic animus against Jews, who are a protected class under the civil rights laws, and was aimed at interfering with Plaintiffs' rights, as members of the Jewish community, to safely traverse campus and take advantage of UCLA's public facilities free from race-based violence and area denial. By "occupying" the area around Royce Quad, including multiple university buildings, for an extended period, the encampment *created and expanded a race-based Jew exclusion zone on an American university campus*. Members of the encampment enforced this antisemitic blockade with barricades, checkpoints, armed security teams, and human phalanxes. In practice, those organizing and executing these tactics relied on race-based threats, and if that did not suffice, plain old race-based violence, to ensure that they maintained control.

157. That the encampment ran on racialized threats and violence was no accident. Although some members may have tried to publicly frame the encampment as peaceful or tolerant as part of a cynical propaganda strategy for dealing with the media, the encampment's militant organizers knew from the beginning that they were there for a "battle." And the group (along with the police) that organizers and front-liners alike were most eager to fight were "Zionists," a racist dog whistle. The Unity of Fields article, for example, refers to "Zionists" "scatter[ing] like cockroaches" in

the face of a line of encampment members "suddenly approaching them" with "wood pallets and metal barricades" in hand. *Advancing the Line* at 6.

158. In sum, the encampment's antisemitic animus and its clear goal of creating, expanding, and enforcing a Jew exclusion zone using racialized violence and area-denial tactics place it squarely within the scope of conspiracies actionable under §1985(3)'s deprivation clause.

## C.    The conspiracy is actionable under the hindrance clause.

159. The UCLA encampment's violent and antisemitic aims also implicate the hindrance clause. The encampment was virulently antisemitic, committed to the creation, maintenance, and enforcement of a Jew exclusion zone, and made use of tactics that denied many members of the Jewish community, including Plaintiffs, rights, privileges, and immunities guaranteed to them by the Constitution. The hindrance clause simply considers that, in addition to the goal of denying Jews their constitutional rights, the encampment was also squarely aimed at "preventing or hindering" law-enforcement from securing those same rights for Jews.

160. As complaints from the Jewish community mounted regarding the encampment's flagrant antisemitism, its willingness to use violence, and its implementation of a racialized Jew exclusion zone, UCLA officials belatedly began to take a harder line. This more severe response was entirely justified under the law (although, to be clear, UCLA could have and should have acted much sooner, as the encampment was in violation of several laws and university policies since it was constructed on the morning of April 25, *e.g.*, *Antisemitism and Anti-Israeli Bias at UCLA* at 51-52). After university officials finally declared the encampment illegal on April 30, a law-enforcement force made up of representatives from

multiple state and local agencies issued an unlawful assembly order on May 1 and eventually cleared the encampment during the early hours of May 2. In other words, law enforcement's deployment to the encampment was intended to restore the rule of law and to protect the community members whose rights the encampment had been trampling since it was formed almost a week before.

161. But regardless of law-enforcement's manifest justification for acting, the encampment did not go quietly. Indeed, one of its organizers (whose account of events was repeatedly endorsed by Defendant People's City Council in an encampment "anniversary" thread) has since explained that manufacturing an opportunity for a "battle" with police was, aside from rendering the "occupied" part of campus unsafe and intolerable for Jews, one of the encampment's main objectives.

162. After stockpiling supplies and heavily recruiting on April 30 and May 1, the encampment was fully focused on this confrontation, which eventually materialized on the evening of May 1, 2025, and the morning of May 2 when law enforcement deployed to clear the encampment and restore safety and security to campus for UCLA's Jewish community. Members of the encampment engaged in an hours-long "battle" with law enforcement, including at least one instance where they "kettled" and drove back a contingent of officers with barricades, shields, and hand weapons.

163. This kind of organized violence—directed against police for the express purpose of preventing law enforcement from clearing the "occupied" area and thus restoring Jews' rights to move about campus freely absent the threat of racial violence and area-denial—is exactly the kind of hindrance conspiracy §1985(3) was written to prohibit.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Count II
## 42 U.S.C. §1986
## Failure to Prevent Civil Rights Conspiracy
## (Against Defendants Doe #1, Abuirshaid, and Bazian)

164.  Plaintiffs incorporate by reference the allegations set forth in the preceding paragraphs.

**A.    Section 1986's neglect or refusal clause.**

165.  Section 1986 of the Ku Klux Klan Act provides that "[e]very person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 … , are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented." 42 U.S.C. §1986.

166.  Under §1986 an individual is not required to have "participated in the conspiracy or shared in the discriminatory animus with members of the conspiracy." *Park v. City of Atlanta*, 120 F.3d 1157, 1160 (11th Cir. 1997). Rather, for liability to attach it is enough that the individual "knew of a §1985 conspiracy and, having the power to prevent or aid in preventing the implementation of the conspiracy, neglected to do so." *Id.*

**B.    The §1986 defendants knew of the §1985(3) conspiracy animating the UCLA encampment.**

167.  On information and belief, the §1986 Defendants knew about the encampment and the antisemitic conspiracy animating it because they were high-ranking officials in organizations that were parties to that conspiracy.

168. On information and belief, Doe #1 was the leader of SJP's UCLA chapter, which publicly took credit for the encampment, played a key role in constructing the encampment on April 25, and subsequently had significant organizational and operational responsibilities as the encampment expanded. Common sense indicates that Doe knew of the conspiracy in which he was a major player.

169. Abuirshaid and Bazian were AMP's Executive Director and Chairman, respectively. On information and belief, both would have regularly communicated with and received reports from Taher Herzallah, AMP's Associate Director of Outreach & Community Organizing. Herzallah's role entails acting as a liaison to campus activism groups on campuses across the country, including SJP chapters, helping student groups procure grants, materials and speakers and to set up programs and activities, and coordinating AMP's grassroots organizing to facilitate national coalition building. On information and belief, Herzallah would have been responsible for coordinating AMP's support of SJP and its initiative to build a nationwide coalition of "Popular University for Gaza" encampments on college campuses, including securing support for UCLA's chapter of SJP and the UCLA encampment.

170. On information and belief, given their knowledge and high-ranking positions, the §1986 Defendants had the power to at least aid in preventing the conspiracy.

171. On information and belief, Abuirshaid and Bazian could have instructed Herzallah to cease using AMP resources to support SJP, its national push for antisemitic campus encampments as part of the "Popular University for Gaza," and the UCLA campus encampment specifically. Abuirshaid and Bazian could also have caused Herzallah/AMP to condition any continued support for those organizations and programs on disavowal

63

of the racialized violence and area-denial tactics that made the UCLA encampment so harmful to the Jewish community.

172.  Doe #1 could have simply refused to participate in launching the encampment and used his authority within UCLA's SJP chapter to cause the chapter to follow suit. Once the encampment started, Doe could have refused to support the violent and race-based tactics that became the encampment's calling card. And if it became clear that the encampment was both outside of his control and engaged in systematic race-based violence, Doe could have told UCLA officials and law enforcement what was happening and encouraged them to act.

173. Rather than take any of these steps to prevent or aid in preventing the conspiracy, on information and belief, the §1986 Defendants neglected their duty or simply refused to act. That they did so is no surprise. After all, the AMP §1986 Defendants have been denigrating Israel and promoting Jew-hatred in the United States for decades. And Doe oversaw perhaps the single most radical SJP chapter in the country. But the fact that a conspiracy against civil rights can be resilient does not make it legal.

174. These failures to act harmed Plaintiffs by enabling the encampment to function at its fullest, most violent potential, which is the direct and proximate cause of Plaintiffs' physical and emotional injuries.

1

## **PRAYER FOR RELIEF**

2    Wherefore, Plaintiffs respectfully request that the Court grant:

3    A. A declaratory judgment that the actions described herein violate
4        deprived Plaintiffs of their rights under the federal law.

5    B. Compensatory and punitive damages in an amount to be
6        determined at trial.

7    C. Interest, attorneys' fees, and costs, as allowed by law.

8    D. Such other relief as the Court deems necessary and just.

9    DATED: September 26, 2025

10

11                                  /s/ Thomas R. McCarthy
12                                  Thomas R. McCarthy*
                                    Zachary P. Grouev*
13                                  Julius Kairey*
                                    CONSOVOY MCCARTHY PLLC
14

15                                  William J. Brown, Jr.
                                    BROWN WEGNER LLP
16

17                                  Richard A. Rosen *
                                    Omer Wiczyk *
18                                  THE LOUIS D. BRANDEIS CENTER
19                                  FOR HUMAN RIGHTS UNDER LAW

20
                                    * Pro hac vice
21

22                                  Attorneys for Plaintiffs

23

24

25

26

27

28

## JURY DEMAND

Plaintiffs request a trial by jury on all issues so triable.


DATED: September 26, 2025


/s/ Thomas R. McCarthy
Thomas R. McCarthy*
Zachary P. Grouev*
Julius Kairey*
CONSOVOY MCCARTHY PLLC

William J. Brown, Jr.
BROWN WEGNER LLP

Richard A. Rosen *
Omer Wiczyk *
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW

* Pro hac vice

Attorneys for Plaintiffs