William J. Brown, Jr. (SBN 192950)
bill@brownwegner.com
Kyle J. Berry (SBN 355393)
kberry@brownwegner.com
BROWN WEGNER LLP
2010 Main Street, Suite 1260 Irvine, California 92614
Telephone: 949.705.0080
*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Matthew Weinberg, et al., | **Case No. 2:25-cv-03714-MCS-JC** |
| Plaintiff, | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| v. | |
| National Students for Justice in Palestine, et al., | **Date of Hearing: 12/15/25** |
| Defendants. | **Time: 9:00 AM** |
| | **Courtroom: Courtroom 7C** |
| | **First Street U.S. Courthouse** |
| | **350 W. 1st St.** |
| | **Los Angeles, CA 90012** |
| | **Honorable Mark C. Scarsi** |
| | **United States District Judge** |

[Additional Counsel Cont. from previous page]
Thomas R. McCarthy (DC Bar No. 48965)*
Zachary P. Grouev (FL Bar No. 10386291)*
Julius Kairey (NY Bar No. 5668249)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (NY Bar No. 1663830)*
Omer Wiczyk (NY Bar No. 4321600)*
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

* Admitted pro hac vice

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ...................................................................................... 1

BACKGROUND ........................................................................................ 2

    I.     NSJP and the "Popular University for Gaza" ............................ 2

    II.    The UCLA encampment—leadership and organizers. ............... 4

    III.   The encampment featured extensive communications and interconnections between its constituent groups and subgroups, including NSJP, PCC, UC Divest, and FJP. ............... 7

    IV.   The encampment was the product of a well-supplied, disciplined, and organized ground game. ............................ 8

    V.    The central, animating features of the encampment were anti-Jewish animus and racially motivated violence and exclusion. ............................ 9

LEGAL STANDARDS ............................................................................. 11

ARGUMENT ........................................................................................... 13

    I.     Plaintiffs have Article III standing. ....................................... 13

    II.    NSJP and PCC ...................................................................... 15

        A.   The FAC plausibly alleges a conspiracy. ......................... 16

        B.   Plaintiffs plausibly allege an intent to deprive Jews of their Thirteenth Amendment rights. .......................... 19

        C.   Plaintiffs plausibly allege racial animus. ......................... 20

        D.   Plaintiffs plausibly allege a hindrance clause claim. ........ 21

        E.   NSJP's and PCC's separate arguments fail. ................... 23

    III.   WESPAC ............................................................................. 27

        A.   The Court has personal jurisdiction over WESPAC. ....... 27

        B.   The Amended Complaint plausibly alleges that NSJP's participation in a §1985(3) conspiracy was within the scope of an agency relationship with WESPAC. ........................... 36

    IV.   The AMP Defendants ............................................................ 37

        A.   AJP Educational Foundation/AMP—§1985(3). ............. 37

        B.   Bazian and Abuirshaid—§1986. ................................... 43

CONCLUSION ........................................................................................ 48

1

2

# TABLE OF AUTHORITIES

**Cases**

*A Society Without a Name v. Virginia*,
   655 F.3d 342 (4th Cir. 2011) ............................................................. 17

*Abdulaziz v. Twitter*,
   2024 WL 4688893 (9th Cir. Nov. 6) ...................................... 14, 15

*AFL-CIO v. Scott*,
   463 U.S. 825 (1983) ............................................................................. 16

*ANI v. WESPAC*,
   No.25-cv-1320 (S.D.N.Y. Feb. 13, 2025) ............................... 32, 34

*Appling v. City of Los Angeles*,
   701 F. App'x 622 (9th Cir. 2017) ............................................. 40, 41

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................. 38

*Axiom Foods, Inc. v. Acerchem Int'l*,
   874 F.3d 1064 (9th Cir. 2017) .................................................. 29, 30

*Bayer v. Neiman Marcus Grp.*,
   861 F.3d 853 (9th Cir. 2017) ........................................................... 13

*Black Lives Matter v. Trump*,
   544 F. Supp. 3d 15 (D.D.C. 2021) ................................................. 18

*Bowie v. Maddox*,
   642 F.3d 1122 (D.C. Cir. 2011) ...................................................... 45

*Bray v. Alexandria Women's Health Clinic*,
   506 U.S. 263 (1993) ................................................. 19, 20, 21, 40

*Buchanan v. Barr*,
   71 F.4th 1003 (D.C. Cir. 2023) ....................................................... 18

*Clark v. Clabaugh*,
   20 F.3d 1290 (3d Cir. 1994) ..................................... 43, 44, 45

*Curtis v. Transam. Premier Life Ins.*,
   2023 WL 3628258 (C.D. Cal. May 24) .................................. 28, 36

*Daimler AG v. Bauman*,
   571 U.S. 117 (2014) ............................................................................. 30

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Dawson v. Delaware,*
    503 U.S. 159 (1992) ........................................................................... 26

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.,*
    592 U.S. 351 (2021) ........................................................................... 30

*Frankel v. Regents of Univ. of Cali.,*
    744 F. Supp. 3d 1015 (C.D. Cal. 2024) ..................................... 1, 13, 15

*Frazier v. International Longshoremen's Union,*
    116 F.3d 1485 (9th Cir. 1997) ........................................................... 18

*Friends of the Earth v. Laidlaw Env't Servs.,*
    528 U.S. 167 (2000) ........................................................................... 13

*Gartenberg v. Cooper Union,*
    765 F. Supp. 3d 245 (S.D.N.Y. 2025) ................................................. 25

*Hampton v. Hanrahan,*
    446 U.S. 754 (1980) ........................................................................... 45

*Hampton v. Hanrahan,*
    600 F.2d 600 (7th Cir. 1979) ............................................................. 45

*Helmann v. Codepink Women for Peace,*
    2025 WL 3030582 (C.D. Cal. June 13) .......................................... 33, 34

*Hoang v. Bank of Am., N.A.,*
    910 F.3d 1096 (9th Cir. 2018) ........................................................... 48

*Holgate v. Baldwin,*
    425 F.3d 671 (9th Cir. 2005) ....................................................... 13, 23

*Idaho Conservation League v. BPA,*
    83 F.4th 1182 (9th Cir. 2023) ........................................................... 15

*John Wiley & Sons v. Rivadeneyra,*
    179 F. Supp. 3d 407 (D.N.J. 2016) .................................................... 42

*Jones v. County of San Bernardino,*
    2021 WL 12251634 (C.D. Cal. Oct. 15) ............................................. 41

*Kurd v. Repub. of Turkey,*
    374 F. Supp. 3d 37 (D.D.C. 2019) ..................................................... 20

*Lacey v. Maricopa Cnty.,*
    693 F.3d 896 (9th Cir. 2012) ............................................................. 39

*Laub v. U.S. Dep't of Interior*,
  342 F.3d 1080 (9th Cir. 2003) ................................................ 36

*Lee v. City of Los Angeles*,
  250 F.3d 668 (9th Cir. 2001) .................................................. 38

*Leishman v. Wash. Off. of Att'y Gen.*,
  2025 WL 957896 (9th Cir.) ..................................................... 41

*Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) ........................ 13

*Manhart v. WESPAC Foundation*,
  2025 WL 2257408 (N.D. Ill. Aug. 7) .................................... 37

*Manhart v. WESPAC Foundation*,
  No. 25-2382 (7th Cir.) ........................................................... 37

*Matsumoto v. Labrador*,
  122 F.4th 787 (9th Cir. 2024) ............................................... 24

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2011) ............................................... 14

*Mendocino Env't Ctr. v. Mendocino Cnty.*,
  192 F.3d 1283 (9th Cir. 1999) ............................... 12, 17, 18

*Miller v. Vega*,
  No. 2:25-cv-4268 (C.D. Cal.) ................................................ 39

*Molina v. Diaz*,
  2021 WL 6125847 (C.D. Cal. Dec. 28) ................................. 41

*Mosher v. Saalfeld*,
  589 F.2d 438 (9th Cir. 1978) ................................................. 18

*Moss v. U.S. Secret Serv.*,
  572 F.3d 962 (9th Cir. 2009) ................................................. 11

*NAACP v. Claiborne Hardware*,
  458 U.S. 886 (1982) ............................................................... 24

*Nat'l Abortions Fed'n v. Operation Rescue*,
  8 F.3d 680 (9th Cir. 1993) .......................................... passim

*Nat'l Found., Inc. v. United States*,
  13 Cl. Ct. 486 (1987) ............................................................. 29

*O'Handley v. Weber*,
  62 F.4th 1145 (9th Cir. 2023) ......................................... 14, 15

*Page v. Clark Cnty. Fire Dist. 6,*
    733 F. Supp. 3d 1006 (W.D. Wash. 2024) ................................................ 42

*Pangburn v. Culbertson,*
    200 F.3d 65 (2d Cir. 1999) ........................................................................ 17

*Schwarzenegger v. Fred Martin Motor Co.,*
    374 F.3d 797 (9th Cir. 2004) ............................................................. 28, 33

*Scott v. Ross,*
    140 F.3d 1275 (9th Cir. 1998) ........................................... 17, 26, 37, 41

*Sealed Plaintiff 1 v. Front,*
    2024 WL 1395477 (E.D. Va. Mar. 31) ..................................................... 14

*Sever v. Alaska Pulp Corp.,*
    978 F.2d 1529 (9th Cir. 1992) .................................................................. 16

*Sher v. Johnson,*
    911 F.2d 1357 (9th Cir. 1990) .................................................................. 30

*Sines v. Kessler,*
    324 F. Supp. 3d 765 (W.D. Va. 2018) ................................................ passim

*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma County,*
    708 F.3d 1109 (9th Cir. 2013) .................................................................. 48

*Soo Park v. Thompson,*
    851 F.3d 910 (9th Cir. 2017) .................................................................... 12

*StandWithUs v. Codepink,*
    No.24-cv-6253 (C.D. Cal.) ......................................................................... 33

*StandWithUs v. MIT,*
    2025 WL 2962665 (1st Cir. Oct. 21) ........................................................ 20

*Starr v. Baca,*
    652 F.3d 1202 (9th Cir. 2011) ............................................................ 11, 12

*Tchatat v. City of New York,*
    2015 WL 5091197 (S.D.N.Y. Aug. 28, 2015) .......................................... 21

*Transgo, Inc. v. Ajac Transmission Parts Corp.,*
    768 F.2d 1001 (9th Cir. 1985) .................................................................. 12

*United States v. Rundo,*
    990 F.3d 709 (9th Cir. 2021) .................................................................... 24

*United States v. Williams*,
        553 U.S. 285 (2008) ................................................................................ 24

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
        865 F.2d 1539 (9th Cir. 1989) .............................................................. 12

*White v. Frank*,
        680 F. Supp. 629 (S.D.N.Y. 1988) ........................................................ 21

*Williams v. Yamaha Motor Co.*,
        851 F.3d 1015 (9th Cir. 2017) .......................................... 30, 32, 33, 34

*Wisconsin v. Mitchell*,
        508 U.S. 476 (1993) .............................................................................. 25

*Zhang Jingrong v. Chinese Anti-Cult World All.*,
        287 F. Supp. 3d 290 (E.D.N.Y. 2018) .................................................. 19

**Statutes**

18 U.S.C. §241 ........................................................................................... 24

42 U.S.C. §1985 ............................................................................. 13, 23, 42

42 U.S.C. §1985(3) ............................................................................. 13, 23

42 U.S.C. §1986 ................................................................................. 42, 44

**Other Authorities**

5B Miller & Spencer, Fed. Prac. & Proc. Civ. §1356 (4th ed. 2025) ............. 12

*Advancing the Line, Emboldening the People: Reflections on the One-Year
        Anniversary of the UCLA Palestine Solidarity Encampment*, Unity of
        Fields (May 1, 2025), perma.cc/J5S3-V9QB ........................................... 5

Constantine and Moran, *Fiscal Sponsorship: Opportunities and Risks for
        Nonprofits*, LAW360 (Oct. 25, 2018), perma.cc/U9W8-FXHA ............ 31

**Rules**

Fed. R. Civ. P. 15(a)(2) ............................................................................... 48

## INTRODUCTION

"In the year 2024, in the United States of America, in the State of California, in the City of Los Angeles, Jewish students were excluded from portions of the UCLA campus." *Frankel v. Regents of Univ. of Cali.*, 744 F. Supp. 3d 1015, 1020 (C.D. Cal. 2024). The organizations and individuals responsible include the defendants here. Their signature tactic: a "fortified encampment near Royce Quad." FAC ¶93. The encampment's open and obvious purpose: to serve as the center of a growing Jewish "exclusion zone enforced by threats, intimidation, and violence," *id.* ¶7, and to "figh[t] the police," *id.* ¶121. The result: racially motivated violence and exclusion on a massive scale, culminating in an "hours-long 'battle' with law enforcement," *id.* ¶162, and followed by a long tail of violence and exclusion as the perpetrators tried to do it all again, *see id.* ¶¶116, 132, 137-40, 142, 145-46.

The *Frankel* lawsuit sought to hold UCLA responsible for letting this go unchecked. This lawsuit seeks to hold the groups behind the encampment responsible directly. Civil rights laws have long proscribed acts "so unimaginable and so abhorrent to our constitutional guarantee[s]." *Frankel*, 744 F. Supp. 3d at 1020. And the law of conspiracy has long thwarted defendants attempting to distance themselves from tortious conduct through complex systems of cooperation. The moving Defendants want to make this case about speech, politics, foreign policy—anything, really, other than that they helped give unabashed Jew hatred violent life and force at UCLA. But the FAC alleges facts supporting a plausible inference that Defendants are responsible under §1985(3) and §1986. At the pleading stage, Plaintiffs need not prove anything more.

The Court should deny the motions to dismiss.

1

## BACKGROUND

After the UCLA encampment was established, it immediately became clear that the encampment's defining feature was racially motivated violence and exclusion, as "[v]iolence was documented [and] Jews, Israelis, and pro-Israel protestors [were] assaulted" as early as April 25. *Id.* ¶98. This pattern escalated for days, resulting in numerous violent attacks and an "ever-growing area around Royce Quad, including [two] occupied buildings at Royce Hall and Powell Library," *id.* ¶105, that functioned as a Jewish "exclusion zone backed by the concrete threat of physical violence," *id.* ¶118. This exclusion zone, as well as the antisemitic violence that enabled it, injured many Jewish students, faculty, and staff, including Plaintiffs. *See, e.g.*, *id.* ¶¶22, 98, 116, 118-19, 132, 137-40, 142, 145-46. To redress these harms, Plaintiffs sued nine defendants (six organizations and three individuals) for conspiring to deprive them of their constitutional rights against racially motivated violence and exclusion and to hinder state law enforcement from protecting those same rights. Four organizations (NSJP, PCC, WESPAC, and AMP), and two individuals (Hatem Bazian and Osama Abuirshaid), have since appeared and moved to dismiss.

## I.    NSJP[1] and the "Popular University for Gaza"

Shortly after October 7, 2023, "NSJP distributed a 'Day of Resistance Toolkit,'" *id.* ¶82, in the wake of Hamas' horrific terrorist attack that "resulted in the murder of nearly 1,200 people," including "more than 40 American citizens," *id.* ¶79. The toolkit celebrated this atrocity as a "historic win." *Id.* ¶82. And following "Hamas's blueprint for antisemitic conduct," it "exhorted SJP 'chapters to host demonstrations on campus/in their

---

[1] AMP founded NSJP in 2010 using AMP's own contact information. AMP created NSJP to bind campus SJP chapters together into a "unified and cohesive" national force. FAC ¶¶39, 82.

PLAINTIFFS' OMNIBUS
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS

2

community'—an effort" NSJP "promised to support by teaching chapters 'how to organize a protest,' including roles, security, media training, and more, on [its next] National Call-in meeting." *Id.* The toolkit also included a survey "offer[ing] 'additional help organizing or planning your protest' to anyone who needed it." *Id.*

On April 20, 2024, NSJP "announced the 'Popular University for Gaza,' a 'coordinated pressure campaign,'" the central feature of which was "establis[hing] autonomous zones on … university campuses." *Id.* ¶92. NSJP "created a logo and mission statement" for this initiative and promoted it almost exclusively on its national social media accounts for the next several weeks. *Id.* ¶60.

One form of promotion NSJP was especially fond of is aptly called an Instagram "collaboration." *E.g.*, *id.* ¶66. As background, a "collaboration" occurs when the manager of an Instagram account seeks ratification of its post by other organizations. *Id.* ¶14 n.4. The posting account chooses one or more additional accounts to request to "collaborate" with, at which point the managers of the requested accounts receive a request to participate in the "collaboration." *Id.* This request includes several explanatory disclaimers that make clear agreeing to collaborate on a post means that the collaborators will be listed as authors, that the post will be shared to all collaborators' followers, and that the post will be public if any collaborator's account can be viewed by the public. *Id.* If the managers of the requested accounts agree to collaborate after reading the disclaimers, the collaboration is finalized and the post issues. *Id.* Instagram "collaborations" necessarily involve an agreement to promote a particular post and a meeting of the minds between the managers of two or more social media accounts. *Id.*

## II.    The UCLA encampment—leadership and organizers.

On April 25, 2024, just five days after NSJP announced the "Popular University for Gaza," NSJP's UCLA chapter, another organization called UC Divest, and PCC "organized a campus encampment" near Royce Quad. *Id.* ¶63; *id.* ¶93 ("established a fortified encampment"). In fact, the five-day interim is an overstatement because several of the groups that built the encampment had already "chose[n] a strategic hilltop location" in preparation of inevitable fights with "Zionists and police" and then spent forty-eight hours leading up to the 25th "amass[ing] a large quantity of scrap wood and pallets" so that they could "assemble barricades immediately." *Id.* ¶94.a. After the encampment launched, NSJP's UCLA Chapter and UC Divest took public credit for it. *Id.* ¶93; *see also id.* ¶109 (PCC joining in with posts, including "collaborations" with several Defendants, "[i]mmediately after the encampment was constructed").

It is worth stopping to lay out the relevant groups and subgroups that made up the encampment's leadership. ***NSJP's*** UCLA chapter has undergraduate and graduate subgroups, both of which were heavily involved in the encampment. *Id.* ¶¶34, 94.g. NSJP doesn't differentiate between these subgroups for its purposes, *id.* ¶35, and they worked together as part of the encampment's leadership. *Id.* ¶94.g. ***UC Divest[2]*** is an unincorporated association made up of other organizations and associations, including several NSJP chapters from UCLA and elsewhere in California, the ***Rank and File for a Democratic Union Caucus of UAW 4811 at UCLA*** (a student labor union), and an entity called Palestinian Youth Movement. *Id.* ¶45. ***PCC*** is an "abolitionist, anticapitalist, and anti-imperialist collective" based out of Los Angeles. *Id.* ¶50. PCC had organizers on the ground at the

---

[2] UC Divest is named as a Defendant and has been served, *see* Dkt.49, but has not appeared and is not moving to dismiss.

encampment, which made it well positioned to determine what supplies were needed. *See id.* ¶111. PCC solicited those supplies, including goggles and shields, in preparation for a fight with the police. *Id.* **NFJP** ("National Faculty for Justice in Palestine")[3], another unincorporated association, was also heavily involved in the encampment. *Id.* ¶76. For example, following a joint phone call between NFJP's and NSJP's UCLA chapters on April 30, 2024, several NFJP members signed up to a list of "faculty representatives" for the encampment, some of whom also ended up serving on the encampment's "security" teams. *Id.*

It is also worth laying out several notable individual organizers. One such individual is **Dylan Kupsh**, who was an "organizing member" of the graduate subgroup of NSJP's UCLA chapter, a "Founding UC Divest Steering Committee Member," a member of the "Rank and File for a Democratic Union," and a member of NSJP's "national steering committee" at the launch of the encampment. *Id.* ¶67 & n.13. Three others are ***Jason Reedy, Albert Corado, and Ricci Sergienko,*** who were all "organizers" affiliated with PCC, who participated in the organization of the encampment and who were on the ground at the encampment. *Id.* ¶¶26, 50, 111. Corado and Reedy produce PCC's official podcast, and were featured with Sergienko in "a July 19, 2024" episode about the encampment. *Id.* ¶50.

An article written by an "organizer" from the UCLA encampment ("the Unity of Fields article")[4] provides more color on the encampment's leadership. *Id.* ¶4. The article states that "[t]he makeup of encampment

---

[3] NFJP (formerly FJP) was named as a Defendant and served, *see* Dkt.30, but has not appeared and is not mobbing to dismiss.

[4] Plaintiffs incorporated the Unity of Fields article into the FAC. *See* FAC ¶¶4, 96 n.16. It is available in full in two forms. *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, Unity of Fields (May 1, 2025), perma.cc/J5S3-V9QB; *Advancing the Line*, perma.cc/E39G-RP9N?type=image (same article with maps).

leads" was "varied, though mostly affiliated with undergraduate and graduate Students for Justice in Palestine and the Rank-and-File Caucus for a Democratic Union, UAW 4811." *Id.* ¶94.g. But others "were *adults who had lived in L.A for years and had organized for even longer, with experience in direct action and connections to local non-student organizations and/or autonomous action networks.*" *Id.* ¶94.h (emphasis added). The encampment also received help from "mostly non-student" "non-direct actionist[s]," "cultural groups or organizations," and "autonomous anarchists and direct actionists." *Id.* ¶94.f.

When the Unity of Fields article was released on the "anniversary" of the encampment, PCC made a lengthy social media thread endorsing the article—remarking that the "militant resistance of the camp [was] rarely uplifted because it contradicts the image of non-threatening peaceful protesters" and applauding the "activat[ion]" of "community self defense … on campus and across the city" for the purpose of fighting the police. *Id.* ¶121; *see also id.* ¶161. Later in the anniversary thread PCC quoted the article again, this time citing the author's "'joy mixed with hate' as the encampment's front line 'reappropriate[d] barricades as shields to form a quasi-barricade enclosing the pigs' while '[s]upporters outside the encampment' cut off law enforcement from the engagement." *Id.* ¶122. PCC's contemporaneous response to these developments while they were happening in 2024 had been to tweet "KETTLE THE COPS CHALLENGE—LAPD F**CK OFF" to its followers. *Id.* "Its retrospective a year later was to celebrate the encampment's 'kettl[ing]' of law enforcement officers and to state that the 'most beautiful moments of a protest is [sic] when the cops are scared and/or on the run.'" *Id.*

In the light of PCC's extended endorsement of the article in the "anniversary" thread, the fact that Reedy/Corado/Sergienko were all on the ground at the encampment, and the fact that the article explains that leadership was "mostly" made up of students rather than adults, it a plausible inference that the article's reference to adult organizers from the Los Angeles area with connections to local non-student organizations and autonomous action networks describes PCC and Reedy/Corado/Sergienko.

## III.   The encampment featured extensive communications and interconnections between its constituent groups and subgroups, including NSJP, PCC, UC Divest, and FJP.

One of the encampment's defining features was a high level of interconnectedness between the various groups and subgroups that were part of its leadership. This is heightened by the fact that many of the relevant groups like NSJP, PCC, UC Divest, and NFJP are unincorporated associations. One function of that is that Kupsh was "simultaneously a leader in no fewer than four" of the relevant groups and subgroups. *Id.* ¶106. But this interconnectedness didn't stop at the org chart. Groups and subgroups associated with encampment leadership were constantly communicating, sharing statements, and working together to exhort others to join the encampment, bolster its growing Jewish exclusion zone, and "defend" (in practice, against Jewish students, faculty, and staff, and the police). *Id.* ¶103.

NSJP's UCLA chapter "organized" the encampment on April 25 "together with UC Divest [and] People's City Council." *Id.* ¶¶63, 93. Those initial stages included collectively "cho[osing] a strategic hilltop location" and 48 hours of "cre[eping] onto Royce Quad to … amas[s] a large quantity of scrap wood and pallets to assemble barricades." *Id.* ¶94.a. NSJP's UCLA chapter and UC Divest took credit for the encampment after it went up. *Id.* ¶93. After the encampment came online, encampment organizers

maintained "constant communication," *id.* ¶97, with internal and external allies as "part of a coordinated effort to plan, execute, supply, reinforce, and 'defend [it],'" *id.* ¶103. These groups included national and regional NSJP elements and PCC, who, among other things, "frequently posted Instagram 'collaborations' encouraging [its] followers to show up at the encampment … ready for a fight." *Id.* ¶104; *see also id.* ¶¶64-66, 107, 109, 115. PCC also posted "lists of supplies (including supplies like goggles and shields likely to be used by the encampment's 'security teams')" and issued "statements purporting to be from the encampment on its official letterhead and using its official logo." *Id.* ¶111.

On April 28, organizers got together to "sketc[h] a plan on how to expand the barricades" to "limi[t] Zionist access to two sides" and "escalate the disruptive effect of the encampment." *Id.* ¶94.e. Two days later, NFJP's and NSJP's UCLA chapters held a joint phone call, after which several NFJP members signed up to a list of "faculty representatives" for the encampment, some of whom also ended up serving on the encampment's "security" teams. *Id.* ¶76. And after UCLA declared the encampment illegal, organizers doubled down on a "coordinated social media campaign" (including Instagram "collaborations" that expressly required an agreement), "to recruit additional 'defenders' from across Los Angeles" in preparation for a fight with the police. *Id.* ¶14; *see also id.* ¶24.

## IV. The encampment was the product of a well-supplied, disciplined, and organized ground game.

Erecting "a fortified camp out of the dust using construction materials and barricades less than a week after NSJP's national leadership announced a national pressure campaign focused on 'autonomous zones' on university campuses" is indicative of a "well-planned, coordinated, and executed operation," *Id.* ¶106, not mere "independent parallel behavior,"

*contra* PCC.Mot.11. Indeed, the groups, subgroups, and individuals involved in leading and organizing the encampment were anything but "an uncoordinated rabble caught up in the heat of the moment." *Id.*

The Unity of Fields article confirms this point, explaining that organizers "chose a strategic hilltop location" with an eye towards violent confrontations with "Zionists and police" and spent two days preparing the site before making their move. *Id.* ¶94.a. Similarly, that the encampment "required a logistics team, … a medic team[,] … a media team[,] …and a security team," all roles organizers quickly filled, supports a plausible inference that the encampment was the product of intentional cooperation, not independent parallel action. *Id.* ¶94.b. So too, the fact that the encampment "boasted substantial stores of supplies and an enormous 'gear depot.'" *Id.* ¶107.

The encampment's tactics tell the same story. Organizers "expanded [the encampment's] perimeter," *id.* ¶94.e, as an "escalatory tactic." *Id.* ¶¶95.b., 96 (maps of the encampment showing coordinated expansion of barricades). And "[l]arge, organized contingents of 'crewed up' non-students arrived … in anticipation of violence," many of them wearing "goggles, helmets, and gloves." *Id.* ¶107. These contingents were the product of a coordinated plan to "recrui[t] manpower and requisitio[n] supplies from outside the UCLA community to sustain the encampment." *Id.*; *see also id.* ¶115.

## V. The central, animating features of the encampment were anti-Jewish animus and racially motivated violence and exclusion.

From the beginning, the overriding purpose of the encampment was anti-Jewish animus and the exclusion of Jewish students, staff, and faculty from "occupied" territory. To start, the site for the encampment was strategically chosen "to avoid taking the low ground beneath Zionists and police." FAC ¶94.a. Organizers then "demarcated five zones that Zionists often

tried to breach, limited entry to only two zones, and established a complex check-in, wristband, and vouching system" to keep out "Zionists." *Id.* ¶13. When organizers later decided to expand the encampment's barricades using "nonpeaceful methods," *id.* ¶95.b, it was to create an "expanded perimeter" that "would use the walls of the adjacent buildings [to] limi[t] Zionist access," *id.* ¶94.e.

These barricades and checkpoints were "enforced by teams of armed [encampment members] and 'human phalanxes,' which were used to 'block certain persons from moving freely through public areas' and 'surroun[d] some other individuals to forcibly move them from areas in or adjacent to the encampment.'" *Id.* ¶13. "[M]embers of the encampment [who] organized into teams of 'security' personnel" were "armed with wooden planks, makeshift shields, pepper spray, tasers, and even a sword." *Id.* ¶118. These armed "security" personnel did their job—attacking and excluding Jews who happened to walk nearby. *See id.* ¶116 (describing three such attacks), ¶132 (attack on Hoftman), ¶142 (attack on Rabbi Gurevich), ¶145 (describing Tsives's racially motivated exclusion from the encampment's "occupied" territory). So did the "crewed up" groups of violent nonstudents "who would emerge from the encampment to chase out anyone who waived an Israeli flag or otherwise showed support for Jews and Israel." *Id.* ¶107; *see also id.* ¶117, ¶145 (Tsives was stopped and blocked when the "security team" saw he was wearing a Star of David necklace).

Though Defendants dispute the encampment's (and thus the conspiracy's) primary purpose, no one else does. UCLA's antisemitism report agreed with Plaintiffs' characterization. *Id.* ¶118. So did UCLA's then-Chancelor in a contemporaneous statement. *Id.* ¶10. So did the Justice Department, after a formal investigation. *Id.* ¶¶13, 22. Even the Unity of

Fields article's author, who was an encampment "organizer," stated plainly that "the most liberating and radicalizing part of the UCLA encampment was fighting the Zionists and police." *Id.* ¶95.k.

The factual allegations in the FAC more than support these conclusions. *See id.* ¶99 ("Intifada Hall," "Israelis are Native 2 Hell," "F**ck all Jews"), ¶100 ("[V]an festooned with Swastikas and other anti-Jewish imagery [was] parked outside the encampment, blaring antisemitic propaganda from a bullhorn and speaker system"), ¶138 ("Kill all the Jews"). Again, the DOJ, UCLA's Chancelor, and UCLA's antisemitism task force report all confirm the allegations of intent to deprive Jewish students, faculty, and staff of their constitutional rights against racially motivated violence and inclusion. *See id.* ¶¶9, 10, 12-13, 22, 90, 100, 101, 117-18, 123.

## LEGAL STANDARDS

Despite six pending motions to dismiss and more than a hundred pages of briefing, Defendants do not seriously dispute the substantive law governing Plaintiffs' §1985(3) and §1986 claims. Instead, almost all of Defendants' hundred-plus pages are devoted to arguments about whether the FAC comports with Federal Rules of Civil Procedure 8 and 12(b)(6).

To satisfy these rules, a complaint's "non-conclusory 'factual content'"—together with all "reasonable inferences from that content" that can be drawn in a plaintiff's favor—need only be "plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009). A factual allegation is non-conclusory and entitled to a "presumption of truth" if it does more than "simply recite the elements of a cause of action." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The idea is that a complaint should "give fair notice [and] enable the opposing party to defend itself effectively" and "plausibly suggest an entitlement to

relief." *Id.* Despite some Defendants' suggestions otherwise, this standard "'does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or … the belief is based on factual information that makes the inference of culpability plausible.'" *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017). At bottom, plausibility fights are about testing bare sufficiency, not "resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case." 5B Miller & Spencer, Fed. Prac. & Proc. Civ. §1356 (4th ed. 2025).

Plaintiffs allege an unlawful conspiracy to deprive Jewish individuals of their constitutional rights against racially motivated violence and exclusion and to prevent state law enforcement from protecting those same rights. A conspiracy exists "when the parties have reached 'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir. 1985). "Such an agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as the actions of the defendants." *Mendocino Env't Ctr. v. Mendocino Cnty.*, 192 F.3d 1283, 1301 (9th Cir. 1999) (cleaned up). "To be liable, each participant in the conspiracy need not know the exact details of the plan" so long as they "share the [conspiracy's] common objective." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc). "A conspiracy must be looked at as a whole, and acts which are in themselves legal lose that character when they become constituent elements of an unlawful scheme." *Transgo*, 768 F.2d at 1020-21.

To plead a civil rights conspiracy under §1985(3), a plaintiff must plausibly allege that at least one "specific act was committed in furtherance

of [the] conspiracy." *Holgate v. Baldwin*, 425 F.3d 671, 676 (9th Cir. 2005); *see* 42 U.S.C. §1985(3) ("[I]f one or more persons engaged [in a conspiracy] do, or cause to be done, any act in furtherance of the object of such conspiracy," injured parties may proceed "against any one or more of the conspirators."). In other words, once a plaintiff has "adequately pled that all Defendants [were] part of the conspiracy," they "may hold each Defendant liable for the reasonably foreseeable acts of their co-conspirators." *Sines v. Kessler*, 324 F. Supp. 3d 765, 795 (W.D. Va. 2018) (applying the reasonably foreseeable standard to a §1985(3) conspiracy).

## ARGUMENT

### I. Plaintiffs have Article III standing.

Article III requires a plaintiff to show (1) an injury in fact, (2) that is "fairly traceable" to the defendant, and (3) that is redressable by court order. *Friends of the Earth v. Laidlaw Env't Servs.*, 528 U.S. 167, 180-81 (2000). These elements "must be supported … with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). In civil rights cases, the "'Supreme Court has instructed [courts] to take a broad view of constitutional standing.'" *Bayer v. Neiman Marcus Grp.*, 861 F.3d 853, 871 (9th Cir. 2017).

***Injury in fact.*** No one disputes that Tsives, Gurevitch, and Hoftman have pleaded an injury. But at least two Defendants argue that Weinberg has not. In *Frankel*, this Court recognized that a future risk of suffering near identical injuries demonstrated standing to seek forward-looking relief. 744 F. Supp. 3d at 1020. Weinberg's injury similarly entitles him to seek damages. FAC ¶137. PCC's contrary argument echoes a losing point from the Patriot Front. *Sealed Plaintiff 1 v. Front*, 2024 WL 1395477, at

*11-*12 (E.D. Va. Mar. 31). And NSJP's argument likens racially motivated exclusion to something less than seeing a cross on a rock. Both are wrong.

*Traceability.* PCC argues that Plaintiffs' injuries are "not fairly traceable to the alleged conduct of PCC, but rather resulted from the acts of unidentified third parties." PCC.Mot.18. But Plaintiffs need only allege facts that, taken as true and construed in their favor, "establish a 'line of causation' between defendants' action and their alleged harm that is more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011). That "is less demanding than proximate causation, and thus the 'causation chain does not fail solely because there are several links' or because a single third party's actions intervened." *O'Handley v. Weber*, 62 F.4th 1145, 1161 (9th Cir. 2023).

This inquiry is capacious. In *O'Handley*, an influencer alleged injuries resulting from a social media suspension. *Id.* Although that was "several steps removed" from a government official's decision to flag one of his posts months earlier, it was "possible to draw a causal line" from the flag to the suspension, "even if it [was] one with several twists and turns." *Id.* at 1161-62. *Abdulaziz v. Twitter* went even further. 2024 WL 4688893 (9th Cir. Nov. 6) (unpublished). There, a Saudi dissident alleged that foreign operatives at Twitter "accessed his Twitter accounts without authorization and provided his personal information" to a foreign government. *Id.* Even though neither the foreign country nor its operatives were defendants, "accepting [the plaintiff's] allegations as true, it [was] 'possible to draw a causal line' between Twitter's actions, or lack thereof," and the plaintiff's injury. *Id.*

Doing the same for the FAC, the causal link here is neither "'hypothetical [n]or tenuous.'" *Idaho Conservation League v. BPA*, 83 F.4th 1182,

1188 (9th Cir. 2023). Plaintiffs' injuries all flow from the encampment's racially motivated violence and exclusion and subsequent efforts to reestablish it. These chains of causation are at least as clear as the one in *O'Handley* that had "several twists and turns," 62 F.4th at 1161-62, much less *Abdulaziz*, which involved multiple culpable parties not before the Court, 2024 WL 4688893, at *1. Additionally, under a conspiracy theory of liability "[e]ach Plaintiff need not be able to point to an injury incurred from each Defendant." *Sines*, 324 F. Supp. 3d at 795. Plaintiffs' injuries are obviously traceable to at least NSJP, which Plaintiffs plausibly allege conspired with the other Defendants to infringe Plaintiffs' constitutional rights against racially motivated violence and exclusion and hinder state law-enforcement officials whose job it was to secure those same rights. Because Plaintiffs have "adequately pled that all Defendants … were part of the conspiracy," they may hold each "liable for [their co-conspirators'] reasonably foreseeable acts." *Id.*

**Redressability** is undisputed. *Cf. Frankel*, 744 F. Supp. 3d at 1027 (finding that Jewish students were "likely to suffer an irreparable injury absent a preliminary injunction"). Thus, all Plaintiffs have adequately pleaded standing.

## II.  NSJP and PCC

Plaintiffs address NSJP's and PCC's motions together because both were centrally involved in the encampment and many of their arguments substantially overlap.

Defendants do not dispute that the elements of a deprivation clause claim are "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in

his person or property or deprived of any right or privilege of a citizen of the United States." *AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983). They also do not dispute that a plaintiff must allege facts making it plausible "that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action," and "that the conspiracy aimed at interfering with rights that are protected against private, as well as official, encroachment.'" *Nat'l Abortions Fed'n v. Operation Rescue*, 8 F.3d 680, 682 (9th Cir. 1993) (cleaned up). Likewise, everyone agrees hindrance clause claims share many of the same basic elements (*e.g.*, conspiracy, act in furtherance, injury), but with some important differences. "First, the purpose must be to interfere with state law enforcement, not just to interfere with the persons seeking to exercise their legal rights." *Operation Rescue*, 8 F.3d at 685. Second, the "interference with the police [must] concern a protected class." *Id.* "Third, the right must be a constitutional right." *Id.*

Instead, NSJP and PCC attack the FAC's deprivation clause allegations on the existence of (1) a conspiracy, (2) intent to deprive Plaintiffs of their constitutional rights against racially motivated violence and exclusion, and (3) racial animus against Jews. They also attack Plaintiffs' hindrance clause theory and raise a few baseless separate arguments.

### A.    The FAC plausibly alleges a conspiracy.

NSJP and PCC first argue that they did not enter a conspiracy to establish the UCLA encampment. Plaintiffs do not dispute that a complaint must plead "plausible allegations—with specific facts" regarding each element, including this one. *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992). But NSJP and PCC ignore that "[d]irect evidence of … an agreement among the parties to violate a plaintiff's constitutional rights

1   will only rarely be available. Instead, it will almost always be necessary to

2   infer such agreements from circumstantial evidence or the existence of joint

3   action." *Mendocino Env't Ctr.,* 192 F.3d at 1302; *see Pangburn v. Culbert-*

4   *son*, 200 F.3d 65, 72 (2d Cir. 1999) (explaining that civil rights conspiracies

5   "'are by their very nature secretive operations.'"). Taken as true and con-

6   strued in Plaintiffs' favor, the FAC's allegations establish a plausible infer-

7   ence that NSJP and PCC entered a conspiracy.

8        The FAC includes extensive allegations of communications and inter-

9   actions between the alleged conspirators, including NSJP and PCC, giving

10  rise to a plausible inference of conspiracy. *See supra* 7-8. Some of these in-

11  teractions are even aptly called "collaborations." FAC ¶14 n.4. NSJP's and

12  PCC's collaborations, together with the FAC's additional allegations of com-

13  munications and interactions, support an inference that there was an "ex-

14  press agreement" between NSJP and PCC, among others, regarding the

15  UCLA encampment. *Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998). But

16  even if they did not, the Court could infer a conspiracy from NSJP's and

17  PCC's "conduct" regarding the encampment, which is plausibly alleged to

18  have been a disciplined and well-coordinated effort. *Id.*; *see supra* 8-9.

19       PCC relies on *A Society Without a Name v. Virginia* and *Sines v. Kess-*

20  *ler*, but neither helps. The allegations in *A Society Without a Name* were

21  "threadbare recitals" that the defendants "entered into a conspiracy," "had

22  a 'meeting of the minds that they would act in concert,'" and that a nonprofit

23  corporation "was created as part of the conspiracy and ... became part of the

24  conspiracy." 655 F.3d 342, 346-47 (4th Cir. 2011). Those are nothing like

25  the detailed factual allegations in the FAC. *See supra* 7-9. And the language

26  PCC extracts from *Sines* is based on two paragraphs alleging that an entire

27  list of defendants "agreed and coordinated with and among each other to

28

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**                    17

plan, organize, promote, and commit the unlawful acts that injured Plaintiffs and countless others in Charlottesville." 324 F. Supp. 3d at 794. *Sines* favors Plaintiffs because *every defendant but one* on that list was not dismissed, including defendants who "functioned as an organizer," were "prominently involved in the organization of the events," used social media channels to "coordinate attendance," "published … content in support of the rally," or simply "attended the even[t]" as part of a white supremacist organization. *Id.* at 784-95. The allegations regarding PCC and Corado/Reedy/Sergienko parallel to the defendants not dismissed in *Sines* rather than the single defendant who was.

NSJP cites additional cases to the same result. *Black Lives Matter v. Trump* is distinguishable because the plaintiffs there failed to grapple with the "obvious alternative explanation … for the defendants' communications and activities other than having formed an agreement." 544 F. Supp. 3d 15, 39 (D.D.C. 2021), *aff'd sub nom. Buchanan v. Barr*, 71 F.4th 1003 (D.C. Cir. 2023). No such obvious alternative explanation exists for the encampment, which was characterized by its well-disciplined and organized ground game. *See supra* 8-9; *see Mendocino Env't Ctr.*, 192 F.3d at 1301 (allegations that "conspirators have committed acts that 'are unlikely to have been undertaken without an agreement' may allow a jury to infer the existence of a conspiracy"). *Mosher v. Saalfeld* is a pro se case decided on summary judgment where the plaintiff had only "vague conclusory allegations" after discovery. 589 F.2d 438, 441 (9th Cir. 1978). And the plaintiff in *Frazier v. International Longshoremen's Union* only had evidence "that some of the various defendants occasionally met with each other and may have discussed [his] grievances." 116 F.3d 1485 (9th Cir. 1997). The FAC alleges far more.

NSJP also takes issue with the FAC's use of "information and belief" pleading. But such pleading is permissible when the facts so pleaded are either bolstered by other factual content or peculiarly available to Defendants. *See supra* 12.

### B. Plaintiffs plausibly allege an intent to deprive Jews of their Thirteenth Amendment rights.

NSJP and PCC argue that Plaintiffs have not plausibly alleged that the former intended to deprive the latter of their constitutional rights against racially motivated violence and exclusion. As with their conspiracy argument, the FAC's well-pleaded factual allegations tell a different story. The overriding purpose of the encampment, from start to finish and even afterwords, was antisemitic violence and the exclusion of Jews. *See supra* 9-11. To be sure, NSJP and PCC disagree with that characterization. But disagreement about the facts is not grounds for dismissal at the pleading stage.

Defendants also argue that they cannot be held liable because the encampment had other, allegedly less malign purposes. But intent to deprive Plaintiffs of their rights need not have been the sole purpose of the conspiracy for Plaintiffs to state a claim, as a civil rights conspiracy may be proven where the defendant "act[s] at least *in part* for the very purpose of producing" a deprivation of rights. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993) (emphasis added). Again, this is the pleading stage. And Plaintiffs have plausibly alleged that the organizers of the encampment intended its key feature, especially given that the allegations show the entire exercise was carefully planned, not a spontaneous reaction to developing events. *See, e.g.*, *Zhang Jingrong v. Chinese Anti-Cult World All.*, 287 F. Supp. 3d 290, 298-99 (E.D.N.Y. 2018).

The cases Defendants rely on to the contrary were either decided at a much later stage of litigation (*Bray*, 506 U.S. at 276 (decided after trial)), alleged significantly fewer instances of racially motivated violence and exclusion (*StandWithUs v. MIT*, 2025 WL 2962665 (1st Cir. Oct. 21) (two isolated instances of violence not directly related to excluding Jewish students)), relied on wholly conclusory allegations that provided no plausible insight into the defendants' intent (*Kurd v. Repub. of Turkey*, 374 F. Supp. 3d 37, 62 (D.D.C. 2019)), or actually help Plaintiffs (*Operation Rescue*, 8 F.3d at 686-87 (allowing hindrance clause claim to proceed because the defendants' conduct evidenced intent to hinder law enforcement)). In contrast to a case like *Kurd*, for example, there is overwhelming evidence that the Court must take as true to support that the central purpose of the encampment was racially motivated exclusion backed by racially motivated violence—as repeatedly recognized by almost everyone who encountered or observed it. It is at least plausible that participants in such a conspiracy "consciously aimed at impairing [the] rights" they took such pains to violate. *Kurd*, 374 F. Supp. 3d at 62.

Plaintiffs have plausibly alleged that Defendants intended to deny their Thirteenth Amendment rights.

### C.    Plaintiffs plausibly allege racial animus.

In the third round of their plausibility fight, NSJP and PCC argue that Plaintiffs have not adequately pleaded anti-Jewish animus. Because the underlying rights targeted by the conspiracy were those to be free from racially motivated violence and exclusion, the animus and intent inquiry essentially merge. *See* supra 9-11. Each of the FAC's well-pleaded facts that supports a plausible inference of ill-intent also supports an inference of racial animus. Otherwise, the intent Plaintiffs just plausibly established

would not have been *racially motivated* violence and *racially motivated* exclusion.

Contrary to Defendants' assertions, courts do not expect Plaintiffs to dispositively prove animus at the pleading stage. *See White v. Frank*, 680 F. Supp. 629, 640 (S.D.N.Y. 1988) ("Allegations of racial animus involve defendants' state of mind, which is difficult to prove in any event and particularly so at the pleading stage."). Rather, just as was the case with intent, Plaintiffs can state a claim under §1985(3) so long as the facts support a plausible inference that "th[e] defendants were motivated at least *in part* by racial animus." *Tchatat v. City of New York*, 2015 WL 5091197, at *5 (S.D.N.Y. Aug. 28, 2015) (emphasis added); *cf. Bray*, 506 U.S. at 276. The FAC more than clears that modest bar.

Plaintiffs have plausibly alleged racial animus.

**D.    Plaintiffs plausibly allege a hindrance clause claim.**

Finally, NSJP and PCC argue that Plaintiffs have not plausibly alleged a hindrance clause claim. Just like their last three arguments, this one fails.

From the beginning, encampment organizers working from NSJP's "Popular University for Gaza" playbook knew that a central point of the encampment was "fight[ing] the Zionists and the police." FAC ¶¶95.k, 97. The conspiracy to prevent law enforcement from protecting Jews at UCLA began a few days before April 25, 2024, when leadership "chose a strategic hilltop location to avoid taking the low ground beneath Zionists and police," FAC ¶94.a, not just when UCLA declared the encampment illegal and law enforcement determined that they would have to clear it by force. The FAC supports a plausible inference that the encampment's goal of hindering law enforcement was directly related to preventing law enforcement from

protecting Jewish students from the racially motivated violence and exclusion that was the encampment's central feature. *See supra* 9-11. The encampment's anti-law enforcement animus and anti-Jewish animus were also intimately linked. The encampment "was sustained by an 'effort to maintain a militant, disciplined movement.'" *Id.* ¶94(b). Organizers treated it like a "'war zone'" where participants engaged in "'counter offensives'" against "Zionists" and the "'pigs.'" *Id.* ¶94.c-d.

As an encampment "organizer" admitted in the Unity of Fields article, leadership "caused [the encampment's] confrontation with the pigs." *Id.* at ¶95.d. After UCLA police announced an intent to clear the encampment, participants "'collected gas masks, handed out goggles and helmets, and prepared to hold [their] ground while the pigs slowly staged.'" *Id.* ¶95.e. The prospect of law enforcement seeking to restore order and protect Jews "radicaliz[ed]" encampment leadership "to the point of fighting the pigs for 6 hours." *Id.* ¶94.d. In a challenge to the "'legitimacy of policing,'" members of the encampment attacked and eventually "'kettled'" law enforcement. *Id.* ¶95.g-i. PCC cheered them on and "CHALLENGE[D]" its followers to "KETTLE THE COPS." *Id.* ¶122. In sum, the encampment's objective "'was fighting the Zionists and police.'" *Id.* ¶95.k. The FAC plausibly alleges an intent to hinder law enforcement's protection of the rights of Jews to be free from racially motivated violence and exclusion.

PCC and NSJP also argue that Plaintiffs have not adequately tied an injury to a hindrance clause conspiracy. But for the reasons Plaintiffs just explained, the conspiracy's goal of denying Jewish students' constitutional rights was inextricably linked to its goal of preventing law enforcement from protecting those same Jewish students from the encampment. The

acts of racially motivated violence and exclusion that injured Plaintiffs were in furtherance of these intertwined aims.

### E.    NSJP's and PCC's separate arguments fail.

*PCC.* PCC's main separate argument is that Plaintiffs are attempting to hold it liable for "protected speech and advocacy." PCC.Mot.5. Not so. As an initial matter, PCC seems to think that Plaintiffs are relying exclusively on its speech to satisfy the "overt act" element of §1985(3). *Id.* That misreads the FAC. For the most part, Plaintiffs are not arguing that PCC's speech necessarily gives rise to the single injurious overt act in furtherance of the conspiracy they must allege to proceed against the entire conspiracy under §1985(3). But that leaves plenty of overt acts to choose from. PCC, for just one example, solicited "supplies like goggles and shields likely to be used by the encampment's 'security teams.'" FAC ¶111. PCC was able to ascertain what supplies were needed because it had Reedy/Corado/Sergienko on the ground as organizers. *See id.* ¶¶50, 111. The FAC also alleges a whole host of other specific overt acts, including "equip[ing] and train[ing] 'human phalanxes' and 'organized self-defense teams' that were deployed at the 'front lines' of the encampment" to "deny access (often violently) to Jewish students, faculty, and staff; expand and maintain the encampment's control over nearby buildings; and engage in a violent clash with law enforcement when police finally stepped in to restore order." *Id.* ¶115. None of this is speech, it is conduct taken in furtherance of a conspiracy.

To the extent PCC argues that Plaintiffs must allege a non-speech overt act attributable to it in particular (as opposed to any of its co-conspirators), that misstates the law of conspiracy. *See Holgate*, 425 F.3d at 676; *Sines*, 324 F. Supp. 3d at 795; 42 U.S.C. §1985(3). And even if it didn't, Plaintiffs have identified several such overt acts. *See supra* 7-11. Plaintiffs

PLAINTIFFS' OMNIBUS
OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS

23

can also use PCC's public statements as evidence that it "authorized, directed, or ratified specific tortious activity" by Reedy, Corado, and Sergienko, which in turn can "justify holding [it] responsible for the consequences of that activity" consistent with the First Amendment. *NAACP v. Claiborne Hardware*, 458 U.S. 886, 927 (1982).

PCC relies heavily on *United States v. Rundo*, 990 F.3d 709, 717 (9th Cir. 2021). But that case helps Plaintiffs, not PCC. Though the Ninth Circuit invalidated part of the Anti-Riot Act, it left in place overt act provisions criminalizing "participat[ing] in" or "carry[ing] on" a riot. *Rundo*, 990 F.3d at 720-21. PCC is a proper Defendant because the FAC supports a plausible inference that it is was "participat[ing] in" and "carry[ing] on" the conspiracy in the sense that it engaged in conduct supporting the conspiracy. There is no First Amendment problem with that.

PCC makes the same mistake in relying on *Matsumoto v. Labrador*, 122 F.4th 787, 814-15 (9th Cir. 2024). Because Plaintiffs have identified plenty of overt acts attributable to PCC and its co-conspirators, the Ninth Circuit's discussion of "recruiting" is simply irrelevant. Even if it were not, *Matsumoto* recognized the longstanding exception for speech integral to unlawful conduct, which is enough to encompass speech integral to denying Jewish students, faculty, and staff their constitutional rights against racially motivated violence and exclusion. *Id.* at 813-14; *United States v. Williams*, 553 U.S. 285, 298 (2008) ("Many long established criminal proscriptions—such as laws against conspiracy, incitement, and solicitation—criminalize speech … intended to induce or commence illegal activities."). Although §1985(3) is not a criminal statute, the underlying conduct alleged in the FAC—conspiracy to commit mass racially motivated violence and exclusion—is also proscribed by federal criminal law. *See* 18 U.S.C. §241.

Finally, during the "Battle of UCLA," PCC tweeted "KETTLE THE COPS CHALLENGE—LAPD F**CK OFF." FAC ¶122. At least once during this violent confrontation, members of the encampment did, in fact, "kettle" law enforcement. *Id.* ¶95.f-h. The Unity of Fields article notes that this was done with the help of "[s]upporters outside the encampment [who made] it difficult for more cops to follow the first contingent." *Id.* ¶95.g. This tweet is an overt act in furtherance of the conspiracy, directly attributable to PCC, and not protected speech. Here again, PCC should focus on the parts of the Anti-Riot Act *Rundo* left intact. The Ninth Circuit explained that speech "instigat[ing]" a riot was fair game "[b]ecause even advocacy that is likely to cause an imminent riot is unprotected." *Id.* at 716-17. PCC spends several pages talking what isn't incitement without ever mentioning this tweet. But there is no fine point of doctrine that can make "CHALLENG[ING]" your followers to "KETTLE THE COPS" in the middle of a riot, a defining feature of which is that rioters kettled the cops, anything but "advocacy directed to inciting or producing imminent lawless action [and] likely to incite or produce such action." *Id.* at 713.

Setting overt acts aside, Plaintiffs can rely on speech to support plausible inferences of conspiracy, intent to deprive and hinder, and racial animus. The First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (rejecting First Amendment challenge to enhanced criminal sentence where defendant selected his victim because of the victim's race); *see also Gartenberg v. Cooper Union*, 765 F. Supp. 3d 245, 267 (S.D.N.Y. 2025) ("[T]here is no constitutional problem with using offensive speech as evidence of motive or intent." (quotations omitted)). Put differently, "the Constitution does not erect a per se barrier to the

admission of evidence concerning one's beliefs and associations . . . simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 165 (1992). As Plaintiffs have explained, the overt acts alleged are primarily conduct. But that doesn't mean that there's no point in showing that PCC was deeply enmeshed with NSJP and other co-conspirators as part of a coordinated plan to establish and "defend" the encampment or that it harbored the same ill-intent and animus its co-conspirators did. PCC's public statements are compelling evidence on all these points.

PCC's First Amendment argument largely consists of misunderstanding conspiracy liability and spinning its wheels attempting to rebut theories of liability Plaintiffs are not asserting. To the extent it seeks to do more by immunizing plausible incitement like its "KETTLE THE COPS CHALLENGE" tweet or by preventing Plaintiffs from relying on its public statements as evidence of agreement, intent, and animus, PCC is simply wrong.

***NSJP.*** NSJP's first separate argument references a supposed "state action" requirement and suggests Plaintiffs have not identified an underlying constitutional right. But "[w]ith a few exceptions" neither argued nor present here, "claims brought pursuant to §1985(3) do not require state action." *Scott*, 140 F.3d at 1284; *accord Operation Rescue*, 8 F.3d at 682, 685. And Plaintiffs are clearly asserting their constitutional rights against racially motivated violence and exclusion. FAC ¶153. This argument fails under longstanding precedent.

NSJP's next separate argument, made generally throughout its brief, is that NSJP cannot be held liable for the conduct of its campus chapter at UCLA. But the first sentence of NSJP's brief concedes that it is a "national student group." NSJP.Mot.1. And NSJP does not say that it has any kind

of corporate form that would excuse it from liability for the acts of its constituent chapters. In effect, NSJP is making a corporate veil argument without any corporate veil. It is unclear how NSJP thinks that it can exist as a "national" group and yet disclaim liability for the campus chapters whenever it likes. It is especially confusing given that NSJP's national leadership launched a nationwide campaign directing its chapters to produce a certain result (here, violent and antisemitic campus encampments), immediately got that result from its chapters en masse, and then continued to express approval and support for the result long after it was clear that the "Popular University for Gaza" was functioning as a nationwide conspiracy to oppress and intimidate Jewish students, faculty, and staff. *See supra* 7-11.

Whatever NSJP doesn't concede, the well-pleaded allegations in the FAC plausibly establish. In short, NSJP and its chapters act as a cohesive, nationally directed unit—exactly what AMP intended when it "call[ed] on Students for Justice in Palestine Chapters to come together as SJP National" during NSJP's founding 15 years ago. FAC ¶39. And even if NSJP could not be held liable for all its chapters in the abstract, the FAC alleges facts supporting a plausible inference that NSJP can be held liable for the acts of its UCLA chapter, which was especially closely tied to national leadership through Kupsh. *Id.* ¶¶34, 67, 92-93, 106-08.

## III.   WESPAC

### A.   The Court has personal jurisdiction over WESPAC.

WESPAC spends most of its brief arguing that the Court lacks personal jurisdiction. But the argument second-guesses the FAC's well-pleaded factual allegations, which plausibly establish specific jurisdiction based on NSJP's undisputed contacts with California and a common-law agency relationship between WESPAC and NSJP. WESPAC offers a sparse

declaration from Nada Khader as rebuttal, *see* Dkt.71-1, but none of Khader's statements controvert the relevant allegations. Those relevant, uncontroverted allegations, which "must be taken as true," establish personal jurisdiction. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). At minimum, Plaintiffs have alleged sufficient uncontested facts to justify jurisdictional discovery on the nature and scope of WESPAC's fiscal sponsorship agreement with NSJP. *See, e.g.*, *Curtis v. Transam. Premier Life Ins.*, 2023 WL 3628258, at *5 (C.D. Cal. May 24).

The FAC alleges that WESPAC was a fiscal sponsor of NSJP, which was a key participant in a civil rights conspiracy aimed at denying the constitutional rights of Jewish students, faculty, and staff at UCLA and hindering the efforts of state law enforcement to protect the same. *See supra* 9-11, 21-23. Specifically, the FAC alleges: (1) WESPAC's fiscal sponsorship of NSJP before, during, and after the latter's participation in this conspiracy, FAC ¶¶47-48; (2) the existence of a written fiscal sponsorship agreement under which WESPAC "assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs" for NSJP, *id.* ¶¶48-49; (3) that agreement, consistent with federal law, required WESPAC to exercise supervision and control over NSJP's use of tax-exempt funds channeled through WESPAC, *id.* ¶¶49, 70; (4) funds distributed to NSJP under the agreement were either directly used to support the UCLA encampment or made their way to NSJP elements supporting the encampment on the ground in California, *id.* ¶¶74-75; and (5) WESPAC's supervision and control over NSJP under the auspices of the agreement amounted to an agency relationship, *id.* ¶¶70-75, 112.

WESPAC's insurance policy with insurer ANI explains that WESPAC, as the tax-exempt entity, "participates in the operations" of the

non-exempt entity in part by "receiving assets" for mutual benefit. FAC ¶49. This is in accordance with longstanding federal tax principles. The reason ANI's insurance policy defines fiscal sponsorship the way it does (*i.e.*, in the manner of a common-law agency relationship), is IRS Revenue Ruling 68-489. That Ruling states that a tax-exempt organization may distribute funds to non-exempt organizations without jeopardizing its tax-exempt status, but only if "it retains control and discretion over use of the funds for section 501(c)(3) purposes." IRS Rev. Rul. 68-489, perma.cc/7YP7-LQGJ. Compliance with this rule requires more than general oversight; the sponsor must control "every disbursement" to "ensure that [it] is applied to exempt purposes." *Nat'l Found., Inc. v. United States*, 13 Cl. Ct. 486, 493 (1987) (finding that a tax-exempt entity would not lose its 501(c)(3) status after making disbursements to non-exempt entities because it "control[led] every disbursement and ensure[d] that the disbursement [was] applied to exempt purposes").

Disputing these well-pleaded allegations, WESPAC offers a seven-paragraph declaration from Khader, "WESPAC's sole full-time employee and the employee who effectuates transfers of funds to those organizations for which WESPAC has served as fiscal sponsor." Dkt.71-1 ¶5. The only statement in Khader's declaration that has anything to do with WESPAC's relationship to NSJP is a claim that she "never provided funding to NSJP to be used in connection with the protest and encampment at UCLA" and that she "would have been the WESPAC employee effecting such transfer" had "any funding been provided." *Id.* ¶6.

"'Federal courts apply state law to determine the bounds of their jurisdiction over a party.'" *Axiom Foods, Inc. v. Acerchem Int'l*, 874 F.3d 1064, 1067 (9th Cir. 2017). But because "California authorizes its courts to

exercise jurisdiction 'to the full extent that such exercise comports with due process.' … 'the jurisdictional analyses under California state law and federal due process are the same.'" *Id.* (cleaned up). The Due Process Clause requires that a defendant have "such contacts with the forum State that the maintenance of the suit is reasonable, in the context of our federal system of government, and does not offend traditional notions of fair play and substantial justice." *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (cleaned up). This focus on contacts has led courts to recognize "two kinds" of personal jurisdiction. *Id.* Specific jurisdiction, the form relevant here, requires that: "(1) the defendant either purposefully direct its activities or purposefully avail itself of the benefits afforded by the forum's laws; (2) the claim arise out of or relate to the defendant's forum-related activities; and (3) the exercise of jurisdiction comport with fair play and substantial justice." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (cleaned up).

Black-letter agency law explains how the FAC's allegations support jurisdiction. "Agency relationships … may be relevant to the existence of specific jurisdiction." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014). "For purposes of personal jurisdiction, the actions of an agent are attributable to the principal." *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990). A common-law agency relationship is defined by the idea that an agent "act[s] on the principal's behalf and subject to the principal's control." Restatement (Third) of Agency §1.01 (2006). Put differently, "the [principal] must have the right to substantially control its [agent's] activities" within the scope of the relationship. *Williams*, 851 F.3d at 1024-25. Thus, the real question on agency is whether the fiscal sponsorship

agreement gave WESPAC the right to substantially control how NSJP functioned, or at least how it used the money it received from WESPAC.

WESPAC begins by contesting general jurisdiction. WESPAC.Mot.10-11. But Plaintiffs don't allege general jurisdiction. *See* FAC ¶¶59, 69-75. Rather, the FAC establishes specific jurisdiction over WESPAC through its fiscal sponsorship of NSJP. Because there is no dispute that NSJP is subject to specific personal jurisdiction in California with respect to the UCLA encampment, the real question on specific jurisdiction is whether NSJP's actions in and directed at California were within the scope of an agency relationship and thus attributable to WESPAC. They were.

WESPAC's insurance policy explains that WESPAC, as the tax-exempt entity, "participates in the operations" of the non-exempt entity in part by "receiving assets" for mutual benefit. FAC ¶49. It follows that, though NSJP does not have its own 501(c)(3) status, *id.* ¶71, it displayed a donation portal on its website, *id.* ¶72. This level of control is why donors can lawfully a take charitable deduction even when "donating" to a non-exempt entity. The sponsor (WESPAC) retains legal ownership of the funds despite the donation portal appearing on its sponsoree's (NSJP) website. *See* Constantine and Moran, *Fiscal Sponsorship: Opportunities and Risks for Nonprofits*, LAW360 (Oct. 25, 2018), perma.cc/U9W8-FXHA. As such, Plaintiffs plausibly allege that WESPAC's fiscal sponsorship relationship required it to "exercise discretion and ultimate control over the use of all funds donated to SJP through the donation portal on SJP's website," until the portal was removed in late 2024. FAC ¶72.

Against this background, the FAC alleges sufficient facts to support a prima facie case of specific jurisdiction. It is plausible that WESPAC maintained a written fiscal sponsorship agreement with NSJP at the time

of the UCLA encampment because WESPAC's insurer sued it for declaratory judgment alleging that such an agreement existed. FAC ¶¶48-49; *see* Compl. (Dkt.1) ¶35, *ANI v. WESPAC*, No.25-cv-1320 (S.D.N.Y. Feb. 13, 2025) (attaching the agreement as Ex.B, which is unavailable on the public docket). It is plausible that, under the agreement, WESPAC "assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs" for NSJP because WESPAC's insurer believed that the agreement satisfied a contract clause using that exact language. *Id.* It is plausible that, under the agreement, WESPAC had "the right to substantially control" the NSJP "programs" it "assumed responsibility to manage" and NSJP's use of WESPAC funds because that is how WESPAC's insurer interpreted the agreement and what federal law has long required. FAC ¶¶48-49, 70; *cf. Williams*, 851 F.3d at 1024-25. It is plausible that the agreement created a common-law agency relationship between WESPAC and NSJP because many such agreements ("direct project" and "contractor" fiscal sponsorships) do exactly that, and WESPAC appears not to have used the grant-making method that is less likely to do so. *Id.* ¶¶70-72. And it is plausible that WESPAC "manage[d]" "programs" and WESPAC-associated funds were used in support of NSJP's participation in the underlying conspiracy because NSJP directed national resources towards supporting the UCLA encampment—the "crown jewel" of NSJP's "Popular University for Gaza" initiative and an encampment closely associated with a member of NSJP's national steering committee. *Id.* ¶¶34, 64-68, 74-75, 92-93, 106, 108.

Khader's strategically crafted denial ignores the key jurisdictional allegations. She says nothing about the terms of WESPAC's fiscal sponsorship agreement (and WESPAC notably fails to produce it). She says nothing

about the level of control WESPAC may or may not have exercised over NSJP "programs" or NSJP's use of tax-exempt funds. And she says nothing about whether any of those programs or funds were in fact used to support NSJP's "Popular University for Gaza" initiative or the "Campus Support Coalition," the vectors Plaintiffs identify as enmeshing WESPAC programs and funds with NSJP's participation in the conspiracy. *See* FAC ¶74. It is no surprise that Khader denies mailing NSJP a check labeled "For use in a civil rights conspiracy at UCLA." But that is not what the Plaintiffs allege happened, and it is not what the Ninth Circuit's personal jurisdiction cases require to plausibly allege specific jurisdiction based on an agency relationship. *See, e.g.*, *Williams*, 851 F.3d at 1024-25. Khader's declaration doesn't defeat the FAC's key factual allegations, which remain "uncontroverted" and thus "must be taken as true." *Schwarzenegger*, 374 F.3d at 800.

WESPAC's legal argument on jurisdiction similarly fails. WESPAC.Mot.12-13. WESPAC exclusively relies on a recent district court decision concluding that allegations regarding WESPAC's fiscal sponsorship of a different organization, without more, were insufficient to plausibly allege an agency relationship or specific jurisdiction based on the sponsored organization's actions in or directed at California. *Helmann v. Codepink Women for Peace*, 2025 WL 3030582, at *21 (C.D. Cal. June 13) (consolidated with *StandWithUs v. Codepink*, No.24-cv-6253 (C.D. Cal.), which WESPAC cites).

Both the facts and the governing law distinguish this case from *StandWithUs*. At a high level, both cases concerned general allegations about fiscal sponsorship. *See* Am.Compl. (Dkt.71) ¶¶96-154, *StandWithUs* (Dec. 19, 2024). But Plaintiffs make more specific allegations about *WESPAC's fiscal sponsorship agreement with NSJP* based on allegations in

a lawsuit brought by WESPAC's insurer, which saw the agreement and was concerned enough about the prospect of liability for the acts of WESPAC's sponsorees that it sought a declaration denying coverage. FAC ¶¶48-49; *see* Compl., *ANI v. WESPAC*. That ANI believed the agreement showed that WESPAC "assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs" for NSJP is strong evidence that the fiscal sponsorship agreement at issue here created an agency relationship. *See Williams*, 851 F.3d at 1024-25 (focusing on the right "to substantially control [an agent's] activities" within the scope of the relationship).

Setting aside that important factual distinction, *StandWithUs* was wrong on the law. The district court accepted that federal law "requires fiscal sponsors to retain 'control and discretion' over how donated funds are used." *Helmann*, 2025 WL 3030582, at *20. But having done so, the court focused on what it saw as WESPAC's subjective reason for obtaining that control instead of what it objectively meant for WESPAC's relationship with its sponsoree. *Id.* Whether WESPAC did so to comply with tax law or for any other reason, when an organization "assume[s] responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs" for another entity as part of an arrangement where the former funds the latter, it is (at least plausibly) entering into an agency relationship regarding the "programs" its sponsoree undertakes and the ways that sponsoree uses channeled funds. *E.g.*, FAC ¶¶49, 70.

By disregarding WESPAC's control over its sponsoree's funds, *Stand-WithUs* undermined federal tax law, which relies on that control as an anti-circumvention measure. To give an example: The American Cancer Society can set up a link on its web page so that tax-deductible donations can be

made to the Jones Research Lab. If the Jones Lab is a 501(c)(3) nonprofit, there is no chance that tax-deductible donor money is being given to a non-tax-exempt organization. But if the Jones Lab is not a 501(c)(3) nonprofit, it would create a huge gap in the tax code for deductions to be taken for donations to the Jones Lab simply because the money is first sent to ACS. To ensure that the government isn't being shortchanged, ACS must be made to ensure that the money it receives on behalf of the Jones Lab is really used for exempt purposes as if it were part of ACS's own expenditures. That's why when a fiscal sponsor (WESPAC) receives and administers funds on behalf of a sponsored organization (NSJP) that is not a 501(c)3, it must be the case that the fiscal sponsor has complete control over how the donated funds are spent. A common mechanism for ensuring that control, demonstrated in WESPAC's contract with ANI, is "assum[ing] responsibility to manage programs, events, revenue" for the sponsoree. FAC ¶49. Contra *StandWithUs*, it is plausible that WESPAC, having received and administered donations on behalf of NSJP for years, exercised full control over NSJP; if it didn't, it would have put its own tax-exempt status at risk.

Because WESPAC's legal and factual arguments fail, the Court should deny WESPAC's motion to dismiss under Rule 12(b)(2). But if the Court remains uncertain on personal jurisdiction after briefing and argument, Plaintiffs request the opportunity to seek jurisdictional discovery against WESPAC on the nature and scope of its fiscal sponsorship agreement with NSJP and the resulting agency relationship. Requests for jurisdictional discovery "should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of*

*Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003). Plaintiffs have identified a narrow set of facts that are determinative as to personal jurisdiction. WESPAC has not directly controverted those allegations but does dispute that its fiscal sponsorship agreement with NSJP accomplished what ANI thought it had when the insurer sought a declaratory judgment. Because at least some "jurisdictional facts are contested," "additional discovery would be useful to establish" the scope of specific jurisdiction, and Plaintiffs have identified a narrow factual issue, granting jurisdictional discovery would be appropriate. *Id.*; *Curtis*, 2023 WL 3628258, at *5.

### B. The Amended Complaint plausibly alleges that NSJP's participation in a §1985(3) conspiracy was within the scope of an agency relationship with WESPAC.

WESPAC's merits arguments largely retread ground already covered. WESPAC.Mot.18-20. For example, WESPAC repeats that Plaintiffs' §1985(3) claims require state action, which Plaintiffs have already explained fails under longstanding precedent.

WESPAC's final argument is a carbon copy of its jurisdictional arguments. WESPAC accuses Plaintiffs of suggesting that "being a fiscal sponsor automatically subjects a sponsor to liability for anything anyone associated with a sponsoree does anywhere in the world." WESPAC.Mot.20. But that strawman isn't what Plaintiffs argue. The Amended Complaint alleges that WESPAC had a written fiscal sponsorship agreement under which it "assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs" for NSJP, creating an agency relationship at least with respect to the specific "programs" WESPAC "assumed responsibility to manage" and WESPAC-associated funds. FAC ¶¶48-49, 70. The Amended Complaint alleges that among these

"programs" were NSJP's "Popular University for Gaza" initiative and the "Campus Support Coalition"—programs that WESPAC does not deny exist and that Plaintiffs have plausibly alleged were used by NSJP as part of a civil rights conspiracy. Specific programs and funding streams are a far cry from "anything" that "anyone associated with a sponsoree does anywhere in the world." WESPAC.Mot.20.

The only legal authority WESPAC provides is *Manhart v. WESPAC Foundation*, 2025 WL 2257408 (N.D. Ill. Aug. 7). *Manhart* (which is currently on appeal, *see* No. 25-2382 (7th Cir.)) briefly explained that a state-law negligence claim against WESPAC failed because Manhart "failed to allege that NSJP [was] liable for any tortious conduct." *Id.* at *12. As an aside, the district court further opined that Manhart had "not pled facts sufficient to show that WESPAC owed [him] any duty" under Illinois tort law based on an IRS rule governing WESPAC's fiscal sponsorship agreement with NSJP. But here, the federal common law of agency supplies that duty. *Manhart* says nothing about whether WESPAC can be held liable for NSJP's participation in a civil rights conspiracy under §1985(3) if, as Plaintiffs plausibly allege, NSJP used WESPAC-associated "programs" or funds to contribute to the conspiracy through the "Popular University for Gaza" and the "Campus Support Coalition." FAC ¶74; *cf. Scott*, 140 F.3d at 1283 (rejecting argument that organizations cannot "be held vicariously liable for conspiracy under §1985(3)" as a matter of federal common law). The Court should thus deny WESPAC's Rule 12(b)(6) motion.

## IV.  The AMP Defendants

### A.  AJP Educational Foundation/AMP—§1985(3).

AMP's motion boils down to calling factual allegations it doesn't like "conclusory." That word doesn't mean what AMP thinks it means. Conclusory allegations are bare *legal* conclusions, such as a "'formulaic recitation

of the elements'" of a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009). While "[c]onclusory allegations *of law* … are insufficient to defeat a motion to dismiss," "[a]ll *factual allegations*" must be "'taken as true.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001) (emphasis added). AMP confuses legal conclusions with factual allegations. And it ignores most of the FAC's factual claims.

***Deprivation Clause.*** On Plaintiffs' deprivation clause claim, AMP doesn't dispute that the UCLA encampment injured Plaintiffs. Instead, AMP argues that Plaintiffs "do not plead three of the first four elements" because it claims the encampment wasn't the product of a conspiracy, wasn't motivated by discriminatory animus, and wasn't supported by AMP. AMP.Mot.7. Each argument ignores the relevant factual allegations, erroneously dismissing them as "conclusory" legal conclusions.

*First*, AMP ignores allegations that it funded, facilitated, and furthered the conspiracy. AMP claims that Plaintiffs haven't alleged a specific act "in furtherance of conspiracy." AMP.Mot.6. But ignoring those facts doesn't mean they don't exist. AMP helped create co-conspirator NJSP. FAC ¶39. AMP facilitated nationwide campus activism like NSJP's "Popular University for Gaza" initiative at issue. *Id.* ¶¶38-39. It "provided at least some support" to co-conspirators "that were either involved in the UCLA encampment or constituent organizations within UC Divest." *Id.* ¶77. And AMP's efforts to do were run by Defendants Bazian and Abuirshaid. FAC ¶42-43. Ignoring these specific allegations, AMP argues that its work "in broad-based coalitions" and support for "campus activism" is a "broad generalization" insufficient show that AMP furthered the conspiracy. AMP.Mot.6. But that strawman argument ignores the other allegations tying AMP to the conspiracy.

*Second*, AMP doesn't rebut the existence of a conspiracy. AMP argues that "[m]erely stating that a conspiracy exists 'without factual specificity is insufficient.'" AMP.Mot.5 (quoting *Miller v. Vega*, Dkt.30, No. 2:25-cv-4268 (C.D. Cal. Aug. 4, 2025) (unpublished op.)). That's a true statement of law. But AMP doesn't address any of the complaint's "'specific allegations,'" let alone explain why they're "insufficient" to show a conspiracy. *Id.* AMP ignores, for example, the complaint's "detailed timeline of the encampment's creation and expansion." FAC ¶¶94-95. It ignores that Defendants supported teams whose express "purpose" "was to intimidate members of the Jewish community and deny them access" to a Jewish "exclusion zone." *Id.* ¶118. It ignores allegations about AMP's "structure" and its relationship to the other Defendants—including Bazian and Abuirshaid, two of AMP's leaders. *Id.* ¶¶38-39, 42-43. It ignores AMP's role in "provid[ing] financial support and organizational capacity" to those engaged in racially motivated violence and exclusion. *Id.* ¶¶38, 41, 77, 114. And it ignores that AMP is under investigation by multiple authorities for these same activities. *Id.* ¶40. These "specific facts" show "the scope of [the] conspiracy," the "role" AMP played, and "when [and] how the conspiracy operated." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 937 (9th Cir. 2012) (en banc).

Ignoring these allegations, AMP rests its "no specific facts" argument on one unpublished opinion. That order dismissed a pro se plaintiff's complaint because it "allege[d] generally that there was an agreement … to deprive him of his constitutional rights" with no other allegations about the agreement. *Miller*, Dkt.30 at 6, No. 2:25-cv-4268. "Courts require more to plead a conspiracy." *Id.* This case has more. AMP's unexplained reliance on *Miller* shows only that the detailed allegations here suffice.

*Third*, AMP doesn't rebut the plausible inference that its participation was motivated by discriminatory animus and intended to deprive Plaintiffs of their Thirteenth Amendment rights. AMP.Mot.5-6. Again, AMP all but ignores the FAC. It addresses only one allegation: "AMP 'frequently engage[s] in rhetoric that promotes antisemitic tropes and support for violence against Israel.'" *Id.* at 6 (quoting FAC ¶41). AMP diminishes that allegation as "simply a conclusory statement of bias," again confusing factual allegations with legal conclusions. *Id.* That AMP "frequently engages" in antisemitic "rhetoric" is a factual claim the Court must take as true. *Id.* ¶41. And that claim raises a plausible *inference* that AMP's participation in the antisemitic conspiracy was animated by "racial … animus" and "aimed at interfering with" Plaintiffs' rights against racially motivated violence and exclusion. *Bray*, 506 U.S. at 268. That's not the only allegation that raises a plausible inference of racial discrimination. Providing "material and operational support" to an inherently discriminatory project is itself evidence that AMP was in on the discrimination. FAC ¶114. That's why AMP has been "under investigation for potential terrorist fundraising" and facilitating the precise kind of racially discriminatory violence and exclusion at issue here—"involvement in planning, organizing, and funding" campus encampments that "posed significant threats to campus safety." *Id.* ¶¶40-41. Each fact makes the inferences of intent and discriminatory animus more plausible.

AMP's cited precedents distinguish themselves. The "conclusory statement of bias" in *Appling v. City of Los Angeles* was a single sentence claiming that "there were different and unconstitutional standards afforded to [the plaintiff] because he is a black American." 701 F. App'x 622, 626 (9th Cir. 2017). Even that claim made it past the pleading stage—it

failed on "summary judgment." *Id.* Another pro se complaint, in *Molina v. Diaz*, didn't allege "that Defendants were motivated by a racial or class-based, invidiously discriminatory animus." 2021 WL 6125847, at *7 (C.D. Cal. Dec. 28). But AMP's race-based antisemitic conduct is front-and-center. *E.g.*, FAC ¶¶40-41. The final unpublished opinion, *Jones v. County of San Bernardino*, dismissed a complaint that "merely repeat[ed] variations of the allegation that Defendants 'conspired' to deny Plaintiffs' constitutional rights but provide[d] no facts to support an inference that Defendants conspired, or shared any common goal, to deprive Plaintiffs of their constitutional right to familial association." 2021 WL 12251634, at *4 (C.D. Cal. Oct. 15). These authorities only confirm that the specific allegations here aren't merely "conclusory statement[s] of bias."

In any event, at the pleading stage Plaintiffs don't need to "show any communication or agreement." *Contra id.* "'A conspiracy can be inferred from conduct and need not be proven by evidence of an express agreement.'" *Scott*, 140 F.3d at 1284. The amended complaint alleges AMP's specific role in the conspiracy to deprive Plaintiffs of their rights, which suffices at this stage. AMP's continued reliance on unpublished pro se cases doesn't rebut that fact. *See Leishman v. Wash. Off. of Att'y Gen.*, 2025 WL 957896, at *2 (9th Cir.). The Court should deny AMP's motion to dismiss Plaintiffs' deprivation claim.

**Hindrance Clause.** AMP doesn't contest that Plaintiffs' hindrance claim arises from Plaintiffs' "exercise of a constitutional right." *Operation Rescue*, 8 F.3d at 687. AMP disputes only the first two elements of liability under the hindrance clause. Again, AMP ignores the allegations of the FAC.

*First*, the FAC alleges that Defendants conspired to interfere with law enforcement. From the beginning, encampment organizers drew "'a clear

militant line of needing to fight the police.'" FAC ¶8. One organizer said that "'the most liberating and radicalizing part of the UCLA encampment was fighting the Zionists *and police*.'" *Id.* Organizers repeatedly clashed with law enforcement, resisting arrest and coordinating efforts "to 'kettle' groups of police" by trapping them in a confined space. *Id.* ¶¶14-17. Organizers 'physically and forcibly resist[ed] attempts by police to restore order." *Id.* ¶105. These allegations support a plausible inference that "the *purpose* of the conspiracy," not merely its "*effect*," was "to interfere with state law enforcement." *Operation Rescue*, 8 F.3d at 685. AMP ignores those allegations.

Instead, AMP argues that the FAC doesn't allege "that *AMP* had the goal of interfering with state law enforcement." AMP.Mot.7. That argument defies the "common sense" of "civil conspiracy" claims. *John Wiley & Sons v. Rivadeneyra*, 179 F. Supp. 3d 407, 412 (D.N.J. 2016). "Though civil conspiracy requires an underlying unlawful act, it does not require that each conspirator separately commit that act." *Id.* (addressing civil conspiracy to commit fraud); *accord Page v. Clark Cnty. Fire Dist. 6*, 733 F. Supp. 3d 1006, 1021 & n.2 (W.D. Wash. 2024) (applying 42 U.S.C. §§1985, 1986). The cases AMP relies on say as much: "In order to state a cause of action under the deprivation clause, *the conspiracy* must be for the purpose of depriving the person or class of persons" of their constitutional rights. *Operation Rescue*, 8 F.3d at 682 (emphasis added). Plaintiffs need not allege that each Defendant independently intended to interfere with law enforcement, so long as they plead that was "the purpose of the *conspiracy*." *Id.* at 685 (emphasis added). Plaintiffs' claims—unaddressed by AMP—allege at least that much.

*Second*, the Amended Complaint alleges discriminatory animus. AMP triples down on its mistaken arguments. It focuses on one allegation about AMP's antisemitic rhetoric, AMP.Mot.8, to the exclusion of others alleging discriminatory animus, *see supra* 9-11. AMP calls it a "sweeping, conclusory allegation," AMP.Mot.8, again confusing factual claims for legal conclusions. And AMP ignores that the encampment's purpose from the very beginning were to discriminate against and intimidate Jewish students, staff, and faculty, and to prevent law enforcement from protecting the victims of that discrimination. *See supra* 9-11, 11-23. "You have no evidence that our involvement in the KKK rally was motivated by racial animus" is hardly a defense to liability under the KKK Act. Likewise, AMP can't hide behind innocuous acts like "funding" and "supporting" when its funding and support goes toward a project the fundamental feature of which was racially motivated violence and exclusion. *See supra* 9-11. The Court should also deny AMP's motion to dismiss as to Plaintiffs' hindrance clause theory.

## B.    Bazian and Abuirshaid—§1986.

Bazian and Abuirshaid do not dispute the test for §1986 liability. Such claims are "dependent upon the existence of a claim under §1985." *Sines*, 324 F. Supp. 3d at 798. The elements are (1) being "aware of a [§1985] conspiracy," (2) having the "power to prevent or aid in preventing the commission of the same," and (3) "neglect[ing] or refus[ing] to do so" such that an act in furtherance of the conspiracy that could have been prevented by "reasonable diligence" causes an injury. *Id.* Because the "nature of conspiracy typically precludes direct evidence or a 'blueprint' of the conspiratorial plan, … firsthand knowledge is not required." *Clark v. Clabaugh*, 20 F.3d 1290, 1296 (3d Cir. 1994).

**Hatem Bazian.** Bazian's motion begins with more of the same, arguing the FAC fails to state a conspiracy claim against AMP. Bazian.Mot.3-4. But Plaintiffs have already shown that AMP's motion should be denied. Bazian also misses the mark because Plaintiffs need not have pleaded a §1985(3) conspiracy against AMP to show that Bazian—the "founder of AJP/AMP and the Chairman of AMP's Board of Directors" as well as the person who serves as AMP's "President" and "chief executive officer" and thus "supervises and controls the organization's affairs and the activities of its officers," FAC ¶42—both knew of and "neglect[ed] or refuse[d]" to "prevent or aid in preventing" the conspiracy by withdrawing AMP's support for NSJP, 42 U.S.C. §1986; *Clark*, 20 F.3d at 1298 ("§1986 is not directed towards the person who causes a §1985 violation" but instead the person who "'fails to take action to frustrate its execution'" despite the means to do so).

The FAC alleges that "AMP was significantly involved in the creation of NSJP" and that NSJP used AMP's contact information as its own. FAC ¶39. That AMP's annual conference features a "Campus Activism Track … designed and led by former SJPers" designed to strengthen NSJP chapters around the country. *Id.* ¶41. And that AMP employs Taher Herzallah as its "Associate Director of Outreach & Community Organizing," where he is charged with acting as a "liaison" to NSJP chapters around the country and "coordinating AMP's grassroots organizing to facilitate national coalition building." *Id.* ¶169. Herzallah's job includes "coordinating AMP's support" for NSJP and its efforts to "build a nationwide coalition of 'Popular University for Gaza encampments on college campuses," *id.*, which the FAC alleges resulted in AMP providing "at least some support" to NSJP (both national leadership and individual chapters located in California that were

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

involved in the encampment or part of UC Divest), *id.* ¶77. Bazian "regularly communicated with and received reports from" Herzallah, together with Abuirshaid. *Id.* ¶169.

Bazian argues that these specific factual allegations are "broad assertions with no details" that fail to establish his "actual knowledge" of the conspiracy Plaintiffs describe. Bazian.Mot.4. But the case he relies on for the "actual knowledge" proposition, *Clark v. Clabaugh*, makes clear that "firsthand knowledge is not required." 20 F.3d at 1296. In fact, that the defendants in *Clark might* have heard "rumors" of a race riot beforehand was enough for the Court of Appeals to reverse a grant of summary judgment and send the §1986 claims to a jury. *Id.* at 1295-98. If potentially circulating rumors create a jury question on knowledge, then AMP's active and sustained involvement in NSJP's operations support a plausible inference that AMP's leadership knew what the groups that it was supporting were doing with that support.

Bazian relies on two other out-of-circuit cases that help Plaintiffs, not Bazian. *See* Bazian.Mot.4. *Bowie v. Maddox* "vacate[d] the dismissal" of the plaintiff's §1986 claims and said nothing substantive other than quoting the statute's text. 642 F.3d 1122, 1128 (D.C. Cir. 2011). And *Hampton v. Hanrahan* vacated several directed defendant verdicts on §1986 claims because "[a]lthough they were not active participants in the [conspiracy, the defendants] took no steps to correct it." 600 F.2d 600, 629 (7th Cir. 1979), *rev'd in part* 446 U.S. 754 (1980); *see also id.* (other directed verdicts improper because the defendants "made no attempt to prevent the irregular conduct of the investigation"). These holdings—at much later stages in a lawsuit—only show that Plaintiffs' claims satisfy Rule 8.

Bazian's "power to prevent" argument fails for similar reasons. Bazian.Mot.5. The FAC alleges that AMP has been heavily involved in NSJP's operations ever since AMP founded it more than a decade ago, including by providing support to specific NSJP chapters with direct ties to the UCLA encampment. FAC ¶¶41, 77, 169. As AMP's "President" and "chief executive officer," Bazian had the power to "supervis[e] and contro[l] the organization's affairs and the activities of its officers." *Id.* ¶42. As the FAC alleges, the head of an organization supporting a conspiracy like this one could have instructed his subordinates to "cease using AMP resources to support [NSJP], its national push for antisemitic campus encampments as part of the 'Popular University for Gaza,' and the UCLA campus encampment specifically." *Id.* ¶171. Bazian could have also instructed his subordinates to "condition any continued support for [NSJP] on disavowal of the racialized violence and area-denial tactics that made the UCLA encampment so harmful to the Jewish community." *Id.*

Given AMP's long history and close relationship with NSJP, it is at least plausible that taking either step would have mattered to quelling the illegal conduct. "[N]eglect[ing] or refus[ing]" to do so, whether out of sympathy for the conspirators or ordinary negligence, resulted in NSJP proceeding full steam ahead with the racially motivated violence and exclusion tactics that caused Plaintiffs' injuries. The Court should thus deny Bazian's motion.

***Osama Abuirshaid.*** Abuirshaid's personal jurisdiction arguments fail because the FAC alleges facts supporting a plausible inference that the effects of neglecting or refusing to aid in preventing the conspiracy would foreseeably be felt in California, where the groups AMP supported were located. Abuirshaid's substantive arguments are identical to Bazian's, and

they fail for the same reasons. *Compare* Bazian.Mot.3-5, *with* Abuirshaid.Mot.9-11. In short, Plaintiffs have shown that the FAC contains specific allegations regarding AMP's long-running relationship with NSJP. Those allegations make it at least plausible that Abuirshaid—AMP's Executive Director—knew that AMP was "coordinating … support" for NSJP and its efforts to "build a nationwide coalition of 'Popular University for Gaza encampments on college campuses," FAC ¶169, which resulted in AMP providing "at least some support" to NSJP elements directly involved in the UCLA encampment, *id.* ¶77. Abuirshaid likewise disputes the allegation that he could have instructed Herzallah to either "cease using AMP resources to support [NSJP], its national push for antisemitic campus encampments as part of the 'Popular University for Gaza,' and the UCLA campus encampment specifically," FAC ¶171, or "condition any continued support for [NSJP] on disavowal of the racialized violence and area-denial tactics that made the UCLA encampment so harmful to the Jewish community." *Id.*; Abuirshaid.Mot.10-11. But Abuirshaid's finger pointing doesn't make the conspiracy any less plausible, especially since Plaintiffs allege that Bazian and Abuirshaid run the organization together. *Id.* ¶¶43, 77, 169.

To the contrary, that AMP's two heads cannot agree that at least *one of them* had the power to change AMP's policy is implausible at best. Even if discovery reveals that AMP's highest officers were powerless to check an associate director of outreach, it's at least plausible at this stage that Bazian and Abuirshaid had the power to control organizational policy and supervise a subordinate's performance. And because those actions would have plausibly influenced NSJP's behavior in perpetuating the racially

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

1  motivated violence and exclusion that injured Plaintiffs, the Court should
2  deny Abuirshaid's motion to dismiss.

### CONCLUSION

The Court should deny the Defendants' motions to dismiss. If the
Court concludes that personal jurisdiction over WESPAC is uncertain, it
should allow for jurisdictional discovery against WESPAC focused on the
nature and scope of its fiscal sponsorship agreement with NSJP.

Finally, if the Court is inclined to grant any of the motions, it should
allow Plaintiffs leave to amend. Federal courts "should freely give leave [to
amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "This policy is to
be applied with extreme liberality." *Hoang v. Bank of Am., N.A.*, 910 F.3d
1096, 1102 (9th Cir. 2018). Thus, courts "may decline to grant leave to
amend only if there is strong evidence of 'undue delay, bad faith or dilatory
motive on the part of the movant, repeated failure to cure deficiencies by
amendment previously allowed, undue prejudice to the opposing party by
virtue of allowance of the amendment, [or] futility of amendment, etc.'"
*Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma County*, 708 F.3d 1109,
1117 (9th Cir. 2013). No such evidence exists here, and there is no argu-
ment that Plaintiffs' claims fail as a matter of law.[5]

---

[5] To give just one example of an area where Plaintiffs could plead additional rel-
evant facts, Plaintiffs have elected not to recite the exhaustive corpus of PCC's and
NSJP's social medial activity, which amounts to hundreds of Twitter/X and Instagram
posts directly related to the UCLA encampment and subsequent efforts to reestablish
it. If the FAC's detailed allegations of the planning, coordination, and organization that
went into the encampment left anything to doubt about the existence of a conspiracy
(and they do not), this corpus would provide a significant number of additional data-
points in support of Plaintiffs' claims. To give another, Plaintiffs could plead additional
facts about NSJP's relationship to WESPAC based on NSJP's website, which contained
a WESPAC donation link.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED: November 24, 2025        BROWN WEGNER LLP
                                CONSOVOY MCCARTHY PLLC
                                THE LOUIS D. BRANDEIS CENTER
                                FOR HUMAN RIGHTS UNDER LAW


                                        By: /s/ Thomas R. McCarthy*
                                        Willam J. Brown, Jr.
                                        Zachary P. Grouev*
                                        Julius Kairey*
                                        Richard A. Rosen *
                                        Omer Wiczyk *

                                        Attorneys for Plaintiffs

**PLAINTIFFS' OMNIBUS**                    49
**OPPOSITION TO DEFENDANTS'**
**MOTIONS TO DISMISS**

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record for Plaintiffs certifies that this opposition contains 13,895 words, which complies with the word limit of L.R. 11-6.1 for memoranda of points and authorities, as modified by this Court's order to permit a brief of no more than 14,000 words.

Dated: November 24, 2025

/s/ Thomas R. McCarthy
Thomas R. McCarthy

1

## <u>CERTIFICATE OF SERVICE</u>

2  The undersigned counsel of record for Plaintiffs certifies that a true

3  and correct copy of the foregoing was electronically filed and served upon all

4  counsel of record. Parties may access this filing through the Court's

5  CM/ECF System.

6

7  Dated: November 24, 2025                    /s/ Thomas R. McCarthy

8                                                           Thomas R. McCarthy

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28