MARK KLEIMAN (S.B.N. 115919)
KLEIMAN / RAJARAM
12121 WILSHIRE BOULEVARD, # 810
LOS ANGELES, CA 90025
TELEPHONE: (310) 392-5455
FACSIMILE: (310) 306-8491
EMAIL: mark@krlaw.us

Attorneys for Defendant
NATIONAL STUDENTS FOR
JUSTICE IN PALESTINE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW WEINBERG, et al.,<br><br>Plaintiffs,<br>vs.<br>NATIONAL STUDENTS FOR<br>JUSTICE IN PALESTINE, et al.,<br><br>Defendants. | Case No. 2:25-cv-03714 MCS (JCx)<br><br>Hon. Mark C. Scarsi<br>Courtroom 7C<br><br>**DECLARATION OF MARK KLEIMAN IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER**<br><br>Date:    January 26, 2026<br>Time:    9:00 a.m.<br>Dept;    7C<br><br>Complaint Filed:  April 25, 2025 |

1

## <u>DECLARATION OF MARK KLEIMAN</u>

I, Mark Allen Kleiman, hereby declare as follows:

1. I am an attorney at law duly licensed to practice before this Court.  If called upon to do so, I could and would testify competently to the following based upon firsthand knowledge.

2. Attached hereto as Exhibit "A" is a true and correct copy of the First Set of Requests for Production of Documents, complete with a 3,000+ word set of definitions and instructions.

3. Attached hereto as Exhibit "B" is a true and correct copy of the Second Set of Requests for Production of Documents, complete with a 3,000+ word set of definitions and instructions

4. Attached hereto as Exhibit C is the First Set of Interrogatories, with only 2,700 words and 17 pages of instructions and definitions.

5. Attached hereto as Exhibit D is a true and correct copy of the First Amended Complaint in <u>Boosinger v. Regents, et al</u>., which includes over a dozen first-person accounts of students brutalized at the Solidarity Encampment merely because of their support for Palestine.

6. The parties met and conferred about this motion last week.  During the conference I asked if the plaintiffs would at least agree not to oppose our request that the declarations of people who have already been traumatized by being doxed be allowed to file their declarations under seal.  Although Plaintiffs' counsel promised to get back to me about this, they never did so a motion for leave to file the declarations under seal is being submitted separately.

I declare under penalty of perjury that the foregoing is true and correct. Executed this fifth day of January, 2026, at Los Angeles, California.

_____

Mark Kleiman

2

DECLARATION OF MARK KLEIMAN IN SUPPORT OF
MOTION FOR A PROTECTIVE ORDER

# EXHIBIT A

**IN THE DISTRICT COURT OF THE**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW WEINBERG, et al., <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, et al., <br><br> Defendants. | Case No.: 2:25-cv-03714-MSC-JCx |

**PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT NATIONAL STUDENTS FOR JUSTICE IN PALESTINE**

In accordance with Federal Rule of Civil Procedure 34, Section 8.b. of the Court's Standing Order (Dkt.28), and the Court's order of November 10, 2025 (Dkt.77), Plaintiffs request that Defendant National Students for Justice in Palestine respond to the following requests for production within 30 days.

**INSTRUCTIONS**

1.     These requests are governed by Federal Rules of Civil Procedure, the Central District of California's Local Rules, and the Court's Standing Order.

1

2.    **Method of Response and Production:** The responses and documents produced in response to these requests shall be provided via email sent to twilson@consovoymccarthy.com, julius@consovoymccarthy.com, and owiczyk@brandeiscenter.com in emails not to exceed 20 MB each or via a secure file transfer platform (*e.g.*, Box.com). To the extent responses cannot be served via email or a secure file transfer platform, please contact the undersigned to make different arrangements.

3.    **Format for Producing Documents:** Except as noted below, all documents shall be produced in native format with appropriate load files.

4.    Documents produced in native should include native file links and corresponding images. All documents must contain a bates number and file names of native files should reflect the production bates number. File names shall not contain embedded spaces. Bates numbers should be endorsed on the lower right corner of all images.

5.    All hidden text such as track changes, hidden columns, etc., should be expanded and rendered.

6.     Any data or files that are encrypted or password protected should be decrypted and/or passwords removed prior to production. If a password cannot be removed, the password must be provided.

7.     Provide the documents in a native format that is compatible with MS Office, if possible. Please contact counsel for Plaintiffs if files cannot be produced in an MS Office compatible format.

8.     Provide a data file (.DAT) containing fielded information to be loaded into a database for all documents in a production. While hard copy documents may not have fielded information (i.e. metadata), these documents should also be referenced in the .DAT file with as much fielded information as reasonably possible. The first line of a .DAT file must contain a header row identifying field names. All family relationship should be preserved, and all family documents should be produced.

9.     Attachments shall sequentially follow the parent document or email and the relationship should be identified using Parent ID and Attachment ID fields.

10.    All metadata associated with native documents, emails, and media files must be produced. The data load file should include, at a minimum, the metadata fields listed below. Date fields should be

provided in the format MM/DD/YYYY and should be the same format throughout the field.

| Field Position | Field Name | Type | Description/Metadata |
|---|---|---|---|
| 1 | BEGDOC | Paragraph | Beginning bates number |
| 2 | ENDDOC | Paragraph | Ending bates number |
| 3 | BEGATTACH | Paragraph | Beginning bates number of family |
| 4 | ENDATTACH | Paragraph | Ending bates number of family |
| 5 | ATTCOUNT | Paragraph | Attachment count |
| 6 | PARENTID | Paragraph | Bates number of family parent |
| 7 | DOCDATE | Date | Date of document or creation date (MM/DD/YYYY) |
| 8 | DATESENT | Date | Date Email Sent (MM/DD/YYYY) |
| 9 | TIMESENT | Time | Time Email Sent (HH:MM:SS AM/PM) |
| 10 | DATERECEIVED | Date | Date Email Received (MM/DD/YYYY) |
| 11 | TIMERECEIVED | Time | Time Email Received (HH:MM:SS AM/PM) |
| 12 | TIMEZONE | Paragraph | Time zone used to process custodian data |
| 13 | AUTHOR | Paragraph | Who created document (LASTNAME, FIRST) |
| 14 | FROM | Paragraph | Who is document sent from (LASTNAME, FIRST) |
| 15 | TO | Paragraph | Who is document sent to (LASTNAME, FIRST) |
| 16 | CC | Paragraph | Who is copied on document (LASTNAME, FIRST) |
| 17 | BCC | Paragraph | Who is blind copied on document (LASTNAME, FIRST) |
| 18 | DOCTYPE | Paragraph | What type of document this is (e.g., Message or attachment) |
| 19 | FILEEXT | Paragraph | File Extension (e.g., .msg or .doc) |
| 20 | EMAILSUBJECT | Paragraph | Email subject line |
| 21 | EMAIL MESSAGE ID | Paragraph | Message ID for email |
| 22 | FILENAME | Paragraph | Original file name |
| 23 | LASTMOD | Date | Date last modified (MM/DD/YYYY) |
| 24 | CUSTODIAN | Paragraph | Custodian (LASTNAME, FIRST) |
| 25 | SOURCE | Paragraph | Where did document come from? |
| 26 | ORIGFOLDER | Paragraph | Original file folder (e.g., Personal Folders\Deleted Items\) |
| 27 | PAGES | Number | Number of pages in document |

11.    For handwritten documents, or documents containing handwriting, identify the author of the handwriting to the extent that the identity of the author of the handwriting is known.

12.     Digital photographs shall be submitted as single-page JPEG files with a resolution equivalent to the original image as it was captured/created. All associated metadata and text fields shall be produced as well. All digital videos shall be submitted as native files with associated metadata and an accompanying single page "PLACEHOLDER" image.

13.     For documents written in a foreign language, produce all translations of that document into English.

14.     Any modifications or deviations from these production specifications may only occur upon agreement between the parties.

15.     **Documents No Longer in Your Possession, Custody, or Control.** When a requested document was in your possession, custody, or control, but is no longer, state with particularity the efforts made to locate the document and the specific reason for its disappearance or unavailability, including: (1) the date of disposition; (2) how the document was disposed; (3) the name, current address, and telephone number of each person who authorized said disposition or had knowledge of said disposition; and (4) if, upon information and belief, a copy of the document exists outside your custody or control, state the name, current

address, and telephone number of the person who has possession, custody, or control over the document.

16. **Scope.** This request includes all documents in the possession, custody, or control of the responding party, companies under its control, attorneys, former attorneys, accountants, financial advisors, investigators, agents, employees, or other representatives or proxies of the party. A party must include in its responses documents which, while not within its own possession, are nonetheless within the party's custody or control, or reasonably available to the party, the party's agents, or the party's attorney.

17. **Asserting Claim of Privilege.** For any document, or part thereof, that contains information responsive to any request set forth below that you seek to withhold under a claim of privilege: (a) redact the information being withheld for privilege and indicate on the produced document where you have redacted information; and (b) for each document withheld or redacted under a claim of privilege, provide an index with the following information: (i) type and date of the document; (ii) document title and description of the subject matter of the document; (iii) name and position of each author, preparer (other than

6

stenographical or clerical personnel), sender, addressee, and recipient of the document; (iv) statement of the exact privilege being claimed, the topic discussed, and the specific facts that form the basis upon which the privilege is claimed. You must provide the information requested in this instruction with sufficient specificity to enable counsel for the Plaintiffs and the Court to assess the applicability of the privilege.

18. **Objections.** You should state with specificity the grounds of any objection to all or part of a request. If you believe that only part of a request is objectionable, make your objection and then respond to the request to the extent not objectionable.

19. **Supplementation.** Pursuant to Fed. R. Civ. P. 26(e)(1), Plaintiffs request that the responses to these requests be supplemented if further information is obtained.

20. **Period at Issue.** Unless otherwise specifically stated, the period at issue covered by these requests begins on January 1, 2023, and runs through the present day.

21. If there are questions regarding these requests, please contact counsel for Plaintiffs well in advance of the deadline for production.

## DEFINITIONS

1. **NSJP, You, Your, and Yours.** The terms "NSJP," "You," "Your," and "Yours," refer to Defendant National Students for Justice in Palestine, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, NSJP's UCLA Chapter, Students for Justice in Palestine, University of California—Los Angeles, Graduate Students for Justice in Palestine, University of California—Los Angeles, and SoCalSJP.

2. **People's City Council.** The terms "People's City Council" and "PCC" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, the

8

entity with which Ricci Sergienko, Albert Corado, and Jason Reedy are or were affiliated.

3.    **American Muslims for Palestine.** The terms "American Muslims for Palestine" and "AMP" refer to AJP Educational Foundation, Inc., the 501(c)(3) nonprofit organization doing business under the name "American Muslims for Palestine" and that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

4.    **WESPAC.** The term "WESPAC" refers to WESPAC Foundation, Inc., the 501(c)(3) nonprofit organization that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. This term includes, but is not limited to, the entity that served as NSJP's fiscal sponsor, including under a letter dated July 27,

9

2023. *See* Dkt.1 (Compl.) ¶35, *ANI v. WESPAC*, No. 7:25-cv-1320 (S.D.N.Y. Feb. 13, 2025).

5. **National Faculty for Justice in Palestine:** The terms "National Faculty for Justice in Palestine" and "NFJP" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

6. **UC Divest Coalition.** The terms "UC Divest Coalition" and "UC Divest" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not

10

limited to, the entity of the same name of which NSJP National Steering Committee member Dylan Kupsh was a founding member.

7.     **Unity of Fields.** The term "Unity of Fields" refers to the unincorporated association of the same name, which was formerly known as the United States branch of "Palestine Action" (a UK-based group that has been designated a terrorist organization by the British government), its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.     **Person.** The term "person" shall include individuals, partnerships, joint ventures, firms, associations, proprietorships, corporations, or other such entities, along with their subsidiaries and divisions, and the individual members, employees, and agents thereof.

9.     **Officer.** The term "officer" shall include any person with a formal or informal position of authority, function, or title. As applied to

11

NSJP, it includes, but is not limited to, any person serving on a committee, a steering committee, or the National Steering Committee.

10. **Committee.** The term "committee" shall include any committee, subcommittee, board, panel, or similar group of persons, officers, employees, volunteers, agents, or representatives that is organized to perform an official or unofficial function.

11. **Steering Committee.** The term "steering committee" means any committee that exercises control over a portion of the operations of NSJP or its subdivisions. The phrase includes, but is not limited to: (1) the National Steering Committee; (2) all steering committees associated with NSJP; and (3) all steering committees associated with NSJP's UCLA Chapter and SoCal SJP.

12. **The National Steering Committee.** The term "National Steering Committee" refers to the committee that exercises overall control over NSJP and of which: (1) Dylan Kupsh is a former member; and (2) Sean Eren and Carrie Zaremba are (or were) members.

13. **The Popular University for Gaza.** The term "Popular University for Gaza" refers to the "coordinated pressure campaign" based on "establishing autonomous zones on … university campuses" that was

12

officially launched by NSJP in a statement on April 20, 2024. *National SJP Launches The Popular University for Gaza*, NSJP (Apr. 20, 2024), perma.cc/8WS8-KJXG.

14. **The Campus Support Coalition.** The term "Campus Support Coalition" refers to the "collective of organizations managed by [NSJP] that work together to support students fighting for Palestinian liberation on university campuses." *Campus Support Coalition*, NSJP (last visited Dec. 3, 2025), bit.ly/4pPl7oe.

15. **The UCLA Encampment.** The term "the UCLA encampment" refers to the encampment that was present near Royce Quad between April 25, 2024, and May 2, 2024.

16. **Efforts to Reestablish the UCLA Encampment:** The term "efforts to reestablish the UCLA encampment" means any action taken on or after May 2, 2024, with the purpose of: reestablishing the UCLA encampment or establishing another encampment on or around UCLA's campus with a similar form or function to the UCLA encampment. Examples of efforts to reestablish the UCLA encampment include, but are not limited to: (1) the May 6 attempt to "occupy" and vandalize Moore Hall; and (2) and the June 10 efforts to "set up an unauthorized and

13

unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" at the top of the Janss Steps, at Kerckhoff Patio, and around UCLA Law School.

17.    **Agents.** The term "agents" includes, but is not limited to, attorneys, accountants, professionals, and other representatives.

18.    **Document.** The term "document" shall be liberally construed to include, but is not limited to, all of the following items, whether written or produced by hand; printed, written, produce, recorded, or reproduced by any mechanical process; electronically or magnetically recorded or stored; recorded upon any tangible thing; or stored in any retrievable form by means of communication, representation, or data retention not otherwise described in this paragraph: agreements; draft agreements; contracts; draft contracts; correspondence; memoranda; summaries or records of personal conversations, interviews or statements; diaries; desk calendars; graphs; reports; computer tapes; computer disks; computer files; computer printouts; electronic mail communications (e-mails); electronic text communications (e.g., Discord, Signal, SMS, Slack, Sametime, Teams, Telegram, and other messaging software and applications), summaries or records of any meetings; conferences;

14

summaries or records of investigations or audits; summaries of any negotiations; opinions of consultants; photographs; motion picture films; video tapes; magnetic tapes; audio cassettes; microfilm; microfiche; brochures; pamphlets; advertisements; circulars; press releases; drafts; checks; letters; telegrams; cables; telexes; facsimiles; telecopies; judicial records; maps; financial statements; drafted financial statements; trial balances; general ledgers; subsidiary ledgers; financial journals; worksheets; work papers; receipts; invoices; registers; registrations; filings; statements; bank statements; brokerage statements; insurance policies; credit reports; appraisals; confirmations; surveys; budgets; forecasts; tax returns; blueprints; diagrams; specifications; licenses; and all other forms of media involving the transmission, representation, communication, or storage of information, including writings that constitute a translation into any language other than the language in which the original exists. Furthermore, different versions of a document (including, but not limited to drafts, revisions, or versions with notes and/or marks not found on the original or other copies) shall be considered distinct documents that must be produced.

19.    **Communication.** The term "communication" shall be liberally construed to include, but is not limited to, the transmission of all written, electronic, or verbal discussions, correspondence, statements, conversations, ideas, memoranda, notations, letters, notices, and documents.

20.    **Relating and/or Concerning.** The terms "relating to," "related to," "relates to" or "concerning" a subject shall mean any document or communication that constitutes, contains, embodies, evidences, reflects, supports, undermines, negates, contradicts, concerns, identifies, states, refers to, regards, records, deals with, describes, or pertains to that subject.

21.    **Each and/or Every.** The term "each" shall be construed to include the term" "every," and the term "every" shall be construed to include the term "each," as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

22.    **Any and/or All.** The term "any" shall be construed to include the term "all," and the term "all" shall be construed to include the word

"any," as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

23. **Identify.** The term "identify" means,

(1) With respect to a person, to provide that person's (i) full name; (ii) current address and telephone number; (iii) current employer; (iv) current business address and telephone number; (v) job or volunteer position; (vi) job or volunteer duties.

(2) With respect to a person who is serving or has served as an officer, employee, contractor, volunteer, representative, or other agent of NSJP or its subdivisions, to additionally provide: (i) a complete description of the responsibilities of such position; (ii) the date upon which the person assumed such position; (iii) if the person's service in such position has lapsed, the date upon which service lapsed and the person (if any) who subsequently held the position; and (iv) if the person is presently serving, the date (if any) upon which the position is expected to lapse and the person (if any) who is expected to next fill the position.

17

(3)     When a request asks that a writing, document, or record of any kind be identified, provide the following information about such writing, document, or record: (i) the title; (ii) the identity of the person in possession, custody, or control of the document; and (iii) the identity of all persons mentioned in, who were signatories to or authors of, or who were present at the formation or execution of the writing, document, or record. If the writing, document or record has been destroyed or lost and all copies thereof have been destroyed or lost, state: (i) the date of destruction or loss; (ii) whether it has been transferred voluntarily or involuntarily to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

(4)     When a request asks that a communication be identified, provide the following information about such communication: (i) the identities of all persons mentioned in or a signatory to, or who were present at the formation or

18

execution of the communication, including whether such persons were serving as an officer, employee, contractor, volunteer, agent, or representative of NSJP, WESPAC, AMP, PCC, Unity of Fields, or any other third party; (ii) the date and time of the communication; and (iii) the identity of the person who is in possession, custody, or control of the communication. If the communication has been destroyed or lost and all copies thereof have been destroyed or lost, additionally state: (i) the date of destruction or loss; (ii) whether it has been transferred voluntarily or involuntarily to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

24.    **Singular and Plural.** The singular form of a word shall include the plural of that word, and the plural shall include the singular, as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

19

## REQUESTS FOR PRODUCTION

1.    All documents relied upon, consulted, or referenced in your responses to Plaintiffs' first set of interrogatories, served concurrently with these requests.

2.    Documents sufficient to show Your organizational structure, including its internal structure, and Your relationship with Your UCLA Chapter, SoCal SJP, and any other chapters, subchapters, committees, steering committees or other sub-entities or divisions. This request includes but is not limited to all organizational charts, filings with any governmental entity or insurer reflecting Your organizational structure, the recordings and minutes of Your "National Call In Meetings," *see* FAC ¶82, the recordings and minutes of Your National Steering Committee meetings, and memoranda or other documents reflecting, referring or relating to Your organizational structure.

3.    All communications on the subject of Your relationship with its UCLA Chapter, SoCal SJP, and any other chapters, subchapters, committees, steering committees or other sub-entities or divisions. This request includes but is not limited to communications between NSJP and

WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

4.    All documents reflecting, referring or relating to the roles played and functions performed by Dylan Kupsh in Your organization, including but not limited to documents regarding Kupsh's role as a member of Your National Steering Committee.

5.    All communications on the subject of Dylan Kuphs's role and function in Your organization, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

6.    All documents reflecting, referring or relating to the roles played and functions performed by Sean Eren and Carrie Zaremba in Your organization, including but not limited to documents regarding their roles as members of Your National Steering Committee.

7.    All communications on the subject of Sean Eren's and Carrie Zaremba's roles and functions in Your organization, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

21

8.    All documents reflecting, referring or relating to NSJP's planning and execution of the Popular University for Gaza initiative, including but not limited to documents regarding efforts to establish encampments on college campuses around the country, efforts to use NSJP resources to fund and supply encampments, and efforts to promote encampments using NSJP social media accounts.

9.    All communications on the subject of NSJP's planning and execution of the Popular University for Gaza, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

10.    All documents reflecting, referring or relating to Jews, Judaism or any Jewish practices or beliefs, including but not limited to NSJP "toolkits," recordings and minutes of Your "National Call In Meetings," FAC ¶82, and recordings and minutes of Your National Steering Committee Meetings.

11.    All communications on the subject of Jews, Judaism or any Jewish practices or beliefs, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

22

12. All documents reflecting, referring or relating to NSJP's creation and management of the Campus Support Coalition, including but not limited to documents regarding requests for support from the Coalition, the use of donations collected through WESPAC to fund or support the Coalition, and any audits, memoranda, or other reports discussing the Coalition's performance.

13. All communications on the subject of the Campus Support Coalition, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

14. All documents reflecting, referring or relating to NSJP's involvement in the UCLA encampment, including but not limited to documents regarding: the use of NSJP's official social media accounts to promote the encampment; which members of Yours were present at the UCLA encampment or on the UCLA campus between April 1, 2024, and May 3, 2024; any supplies or funding provided by You to or for the benefit of the UCLA encampment; and the exclusion of any persons or groups of persons from the encampment.

15. All communications on the subject of the UCLA encampment, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party. This request includes but is not limited to communications with UCLA employees or representatives regarding the encampment; communications regarding encampment security, UCLA security, or law enforcement; and communications regarding the exclusion of any persons or groups of persons from the encampment.

16. All documents reflecting, referring or relating to transactions or purchases made for, on behalf of, or involving a transfer of funds related to the UCLA encampment.

17. All communications on the subject of transactions or purchases made for, on behalf of, or involving a transfer of funds relating to the UCLA encampment, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

18. All records of any meetings relating to the Popular University for Gaza, the Campus Support Coalition, the UCLA encampment, or efforts to reestablish the UCLA encampments. This request includes but

24

is not limited to notes, minutes, presentations, and any other prepared materials used during or created after such meetings.

19. All documents summarizing, commenting on, reviewing, or otherwise analyzing the events surrounding the UCLA encampment and subsequent efforts to reestablish it. This request includes but is not limited to after-actions, post-mortems, audits, and any other similar memoranda or reports.

20. All social media posts made by You or Your officers, employees, contractors, volunteers, agents, or other representatives, including but not limited to posts on Instagram, Twitter/X, Bluesky, Threads, Mastodon, Discord, and Telegram, regarding the UCLA encampment and subsequent efforts to reestablish it during the period at issue.

21. All documents reflecting, referring or relating to NSJP's involvement in efforts to reestablish the UCLA encampment, including but not limited to documents regarding: the use of NSJP's official social media accounts to promote efforts to reestablish the encampment; which members of Yours were present at efforts to reestablish the encampment or on the UCLA campus between May 3, 2024, and August 1, 2024; any

supplies or funding provided by You to or for the benefit of efforts to reestablish UCLA encampment; and the exclusion of any persons or groups of persons from the encampment; communications with UCLA employees or representatives regarding the encampment; communications regarding encampment security, UCLA security, or law enforcement; and communications regarding exclusion of any persons or groups from the encampment.

22.    All communications on the subject of efforts to reestablish the UCLA encampment, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

23.    All documents reflecting, referring or relating to AMP's involvement in NSJP's creation, funding, and operation of its national initiatives, including but not limited to documents regarding AMP's involvement in the Popular University for Gaza, the Campus Support Coalition, the UCLA encampment, and efforts to reestablish the encampment.

24.    All communications on the subject of AMP's involvement in NSJP's creation, funding, and operation of its national initiatives,

26

including, but not limited to, communications regarding AMP's involvement in the Popular University for Gaza, the Campus Support Coalition, the UCLA encampment, and efforts to reestablish the encampment to reestablish the UCLA encampment, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

25. All documents reflecting, referring or relating to the article *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, published by Unity of Fields on May 1, 2025.

26. All communications on the subject of the article *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, published by Unity of Fields on May 1, 2025. between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, including but not limited to communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party.

27.    All documents reflecting, referring or relating to Your sources of funding, including but not limited to financial statements and statements of cash flow or income and expenses (whether or not audited).

28.    All documents reflecting, referring or relating to the structure of Your fiscal sponsorship by WESPAC, including but not limited to the July 27, 2023, letter described in #4 of the definitions section.

29.    All communications between NSJP and WESPAC, AMP, PCC, NFJP, UC Divest, Unity of Fields, or any other third party relating to WESPAC's fiscal sponsorship of NSJP, including, but not limited to, communications regarding the July 27, 2023, letter.

30.    All documents reflecting, referring or relating to Your relationship with WESPAC, including but not limited to internal memoranda, reports, audits, and communications with WESPAC and Your insurer regarding the same.

31.    All documents reflecting, referring or relating to any representations made by You as to whether contributions to You are tax-deductible.

Dated: December 5, 2025

William J. Brown, Jr. (SBN 192950)
Kyle J. Berry (SBN 355393)
BROWN WEGNER LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0080
bill@brownwegner.com
kberry@brownwegner.com

Respectfully submitted,

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy (pro hac vice)
Zachary P. Grouev (pro hac vice)
Julius Kairey (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (pro hac vice)
Omer Wiczyk (pro hac vice)
LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that, on December 5, 2025, I served the foregoing Plaintiffs'

First Requests for Production to Defendant National Students for Justice

in Palestine on counsel for the parties listed below, by both email and

United States Postal Service Priority Mail:

Mark Kleiman
KLEIMAN / RAJARAM
12121 Wilshire Boulevard, #810
Los Angeles, CA 90025
Phone: 310-392-5455
Email: mark@krlaw.us

*Counsel for National Students for Justice in Palestine*

Max A. Schoening
QURESHI LAW
700 Flower St., Suite 1000
Los Angeles, CA 90017
Phone: 213-786-3478
Email: max@qureshi.law

Christina A. Jump
Samira S. Elhosary
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy., STE 1010
Richardson, TX 75080
Phone: 972-914-2507
Emails: cjump@jump-start-legal.com
selhosary@clcma.org

*Counsel for AJP Educational Foundation, Inc., Hatem Al-Bazian,
and Osama Abuirshaid*

Robert L. Herbst
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, NY 10170
Phone: 914-450-8163
Email: rherbst@herbstlawny.com

Joshua Colangelo-Bryan
HUMAN RIGHTS FIRST
121 West 36th Street, PMB 520
New York, NY 10018
Phone: 212-845-5243
Email: colangeloj@humanrightsfirst.org

Ramsey Judah
JUDAH LAW GROUP
1026 W. Foothill Blvd
Upland, CA 91786
Phone: 626-899-7667
Email: ramsey@judahlawgroup.com

*Counsel for WESPAC Foundation*

Dan Stormer
Rebecca Brown
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
Phone: 626-585-9600
Emails: dstormer@hadsellstormer.com
rbrown@hadsellstormer.com

*Counsel for People's City Council*

*/s/ Thomas R. McCarthy*

31

# EXHIBIT B

**IN THE DISTRICT COURT OF THE
CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW WEINBERG, et al., <br><br> Plaintiff, <br><br> vs. <br><br> NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, et al., <br><br> Defendants. | Case No.: 2:25-cv-03714-MSC-JCx |

**PLAINTIFFS' SECOND REQUESTS FOR PRODUCTION OF
DOCUMENTS TO DEFENDANT NATIONAL STUDENTS FOR
JUSTICE IN PALESTINE**

In accordance with Federal Rule of Civil Procedure 34, Section 8.b. of the Court's Standing Order (Dkt.28), and the Court's order of November 10, 2025 (Dkt.77), Plaintiffs request that Defendant National Students for Justice in Palestine respond to the following requests for production within 30 days.

**INSTRUCTIONS**

1.    These requests are governed by Federal Rules of Civil Procedure, the Central District of California's Local Rules, and the Court's Standing Order.

1

2.    **Method of Response and Production:** The responses and documents produced in response to these requests shall be provided via email sent to twilson@consovoymccarthy.com, julius@consovoymccarthy.com, and owiczyk@brandeiscenter.com in emails not to exceed 20 MB each or via a secure file transfer platform (*e.g.*, Box.com). To the extent responses cannot be served via email or a secure file transfer platform, please contact the undersigned to make different arrangements.

3.    **Format for Producing Documents:** Except as noted below, all documents shall be produced in native format with appropriate load files.

4.    Documents produced in native should include native file links and corresponding images. All documents must contain a bates number and file names of native files should reflect the production bates number. File names shall not contain embedded spaces. Bates numbers should be endorsed on the lower right corner of all images.

5.    All hidden text such as track changes, hidden columns, etc., should be expanded and rendered.

6.     Any data or files that are encrypted or password protected should be decrypted and/or passwords removed prior to production. If a password cannot be removed, the password must be provided.

7.     Provide the documents in a native format that is compatible with MS Office, if possible. Please contact counsel for Plaintiffs if files cannot be produced in an MS Office compatible format.

8.     Provide a data file (.DAT) containing fielded information to be loaded into a database for all documents in a production. While hard copy documents may not have fielded information (i.e. metadata), these documents should also be referenced in the .DAT file with as much fielded information as reasonably possible. The first line of a .DAT file must contain a header row identifying field names. All family relationship should be preserved, and all family documents should be produced.

9.     Attachments shall sequentially follow the parent document or email and the relationship should be identified using Parent ID and Attachment ID fields.

10.     All metadata associated with native documents, emails, and media files must be produced. The data load file should include, at a minimum, the metadata fields listed below. Date fields should be

3

provided in the format MM/DD/YYYY and should be the same format throughout the field.

| Field Position | Field Name | Type | Description/Metadata |
|---|---|---|---|
| 1 | BEGDOC | Paragraph | Beginning bates number |
| 2 | ENDDOC | Paragraph | Ending bates number |
| 3 | BEGATTACH | Paragraph | Beginning bates number of family |
| 4 | ENDATTACH | Paragraph | Ending bates number of family |
| 5 | ATTCOUNT | Paragraph | Attachment count |
| 6 | PARENTID | Paragraph | Bates number of family parent |
| 7 | DOCDATE | Date | Date of document or creation date (MM/DD/YYYY) |
| 8 | DATESENT | Date | Date Email Sent (MM/DD/YYYY) |
| 9 | TIMESENT | Time | Time Email Sent (HH:MM:SS AM/PM) |
| 10 | DATERECEIVED | Date | Date Email Received (MM/DD/YYYY) |
| 11 | TIMERECEIVED | Time | Time Email Received (HH:MM:SS AM/PM) |
| 12 | TIMEZONE | Paragraph | Time zone used to process custodian data |
| 13 | AUTHOR | Paragraph | Who created document (LASTNAME, FIRST) |
| 14 | FROM | Paragraph | Who is document sent from (LASTNAME, FIRST) |
| 15 | TO | Paragraph | Who is document sent to (LASTNAME, FIRST) |
| 16 | CC | Paragraph | Who is copied on document (LASTNAME, FIRST) |
| 17 | BCC | Paragraph | Who is blind copied on document (LASTNAME, FIRST) |
| 18 | DOCTYPE | Paragraph | What type of document this is (e.g., Message or attachment) |
| 19 | FILEEXT | Paragraph | File Extension (e.g., .msg or .doc) |
| 20 | EMAILSUBJECT | Paragraph | Email subject line |
| 21 | EMAIL MESSAGE ID | Paragraph | Message ID for email |
| 22 | FILENAME | Paragraph | Original file name |
| 23 | LASTMOD | Date | Date last modified (MM/DD/YYYY) |
| 24 | CUSTODIAN | Paragraph | Custodian (LASTNAME, FIRST) |
| 25 | SOURCE | Paragraph | Where did document come from? |
| 26 | ORIGFOLDER | Paragraph | Original file folder (e.g., Personal Folders\Deleted Items\) |
| 27 | PAGES | Number | Number of pages in document |

11.    For handwritten documents, or documents containing handwriting, identify the author of the handwriting to the extent that the identity of the author of the handwriting is known.

4

12.    Digital photographs shall be submitted as single-page JPEG files with a resolution equivalent to the original image as it was captured/created. All associated metadata and text fields shall be produced as well. All digital videos shall be submitted as native files with associated metadata and an accompanying single page "PLACEHOLDER" image.

13.    For documents written in a foreign language, produce all translations of that document into English.

14.    Any modifications or deviations from these production specifications may only occur upon agreement between the parties.

15.    **Documents No Longer in Your Possession, Custody, or Control.** When a requested document was in your possession, custody, or control, but is no longer, state with particularity the efforts made to locate the document and the specific reason for its disappearance or unavailability, including: (1) the date of disposition; (2) how the document was disposed; (3) the name, current address, and telephone number of each person who authorized said disposition or had knowledge of said disposition; and (4) if, upon information and belief, a copy of the document exists outside your custody or control, state the name, current

5

address, and telephone number of the person who has possession, custody, or control over the document.

16. **Scope.** This request includes all documents in the possession, custody, or control of the responding party, companies under its control, attorneys, former attorneys, accountants, financial advisors, investigators, agents, employees, or other representatives or proxies of the party. A party must include in its responses documents which, while not within its own possession, are nonetheless within the party's custody or control, or reasonably available to the party, the party's agents, or the party's attorney.

17. **Asserting Claim of Privilege.** For any document, or part thereof, that contains information responsive to any request set forth below that you seek to withhold under a claim of privilege: (a) redact the information being withheld for privilege and indicate on the produced document where you have redacted information; and (b) for each document withheld or redacted under a claim of privilege, provide an index with the following information: (i) type and date of the document; (ii) document title and description of the subject matter of the document; (iii) name and position of each author, preparer (other than

6

stenographical or clerical personnel), sender, addressee, and recipient of the document; (iv) statement of the exact privilege being claimed, the topic discussed, and the specific facts that form the basis upon which the privilege is claimed. You must provide the information requested in this instruction with sufficient specificity to enable counsel for the Plaintiffs and the Court to assess the applicability of the privilege.

18.   **Objections.** You should state with specificity the grounds of any objection to all or part of a request. If you believe that only part of a request is objectionable, make your objection and then respond to the request to the extent not objectionable.

19.   **Supplementation.** Pursuant to Fed. R. Civ. P. 26(e)(1), Plaintiffs request that the responses to these requests be supplemented if further information is obtained.

20.   **Period at Issue.** Unless otherwise specifically stated, the period at issue covered by these requests begins on January 1, 2023, and runs through the present day.

21.   If there are questions regarding these requests, please contact counsel for Plaintiffs well in advance of the deadline for production.

## DEFINITIONS

1.    **NSJP, You, Your.** The terms "NSJP," "You," "Your," "Yours," refer to Defendant National Students for Justice in Palestine, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, NSJP's UCLA Chapter, Students for Justice in Palestine (SJP), University of California—Los Angeles, Graduate Students for Justice in Palestine, University of California—Los Angeles, and SoCalSJP.

2.    **People's City Council.** The terms "People's City Council" and "PCC" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, the

8

entity with which Ricci Sergienko, Albert Corado, and Jason Reedy are or were affiliated.

3.     **American Muslims for Palestine.** The terms "American Muslims for Palestine" and "AMP" refer to AJP Educational Foundation, Inc., the 501(c)(3) nonprofit organization doing business under the name "American Muslims for Palestine" and that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

4.     **WESPAC.** The term "WESPAC" refers to WESPAC Foundation, Inc., the 501(c)(3) nonprofit organization that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. This term includes, but is not limited to, the entity that served as NSJP's fiscal sponsor, including under a letter dated July 27,

9

2023. *See* Dkt.1 (Compl.) ¶35, *ANI v. WESPAC*, No. 7:25-cv-1320 (S.D.N.Y. Feb. 13, 2025).

5.      **National Faculty for Justice in Palestine:** The terms "National Faculty for Justice in Palestine" and "NFJP" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

6.      **UC Divest Coalition.** The terms "UC Divest Coalition" and "UC Divest" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not

limited to, the entity of the same name of which NSJP National Steering Committee member Dylan Kupsh was a founding member.

7.    **Unity of Fields.** The term "Unity of Fields" refers to the unincorporated association of the same name, which was formerly known as the United States branch of "Palestine Action" (a UK-based group that has been designated a terrorist organization by the British government), its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8.    **Person.** The term "person" shall include individuals, partnerships, joint ventures, firms, associations, proprietorships, corporations, or other such entities, along with their subsidiaries and divisions, and the individual members, employees, and agents thereof.

9.    **Officer.** The term "officer" shall include any person with a formal or informal position of authority, function, or title. As applied to

11

NSJP, it includes, but is not limited to, any person serving on a committee, a steering committee, or the National Steering Committee.

10. **Committee.** The term "committee" shall include any committee, subcommittee, board, panel, or similar group of persons, officers, employees, volunteers, agents, or representatives that is organized to perform an official or unofficial function.

11. **Steering Committee.** The term "steering committee" means any committee that exercises control over a portion of the operations of NSJP or its subdivisions. The phrase includes, but is not limited to: (1) the National Steering Committee; (2) all steering committees associated with NSJP; and (3) all steering committees associated with NSJP's UCLA Chapter and SoCal SJP.

12. **The National Steering Committee.** The term "National Steering Committee" refers to the committee that exercises overall control over NSJP and of which: (1) Dylan Kupsh is a former member; and (2) Sean Eren and Carrie Zaremba are (or were) members.

13. **The Popular University for Gaza.** The term "Popular University for Gaza" refers to the "coordinated pressure campaign" based on "establishing autonomous zones on … university campuses" that was

12

officially launched by NSJP in a statement on April 20, 2024. *National SJP Launches The Popular University for Gaza*, NSJP (Apr. 20, 2024), perma.cc/8WS8-KJXG.

14.   **The Campus Support Coalition.** The term "Campus Support Coalition" refers to the "collective of organizations managed by [NSJP] that work together to support students fighting for Palestinian liberation on university campuses." *Campus Support Coalition*, NSJP (last visited Dec. 3, 2025), bit.ly/4pPl7oe.

15.   **The UCLA Encampment.** The term "the UCLA encampment" refers to the encampment that was present near Royce Quad between April 25, 2024, and May 2, 2024.

16.   **Efforts to Reestablish the UCLA Encampment:** The term "efforts to reestablish the UCLA encampment" means any action taken on or after May 2, 2024, with the purpose of: reestablishing the UCLA encampment or establishing another encampment on or around UCLA's campus with a similar form or function to the UCLA encampment. Examples of efforts to reestablish the UCLA encampment include, but are not limited to: (1) the May 6 attempt to "occupy" and vandalize Moore Hall; and (2) and the June 10 efforts to "set up an unauthorized and

13

unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" at the top of the Janss Steps, at Kerckhoff Patio, and around UCLA Law School.

17. **Agents.** The term "agents" includes, but is not limited to, attorneys, accountants, professionals, and other representatives.

18. **Document.** The term "document" shall be liberally construed to include, but is not limited to, all of the following items, whether written or produced by hand; printed, written, produce, recorded, or reproduced by any mechanical process; electronically or magnetically recorded or stored; recorded upon any tangible thing; or stored in any retrievable form by means of communication, representation, or data retention not otherwise described in this paragraph: agreements; draft agreements; contracts; draft contracts; correspondence; memoranda; summaries or records of personal conversations, interviews or statements; diaries; desk calendars; graphs; reports; computer tapes; computer disks; computer files; computer printouts; electronic mail communications (e-mails); electronic text communications (e.g., Discord, Signal, SMS, Slack, Sametime, Teams, Telegram, and other messaging software and applications), summaries or records of any meetings; conferences;

14

summaries or records of investigations or audits; summaries of any negotiations; opinions of consultants; photographs; motion picture films; video tapes; magnetic tapes; audio cassettes; microfilm; microfiche; brochures; pamphlets; advertisements; circulars; press releases; drafts; checks; letters; telegrams; cables; telexes; facsimiles; telecopies; judicial records; maps; financial statements; drafted financial statements; trial balances; general ledgers; subsidiary ledgers; financial journals; worksheets; work papers; receipts; invoices; registers; registrations; filings; statements; bank statements; brokerage statements; insurance policies; credit reports; appraisals; confirmations; surveys; budgets; forecasts; tax returns; blueprints; diagrams; specifications; licenses; and all other forms of media involving the transmission, representation, communication, or storage of information, including writings that constitute a translation into any language other than the language in which the original exists. Furthermore, different versions of a document (including, but not limited to drafts, revisions, or versions with notes and/or marks not found on the original or other copies) shall be considered distinct documents that must be produced.

19. **Communication.** The term "communication" shall be liberally construed to include, but is not limited to, the transmission of all written, electronic, or verbal discussions, correspondence, statements, conversations, ideas, memoranda, notations, letters, notices, and documents.

20. **Relating and/or Concerning.** The terms "relating to," "related to," "relates to" or "concerning" a subject shall mean any document or communication that constitutes, contains, embodies, evidences, reflects, supports, undermines, negates, contradicts, concerns, identifies, states, refers to, regards, records, deals with, describes, or pertains to that subject.

21. **Each and/or Every.** The term "each" shall be construed to include the term" "every," and the term "every" shall be construed to include the term "each," as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

22. **Any and/or All.** The term "any" shall be construed to include the term "all," and the term "all" shall be construed to include the word

16

"any," as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

23. **Identify.** The term "identify" means,

(1) With respect to a person, to provide that person's (i) full name; (ii) current address and telephone number; (iii) current employer; (iv) current business address and telephone number; (v) job or volunteer position; (vi) job or volunteer duties.

(2) With respect to a person who is serving or has served as an officer, employee, contractor, volunteer, representative, or other agent of NSJP or its subdivisions, to additionally provide: (i) a complete description of the responsibilities of such position; (ii) the date upon which the person assumed such position; (iii) if the person's service in such position has lapsed, the date upon which service lapsed and the person (if any) who subsequently held the position; and (iv) if the person is presently serving, the date (if any) upon which the position is expected to lapse and the person (if any) who is expected to next fill the position.

17

(3)    When a request asks that a writing, document, or record of any kind be identified, provide the following information about such writing, document, or record: (i) the title; (ii) the identity of the person in possession, custody, or control of the document; and (iii) the identity of all persons mentioned in, who were signatories to or authors of, or who were present at the formation or execution of the writing, document, or record. If the writing, document or record has been destroyed or lost and all copies thereof have been destroyed or lost, state: (i) the date of destruction or loss; (ii) whether it has been transferred voluntarily or involuntarily to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

(4)    When a request asks that a communication be identified, provide the following information about such communication: (i) the identities of all persons mentioned in or a signatory to, or who were present at the formation or

18

execution of the communication, including whether such persons were serving as an officer, employee, contractor, volunteer, agent, or representative of NSJP, WESPAC, AMP, PCC, Unity of Fields, or any other third party; (ii) the date and time of the communication; and (iii) the identity of the person who is in possession, custody, or control of the communication. If the communication has been destroyed or lost and all copies thereof have been destroyed or lost, additionally state: (i) the date of destruction or loss; (ii) whether it has been transferred voluntarily or involuntarily to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

24. **Singular and Plural.** The singular form of a word shall include the plural of that word, and the plural shall include the singular, as necessary to bring within the scope of these requests information that might otherwise be construed to be outside their scope.

19

## REQUESTS FOR PRODUCTION

32. All communications to or from the following email address: finance@nationalsjp.org.

33. All communications between SJP, NSJP, any member of NSJP's steering committee, or NSJP's UCLA Chapter and WESPAC's board of directors. For purposes of this request, "WESPAC's board of directors" means Howard Horowitz, Marina Guvenc, Andom Ghebreghiorgis, Jeanne Shaw, Latifa Williams, Gayle Dunkelberger, and Ema Froning, and any other individual who served on WESPAC's board of directors during the relevant time period.

34. Any version of the fiscal sponsorship agreement attached to the Declaration of Nada Khader filed in this case (Dkt.84-1) that was in effect from January 1, 2023, through the present day.

35. All communications or documents relating to funds "awarded by donors to WESPAC for the benefit and use by NSJP," including "tax-deductible grants, contributions, and gifts," as contemplated in WESPAC's fiscal sponsorship agreement with NSJP and sufficient to show the total amount of such funds received by NSJP and the years in

20

which they were received, as well as the total amount of such funds accessed by NSJP. *See* Dkt.89-1 at 4.

36.    All communications or documents relating to WESPAC's agreement to "make [tax-deductible grants, contributions, and gifts] available" to NSJP "upon request" and to "authoriz[e] NSJP to make purchases on its own behalf" from such grants, contributions, and gifts, as contemplated in WESPAC's fiscal sponsorship agreement with NSJP. *See* Dkt.89-1 at 4.

37.    All communications or documents relating to any of the named Plaintiffs in this case, *i.e.*, Matthew Weinberg, Rabbi Dovid Gurevich, Nir Hoftman, and Eli Tsives.

38.    All communications on the subject of NSJP's planning and execution of the Popular University for Gaza, the Campus Support Coalition, and the UCLA encampment or efforts to reestablish the UCLA encampment, between NSJP and any foreign government, instrumentality of a foreign government, foreign entity, or foreign individual, including but not limited to Qatar, Turkey, Iran, the Muslim Brotherhood, Hamas, the Qatar Foundation, and the International Union of Muslim Scholars.

21

39.     All communications on the subject of funding, transactions, or purchases made for, on behalf of, or involving the Popular University for Gaza, the Campus Support Coalition, and the UCLA encampment or efforts to reestablish the UCLA encampment, between NSJP and any foreign government, instrumentality of a foreign government, foreign entity, or foreign individual, including but not limited to Qatar, Turkey, Iran, the Muslim Brotherhood, Hamas, the Qatar Foundation, and the International Union of Muslim Scholars.

40.     All communications referring or relating to Jews, Judaism, or any Jewish practices or beliefs, between NSJP and any foreign government, instrumentality of a foreign government, foreign entity, or foreign individual, including but not limited to Qatar, Turkey, Iran, the Muslim Brotherhood, Hamas, the Qatar Foundation, and the International Union of Muslim Scholars.

Dated: December 22, 2025

William J. Brown, Jr. (SBN
192950)
Kyle J. Berry (SBN 355393)
BROWN WEGNER LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0080
bill@brownwegner.com
kberry@brownwegner.com

Respectfully submitted,

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy (pro hac
vice)
Thomas A. Wilson (pro hac vice)
Zachary P. Grouev (pro hac vice)
Julius Kairey (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
twilson@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (pro hac vice)
Omer Wiczyk (pro hac vice)
LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

*Counsel for Plaintiffs*

23

## CERTIFICATE OF SERVICE

I certify that, on December 22, 2025, I served the foregoing Plaintiffs' Second Requests for Production to Defendant National Students for Justice in Palestine on counsel for the parties listed below, by both email and United States Postal Service Priority Mail:

Mark Kleiman
KLEIMAN / RAJARAM
12121 Wilshire Boulevard, #810
Los Angeles, CA 90025
Phone: 310-392-5455
Email: mark@krlaw.us

*Counsel for National Students for Justice in Palestine*

Max A. Schoening
QURESHI LAW
700 Flower St., Suite 1000
Los Angeles, CA 90017
Phone: 213-786-3478
Email: max@qureshi.law

Christina A. Jump
Samira S. Elhosary
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy., STE 1010
Richardson, TX 75080
Phone: 972-914-2507
Emails: cjump@jump-start-legal.com
selhosary@clcma.org

*Counsel for AJP Educational Foundation, Inc., Hatem Al-Bazian, and Osama Abuirshaid*

24

Robert L. Herbst
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, NY 10170
Phone: 914-450-8163
Email: rherbst@herbstlawny.com

Joshua Colangelo-Bryan
HUMAN RIGHTS FIRST
121 West 36th Street, PMB 520
New York, NY 10018
Phone: 212-845-5243
Email: colangeloj@humanrightsfirst.org

Ramsey Judah
JUDAH LAW GROUP
1026 W. Foothill Blvd
Upland, CA 91786
Phone: 626-899-7667
Email: ramsey@judahlawgroup.com

*Counsel for WESPAC Foundation*

Dan Stormer
Rebecca Brown
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
Phone: 626-585-9600
Emails: dstormer@hadsellstormer.com
rbrown@hadsellstormer.com

*Counsel for People's City Council*

*/s/ Thomas R. McCarthy*

25

# EXHIBIT C

## IN THE DISTRICT COURT OF THE
## CENTRAL DISTRICT OF CALIFORNIA

MATTHEW WEINBERG, et al.,

        Plaintiff,

vs.

NATIONAL STUDENTS FOR
JUSTICE IN PALESTINE, et al.,

        Defendants.

Case No.: 2:25-cv-03714-MSC-JCx

## PLAINTIFFS' FIRST INTERROGATORIES TO DEFENDANT
## NATIONAL STUDENTS FOR JUSTICE IN PALESTINE

In accordance with Federal Rule of Civil Procedure 33, Section 8.b. of the Court's Standing Order (Dkt.28), and the Court's order of November 10, 2025 (Dkt.77), Plaintiffs request that Defendant National Students for Justice in Palestine respond to the following Interrogatories within 30 days.

## INSTRUCTIONS

1. These interrogatories are governed by Federal Rules of Civil Procedure, the Central District of California's Local Rules, and the Court's Standing Order.

1

2.      **Method of Response and Production:** Responses to these interrogatories shall be provided in writing and served upon counsel for Plaintiffs by email sent to twilson@consovoymccarthy.com, julius@consovoymccarthy.com, and owiczyk@brandeiscenter.com in emails not to exceed 20 MB each. To the extent the responses cannot be served via email, please contact the undersigned to make different arrangements.

3.      **Information in Your Possession, Custody, and Control.** You shall provide all responsive information in your possession, custody, or control, including, without limitation, all information that is available to you, your agents, representatives, accountants, attorneys, professionals, fiduciaries, or any other source from which such information may reasonably be obtained.

4.      **Information No Longer in Your Possession, Custody, or Control.** If you do not know and cannot reasonably obtain the answer to an interrogatory or any portion thereof, you shall: (1) respond to the extent possible; (2) state the reasons why you cannot respond to the remainder; (3) describe the efforts you made to secure the requested

information; and (4) identify any person who may possess the requested information or the location where that information is found.

5.    **Objections.** If you object to part of an interrogatory, you shall state the objection and respond to the remainder of the interrogatory.

6.    **Asserting Claim of Privilege.** If you object to an interrogatory on the ground that it seeks information you believe to be privileged, protected, or otherwise immune from discovery, you must furnish an index with the following information: (1) the nature of the privilege, immunity, or other ground claim; (2) the name and position of each author, preparer, sender, addressee, and recipient of the document; (3) the date of the document; (4) the type of document (e.g., memorandum, letter, report, or email); and (5) a general description of the subject matter of the document sufficient to enable the requesting party to assess the applicability of the claimed privilege, immunity, or other ground for the refusal to produce.

7.    **Business Records.** To the extent you choose to produce business records in response under Fed. R. Civ. P. 33(d), the records should be produced in a manner consistent with Plaintiffs' instructions to its first set of requests for production.

8.    **Lost, Destroyed, or Otherwise Disposed Of.** If responsive documents or information have been lost, destroyed, or otherwise disposed of, provide the following:

(1)    A detailed description of the document and its contents, including, without limitation, the document's date of creation, originator, recipients, and subject;

(2)    A description of the facts surrounding the loss, destruction, or other disposition, including, without limitation: (i) the date of loss, destruction, or other disposition; (ii) the name, address, and telephone number of the person(s) who authorized, requested, or performed the destruction or other disposition; and (iii) the name, address, and telephone number of any person who may be familiar with the document and who is capable of discussing the contents.

9.    **Period at Issue.** Unless otherwise specifically stated, the period at issue covered by these interrogatories begins on January 1, 2023, and runs through the present day.

10.    **Supplementation.** These interrogatories are deemed to be continuing in nature, and you are required to supplement your responses hereto promptly if further information is obtained, either directly or indirectly, between the time of these answers and the time of trial.

11.    **Duplication.** If an act, event, transaction, occasion, instance, matter, course of conduct, course of action, person or writing is mentioned or referred to in response to more than one of these interrogatories, You need not provide a complete identification and description in every instance, provided You supply a complete identification in one such instance, and in each such instance make a specific reference to the place, paragraph and page number in the answers to these interrogatories where it, he or she is fully identified and described.

## DEFINITIONS

1.    **NSJP, You, Your, and Yours.** The terms "NSJP," "You," "Your," and "Yours," refer to Defendant National Students for Justice in Palestine, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf

5

of any of these entities or individuals. These terms include, but are not limited to, NSJP's UCLA Chapter, Students for Justice in Palestine, University of California—Los Angeles, Graduate Students for Justice in Palestine, University of California—Los Angeles, and SoCalSJP.

2. **People's City Council.** The terms "People's City Council" and "PCC" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, the entity with which Ricci Sergienko, Albert Corado, and Jason Reedy are or were affiliated.

3. **American Muslims for Palestine.** The terms "American Muslims for Palestine" and "AMP" refer to AJP Educational Foundation, Inc., the 501(c)(3) nonprofit organization doing business under the name "American Muslims for Palestine" and that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees,

agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, Defendants Hatem Al-Bazian and Osama Abuirshaid.

4.    **WESPAC.** The term "WESPAC" refers to WESPAC Foundation, Inc., the 501(c)(3) nonprofit organization that is listed as a Defendant in this case, its predecessors, successors, divisions, subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. This term includes, but is not limited to, the entity that served as NSJP's fiscal sponsor, including under a letter dated July 27, 2023. *See* Dkt.1 (Compl.) ¶35, *ANI v. WESPAC*, No. 7:25-cv-1320 (S.D.N.Y. Feb. 13, 2025).

5.    **National Faculty for Justice in Palestine:** The terms "National Faculty for Justice in Palestine" and "NFJP" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other

7

affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

6.      **UC Divest Coalition.** The terms "UC Divest Coalition" and "UC Divest" refer to the unincorporated association of the same name that is listed as a Defendant in this case, its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals. These terms include, but are not limited to, the entity of the same name of which NSJP National Steering Committee member Dylan Kupsh was a founding member.

7.      **Unity of Fields.** The term "Unity of Fields" refers to the unincorporated association of the same name, which was formerly known as the United States branch of "Palestine Action" (a UK-based group that has been designated a terrorist organization by the British government), its predecessors, successors, divisions, chapters, sub-chapters, committees, steering committees, subsidiaries, and other affiliates, and

8

all subsidiaries, and affiliates, and all present and former directors, officers, employees, agents, consultants, representatives, attorneys, and any other persons acting for or on behalf of any of these entities or individuals.

8. **Person.** The term "person" shall include individuals, partnerships, joint ventures, firms, associations, proprietorships, corporations, or other such entities, along with their subsidiaries and divisions, and the individual members, employees, and agents thereof.

9. **Officer.** The term "officer" shall include any person with a formal or informal position of authority, function, or title. As applied to NSJP, it includes, but is not limited to, any person serving on a committee, a steering committee, or the National Steering Committee.

10. **Committee.** The term "committee" shall include any committee, subcommittee, board, panel, or similar group of persons, officers, employees, volunteers, agents, or representatives that is organized to perform an official or unofficial function.

11. **Steering Committee.** The term "steering committee" means any committee that exercises control over a portion of the operations of NSJP or its subdivisions. The phrase includes but is not limited to: (1)

9

the National Steering Committee; (2) all steering committees associated with NSJP; and (3) all steering committees associated with NSJP's UCLA Chapter and SoCal SJP.

12. **The National Steering Committee.** The term "National Steering Committee" refers to the committee that exercises overall control over NSJP and of which: (1) Dylan Kupsh is a former member; and (2) Sean Eren and Carrie Zaremba are (or were) members.

13. **The Popular University for Gaza.** The term "Popular University for Gaza" refers to the "coordinated pressure campaign" based on "establishing autonomous zones on … university campuses" that was officially launched by NSJP in a statement on April 20, 2024. *National SJP Launches The Popular University for Gaza*, NSJP (Apr. 20, 2024), perma.cc/8WS8-KJXG.

14. **The Campus Support Coalition.** The term "Campus Support Coalition" refers to the "collective of organizations managed by [NSJP] that work together to support students fighting for Palestinian liberation on university campuses." *Campus Support Coalition*, NSJP (last visited Dec. 3, 2025), bit.ly/4pPl7oe.

10

15. **The UCLA Encampment.** The term "the UCLA encampment" refers to the encampment that was present near Royce Quad between April 25, 2024, and May 2, 2024.

16. **Efforts to Reestablish the UCLA Encampment:** The term "efforts to reestablish the UCLA encampment" means any action taken on or after May 2, 2024, with the purpose of: reestablishing the UCLA encampment or establishing another encampment on or around UCLA's campus with a similar form or function to the UCLA encampment. Examples of efforts to reestablish the UCLA encampment include, but are not limited to: (1) the May 6 attempt to "occupy" and vandalize Moore Hall; and (2) and the June 10 efforts to "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers" at the top of the Janss Steps, at Kerckhoff Patio, and around UCLA Law School.

17. **Agents.** The term "agents" includes, but is not limited to, attorneys, accountants, professionals, and other representatives.

18. **Document.** The term "document" shall be liberally construed to include, but is not limited to, all of the following items, whether written or produced by hand; printed, written, produce, recorded, or reproduced

11

by any mechanical process; electronically or magnetically recorded or stored; recorded upon any tangible thing; or stored in any retrievable form by means of communication, representation, or data retention not otherwise described in this paragraph: agreements; draft agreements; contracts; draft contracts; correspondence; memoranda; summaries or records of personal conversations, interviews or statements; diaries; desk calendars; graphs; reports; computer tapes; computer disks; computer files; computer printouts; electronic mail communications (e-mails); electronic text communications (e.g., Discord, Signal, SMS, Slack, Sametime, Teams, Telegram, and other messaging software and applications), summaries or records of any meetings; conferences; summaries or records of investigations or audits; summaries of any negotiations; opinions of consultants; photographs; motion picture films; video tapes; magnetic tapes; audio cassettes; microfilm; microfiche; brochures; pamphlets; advertisements; circulars; press releases; drafts; checks; letters; telegrams; cables; telexes; facsimiles; telecopies; judicial records; maps; financial statements; drafted financial statements; trial balances; general ledgers; subsidiary ledgers; financial journals; worksheets; work papers; receipts; invoices; registers; registrations;

filings; statements; bank statements; brokerage statements; insurance policies; credit reports; appraisals; confirmations; surveys; budgets; forecasts; tax returns; blueprints; diagrams; specifications; licenses; and all other forms of media involving the transmission, representation, communication, or storage of information, including writings that constitute a translation into any language other than the language in which the original exists. Furthermore, different versions of a document (including, but not limited to drafts, revisions, or versions with notes and/or marks not found on the original or other copies) shall be considered distinct documents that must be produced.

19. **Communication.** The term "communication" shall be liberally construed to include, but is not limited to, the transmission of all written, electronic, or verbal discussions, correspondence, statements, conversations, ideas, memoranda, notations, letters, notices, and documents.

20. **Relating and/or Concerning.** The terms "relating to," "related to," "relates to" or "concerning" a subject shall mean any document or communication that constitutes, contains, embodies, evidences, reflects, supports, undermines, negates, contradicts, concerns,

identifies, states, refers to, regards, records, deals with, describes, or pertains to that subject.

21.    **Each and/or Every.** The term "each" shall be construed to include the term" "every," and the term "every" shall be construed to include the term "each," as necessary to bring within the scope of these interrogatories information that might otherwise be construed to be outside their scope.

22.    **Any and/or All.** The term "any" shall be construed to include the term "all," and the term "all" shall be construed to include the word "any," as necessary to bring within the scope of these interrogatories information that might otherwise be construed to be outside their scope.

23.    **Identify.** The term "identify" means,

(1)    With respect to a person, to provide that person's (i) full name; (ii) current address and telephone number; (iii) current employer; (iv) current business address and telephone number; (v) job or volunteer position; (vi) job or volunteer duties.

(2)    With respect to a person who is serving or has served as an officer, employee, contractor, volunteer, representative, or

14

other agent of NSJP or its subdivisions, to additionally provide: (i) a complete description of the responsibilities of such position; (ii) the date upon which the person assumed such position; (iii) if the person's service in such position has lapsed, the date upon which service lapsed and the person (if any) who subsequently held the position; and (iv) if the person is presently serving, the date (if any) upon which the position is expected to lapse and the person (if any) who is expected to next fill the position.

(3) When an interrogatory requests that a writing, document, or record of any kind be identified, provide the following information about such writing, document, or record: (i) the title; (ii) the identity of the person in possession, custody, or control of the document; and (iii) the identity of all persons mentioned in, who were signatories to or authors of, or who were present at the formation or execution of the writing, document, or record. If the writing, document or record has been destroyed or lost and all copies thereof have been destroyed or lost, state: (i) the date of destruction or loss;

15

(ii) whether it has been transferred voluntarily or involuntarily to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

(4)    When an interrogatory requests that a communication be identified, provide the following information about such communication: (i) the identities of all persons mentioned in or a signatory to, or who were present at the formation or execution of the communication, including whether such persons were serving as an officer, employee, contractor, volunteer, agent, or representative of NSJP, WESPAC, AMP, PCC, Unity of Fields, or any other third party; (ii) the date and time of the communication; and (iii) the identity of the person who is in possession, custody, or control of the communication. If the communication has been destroyed or lost and all copies thereof have been destroyed or lost, additionally state: (i) the date of destruction or loss; (ii) whether it has been transferred voluntarily or involuntarily

to others, and if so, their identity; (iii) all dates, essential terms, and other details of said writing, document, or record; and (iv) the identity of any person known to you who can give competent secondary evidence of its contents.

24.    **Singular and Plural.** The singular form of a word shall include the plural of that word, and the plural shall include the singular, as necessary to bring within the scope of these interrogatories information that might otherwise be construed to be outside their scope.

## INTERROGATORIES

1.    Fully describe Your organizational chart and the structure of Your committees, including any steering committees and the National Steering Committee, at all times during the period at issue.

2.    Identify all persons serving as Your officers, employees, contractors, volunteers, agents, or representatives during the period at issue.

3.    Identify all persons and entities with whom You communicated regarding the Popular University for Gaza, the Campus Support Coalition, the UCLA Encampment, or efforts to reestablish the UCLA encampment during the period at issue.

4.     Identify the person or persons responsible for controlling Your official social media accounts during the period at issue.

5.     Identify all documents and communications relating to the Popular University for Gaza and Campus Support Coalition produced during the period at issue.

6.     Identify all documents and communications relating to the article *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, published by Unity of Fields on May 1, 2025, produced during the period at issue.

7.     Identify the person employed by, affiliated with or acting on Your behalf who is most knowledgeable about Your sources of funds, including Your fiscal sponsorship by WESPAC.

8.     Identify the person employed by, affiliated with or acting on Your behalf who is most knowledgeable about the UCLA encampment.

9.     Identify the person or persons who authored the article *Advancing the Line, Emboldening the People: Reflections on the One-Year Anniversary of the UCLA Palestine Solidarity Encampment*, published by Unity of Fields on May 1, 2025.

18

10.    Identify all documents and communications relating to Your fiscal sponsorship by WESPAC produced during the period at issue, including the July 27, 2023, letter discussed in paragraph #4 of the definitions section.

11.    Identify the persons or persons with operational control of the UCLA Chapter during the period at issue.

Dated: December 5, 2025

William J. Brown, Jr. (SBN 192950)
Kyle J. Berry (SBN 355393)
BROWN WEGNER LLP
2010 Main Street, Suite 1260
Irvine, California 92614
(949) 705-0080
bill@brownwegner.com
kberry@brownwegner.com

Respectfully submitted,

/s/ *Thomas R. McCarthy*
Thomas R. McCarthy (pro hac vice)
Zachary P. Grouev (pro hac vice)
Julius Kairey (pro hac vice)
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
zach@consovoymccarthy.com
julius@consovoymccarthy.com

Richard A. Rosen (pro hac vice)
Omer Wiczyk (pro hac vice)
LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1330 6th Avenue, 23rd Floor
New York, NY 10019
(917) 363-9004
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com

*Counsel for Plaintiffs*

20

## CERTIFICATE OF SERVICE

I certify that, on December 5, 2025, I served the foregoing Plaintiffs'

First Set of Interrogatories to Defendant National Students for Justice in

Palestine on counsel for the parties listed below, by both email and

United States Postal Service Priority Mail:

Mark Kleiman
KLEIMAN / RAJARAM
12121 Wilshire Boulevard, #810
Los Angeles, CA 90025
Phone: 310-392-5455
Email: mark@krlaw.us

*Counsel for National Students for Justice in Palestine*

Max A. Schoening
QURESHI LAW
700 Flower St., Suite 1000
Los Angeles, CA 90017
Phone: 213-786-3478
Email: max@qureshi.law

Christina A. Jump
Samira S. Elhosary
MUSLIM LEGAL FUND OF AMERICA
100 N. Central Expy., STE 1010
Richardson, TX 75080
Phone: 972-914-2507
Emails: cjump@jump-start-legal.com
selhosary@clcma.org

*Counsel for AJP Educational Foundation, Inc., Hatem Al-Bazian,
and Osama Abuirshaid*

21

Robert L. Herbst
HERBST LAW PLLC
420 Lexington Avenue, Suite 300
New York, NY 10170
Phone: 914-450-8163
Email: rherbst@herbstlawny.com

Joshua Colangelo-Bryan
HUMAN RIGHTS FIRST
121 West 36th Street, PMB 520
New York, NY 10018
Phone: 212-845-5243
Email: colangeloj@humanrightsfirst.org

Ramsey Judah
JUDAH LAW GROUP
1026 W. Foothill Blvd
Upland, CA 91786
Phone: 626-899-7667
Email: ramsey@judahlawgroup.com

*Counsel for WESPAC Foundation*

Dan Stormer
Rebecca Brown
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, CA 91103
Phone: 626-585-9600
Emails: dstormer@hadsellstormer.com
rbrown@hadsellstormer.com

*Counsel for People's City Council*

*/s/ Thomas R. McCarthy*

22

# EXHIBIT D

Electronically Received 08/11/2025 04:35 PM

THOMAS B. HARVEY (SBN 287198)
LAW OFFICES OF THOMAS B. HARVEY
365 E. Avenida De Los Arboles, # 226
Thousand Oaks, CA 91360
Tel: (805) 768-4440
Email: tbhlegal@proton.me

MARK KLEIMAN (SBN 115919)
KLEIMAN/RAJARAM
12121 Willshire Blvd., Suite 810
Los Angeles, California 90025
Tel: (310) 392-5455
Fax: (310) 306-8491
Email: mark@rklaw.us

Additional attorneys for Plaintiffs listed on Attachment "A"

ATTORNEYS FOR PLAINTIFFS

**FILED**
Superior Court of California
County of Los Angeles
**08/11/2025**
David W. Slayton, Executive Officer / Clerk of Court
By: _____ T. Bivins _____ Deputy

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### COUNTY OF LOS ANGELES

THISTLE BOOSINGER; ROE 1; ROE 2; FARAAZ QURESHI; JAKOB JOHNSON; JACK KEARNS; AFNAN KHAWAJA; DOLORES QUINTANA; CATHERINE HAMILTON; ROE 8; SHANDRA CAMPBELL; ROE 6; ANGELICA JIT; ROE 15: ROE 9; ROE 10; ROE 3; ROE 14; BINYAMIN MORYOSEF; JAMES (JIMI) PERIC DEGEN; ISABELLA LEE; ROE 4; AARON PALMER; MAHMOUD ALNAOUQ; JOSEPH MURPHY; ROE 5; ROE 11; LUBNA HAMMAD; ROE 12; BHARAT VENKAT; ROE 7; GINA VIOLA PEAKE; ERIC WEFALD; ROE 13; NASIHA SOLAKOVIC.

      Plaintiffs,

      V.

REGENTS OF THE UNIVERSITY OF CALIFORNIA, MICHAEL V. DRAKE, in his Official Capacity as the President of the University of California,  DARNELL HUNT, MICHAEL BECK, MONROE GORDEN, JR., RICK

Case No. 25STCV08969
*Assigned To Hon. Samantha Jessner, Dept 7*
*Action Filed March 24, 2025*

**FIRST AMENDED COMPLAINT**

[Amount in Controversy Exceeds $35,000]

[California Constitution Art. I, §13; Cal. Civ. Code §§  52.1, 51.7; Government Code § 815.6; Cal. Code of Civil Procedure § 526a; Assault; Battery; Negligence]

- 1 -
FIRST AMENDED COMPLAINT

BRAZIEL, EUGENE BLOCK, in their personal capacities, JULIO FRENK, in his official capacity as Chancellor of UCLA; and SCOTT SCHEFLER, CALIFORNIA HIGHWAY PATROL (State of California); LOS ANGELES POLICE DEPARTMENT (the City of Los Angeles); ISAAC BOKHOOR; MATIN MEHDIZADEH; TOM BIBIYAN; JARED RUBIN; EDWIN KOHEN; NOURI MEHDIZADEH; EDAN ON; EYAL SHALOM; RONALD MISHIYEV; JONATHAN YASHAR; DAVID MERABI;ELIRAN BISMUT; ROY ELBAZ; BRAD HISLE; ARLAN MITNICK; MALACHI JOSHUA MARLAN-LIBRETT; ALON ABISHOOR; SHAI ABISHOOR; RONY ABISHOOR; DANIEL KHALILI;ANTHONY PROUZININ; and Does 1-100

Defendants and Respondents.

- 2 -
FIRST AMENDED COMPLAINT

**TABLE OF CONTENTS**

**INTRODUCTION** ...........................................................................................................- 4 -

**FACTUAL BACKGROUND** ........................................................................................- 7 -

**A.  UCLA HAS HISTORICALLY BEEN HOSTILE TO PRO-PALESTINIAN ADVOCACY** ............................................................................................ - 7 -

**B.  OCTOBER 7, 2023 to APRIL 24, 2024: HARASSMENT OF PRO-PALESTINIAN STUDENTS INCREASES RAPIDLY** .......................................................... - 9 -

**C.  APRIL 25, 2024 to MAY 2, 2024: PALESTINE SOLIDARITY ENCAMPMENT, THE MOB ATTACK, AND POLICE RAID**........................................................ - 12 -
  **April 25, 2024: The Palestine Solidarity Encampment Begins in Peace**............................ - 12 -
  **April 27, 2024: Counter Protesters Escalate Their Violence** ............................................. - 14 -
  **April 28, 2024 and April 29, 2024: The Jumbotron Escalates Mob Violence** ................... - 14 -
  **April 30, 2024: The Mob Attack**......................................................................................... - 17 -
  **May 1, 2024 to May 2, 2024: The Police Raid**……………………………………….. - 20 -
  **June 10, 2024: Kettling and Police Shootings**................................................................. - 21 -
  **Ongoing Harm and Continuing Threat**………………………………………………… - 22 -
  **Further Protest Intent and the Threat of Recurrent Illegal Suppression**……………… - 23 -

**JURISDICTION AND VENUE**...................................................................................- 24 -

**PARTIES** ......................................................................................................................- 24 -

**THE PLAINTIFFS** .......................................................................................................- 24 -

   **Pseudonymous Plaintiffs**……………………………………………………………… - 64 -

**THE DEFENDANTS** .................................................................................................. - 64 -
  **Rioting Mob Defendants**.................................................................................................... - 64 -
  **University of California and UCLA Defendants**................................................................ - 68 -
  **Defendants Generally** ....................................................................................................... - 70 -

**CLAIMS FOR RELIEF** ...............................................................................................- 70 -

**PRAYER FOR RELIEF** ...............................................................................................- 86 -

FIRST AMENDED COMPLAINT

**<u>INTRODUCTION</u>**

1. This case is about the University of California, Los Angeles ("UCLA") repeatedly and systemically violating the civil rights of students, faculty, and community members who protested against a genocide in Palestine and UCLA's investment in companies that profit from that genocide. Because of UCLA's relentless discriminatory crusade against people expressing a pro-Palestinian viewpoint, a violent mob—comprised of self-described Zionists and members of far-right extremist groups, among others—ruthlessly attacked protesters for hours beginning on April 30, 2024, while the UCLA Police Department ("UCPD") and private security companies stood and watched.

2. Mob members violently assaulted protesters wearing keffiyehs, hijabs, and other symbols of pro-Palestinian viewpoints, in some instances breaking their bones, sexually assaulting them, burning their eyes with chemical munitions, punching them, hitting them with metal rods, poles, and boards, and hurling incendiary devices into the peaceful encampment.[1]

3. Mob members acted as a group, making coordinated moves. They put larger people up front to break the protestors' line—assaulting protesters physically, blasting bullhorns in their ears, and jabbing flagpoles into the encampment, striking people inside. The mob members seemed to be enjoying themselves, socializing in between brutalizing protesters. They shot chemical munitions, laughed and joked about it, planned the next attack, and then attacked the protesters again.

4. The unhinged mob violently, brutally, and relentlessly attacked the pro-Palestine protesters in the Palestine Solidarity Encampment at UCLA for five hours beginning on April 30, 2024. It was the worst night of violence against pro-Palestinian protesters in all of 2024's campus protests around the country.

//

//

//

5. Not a single member of the mob attack was arrested that night, even though police and private security watched from just a few yards away as the attack raged for hours

---

[1] Robin D.G Kelley, *UCLA's Unholy Alliance*, BOSTON REVIEW (May 18, 2024), https://www.bostonreview.net/articles/uclas-unholy-alliance/.

FIRST AMENDED COMPLAINT

and was broadcast live to millions of people across the country and in Los Angeles.[2]

6.      After this hate-filled mob attack ended, and while many protesters were still seeking medical attention for their injuries, the encampment's peaceful demonstrators faced a phalanx of militarized police on May 1, 2024. UCLA and UCPD asked the Los Angeles Police Department ("LAPD") and the California Highway Patrol ("CHP") to forcibly remove people expressing pro-Palestinian views. Police hurled flashbangs, shot powerful kinetic impact projectiles at peoples' heads and faces, and used excessive physical force against and falsely arrested students, faculty, and concerned community members. Protesters were dragged, beaten, and body slammed by cops during this hours-long raid on the encampment. Over 200 pro-Palestinian protesters were arrested, with many reporting invasive searches, false arrests, and public humiliation during their arrest and detention.

7.      On June 10, 2024, pro-Palestinian protesters were once again attacked by militarized police forces, falsely arrested, beaten, shot with less lethal munitions, and had their civil rights violated.

8.      UCLA has a long and well-documented history of discriminating against pro-Palestinian views, whether the people expressing them are Muslim, Jewish, Christian, atheist, agnostic, or of any other faith. This hostile environment is marked by anti-Palestinian, anti-Arab, anti-Muslim, and Islamophobic incidents and a complete erasure of Jewish criticism of Israel, Zionism, and the impact of both on Palestinians.[3]

9.      Between October 7, 2023, and April 2024, pro-Palestinian students faced physical attacks, threats of violence, and harassment, including Islamophobic slurs. One student was held at knifepoint by a Zionist counter protester who disrupted a rally near UCLA in Westwood. Muslim women wearing hijabs were threatened and verbally abused. Students wearing keffiyehs and other

---

[2] Robin D.G Kelley, *UCLA's Unholy Alliance*, BOSTON REVIEW (May 18, 2024), https://www.bostonreview.net/articles/uclas-unholy-alliance/.

[3] See the UCLA taskforce report on anti-Palestinian, anti-Muslim, and anti-Arab racism at UCLA- Gaye Johnson, Sherene Razack et al, *Report Of Task Force On Anti - Palestinian, Anti - Muslim And Anti - Arab Racism*, *Corrected May 15 Report*, at 1 (May 15 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&amp;e=1&amp;st=6s3n3uvu&amp;dl=0.

FIRST AMENDED COMPLAINT

pro-Palestine clothing were attacked with chemical munitions, assaulted, and threatened with rape and other violence on campus. Despite reports to authorities, UCLA took no action to safeguard students or hold perpetrators accountable.

10.    The events at UCLA highlight systemic anti-Palestinian bias and the administration's failure to uphold its obligation to protect the rights of students and faculty to engage in peaceful protest and expression.[4]  The university's actions and omissions have not only fostered an unsafe and hostile environment but have also violated the constitutional rights of those advocating for Palestinian rights, particularly their rights to free speech and assembly under Article 1, §2 of the California Constitution.

11.    This action seeks to hold UCLA accountable for its failure to address and prevent Islamophobic, anti-Palestinian and anti-Arab discrimination, its violation of civil rights of all pro-Palestinian protesters—a group comprised of a wide range of people including Jewish people—and to demand systemic changes to ensure the safety and equity of all members of the university community.

12.    This action also seeks to hold individual members of the mob that attacked the Palestine Solidarity Encampment accountable for brutally beating and terrorizing protesters because of their pro-Palestine political views and activity, as well as those who financed, organized, and encouraged the attacks.

13.    Plaintiffs seek to enjoin UCLA's practice and policy of punishing pro-Palestinian speech, a declaration that law enforcement's violent actions in clearing the Palestine Solidarity Encampment were unlawful, and fair compensation for violation of their rights—including the unlawful use of force, assault, battery, and civil rights violations—by UCLA, police, and the mob. Because UCLA refuses to disclose the nature and extent of its investments in companies profiting from genocide, population removal, and other international crimes, UCLA will continue to be a site of rallies and protests, and Plaintiffs are

---

[4] Gaye Johnson, Sherene Razack et al, *Second Report of the UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism: the Militarization of Campus - The Racial Violence Hub*, THE RACIAL VIOLENCE HUB at 15 (June 28, 2024), https://racialviolencehub.com/second-report-of-the-ucla-task-force-on-anti-palestinian-anti-muslim-and-anti-arab-racism-militarization-of-campus/

- 6 -

FIRST AMENDED COMPLAINT

likely to encounter the same repression unless it is enjoined.

## FACTUAL BACKGROUND

### A. UCLA HAS HISTORICALLY BEEN HOSTILE TO PRO-PALESTINIAN ADVOCACY

14.    UCLA has long been a hostile environment for Arab and Palestinian students, faculty, and staff.[5] Incidents include harassment of faculty for teaching material critical of Israel, profiling of Muslim and Arab students, and administrative indifference to racism. A notable example is the 2012 report by UC President Yudof's Advisory Council, co-authored by a pro-Israel lobbyist, which equated criticism of Israel with anti-Semitism and targeted pro-Palestinian activism. Then-Chancellor Gene Block endorsed this report, setting a tone of administrative hostility.

15.    In 2012, Professor David Shorter faced a smear campaign and threats after including pro-Boycott, Divestment, and Sanction material in a course he was teaching. UCLA's administration failed to support him during this ordeal. Muslim and Arab students have been profiled and shadowed by campus police while targeted Islamophobic acts, such as leaving raw pork at a Muslim student's door were ignored. In 2023, UCLA students wearing hijabs were exploitatively recorded, leading to online harassment and calls for their expulsion. These incidents reflect a broader pattern of anti-Palestinian, anti-Arab, and Islamophobic racism, compounded and burgeoned by administrative inaction.

16.    In 2014, students seeking divestment from companies supporting the Israeli occupation were harassed, doxxed, and threatened with violence. Non-university Zionist groups brought Israeli soldiers to campus to intimidate students, often filming them without consent. Chancellor Block ignored repeated appeals to address these concerns, prioritizing meetings with pro-Israel groups over the safety of pro-Palestinian students.

17.    Faculty members who spoke out about Palestine also faced institutional backlash. Courses that explored Palestinian history and human rights were scrutinized, and professors teaching

---

[5] Gaye Johnson, Sherene Razack et al, *Report Of Task Force On Anti - Palestinian, Anti - Muslim And Anti - Arab Racism, Corrected May 15 Report*, at 1 (May 15 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&amp;e=1&amp;st=6s3n3uvu&amp;dl=0

FIRST AMENDED COMPLAINT

these subjects were often accused of spreading propaganda.[6] In one instance, a faculty member was denied tenure solely as a result of complaints from national pro-Israel advocacy groups that are not part of the UCLA community, despite that professor's otherwise impeccable teaching record and strong support from UCLA students and colleagues.

18.    The administrative atmosphere discouraged many Arab and Palestinian students, as well as Jewish and other students who supported human rights for Palestinians, from openly engaging in activism or expressing their views. Several students reported receiving anonymous threats, while others experienced heightened surveillance during campus events. This environment of intimidation had a chilling effect on free speech and academic discourse surrounding Palestinian issues.

19.    The repression of Palestinian and Muslim students and those who associate with and support them stands in stark contrast to UCLA's tolerant approach to other protests. Whether it was the protests following the police killing of Michael Brown, Jr., or the murder of George Floyd, the UAW strikes, protests against apartheid, Vietnam, or virtually any protest that has ever occurred at UCLA, the Palestine exception to freedom of expression and association has been in full force.

20.    UCLA faculty have been harassed for teaching material deemed critical of Israel, some subjected to McCarthy-style witch hunts violating academic freedom and freedom of expression in service of national pro-Israel lobbying groups.[7] Muslim and Arab students have been profiled and shadowed by campus police and have been threatened for wearing clothing associated with pro-Palestinian views.

21.    As recently as three weeks ago, a poster inside an Arab-American faculty member's office that simply read "Teach Palestine" was ripped off the wall while someone screamed he was a "terrorist sympathizer" who should be banned from campus. Although the faculty member filed an internal complaint, UCLA has taken no action.

[6] Gaye Johnson, Sherene Razack et al, *Third Report of the UCLA Task Force on Anti-Palestinian, Anti-Muslim, and Anti-Arab Racism - The Racial Violence Hub*, THE RACIAL VIOLENCE HUB at 4 (Jan. 31, 2025), https://racialviolencehub.com/third-report-ucla-task-force-anti-palestinian-anti-muslim-anti-arab-racism/
[7] Robin D.G Kelley, *UCLA's Unholy Alliance*, BOSTON REVIEW (May 18, 2024), https://www.bostonreview.net/articles/uclas-unholy-alliance/.

FIRST AMENDED COMPLAINT

22.    Not only has the university for years refused to take any kind of action against this harassment, but former Chancellor Block also harbored nakedly racist, anti-Palestinian sentiments. Throughout all these years, the upper administration—especially former Chancellor Block—refused to engage with appeals, even from senior faculty members, about the increasingly racist and hostile environment on campus.

23.    When Students for Justice in Palestine ("SJP") held their national conference at UCLA in 2018, pro-Palestinian advocates faced violent attacks from outside protesters and received no support from UCLA. Then-Chancellor Gene Block published an editorial asserting that SJP was antisemitic for its support of the boycott, divestment, and sanctions movement.

**B**. **OCTOBER 7, 2023 TO APRIL 24, 2024: HARASSMENT OF PRO-PALESTINIAN STUDENTS INCREASES RAPIDLY**

24.    On October 7, 2023, Hamas conducted an armed operation on Israeli military installations and towns. The attack left approximately 300 Israeli soldiers and over 900 civilians dead, and approximately 240 were abducted and taken to Gaza. At the UCLA campus, students were genuinely shell-shocked and saddened by the sudden loss of life.

25.    When Israel's leadership announced its genocidal intent in Gaza, the mood at UCLA shifted. Many students and faculty felt betrayed by one-sided, acontextual university statements that focused their attention only on the Hamas attack and not the immediate, destructive actions of the Israeli Defense Forces, let alone the history of occupation and apartheid-like oppression that preceded the October 7 attack.[8]

//

//

26.    The Israeli response to the attack constituted a violation of the genocide convention[9],

---

[8] UCLA Faculty for Academic Freedom, *Op-ed: UCLA must protect free speech, academic freedom of those advocating for Palestine - Daily Bruin*, DAILY BRUIN (Dec. 5, 2023), https://dailybruin.com/2023/12/05/op-ed-ucla-must-protect-free-speech-academic-freedom-of-those-advocating-for-palestine.

[9] "After reviewing the facts established by independent human rights monitors, journalists, and United Nations agencies, we conclude that Israel's actions in and regarding Gaza since October 7, 2023, violate the Genocide Convention. Specifically, Israel has committed genocidal acts of killing, causing serious harm to, and inflicting

- 9 -

FIRST AMENDED COMPLAINT

war crimes, and crimes against humanity, with widespread airstrikes, ground incursions, deliberate destruction of Gaza's water system, and an intensive blockade of Gaza—all broadcast by Israeli leadership, funded by the U.S. government and supported by UCLA university officials. These actions targeted civilian infrastructure, including schools, hospitals, and shelters, resulting in mass casualties and destruction. The intentional targeting of civilians and the systematic deprivation of essential resources like water, food, and electricity meet the definitions of genocide under international law. Students and faculty on campus identified these atrocities as part of a broader campaign of ethnic cleansing and systemic violence against Palestinians.

27.    Israel's genocidal acts after Hamas's October 7 attack, along with UCLA's response, triggered a wave of pro-Palestinian activism and anti-Palestinian violence at UCLA.

28.    Harassment and violence directed at Palestinians, Arabs, Muslims, and solidarity activists proliferated. Students were physically attacked in Westwood by Zionist protesters; one student had a knife held to their throat by a Zionist protestor. UCPD officers did not intervene beyond asking the attackers to leave.

29.    On October 11, 2023, faculty held a teach-in about the crisis in Gaza. Before the teach-in began, threatening messages were shared in public and private chat rooms, leading organizers to decide to move the event online. Participants were attacked both in person and online by pro-Israel protesters.

30.    Approximately fifteen (15) students went to the originally planned in-person teach-in location in Kaplan Hall because they did not know the teach-in had moved online for safety reasons. Seven men went to that location and intimidated and harassed the students. When these men arrived, the attendees were sitting on the floor, watching the Zoom event. The men called them "terrorists,"

conditions of life calculated to bring about the physical destruction of Palestinians in Gaza, a protected group that forms a substantial part of the Palestinian people." University Network For Human Rights International Human Rights Clinic Boston University School Of Law International Human Rights Clinic Cornell Law School Centre For Human Rights, University Of Pretoria Lowenstein Human Rights Project, Yale Law School, *Genocide In Gaza Analysis Of International Law And Its Application To Israel's Military Actions Since October 7, 2023*, UNIVERSITY NETWORK FOR HUMAN RIGHTS (May 15, 2024), https://static1.squarespace.com/static/66a134337e960f229da81434/t/66fb05bb0497da4726e125d8/17277270370 94/Genocide+in+Gaza+-+Final+version+051524.pdf.

- 10 -

FIRST AMENDED COMPLAINT

"baby murderers," and "killers," and threatened violence against them. One said, "I'm gonna rip your head off" and "You better fucking run from me you terrorist." The men grabbed the students' laptops and threw them onto the floor and into the trash. As students attempted to leave, one of the men blocked their exit, physically intimidated them, and screamed at them.

31.    On October 12, 2023, students faced verbal and physical assaults from pro-Israel protesters. Muslim women in hijabs and keffiyehs were specifically targeted with threats of rape and killing, and racial and religious slurs. The mob shoved students, forcing them to form human barriers for protection. Despite the visibility of these events, UCLA officials refused to take any measures to dissuade perpetrators or hold them accountable for their violence.

32.    By October 30, 2023, Islamophobic incidents at UCLA escalated. Two students wearing hijabs were filmed without consent, resulting in online death threats and harassment. The same day, a man carried a sign equating Islam with Nazism during a pro-Israel rally attended by UCLA administrators.

33.    Pro-Palestinian students, fearing the escalating attacks and unable to rely on UCLA to protect them, created their own safety protocols, including escorting one another while on campus or walking home. The group prioritized providing safety escorts to Muslims and Muslim-appearing people wearing hijabs or keffiyehs.

34.    Faculty at UCLA, the UC Ethnic Studies Faculty Council, and a group of Palestinian faculty with members across twelve schools and seven campuses wrote to the University of California, alerting it to the dangers of its rhetoric and the consequences that pro-Palestinian students were already experiencing.[10] UCLA's leadership took no steps to protect students.

//

//

---

[10] Gaye Johnson, Sherene Razack et al, *Report Of Task Force On Anti - Palestinian, Anti - Muslim And Anti - Arab Racism*, *Corrected May 15 Report*, at 8 (May 15 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&amp;e=1&amp;st=6s3n3uvu&amp;dl=0

FIRST AMENDED COMPLAINT

35.    On October 31, 2023, Associate Vice Chancellor of Campus Life Mike DeLuca laughed and joked with Zionist protesters while a man walked through a rally with a sign equating Islam to terrorism and Nazism. UCLA officials took no steps to intervene.

36.    The anti-Arab, anti-Muslim, and anti-Palestinian harassment and assault continued between November 2023 and April 2024 and included the following incidents, many of which were part of a formal complaint to the Department of Education's Office of Civil Rights: a Black student in a keffiyeh being sprayed with chemical munitions and repeatedly followed on campus; UCPD detaining pro-Palestinian protesters for removing an offensive poster; UCLA officials failing to respond to the Task Force On Anti-Palestinian, Anti-Arab, and Anti-Muslim Racism; and the invitation of Israel's former foreign minister Tziporah Livni to speak at UCLA, among others.

C.    **APRIL 25, 2024 TO MAY 2, 2024: PALESTINE SOLIDARITY ENCAMPMENT, THE MOB ATTACK, AND POLICE RAID**

**April 25, 2024: The Palestine Solidarity Encampment Begins in Peace**

37.    In April 2024, students nationwide protested against Israel's genocidal acts in Palestine, the United States government's funding for it, and universities' refusal to divest from companies profiting from it. UCLA was no different.

38.    Motivated by the genocide of the Palestinian people in Gaza and by the UCLA administration's repression of pro-Palestine students and simultaneous tolerance for, and encouragement of, their Zionist attackers, students established the Palestine Solidarity Encampment on Royce Quad on April 25, 2024, to amplify their demands and keep themselves safe.

39.    Royce Quad is approximately 190 yards long and over 70 yards deep. Four buildings have entrances facing Royce Quad: Powell Library, Royce Hall, Haines Hall, and Kaplan Hall. Each of these buildings has multiple entrances besides the entrances facing Royce Quad.

40.    The only walkway encumbered by the encampment was the brick walkway between Royce Hall and Powell Library. Students could walk around the encampment to get between the two buildings, adding about one minute to their walk.

//

//

FIRST AMENDED COMPLAINT

41.    Access to Tongva steps was not restricted by the encampment, nor were the East-West sidewalks of Royce Quad. Any restrictions to academic buildings were made by UCLA, not the encampment.

42.    The encampment area was set back from the entrances to Royce Hall and Powell Library, such that steps, entrances, and walkways surrounding these buildings were freely accessible. Both buildings could be easily accessed from their normal entrances (and these wide areas were later filled with Zionist counter-protestors, including during the daytime). UCLA administration opted to close the entrances proximate to the encampment, as announced in a BruinALERT.

43.    The encampment was a peaceful expression of dissent, demanding divestment from companies complicit in the Israeli occupation and demanding transparency in UC investments. The encampment included Jewish Seder services and Muslim prayer services—both of which were disrupted by the mob outside the encampment—and lectures and book discussions led by faculty and graduate students, all while maintaining a strict policy of non-engagement with the mob brewing outside the perimeter of the community space.

44.    The encampment included a library, food available to everyone, and a medical tent. There were film screenings, reading groups, and education sessions on the history of Israel-Palestine.

45.    People entering the encampment were asked to agree to certain safety protocols. No one was prohibited from the encampment unless their actions were disruptive or a safety threat.

46.    UCLA was immediately aware of the encampment and quickly released public statements and a message to the UCLA community. UCLA officials told students, faculty, and staff they were aware of the encampment, that it was peaceful, aligned with the right to free expression, and minimally disruptive. Classes continued as planned. UCLA announced that it had restricted access to Royce Hall and Powell Library but that everyone could enter from other entrances not directly facing the Royce Quad.

//

//

- 13 -

FIRST AMENDED COMPLAINT

**April 27, 2024: Counter Protesters Escalate Their Violence**

47.    On April 27, 2024, Administrative Chancellor Michael Beck sent an email to faculty stating that university officials had permitted a large pro-Israel counter protest for the next day. He told Randall Kuhn, a public health professor at UCLA, that a counter protest would not risk student safety. He further stated that counter protesters do not want to "pick a fight".

48.    Later that day, counter-protesters brought weapons, including a large sword that was confiscated by police, and threatened encampment members with violence, all while hurling racial and ethnic slurs. However, though UCLA officials were regularly in and around the encampment, they did not take any action to curb the dangerous acts of the counter-protestors—not even against the person brandishing a sword.

49.    Counter protestors physically harassed and verbally threatened students in the encampment, attempting to enter the encampment to attack students and destroy encampment members' property. Although Darnell Hunt and other UCLA administrators were repeatedly told of these events, they did not act to prevent escalating counter protestor violence and did not direct the UCPD to do so.

**April 28, 2024 and April 29, 2024: The Jumbotron Escalates Mob Violence**

50.    At about 9:00am on April 28, 2024, counter protesters erected a large Jumbotron in the area immediately adjacent to the encampment upon documented approval from the UCLA Administration. The main counterprotest was led by the Israeli American Council (IAC). By 10:30am, there were about 1,000 pro-Israel counter protesters immediately adjacent to our encampment.

51.    Despite receiving specific warnings from the Cultural Affairs Commission that "Zionists who do not attend this school are being allowed entry into UCLA to freely harass students" and that "various attacks like these have been happening on campus for weeks," These deliberate acts escalated the confrontation by permitting this expensive counter protest funded by a $70,000 GoFundMe account.

52.    Counter protesters pushed, spat on, punched, sexually harassed, and yelled slurs at the encampment and pro-Palestine protestors. They also held up racist and Islamophobic signs. One sign, for example, read "Palestine looks like" and featured a swastika and a scene of a woman being

- 14 -
FIRST AMENDED COMPLAINT

sexually assaulted. At about 2:00 pm, UCPD officers arrived in riot gear. Counter protesters clapped, cheered, and exclaimed "God Bless LAPD!" in response. As UCPD officers file in on the side of the counter-protest, counter protesters chant "L-A-P-D! WE LOVE YOU!" A counter protester yelled through a megaphone, "Let's leave! It's their turn now", thus making way for the police to file in.

53. Later that day, UCLA stood by as the counter protesters set up a jumbotron with extremely loud stadium-sized speakers immediately next to the encampment, without a permit. It remained there through May 2, 2024. This served as a siren song for the mob to assemble—it even gave them a place to do so, from which they eventually launched a violent mob attack on April 30, 2024. It also signaled to the mob that UCLA would not interfere with their campaign against the encampment.

54. The jumbotron played a loop of clips of graphic descriptions of rape and sexual violence, sounds of gunshots, screaming babies, clips of President Biden pledging unconditional support for Israel, and extremely loud amplified music, including a loop of the Israeli song 'Meni Mamtera,' a children's song Israeli soldiers used to torture Palestinian captives.

55. At night, the noise and light from the jumbotron made it impossible for encampment members to sleep. During the day, it interrupted teaching and research. The audio could be heard at high volume in classrooms and offices in Kaplan Hall and Haines Hall. Multiple faculty members filed Title IX complaints, including at least one survivor of sexual assault who had to walk by the jumbotron to go to work and felt that the images and audio were triggering. One faculty member reported the jumbotron to two deans and requested that they expedite its removal.

56. UCLA administration knew about the jumbotron and knew that it was inciting even more aggression among violent mob assembling outside the encampment. Administrators were regularly present at the encampment site. Administrative Vice Chancellor Michael Beck visited several times. Beck negotiated with encampment leaders about various safety-related topics and transmitted messages to and from the UCLA administration. Several deans were observed at the encampment site during this period. Throughout these visits, students and faculty alike warned the

- 15 -
FIRST AMENDED COMPLAINT

administrators about the steadily escalating violence against them and the grave danger that it would worsen.[11]

57.    UCLA also knew about the jumbotron because UCLA Fire Marshal Ricardo Barboza also regularly visited the encampment to make requests, including about how the encampment was physically organized, all in the shadow of the jumbotron.

58.    Representatives from the UCLA Student Affairs and Student Organizations, Leadership, and Engagement ("SOLE") offices were present nearly continuously during the day and sometimes in the evening, including Mick DeLuca, Philip Goodrich, Kristopher Kaupalolo, and Jason Zeck. Officers from UCPD and private security companies were also present, especially after the first day, and were there all day and night.

59.    On April 29, 2024, faculty and students organized a walkout in support of the student demands and their presence in the encampment. The walkout was also in response to UCLA's failure to protect students from violence from Zionist counter protesters.

60.    Faculty gathered at Royce Hall to demand accountability from the UCLA administration. Speeches emphasized solidarity with the encampment and condemned the UCLA administration's failure to protect students from the harm that had occurred and the danger of further attacks and increasing violence. On information and belief, these speeches were heard by more than one of the UCLA defendants, and the warnings from those speeches regarding the imminent violent attacks were reported to these UCLA defendants. Abandoned, the encampment members had to work to enhance their own safety after increased threats and the University's refusal to address those threats.

61.    That same day, tensions escalated further when a student raised a Palestinian flag atop scaffolding near Powell Library. Police forcibly removed the students, knocking them unconscious

---

[11] See the UCLA taskforce report on anti-Palestinian, anti-Muslim, and anti-Arab racism at UCLA- Gaye Johnson, Sherene Razack et al, *Report Of Task Force On Anti - Palestinian, Anti - Muslim And Anti - Arab Racism*, *Corrected May 15 Report*, at 8 (May 15 2024), https://www.dropbox.com/scl/fi/k6qkx97jdfrg61i6vlnxq/CORRECTED-MAY-15-REPORT-OF-TASK-FORCE-ON-ANTI.pdf?rlkey=j82r8gn89i03yclzn6hcxgz3u&amp;e=1&amp;st=6s3n3uvu&amp;dl=0

FIRST AMENDED COMPLAINT

during the arrest and denying them immediate medical aid. This police violence drew widespread criticism.

**April 30, 2024: The Mob Attack**

62.    At approximately 5 p.m. on April 30, 2024, UCLA declared the encampment unlawful. Despite evidence that violence was almost entirely initiated by the group of counter protesters who would attack the encampment later that night, Chancellor Block framed the encampment as the source of disruption.

63.    At approximately 10:30 PM, after UCLA officials' statements throughout the day that made clear the university would not impinge the mob's activity, the mob attacked. An initial group of dozens of men approached the Southeast corner of the encampment, some in Guy Fawkes-like white masks and some draped in Israeli flags. While the loud sound of crying babies played on the jumbotron, these men wielded chemical munitions, hammers, knives, stink bombs, commercial-grade fireworks, baseball bats, and metal and wooden rods.

64.    The mob sprayed chemical munitions at encampment members, yanked away boards and metal barricades, and hurled themselves at the encampment. Encampment members thought the mob was shooting at them. Men in full-faced white masks began breaking down the barriers using knives, hammers, and their feet. One, armed with a long metal rod, tried to spear people in the spine. Another member of the mob launched planks of wood into the encampment, striking a young woman in the back of the head.

65.    Encampment members witnessed the mob's extreme violence, threats of violence, and UCLA's failure to intervene. They saw people get their heads split open, suffer from open wounds and concussions, scream in pain and fear, with fireworks and mayhem all around them. They heard the racist, anti-Palestinian, Islamophobic insults and the threats of rape. As the mob became more menacing, UCLA private security did nothing—and then fled the area. For hours, encampment members were alone as the mob attacked; private security had left and police had not yet arrived. It was immediately apparent that there was not a semblance of protection for the physical safety of the encampment members, and the mob had successfully transformed a peaceful, interfaith community space into a site of horror.

FIRST AMENDED COMPLAINT

66. The mob shot multiple incendiary fireworks into the encampment, which was filled with flammable tents. One student frantically used a fire extinguisher to prevent any of the fireworks sparks from setting the tents ablaze.

67. In the first few minutes, and continuing sporadically throughout the hours-long mob attack, attackers sprayed various chemical munitions into the eyes of encampment members.

68. For nearly five hours that night, from approximately 10:30 p.m. until 3:15 a.m., the mob attack raged on. Mob members coordinated their attacks, taking turns spraying irritants at, punching, kicking, spitting on, screaming at, and throwing objects at the bodies of encampment members—from glass bottles to whole six-foot-long metal barricades. They got a running start back on the grass of the Eastern portion of Royce Quad and slammed themselves into part of the encampment's fortifications, dragging out pro-Palestinian protesters to further attack them. When they could make no more progress, they fell back a few yards and regrouped in coordination. Shortly after, they focused their attack on a new part of the encampment. They moved back and forth up and down the barricades, coordinating their actions to launch and relaunch their attacks in an unremitting tirade.

69. For many pro-Palestinian protesters, the scene evoked images they had personally experienced in Palestine, with Israeli soldiers standing by menacingly while illegal Israeli settlers attacked or killed Palestinians under their watch.

70. On the night of April 30-May 1, 2024, Defendants Block and Hunt personally observed in real-time via security cameras as an armed mob attacked the Palestine Solidarity Encampment with "bear mace and other chemical irritants, hammers, knives, stink bombs, high-grade fireworks, metal and wooden rods," sending multiple students to the hospital with serious injuries including head trauma requiring stitches and staples.

71. Despite having the authority to direct immediate law enforcement intervention, Defendants Block and Hunt made the conscious decision to allow the violence to continue for hours, with UCPD officers retreating inside Royce Hall rather than protecting students. When Plaintiffs and their families called UCPD for help, operators were instructed to tell callers the situation was "under control" and to hang up on them. After California Highway Patrol finally arrived at midnight,

Defendants permitted all attackers to leave without questioning or arresting a single assailant, while planning to arrest only the student victims the following day.

72. From April 25-30, 2024, Defendants Block, Hunt, Beck, Drake, Gorden, Braziel, and Scheffler, with full knowledge of ongoing violent attacks against Plaintiffs, deliberately permitted violent, self-described Zionists and white supremacists to remain on campus and continue threatening and assaulting pro-Palestinian protesters with racist and homophobic slurs, including "Hamas would kill you fags," "bitch-ass n—," "listen to your master" (directed at Black women), and explicit death threats such as "We're not American Jews! We're Israelis! You stand up against us, we'll fucking slit your throat."

73. Despite multiple reports to UCPD, campus administrators, and the Office of Equity, Diversity, and Inclusion documenting these attacks, Defendants made the conscious decision to take no protective action while simultaneously providing armed private security guards to protect the counter protesters' expensive equipment.

74. Following the violent attacks on the encampment, Defendants Block, Hunt, Beck, and Drake engaged in a coordinated campaign to conceal their facilitation of violence against Plaintiffs. Although this campaign did not cause the injuries which are the subject of this lawsuit, the misstatements and omissions of these defendants are evidence of the defendants' motives to suppress protected political speech on behalf of and in support of members of protected classes based upon their religious, racial, linguistic, and national origins.

75. Despite having video evidence and direct knowledge that the encampment residents were victims of unprovoked attacks by a violent mob, Defendant Block issued public statements falsely characterizing the peaceful protesters as the aggressors and claiming that "students on their way to class have been physically blocked from accessing parts of the campus," when in truth all buildings and classrooms remained accessible and campus security had closed certain entrances by administrative decision, not student action.

76. Block omitted from his public statements any mention of the documented racist threats, physical assaults, or chemical weapons attacks. These material misrepresentations were made with knowledge of their falsity and with the specific intent to justify the planned arrest of student

- 19 -

FIRST AMENDED COMPLAINT

victims while shielding the actual perpetrators from accountability, demonstrating fraud in the concealment of Defendants' own misconduct and deliberate facilitation of violence against Plaintiffs.

77. Block also concealed that UCLA's communications about the encampment were being managed by SKDK, a firm that is a registered agent for the State of Israel under the Foreign Agents Registration Act.

**May 1, 2024 to May 2, 2024: The Police Raid**

78. Less than twelve (12) hours after encampment members survived the violent mob attack, police spent the following day setting the stage for their own raid on the encampment. From the late hours of May 1, 2024, to the early morning of May 2, 2024, law enforcement agencies, including the CHP and LAPD, began their raid on the encampment. Officers targeted barricades with flashbangs, forcibly removing and arresting students, faculty, and community members. Reports detailed severe injuries, including burns, respiratory issues, and head trauma, all caused by excessive police force.

79. Pro-Palestinian protesters witnessed the police force's extreme violence and threats of violence against their fellow peaceful protestors. They saw fingers shot off, people dragged and thrown by police, zip ties cut into wrists, and people being threatened with live fire. They knew they were being arrested for their pro-Palestinian activity, not a violation of the law.

80. Over 200 individuals were arrested during the raid, and many were subjected to invasive searches, false arrests, sexual assaults, and prolonged detentions. Protesters reported being unmasked and paraded before cameras, their identities exposed without consent. Women wearing hijabs were forced to remove them, infringing on their religious practices.

81. By 6:00 AM on May 2, 2024, the encampment had been completely leveled. UCLA's response drew condemnation from human rights organizations and advocacy groups, who criticized the administration for prioritizing external interest groups over the safety and constitutional rights of its own students and community.

//

//

- 20 -
FIRST AMENDED COMPLAINT

82.     In the aftermath, student groups continued their advocacy through teach-ins and rallies. The events highlighted systemic issues within UCLA's administration, including its failure to protect marginalized communities and its complicity in perpetuating structural violence.

83.     The events at UCLA underscore systemic bias and administrative failure to protect pro-Palestinian advocates from harassment and violence. While the encampment sought to foster dialogue and accountability, the university's actions reflected a pattern of suppressing dissent and prioritizing interest group pressures over community safety and equity.[12]

84.     The University's deployment of police on May 1-2, 2024, was neither neutral nor aimed at ensuring the safety of all students. Law enforcement protection was withheld when counter-protestors engaged in violence against the encampment the prior evening yet mobilized in overwhelming force against peaceful demonstrators advocating for Palestinian rights.

85.     The size, posture, and tactics of the police presence which included military-style equipment and riot control weapons were disproportionate to any legitimate safety need and were calculated to intimidate, surveil, and disperse protected political expression if that expression supported or advocated for the students, faculty, and staff whose families were being killed in Gaza.

86.     This selective enforcement not only escalated tensions but also entrenched a climate of fear for students and faculty who wish to engage in pro-Palestinian, anti-genocide advocacy or other disfavored political expression, deterring many from doing so and forcing others to limit, conceal, or self-censor their participation to avoid repercussions, harm or arrest—all in the name of equity and justice for all.

**June 10, 2024: Kettling and Police Shootings**

87.     The organizers of the Palestine Solidarity Encampment advertised a memorial march to begin in the early afternoon on June 10, 2024, to honor the lives of Palestinians in Gaza killed by Israeli Defense Forces since October 7, 2023. The march, with almost 200 participants, started at approximately 2 p.m. next to the Bruin bear sculpture in Bruin Plaza, a central outdoor space for

---

[12] Maya Vibhakar, *UCLA academic departments release statements condemning handling of encampment - Daily Bruin*, DAILY BRUIN (May 4, 2024), *https://dailybruin.com/2024/05/04/ucla-academic-departments-release-statements-condemning-handling-of-encampment*.

FIRST AMENDED COMPLAINT

undergraduates and a common site for rallies.

88.    After several hours and multiple location changes, the marchers arrived in their funeral procession at Shapiro Court, reading the names of those killed in Gaza.

89.    At approximately 8 p.m., police with batons and 40mm weapons loaded with high-speed kinetic impact projectiles—what the police term "less than lethal" munitions—including rubber bullets and pepper bullets, assembled near the marchers.

90.    As over a hundred protesters made up of students, faculty, and staff attempted to exit from the South side of the courtyard, they were met with another line of UCPD officers who did not allow them to leave.

91.    Marchers, all attempting to disperse and avoid physical confrontation with UCPD, were now being dangerously kettled into a very tight space toward the South exit.

92.    A UCPD officer yelled at the crowd to move, but there was nowhere to go. Police blocked all means of exit.

93.    Police pulled marchers, grabbing arms, legs, and torsos as well as clothing and backpacks. Officers hit marchers with their batons, hands, and feet as they arrested them. Some marchers were choked, attacked, and stepped on by officers.

94.    Officers fired the so-called "less lethal" munitions at a student from less than five feet away.

95.    Police violently arrested marchers and walked them into Dodd Hall, where they were detained, seated in zip ties against the wall.

**Ongoing Harm and Continuing Threat**

96.    Defendants' actions on April 30-May 2, 2024, and June 10, 2024, are not isolated incidents but part of an ongoing pattern of viewpoint-based suppression of protected speech. Since these events, UCLA has adopted and continues to enforce new protest restrictions, including bans on masks, encampments, and the blocking of pathways, which are applied selectively to demonstrations supporting Palestinian rights.

//

//

- 22 -

FIRST AMENDED COMPLAINT

97.    Plaintiffs remain students, faculty, and community members engaged in expressive activity on campus, and they face a credible and well-founded fear that these policies will be used again to arrest, discipline, or otherwise retaliate against them for their protected speech.

98.    This selective enforcement, coupled with the prior deployment of armed police to intimidate, surveil, and forcibly disperse peaceful demonstrators, has created a climate of fear that deters many from participating in political expression at all, and forces others to limit, conceal, or self-censor their participation to avoid repercussions, harm, or arrest.

99.    Absent injunctive relief, these unconstitutional policies and practices will continue to chill speech, undermine academic freedom, and prevent plaintiffs and others similarly situated from fully exercising their rights to free speech, association, and assembly.

**Further Protest Intent and the Threat of Recurrent Illegal Suppression**

100.    Plaintiffs and members of the Palestine Solidarity movement at UCLA intend to continue engaging in on-campus expressive activities, including rallies, marches, and, if appropriate, renewed encampments or other establishment of what the University deems "structures" in Royce Quad and other campus locations, to advocate for divestment from companies profiting from Israel's military actions.

101.    Defendants have not disavowed their prior actions in ordering the May 2, 2024 clearing of the Palestine Solidarity Encampment or the June 10, 2024 arrests of Plaintiffs.

102.    Defendants have publicly defended their handling of the May 2 and June 10 incidents as appropriate responses to campus protest activity, and have not implemented any changes to University policies or enforcement practices governing the declaration of unlawful assemblies, use of police force against peaceful demonstrators, or arrests at on-campus protests that would reduce the likelihood that peaceful, protected speech will be further repressed in violation of the California Constitution and statutory guarantees. As but one example on October 21, 2024, on Royce Quad, Jewish students erected a small three-sided "sukkah" to commemorate a traditional Jewish harvest festival, naming it the "Gaza Solidarity Sukkkah".  UCLA officials declared the

- 23 -

FIRST AMENDED COMPLAINT

Sukkah to be in violation of time place and manner restrictions, UCPD in riot gear ordered the students to disperse and arrested at least one student. On information and belief none of the violent counter-protestors who had been threatening the Jewish students in the Sukkah were arrested or ordered to disperse.

103.   On information and belief, UCLA continues to maintain and enforce policies authorizing the declaration of unlawful assemblies and the removal of protest encampments under circumstances alleged herein to violate the California Constitution, and has rejected calls from faculty, students, and community members to rescind or amend such policies

104.   The continuation of these policies, coupled with Defendants' public defense of the challenged actions and the absence of any institutional reforms, establishes a reasonable probability that Plaintiffs will again be subjected to the same violations of their rights in connection with future expressive activities on campus absent injunctive relief from this Court.

## JURISDICTION AND VENUE

105.   Jurisdiction is proper under Article VI, § 10 of the California Constitution and under Code of Civil Procedure sections 410, 526, 526a, and 1060.

106.   Venue is proper in this Court pursuant to Code of Civil Procedure §§ 393 and 395 because the conduct complained of occurred in Los Angeles, and this action proceeds against public officers in Los Angeles for actions taken "in virtue of [their] office." Code Civ. Proc. § 393(b). The relief sought is within this Court's power to grant.

## PARTIES

## THE PLAINTIFFS

107.   The Plaintiffs are thirty-five people who were devastated by Israel's genocidal attacks on Palestine, UCLA's blanket support for them, and UCLA's investment in companies that profit from mass death and human suffering. They believe in Palestine's right to self-determination, they want an end to the genocide in Palestine, they want UCLA to divest from companies profiting from it, and they want their freedom of expression to be respected.

- 24 -
FIRST AMENDED COMPLAINT

108.    The Plaintiffs were on UCLA's campus between April 30 and May 2, 2024, or June 10, 2024. They are students and faculty at UCLA, legal observers, journalists, and concerned citizens. They are Jewish, Muslim, Christian, atheist, and agnostic. They are Black, white, Palestinian, Arab, South and East Asian, and Latin American.

109.    All Plaintiffs bring this suit in their individual capacities for injunctive, declaratory, and monetary relief against the Defendants.

110.    All Plaintiffs have either complied or substantially complied with the Government Claims filing requirements and have administratively exhausted their ability to seek remedies against the California Highway Patrol and the City of Los Angeles.

**Thistle Boosinger**

111.    Plaintiff Thistle Boosinger is a pro-Palestinian protester. At all relevant times, she was a resident of Los Angeles County.

112.    Before the violent mob attack on the encampment, Thistle was a Taiko drum musician and taught drumming in music classes and an afterschool program.

113.    Thistle frequently visited UCLA's campus, enjoying time with her friends and fellow musicians. Before April 30, 2024, Thistle's social community revolved in large part around her drum group, with which she practiced three to four days a week.

114.    On April 30, 2024, Thistle was helping to distribute masks and other gear at the Palestine Solidarity Encampment when a group of mob members tried to dismantle the encampment's protective structures.

115.    Thistle reached between the plywood boards and grabbed the metal bike rack UCLA staff had placed around the perimeter of the encampment. As she reached out her hand, members of the mob incited other attackers, yelling, "Hit their hands! Hit their hands!!"  A member of the mob hit Thistle's hand repeatedly with a metal rod so hard that it shattered her hand and severed a nerve in her ring finger.

116.    Thistle was in excruciating pain that night and for many days thereafter. She has had three painful and unsuccessful surgeries on her hand.

//

- 25 -

FIRST AMENDED COMPLAINT

117. Thistle has ongoing pain as well as reduced mobility and strength in her hand. After each of her three surgeries, Thistle has lost income due to her inability to use her hand. She has not been able to play the drums ever since. She can no longer teach music and has been forced to attempt other employment due to her injuries.

118. Thistle continues to suffer psychologically, financially, and emotionally to the present day.

**Roe 1**

119. Roe 1 is a Palestinian with family in Palestine. During her time at UCLA, Roe 1 was a member of Students for Justice in Palestine, the Middle Eastern Student Association, the Muslim Student Association, and the Psi Chi International Honors Society in Psychology. At all relevant times, Roe 1 was a student at UCLA.

120. Roe 1 is the victim of multiple incidents of racist and anti-Palestinian harassment at UCLA because she is Palestinian, including an incident when she was attacked while she was selling keffiyehs. Despite making a formal complaint about this attack, Roe 1 never received an update on this investigation or any other investigation from UCLA.

121. Roe 1 was present in the encampment for several days before the mob attacked on April 30, 2024. She saw the evolution of this group from a somewhat small throng of Zionist counter protesters shouting vulgar, racist, and sexualized insults and threats into a massive, overwhelmingly violent, unhinged mob on April 30.

122. On April 27, they called her a "baby killer" and a "terrorist" and asked her if she would care if she were raped. On April 28, their threats escalated into physical violence, causing Roe 1 to collapse in a panic attack. On April 29, a group of Zionists surrounded and threatened her, swinging so close to her face that she had another panic attack because of the assault. Roe 1 had multiple panic attacks during this time, whether at the encampment or away from it, due to the menace of this escalating group of counter protesters.

123. On the night of April 30, mob members sprayed her with chemical munitions. Her eyes burned as if on fire, and she fell to the ground in immense pain, hyperventilating. Roe 1 felt like

FIRST AMENDED COMPLAINT

she would never be able to open her eyes. At that moment, the mob started attacking the encampment with fireworks. Roe 1 could not see and had to be taken to the encampment's medical tent.

124. The mob's chemical munition and firework attack was highly traumatizing. The mob attack reminded her of scenes she was familiar with from growing up Palestinian—scenes of illegal Zionist settlers storming the homes of Palestinians while the Israeli military stood by and watched or even facilitated. The mob attackers used the same tactics at UCLA she had seen in Palestine.

125. Roe 1 was also present on June 10, 2024, for an anti-genocide protest on UCLA's campus. Police responded violently, arresting peaceful protesters, kettling them, and shooting protesters with kinetic impact projectiles.

126. Without warning, UCPD officers swarmed Roe 1, lifting her into the air and slamming her violently into the ground. She screamed in terror. As three large police officers kept forcibly shoving her to the ground, she was confused, disoriented, and in serious pain. Despite not being able to move, the officers kept screaming at her, "Stop resisting!" as they zip-tied her.

127. As police pulled her up off the ground, Roe 1 tried to speak, but police shoved her so hard that her head whiplashed forward in extreme pain. She collapsed from the beating, leaving police to carry her limp, folded body up the stairs. Two officers then pushed her up against a wall.

128. Police would not say why she was detained. She demanded access to a lawyer. Police further tightened her zip-ties until her wrists bled. A female officer told her that she would be released if she just provided her name. After she had given her name, a Lieutenant arrived and told her she would be taken to the police station.

129. Police refused to say why she was arrested and locked Roe 1 in a room for around an hour where she was taunted by officers who had previously refused to investigate claims she made.

130. She sustained bruises requiring medical treatment as a result of being violently thrown to the ground and psychological and emotional to this day.

131. Roe 1 continues to suffer psychologically and emotionally to this day, including suffering from panic attacks.

//

//

- 27 -

FIRST AMENDED COMPLAINT

**Roe 2**

132.    Plaintiff Roe 2 is a pro-Palestinian protester who works as a schoolteacher in Los Angeles. He was a lifeguard and had first aid training. At all relevant times, he was a resident of Los Angeles County.

133.    Roe 2 was appalled by footage of the mob attack on April 30 and, given his first aid knowledge and CPR training, thought he could help people if there were further mob attacks.

134.    Roe 2 came to the encampment the night of May 1 and was present the police arrived and stormed it, pointing rifles at his face and those around him, terrifying everyone.

135.    Later police stormed the plywood enclosure the encampment members had erected to protect themselves from the mob assaults.  Roe 2 saw the explosions from percussion grenades as they were going off over his head.

136.    The police, wielding long guns, shot several people in front of Roe 2. Roe 2 was doing nothing to threaten anyone, and the police had no reason to think otherwise.  Despite this, an officer aimed what looked like a shotgun directly at him and shot him in the chest. He fell to the ground in pain, watching others get shot while percussion grenades exploded overhead.

137.    Roe 2's pain, already excruciating, became even more unbearable throughout the night.

138.    Roe 2 suffered a fractured sternum and a pulmonary contusion. In addition to his physical injuries, Roe 2 continues to suffer psychologically and emotionally to the present day.

**Faraaz Qureshi**

139.    Faraaz Qureshi, a student and activist, was a peaceful participant in a protest at UCLA on the night of May 1st, 2024, and the early hours of May 2nd, 2024, when the police raided the Palestine Solidarity Encampment.

140.    At approximately 4:35 a.m., Qureshi was shot four times—once in the right pinky finger, twice in the chest, and once in the back. The impact of the rubber bullet on his finger caused a severe open fracture, breaking the bone into three pieces, dislocating the finger, and causing extensive soft tissue damage. His skin was torn open, exposing bone, and he experienced immediate

- 28 -

FIRST AMENDED COMPLAINT

and intense pain. His finger quickly began to turn blue, indicating possible vascular compromise. The other rounds left contusions and abrasions on his chest and back, causing additional pain and bruising.

141.    Due to the police barricades preventing emergency medical personnel from entering the protest area, Qureshi had to be evacuated by fellow protesters. He and his friends navigated through bushes, fences, and infrastructure to reach a waiting car, which transported him to the emergency room.

142.    Upon arrival, doctors initially considered amputating his finger due to the severity of the injury. However, after extensive examination, he underwent a surgical procedure to clean and stabilize the wound. He was treated with IV morphine for pain management and prescribed antibiotics to prevent infection.

143.    As of his most recent medical evaluation, Qureshi continues to experience significant pain and limited mobility in his finger. He has undergone follow-up appointments with orthopedic specialists and faces the possibility of additional surgeries to restore function to his hand. His injuries have directly impacted his ability to perform daily tasks, and he remains unable to work since the date of the incident.

144.    Beyond the physical injuries, Qureshi has suffered severe emotional distress. The trauma of witnessing police brutality, coupled with the pain and uncertainty surrounding his recovery, has left him struggling with anxiety and psychological distress. He has also experienced significant disruption to his personal and academic life.

**Jakob Johnson**

145.    Jakob Johnson is a 2024 graduate of UCLA. During his time at UCLA, he worked at the school library. At all relevant times, she was a resident of Los Angeles County.

146.    On June 10, 2024, Jakob joined other students and faculty on campus to bear witness to over 46,000 Palestinians who had been martyred or buried under the rubble by Israel's genocidal assault on Gaza.

147.    The peaceful protesters' funeral march was eventually marshaled by police into a narrow courtyard between two buildings, trapping them there with no way to leave. Jakob and others tried to leave, but they were blocked by police at the south side of the courtyard. As Jakob was trying

- 29 -
FIRST AMENDED COMPLAINT

to find an exit, police quickly advanced on him and others. All of a sudden, Jakob saw a group of UCPD officers violently throw a young woman to the ground just feet away from him, holding her up by her hands while beating her.

148. As Jakob pleaded with the police to stop beating her, the police continued to advance, and Jakob noticed one brandishing a gun.

149. The police that were advancing continued to yell, "Move back!" while the police behind Jakob and the crowd prevented them from moving anywhere. As the police kettled Jakob and the others, Jakob held both of his hands up in the air and pleaded for the police to stop advancing and to let them leave and disperse safely.

150. Jakob was doing nothing to threaten anyone, and the police had no reason to think otherwise. He watched in terror for some twenty seconds as an officer lined up a shot, pointing his weapon directly at his chest. The officer shot Jakob from less than ten feet away. The rubber bullet knocked Jakob to the ground where he was nearly trampled because of the police charge on the trapped crowd. He panicked and went into shock. He felt like he might die right there.

151. Although a volunteer medic who was present warned the police that Jakob needed urgent medical attention, the police continued to crush the crowd into a small area, knocking Jakob back down onto the ground twice more.

152. After Jakob was carried to safety away from further police attacks volunteer medics cleaned Jakob's wound and told him to go to the emergency room immediately. At the hospital emergency room, Jakob was coughing up blood and was hospitalized.

153. The so-called "less lethal munition" injured Jakob's heart and lungs and caused an entry wound that did not heal for weeks and permanently scarred him.

154. Although Jakob experienced severe depression, UCLA refused him access to the free UCLA Counseling and Psychological Services offered to students.

155. Although Jakob had been admitted to law school, in August of 2024, two weeks before classes started, Jakob had to withdraw as he was still reeling from the aftermath of being shot by police.

//

- 30 -

FIRST AMENDED COMPLAINT

156.    In October of 2024, Jewish Voice for Peace organized an on-campus event to observe the Jewish holiday of Sukkot.  Jakob was present when a phalanx of UCPD officers in full riot gear charged them, triggering an episode so severe that Jakob had trouble breathing. He continues to suffer psychologically and emotionally to this day.

**Jack Kearns**

157.    Jack Kearns is a 2024 graduate of UCLA where he obtained a Master of Public Policy. Jack was present in the encampment from the day it was established and was there regularly between April 25 and May 2. At all relevant times, he was a resident of Los Angeles County.

158.    On the night of April 30, Jack started a shift as part of the safety team at the encampment at 9:00 PM. While things were calm initially, the mob started assembling outside the encampment at around 10:30 PM, playing loud music, and insulting him and people.

159.    Jack was on the front lines when the mob launched fireworks into the Palestine Solidarity Encampment, and he was sprayed with chemical munitions by the mob. The mob began to violently attack the encampment around midnight.

160.    Shortly after seeing another pro-Palestinian protester being assaulted, Jack tried to pull him to safety. As he reached his arms around the other protester, a member of the mob hit Jack in the head with a large piece of wood. Jack fell to the ground, lost consciousness, and was treated by medics. He struggled to stand up, was woozy, and had a hard time seeing.

161.    While waiting at the medic tent, he saw the other pro-Palestinian protester who had been beaten by the mob walking up, covered in blood.

162.    A fellow protester told Jack he needed to go to the hospital for his head wound. Jack went to a hospital for treatment for his head wound and concussion. After a CT scan and examination, Jack was diagnosed with a concussion. Doctors told Jack he should have an MRI, which he did thereafter.

163.    Jack experienced pain, dizziness, and constant headaches for weeks after the brutal attack forcing him to miss work and valuable time in the classroom.

//

//

- 31 -

FIRST AMENDED COMPLAINT

**Afnan Khawaja**

164.    Plaintiff Afnan Khawaja was a fourth-year computer science student at UCLA at the time of the attack. At all relevant times, he was a resident of California.

165.    On May 1, 2024, on the UCLA Campus, a violent mob punched and kicked Afnan in the face multiple times while Afnan attempted to rescue another student from the mob, causing cuts to Afnan's lip.

166.    Shortly after the mob attacked Afnan without provocation, Afnan retreated behind a barricade, but the mob sprayed a chemical munition and temporarily blinded Afnan multiple times, leaving residual pain and burning in Afnan's hands and face.

167.    Minutes later, the mob then dismantled the barricade, and as Afnan tried to recover a piece of the barricade to protect the defenseless students that were being attacked by the violent mob, Defendant Edan On blasted Afnan on the head with a wooden rod, concussing and injuring Afnan.

168.    As a direct and proximate result of the attack and Defendants' reckless and negligent conduct, Afnan suffered multiple injuries and damages, the exact amount of which will be determined according to proof at trial.

**Dolores Quintana**

169.    Plaintiff Dolores Quintana is a journalist and the editor of the Century City Westwood News. At all relevant times, she was a resident of Los Angeles County.

170.    By the time Dolores arrived to cover the April 30 rioters attacking the encampment, she was already known to them because of her earlier newsgathering.  On April 25 she witnessed members of the mob trying to infiltrate the encampment and provoke encampment members, yelling "If you touch us we'll beat your ass!". Encampment members calmly formed a nonviolent human line to protect the encampment and de-escalate the situation until the mob members left. On April 28, a counter protester tore down a pro-Palestinian sign and threw it at Dolores, hitting her in the head while nearby UCLA private security never intervened.

//

//

- 32 -

FIRST AMENDED COMPLAINT

171.    The mob accosted Dolores upon her arrival on April 30, aggressively approaching her in such a threatening manner that she fell while backpedaling. As she gathered herself to stand, mob member Edan On, wearing a terrifying white mask, menacingly got within an inch of her face.

172.    As On approached her, another member of the mob threatened Dolores, wielding a large chunk of wood just inches from her face. Another member of the mob then shouted in her face with a megaphone and shined a bright LED light in her eyes, blinding her.

173.    As Dolores continued to film, Edan On came up behind her and threatened her with a long white pole.

174.    Dolores also filmed another member of the mob named Eyal Shalom spraying chemical munitions at a pro-Palestinian protester. As Dolores moved backward to escape the cloud of chemical munition Eyal Shalom ran into her. Another member of the mob yelled "Fuck you!" at Dolores and slapped her hand causing her phone to fly several feet away to the ground.

175.    Around 1:00 AM, Dolores spotted Eyal Shalom moving towards her. Before she could react, a second mob member coordinated with Shalom to distract Dolores by blinding her with a bright light. While she was blinded by the light one attacker shined in her eyes, Shalom sprayed chemical munitions directly into Dolores' face and eyes at point-blank range. The chemical spray blinded her left eye, and caused excruciating pain, burning her eye and her face.

176.    Her face was burning, and she could barely breathe. She could not see out of her left eye, and her right eye began to burn and get blurry. As Dolores tried to get away, she heard fellow reporter Catherine Hamilton's blood-curdling scream from being sprayed with chemical munitions.

**Catherine Hamilton**

177.    Catherine Hamilton is a fourth-year undergraduate student at UCLA, majoring in gender studies and political science with a minor in professional writing. She is currently a Board Member and Executive Committee Member of the UCLA Communications Board. Catherine is also the Editor in Chief of the UCLA Undergraduate Law Journal, where she previously served as the Managing Editor, Executive Articles Editor, and Editor since 2021. She also served as the News Editor for the Daily Bruin student newspaper for the 2023-2024 academic year and previously held roles as the National News and Higher Education Assistant Editor and Contributor at the paper. At

FIRST AMENDED COMPLAINT

all relevant times, she was a resident of Los Angeles County.

178.    On Saturday evening, April 27, 2024, Catherine arrived on campus at approximately 11:00 PM in her role as a journalist and photographer. Nouri Mehdizadeh---one of the Zionist counter protesters who was present regularly at the encampment---approached Catherine with a group of around ten other people, threatening and assaulting her. Mehdizadeh repeatedly cursed her and took pictures of her press credentials which contained personal identifying information.

179.    Mehdizadeh grabbed Catherine and struck her. Other mob members shined bright lights directly into her eyes. UCLA private security who witnessed this from nearby did nothing.

180.    On April 28, 2024, counter protesters, escalating the violence that would eventually lead to the mob attack a few days later, assaulted, harassed, and threatened Catherine while she was newsgathering. UCLA private security again refused to intervene, saying she had put herself at risk by coming to do her job.

181.    On April 30, 2024, Catherine again returned to cover the encampment. In response to the increasing harassment and assaults on the media, UCLA Media Relations had previously promised and granted all student reporters from The Daily Bruin 24-hour access to Haines Hall for their safety. When Catherine tried to enter the building UCLA's private security denied her access.

182.    Catherine called UCLA Media Relations to notify them that UCLA's private security had kept her from entering Haines Hall.  She warned that she was concerned for her safety as she had been attacked multiple times, and the mob was growing increasingly violent. Despite her repeated calls to UCLA Media Relations over three hours, she was never allowed into the building.

183.    The mob repeatedly struck Catherine and sprayed her and her reporter colleagues with painful chemical munitions. They also shot fireworks and other incendiaries into the Palestine Solidarity Encampment, burning Catherine's hand and making her fear for her life.

184.    Mehdizadeh followed Catherine around the perimeter of the Palestinian Solidarity Encampment, yelling at her and terrifying her, coordinating his assaults with other mob members.

185.    Just after midnight on April 30, Mehdizadeh and other mob members coordinated to physically assault Catherine and her Daily Bruin colleagues. The mob coordinated with Mehdizadeh to block Catherine and her colleagues' path by forming a human wall with outstretched arms,

preventing them from moving forward. Suddenly, the mob sprayed an unknown chemical munition directly into Catherine's eyes, causing immense pain and significantly impairing her vision.

186.    A member of the mob also hit Catherine hard in the chest and knocked one of her colleagues to the ground while screaming racial epithets. As Catherine and her colleagues screamed in pain, nearby UCLA private security did nothing.

187.    Upon being attacked by Mehdizadeh and the mob, Catherine felt like she was having a panic attack. The pain in her sternum was so intense that she could not stand up. Catherine also could not see anything, and her eyes were in excruciating pain. She asked UCLA private security if they could help her with water for her eyes and if they could help her and her colleagues safely get back to the Daily Bruin office. UCLA private security refused.

188.    As a result of these attacks, Catherine required hospital treatment and her eyes burned for several days afterward. Similarly, the pain in Catherine's sternum continued for several days, making it hard to even sit up.

189.    Catherine continues to suffer psychologically and emotionally to this day. She truly believed the mob was going to kill someone that night. She barely goes to campus and minimizes her time there.

**Roe 8**

190.    Plaintiff Roe 8 is a pro-Palestinian protester and a 3rd year undergraduate student at UCLA who works for the UCLA Library. At all relevant times, they were a resident of Los Angeles County.

191.    At approximately 8:00 PM on April 25, Roe 8 was at the Palestine Solidarity Encampment, when an older man carrying a large Israeli flag approached them with a group from the Zionist counter protesters. The group was yelling at and threatening the encampment members when the older man with the flag shoved Roe 8 off the ledge onto the ground and kicked Roe 8. Nearby UCLA private security guards did nothing to prevent the attack or help Roe 8.

192.    As the counter protesters who would later attack the encampment en masse on April 30 became more aggressive and violent, they sexually harassed and physically threatened Roe 8. Early one morning while it was still dark, Roe 8 was standing watch at the edge of the encampment when

- 35 -
FIRST AMENDED COMPLAINT

another older man rode his bicycle toward them, threatening to run Roe 8 over and saying he hoped Roe 8 would be raped.

193. Roe 8 was present early in the morning of May 2 when police violently attacked the encampment. Police struck Roe with a baton multiple times as they kettled Roe 8 and others.

194. Roe 8, who was wearing a keffiyeh, was not threatening anyone and had been completely nonviolent. Despite this, an officer violently grabbed Roe 8 from behind and slammed them to the ground. Multiple officers piled on top, and one shoved Roe 8's face down so hard that it split open their nose.  While their nose was bleeding, and their mouth was filled with dirt an officer kneeled on Roe 8's neck and shoulders while another tied zip-ties, so tightly that Roe 8 lost feeling in their fingers, and their hands turned purple.

195. While Roe 8 was still bleeding, in pain, and losing circulation in their hands, a male officer unzipped Roe 8's sweatshirt and physically searched them. Instead of a pat-down for weapons, the officer probed deeply, and for quite a long time, into Roe 8's pant pockets. The grope-like "search" was so deep and so prolonged that Roe 8 felt extremely uncomfortable and sexually violated. Roe 8 had no weapons.

196. Roe 8 remained on a curb for about an hour, asking one officer with a pair of scissors if he could loosen the zip-ties because Roe 8 was in immense pain. The officer said he could not do anything about it, had no way of cutting them off, and refused to get someone else to help Roe 8.

197. A female officer eventually came to confiscate the rest of Roe 8's belongings. While attempting to remove a ring from Roe 8's finger, the female officer noticed that their fingers were purple and so swollen that she could not remove Roe 8's ring. The female officer immediately asked another officer to replace Roe 8's zip ties with a less harmful pair.

198. Throughout the hours-long detention Roe 8 was never allowed to use the restroom or given water.

199. In addition to suffering a cut and battered face, Roe 8 suffered painful bruises on her torso, arms, and legs that lasted for many days.

200. Roe 8 continues to suffer psychologically and emotionally to this day.

//

FIRST AMENDED COMPLAINT

**Shandra Campbell**

201.    Plaintiff Shandra Campbell is a pro-Palestinian protester. She is a member of CodePink, a feminist grassroots organization working to end U.S. warfare and imperialism, support peace and human rights initiatives, and redirect resources into healthcare, education, green jobs, and other life-affirming programs.

202.    On April 30, 2024, the mob attacked Shandra with chemical munitions, causing her chest and eyes to start burning and then to cough and gag due to her asthma.

203.    After going to her car to get a mask and goggles for protection, she returned to the encampment to help administer first aid, staying as far from the attackers as possible. She felt like she was in a war zone, but stayed both to render aid and because it was too dangerous to leave until the rioting mob left.

204.    On the night of the protest on June 10, 2024, A UCPD Lieutenant sexually assaulted Shandra, grabbing and groping her breasts under the pretext of detaining her. Shandra had no weapons and did not pose a threat to the officer or anyone else. There was no reasonable justification for the Lieutenant to grab her in a sexually assaultive manner.

205.    Shandra continues to suffer psychologically and emotionally to the present day.

**Roe 6**

206.    Plaintiff Roe 6 is a pro-Palestinian protester. She is a vocalist, songwriter, music producer, and educator. At all relevant times, she was a resident of Los Angeles County.

207.    On the night of April 29 after 10:00 PM, Roe 6 went to the outer edge of the safety perimeter. Counter protesters, escalating their violence in a ramp-up to their April 30 attack, threatened her and threw water bottles at her.

208.    On the night of April 30, Roe 6 was present when the mob assembled. Around 11:00 PM, they started shooting fireworks into the encampment, one exploding next to her.

209.    The mob assaulted Roe 6 with chemical munitions twice. The spray was all around the air, making it hard to breathe. This was terrifying as she could not see, was in extreme pain, and struggled to breathe. The chemicals spread all over her hair, skin, and hands. No matter how many times she washed her hands, they wouldn't stop burning, and it was extremely painful.

210.     A mob member threw a projectile, which struck her left eye, causing excruciating pain. Roe 6 collapsed and was screaming. She was unable to see out of her eye for around twenty minutes and got a black eye. Someone from the camp assisted her and took her to their medical tent, where she got some ice.

211.     Out of concern that the authorities were not protecting the encampment from violent attacks, Roe 6 remained present on May 1. Roe 6 was unable to get any rest due to the burning and pain from the macing. She went to the medical tent in the morning and had her hands wrapped up. Her hands burned the entirety of May 1.

212.     In the early hours of the morning on May 2, police shot flash bangs and rubber bullets.

213.     Roe 6 saw the police hitting people with batons. There was a professor next to Roe 6, who was screaming, identifying herself as a professor. This same officer then grabbed Roe 6 by the collar of her jacket and dragged her down to the ground.

214.     Police then zip-tied Roe 6 and was detained for hours. During this time, Roe 6 was denied medical treatment for over eight hours, despite numerous requests. She told the police her hands were burning, showed them the wrappings, and repeatedly asked for a medic, but the police denied her requests. They kept telling her she would be treated later.

215.     When Roe 6 eventually was treated hours later, she had developed a severe reaction from the chemical munitions and fireworks.

216.     Police patted Roe 6 down several times. She had a menstrual pad on and was repeatedly rubbed in her vaginal area. Once before going on the bus, once after getting off the bus, and once before being booked by another female officer. She was patted down yet again by that same officer.

217.     After her release, Roe 6 sought medical treatment for her eye.

218.     Roe 6 experiences ongoing blurriness in her left eye. In addition to her physical injuries, Roe 6 continues to suffer psychologically and emotionally to the present day.

//

//

FIRST AMENDED COMPLAINT

**Angelica Jit**

219.    Plaintiff Angelica Jit was a community member supporting student protesters at the at the time of the attack. At all relevant times, she was a resident of California.

220.    On May 1, 2024, on the UCLA Campus, upon information and belief, Defendant Eliran Bismut or another assailant blasted Angelica in the head with a 2 X 4 wooden plank.

221.    The blow to the head caused Angelica to suffer a concussion.

222.    As a direct and proximate result of the attack and the Defendants' reckless and negligent conduct, Angelica suffers from physical injuries, PTSD, and damages, the exact amount of which is to be determined according to proof at trial.

223.    On May 1, 2024, on the UCLA Campus, upon information and belief, Defendant Eliran Bismut or another assailant blasted Angelica in the head with a 2 X 4 wooden plank.

224.    The blow to the head caused Angelica to suffer a concussion.

225.    As a direct and proximate result of the attack and the Defendants' reckless and negligent conduct, Angelica suffers from physical injuries, PTSD, and damages, the exact amount of which is to be determined according to proof at trial.

**Roe 15**

226.    Plaintiff Roe 15 was a community member protecting student protesters from the violent mob at the time of the attack. At all relevant times, he was a resident of California.

227.    On May 1, 2024, on the UCLA Campus, a violent mob surrounded Roe 15 and began attacking him from every direction.

228.    The violent mob threw an object that struck Roe 15 in the face, punched Roe 15, and sprayed him with a chemical munition.

229.    Roe 15 suffered a black eye, jaw pain, a swollen nose, and eye pain, all of which took at least two weeks to heal.

230.    As a direct and proximate result of the attack and Defendants' reckless and negligent conduct, Roe 15 suffers from physical injuries and damages, the exact amount of which will be determined according to proof at trial.

//

- 39 -

FIRST AMENDED COMPLAINT

**Roe 9**

231. Roe 9 is a graduate student at UCLA, pursuing joint degrees in public health and social welfare. She has organized with Jewish Voice for Peace and is a member of Graduate Students for Justice in Palestine. Roe 9 has engaged in the movement for justice in Palestine for around five years. Roe 9 suffered numerous injuries as a result of UCLA's failure to protect its students against the mob and the police. At all relevant times, she was a resident of Los Angeles County.

232. Roe 9 broke down into tears several times at the encampment. Escalating threats of sexual violence from the counter protesters who would later become a violent mob and the images on the jumbotron increased her fear and apprehension.

233. She believed the threat was real and that UCLA would do nothing to protect them, even against bomb threats.

234. Roe 9 left the encampment to alert UCLA that "something horrible was going to happen. It's not a question of if; it's a question of when." Fifteen minutes later, Roe 9 received news via text message that the mob was violently attacking the encampment.

235. Roe 9 arrived at the encampment on April 30 at approximately 11:15 PM. The experience was "madness." People were terrified, and the mob caused chaos.

236. The mob attacked Roe 9 with chemical munitions repeatedly that night, causing her to gag and vomit. Her eyes were red, her skin felt like it was burning, and she was in significant pain. The effects lasted well into the next day.

237. The entire experience was traumatizing. Watching the mob attack and injure her friends and colleagues and the violent images and sounds haunt her to this day.

238. On May 1 and 2, 2024, Roe 9 was present when police raided the encampment and violently attacked students and faculty, among other protesters. Roe 9 was terrified as police threw flashbangs into the encampment.

239. An officer stood over Roe 9 and aimed his weapon down at her face, threatening to shoot her from less than 2 feet away. She was terrified.

240. Police then kettled Roe 9 against a wall with other protesters as police kept advancing, yelling, "Move back!" Roe 9 was at the back of the group, and there was no place for Roe 9 to go. As

FIRST AMENDED COMPLAINT

she pressed herself against the wall, she feared she was going to be crushed as police pressed the crowd tighter and tighter against her. Police arrested and zip-tied Roe 9, injuring her in the process.

241.    When Roe 9 was finally released from the jail hours later, around 8:30 AM, she was reduced to tears, sobbing uncontrollably. Roe 9 continues to suffer psychologically and emotionally from the mob attack and police raid.

**Roe 10**

242.    Roe 10 is a PhD candidate at UCLA. He is also a Teaching Fellow, an awarded teacher, and a member of the Graduate Student Union. Roe 10 earned his B.S. in physics from the UC system. At all relevant times, he was a resident of Los Angeles County.

243.    Roe 10 was present at the encampment from April 25 until May 2 and served as a member of the safety team.

244.    On April 27, 2024, Roe 10 observed a member of the group gathering outside the encampment that would eventually escalate into a mob threatening to set the encampment on fire. Later that evening, a crowd of 30-50 attempted to break into the encampment. After things de-escalated, they retreated to the Royce steps, where they continued blasting noise at the encampment into the late evening.

245.    Around noon on April 28, 2024, a small group counter protesters attacked Roe 10 as part of the escalation that eventually grew into a much larger, coordinated, violent attack on April 30. His attacker jumped on Roe 10's back, spun around, and then punched Roe 10 in the face. The group coordinated to help the lead attacker escape.

246.    Roe 10 suffered a concussion as a result. He had headaches and trouble focusing for over 24 hours.

247.    While on the encampment's safety team that same day, Roe 10 was attacked again, having his arm wrenched behind his back in a painful position.

//

248.    On the evening of April 30 into the morning of May 1, 2024, Roe 10 was present while the mob, now at full strength, attacked the encampment. Throughout the attack, the mob sprayed Roe

- 41 -

FIRST AMENDED COMPLAINT

10 with chemical munitions many times, causing Roe 10 intense pain and nonstop coughing. Members of the mob pointed a laser pointer into Roe 10's eyes, temporarily blinding him.

249.    Roe 10 asked UCLA private security posted nearby if they were going to do anything to protect the encampment against the mob's attack, but the UCLA private security guards ignored him and his pleas for help. Roe 10 was terrified knowing that neither police nor UCLA private security would do anything to help pro-Palestine protesters.

250.    No one stopped the attackers.

251.    Later during the day on May 1, Roe 10 again approached UCLA private security to ask them if they were going to intervene as more mob members assembled outside the encampment. UCLA private security laughed at him, ignoring his concerns, despite the mob's violent attack the night before.

252.    When the police raided the encampment on the morning of May 2, 2024, Roe 10 was doing nothing to threaten anyone, and the police had no reason to think otherwise. Despite this, a police officer hit Roe 10 with open palm strikes to Roe 10's face and neck, knocking off Roe 10's glasses and causing his throat to clamp shut, making it difficult to breathe. The police officer then grabbed Roe 10's climbing helmet, pulled it down over Roe 10's neck, and dragged Roe 10 to the ground, strangling Roe 10 with the helmet's strap. Roe 10 screamed in pain and worried that he was about to pass out.

253.    When the police officer stopped strangling him, Roe 10 was lying on the ground in a daze. While on the ground, an officer forced Roe 10's arms behind his back in a painful position and pressed a knee into Roe 10's upper back, causing Roe 10's lungs to feel compressed and making it even more difficult to breathe. When Roe 10 told the officer that he was having trouble breathing, the police officer dismissed him. Police then zip-tied Roe 10 so tightly that it left painful marks on his wrists even after the zip-ties were removed. Police refused to help Roe 10 recover his glasses so he could see.

254.    Roe 10's shoulders were in immense pain his throat painfully swelled shut, and he lost the ability to speak or whisper. Roe 10 could only mouth words to communicate.

FIRST AMENDED COMPLAINT

255.    Eventually, police took Roe 10 to a nurse who failed to conduct a meaningful inspection of Roe 10's injuries, and returned him to the holding cell without treating the swelling in his throat.

256.    Roe 10 suffered numerous injuries as a result of the police attack and sought medical attention at the hospital. His throat was in pain for several days. Roe 10 also had a large bruise on his leg, and the pain in his leg lasted for three months.

257.    Roe 10 continues to suffer psychologically and emotionally to this day.

### Roe 3

258.    In 2024, Plaintiff Roe 3 was a UCLA student affiliated with the Graduate Student Union, and Graduate Students for Justice in Palestine. Roe 3 also received his B.S. from UCLA. At all relevant times, he was a resident of Los Angeles County.

259.    Roe 3 was present at the encampment between April 25 and May 2, 2024. He wore a keffiyeh every day at the encampment until it was lost after being sprayed with chemical munitions.

260.    On April 28, 2024, Roe 3 attempted to de-escalate tensions and protect a group of pro-Palestinian students near the encampment from an increasingly hostile group of Zionist counter protesters that was gathering. They screamed racist insults at Roe 3, deafened him with bullhorns blasted close to his ears, and shoved him.

261.    Roe 3 was working safety when the mob arrived on the evening of April 30. The mob shot fireworks and chemical gas into the encampment in a coordinated fashion, blasted music to terrorize them, and wore masks to hide their identity. Roe 3 feared the mob would kill someone that night. A member of the mob sprayed chemical munitions directly into one of his eyes as he tried to stop the mob's attempts to attack the encampment. Roe 3's eye burned intensely.

262.    Around midnight on April 30, Roe 3 encountered a group of around 30 to 40 mob members attempting to storm into the encampment by force. Fearing for the safety of the encampment, Roe 3 and others rushed over and formed two lines of people to non-violently prevent the mob from entering. The mob threatened Roe 3 with racial slurs and shoving Roe 3.

- 43 -
FIRST AMENDED COMPLAINT

263. Throughout the early morning hours of May 1, multiple smaller groups of the mob threatened and attempted to enter the encampment throughout the night, preventing Roe 3 from getting to sleep until around 6:00 AM.

264. Roe 3 was present during the police raid of the encampment on the evening of May 1 through the early morning of May 2. When the police arrived, the mob cheered for them and chanted "USA! USA!"

265. He was afraid when the police fired numerous flash-bangs at the encampment and saw police point their less-lethal weapons at the crowd and fire into it.

266. To this day, Roe 3 continues to suffer psychologically and emotionally as a result of being attacked by the mob and the police.

**Roe 14**

267. Plaintiff Roe 14 was a fourth-year Biomedical Engineering student at UCLA at the time of the attack. At all relevant times, he was a resident of Los Angeles County.

268. On May 1, 2024, on the UCLA Campus, Roe 14 was providing volunteer medical services to student victims of the violent mob attack when a thug donning a black hoodie sweatshirt and a red bandana knocked Roe 14 unconscious with two blows to Roe 14's head using a 2 X 4 wooden plank.

269. Roe 14 remained unconscious for approximately 5 minutes and shortly after regaining consciousness, the violent mob sprayed Roe 14 with a chemical munition, blinding him. Roe 14's head bled profusely and Roe 14's eyes burned.

270. Roe 14 was later transferred to the ER with two head contusions. Emergency physicians diagnosed Roe 14 with a concussion.

271. As a direct and proximate result of the attack and Defendants' reckless and negligent conduct, Roe 14 suffers from physical injuries, PTSD, and damages, the exact amount of which will be determined according to proof at trial.

**Binyamin Moryosef**

272. Plaintiff Binyamin Moryosef is a 4th-year Jewish undergraduate student at UCLA and is employed by the university. He is a College Corps Fellow at UCLA and volunteers with 826LA,

- 44 -

FIRST AMENDED COMPLAINT

an after-school tutoring and writing program for students ages 6 to 18. At all relevant times, he resided in Los Angeles County.

273. As the son of an Israeli immigrant and ethnically Jewish, Binyamin was looking for the chance to act and was moved by the encampment's expression of solidarity with the suffering of the Palestinian people. He was present at the encampment in the days leading up to April 30, 2024.

274. On April 30, Binyamin arrived at the encampment around 10:00 PM to volunteer as a member of the safety team. Upon his arrival, Binyamin experienced the mob attacking the encampment in a coordinated fashion with fireworks. Benjamin was terrified by the violence of the mob's attack which reminded him of the Israeli military's genocidal attacks in Gaza.

275. Binyamin returned to the encampment later in the day on May 1. The experience of being attacked by police flash-bangs was extremely distressing. When police raided the encampment on May 2, they brandished weapons forcefully shoved Binyamin, and made him feel like he was being treated worse than an animal.

276. On June 10, 2024, Binyamin joined other students on campus to bear witness to over 46,000 Palestinians who had been martyred or buried under the rubble by Israel's genocidal assault on Gaza. Police surrounded the protesters who were shouting "Let us out!" and tried to leave.

277. Benyamin was doing nothing to threaten anyone, and the police had no reason to think otherwise. Without giving a notification of dispersal, police physically attacked Binyamin, attempting to wrestle him to the ground. Without giving him any explanation, police violently grabbed Benyamin and zip-tied him, forcing his arm into an excruciatingly painful position and causing him to breathe heavily. The pain was overwhelming and unbearable. Binyamin pleaded multiple times for the police to lessen the strain of the zip-ties that were causing him so much pain, only to be ignored.

278. Binyamin continues to suffer psychologically and emotionally to the present day.

**James (Jimi) Peric Degen**

279. Plaintiff James Peric Degen (Jimi) graduated from UCLA School of Law in 2024. During law school, he was a member of Law Students for Justice in Palestine, the Labor and Employment Law Association, the National Lawyers Guild, and the Afghan Scholars Humanitarian Parole Project. Jimi co-founded the UCLA chapter of the Peoples Parity Project and, as a student

- 45 -

FIRST AMENDED COMPLAINT

advocate in the International Human Rights Litigation Clinic at the Promise Institute, Jimi assisted Iranian immigrants arbitrarily detained after 9/11. Jimi graduated from West Point in 2012 and served as an officer in the Army for eight years before attending law school. At all relevant times, he was a resident of Los Angeles County.

280.    During his time serving in the military, Jimi became aware of how the United States government's and other US institutions' blanket support for Israel contributed to the oppression of Palestinians. This awareness motivated him to go to law school to work in human rights and join the movement for justice in Palestine.

281.    Jimi grew concerned about the escalating violence by the mob and the lack of protection being provided by UCLA and the police. Jimi showed up a little before midnight on April 30 to serve as a volunteer Legal Observer and document the violations of the rights of the encampment members alongside Plaintiff Isabella Lee.

282.    While documenting the mob attack and the police's and UCLA private security's failures to intervene, one mob member threatened Jimi with a baseball bat or pole-like object. The mob also sprayed Jimi with chemical munitions multiple times. Even though Jimi had undergone tear gas training during his time in the military, the chemical munition caused him immense pain and discomfort, which continued to irritate his ears, nose, throat, and lungs for several days.

283.    Jimi and Isabella both wore bright green hats identifying themselves as Legal Observers. At one point a mob member pointed at Jimi and Isabella, telling other mob members that the pair was a part of the encampment. As Jimi turned his back on the mob to face the police, someone from the mob threw a metal water bottle striking Jimi in the back of the head, knocking the hat off his head, causing him pain, and leaving him feeling shocked and woozy.

284.    Moments later a mob member threw another water bottle that struck Isabella in the head. When Isabella turned to ask who had assaulted her, a group of mob members swarmed her. Within seconds, they were surrounded by about a dozen male mob members, many of whom Jimi had witnessed committing acts of violence against the encampment. When Jimi attempted to shield Isabella from the attack, the mob coordinated their attack and started shoving Jimi, pushing him away from Isabella down a hill, calling him a "faggot."

- 46 -

FIRST AMENDED COMPLAINT

285. When Jimi began to film the mob, one mob member started throwing shadow punches at Jimi, while another snatched Jimi's phone out of his hand from behind. The mob opened a pathway for the phone thief to slip away, while other mob members grabbed Jimi, preventing him from following the phone thief. One mob member taunted Jimi saying they would give Jimi back his phone when Jimi gave back their "hostages."

286. UCLA private security did nothing during this attack, refusing to come to his aid during his assault and robbery.

287. Around 3:45 AM on May 1, Jimi observed police in full riot gear push a group of encampment students back and appear to detain them near the flagpole, where they then let the mob scream in the students' faces and threaten them. As the police stood back and laughed, Jimi intervened to de-escalate the situation by forming a non-violent human wall between the students and the mob. One of the mob members got inches from Jimi's face, threatening and screaming at Jimi while the police looked on and again did nothing to intervene. After several minutes of this, the police finally allowed the students to leave without explanation.

288. Jimi suffered numerous injuries from the mob as well as the police's and UCLA's failure to protect him.

289. Jimi continues to suffer psychologically and emotionally to the present day.

**Isabella Lee**

290. Plaintiff Isabella Lee graduated from UCLA School of Law in 2024 where she was a Leadership Fellow for the People's Parity Project, which she co-founded at UCLA. She was also the Co-Chair of the Labor and Economic Justice Clinic, a member of the National Lawyers Guild ("NLG"), a member of Law Students for Justice in Palestine, a student in the Human Rights Litigation Clinic, and a Senior Editor for the UCLA Law Review. At all relevant times, she resided in Los Angeles County.

291. Before law school, Isabella served as an NLG Legal Observer ("Legal Observer") during the movement for George Floyd protests around southern California in the summer of 2020. When the encampment started, Isabella volunteered to serve as a Legal Observer to help ensure the fundamental rights of encampment members to assembly and expression were protected.

- 47 -

FIRST AMENDED COMPLAINT

292.    Just after 11:00 AM on April 28, 2024, Isabella observed a man draped in an Israeli flag, hit a pro-Palestinian protester with a large wooden flagpole within eyesight and earshot of UCLA administrators who did nothing to intervene. Shortly thereafter a mob member began screaming in Isabella's face to stop filming, when an older mob member threatened Isabella, saying "I'm going to punch you! Believe me!" A concerned pro-Palestinian protester stepped in and de-escalated the situation.

293.    Later on, a different mob member repeatedly thrust her body into Isabella, while screaming at pro-Palestinian protesters through a megaphone. Isabella pleaded with the woman to stop, but she ignored Isabella. After communicating with other Legal Observers, all fearing for their safety, Isabella relocated atop a hill to observe the protest from a distance.

294.    On April 30, 2024, Isabella arrived at the encampment around 10:00 PM. After observing increasingly threatening behavior from the mob, she entered the encampment to gather information about the threats and slurs yelled by the mob and to wait for her fellow Legal Observer, Plaintiff James (Jimi) Peric Degan, to arrive so she could more safely observe the perimeter in a pair. Suddenly, Isabella heard screaming near the front of the safety barricades and ran to start documenting. As she arrived at the perimeter of the encampment, a member of the mob sprayed Isabella with a chemical munition. Her eyes were stinging and burning intensely. Isabella was choking and coughing uncontrollably. She felt like she couldn't breathe.

295.    Isabella then saw a flaming projectile fly over her head land inside the encampment and explode. She heard screams and cries for medics as the mob sprayed more chemical munitions.

296.    When the police arrived, Isabella observed the mob stop their attack for a moment, but when police demonstrated they would not intervene, the mob resumed and doubled-downed on their violent attack. Together Isabella and Jimi documented the mob engaging in multiple assaults on the encampment and its members in the presence of UCLA private security and the police (who were both on the ground and in helicopters). Neither UCLA's private security nor the police took any steps to intervene or stop the violent attack.

297.    At one point Isabella observed riot police form a line near the flagpole. Mob members who had been violently attacking the encampment began to cheer for the police, chanting "Mission

FIRST AMENDED COMPLAINT

Accomplished!" and "USA! USA!" One leader of the mob proclaimed over the megaphone: "Our job here is done! Let the police finish the job!"

298. While documenting this scene, one of the mob members threw a metal water bottle striking Jimi in the head. Moments later, a mob member threw another water bottle striking Isabella in the back of her head, causing her pain. Within seconds a group of hostile mob members then swarmed Isabella and Jimi and began threatening them.

299. When the mob separated Isabella from Jimi in a coordinated fashion, she began to panic. Her heart was racing out of control. She felt like she was leaving her body. At that moment, Isabella was terrified that the mob of violent men was going to physically and sexually assault her. As the mob closed in around Isabella and taunted her, Defendant Jared Rubin flashed a strobe light in her eyes, disorienting her, and Defendant Daniel Khalili blasted a megaphone in her ears. Another member of the mob wearing a Dodgers jacket, Rony Abishoor tried to yank Isabella's phone out of her hand and started screaming, "She touched my penis!"

300. At no point did UCLA's private security or the police intervene to stop Isabella from being attacked and sexually harassed by the mob.

301. A few minutes later, Isabella saw a mob member wearing Jimi's bright green Legal Observer hat that had been stolen earlier. When she tried to follow the thief to retrieve the hat, a group of mob members blocked her so the thief could run away.

302. Isabella turned her attention back to a line of riot police who had moved in and pushed a group of encampment students out into the street near the flagpole where they appeared to detain them and allow the mob to harass and threaten them. While filming this scene, a female mob member accosted Isabella threatening to steal Isabella's phone and yelling "Shut the fuck up, bitch!" in plain view of the police standing nearby, who do nothing to intervene.

303. Soon after her harrowing experience, Isabella sent a letter to the Dean of UCLA School of Law on May 4, 2024, asking for urgent safety accommodations for law students required to take their finals on campus in person. Isabella's email also asked for a meeting to relay her experience of being attacked on UCLA's campus and her concerns with the police and UCLA's failure to protect students. The Dean delayed meeting with Isabella until well into the summer. When Isabella was

- 49 -
FIRST AMENDED COMPLAINT

finally granted a meeting with the Dean, the Dean told her, coldly, that he could not say anything in response about what had happened.

304.   Isabella continues to suffer psychologically and emotionally to this day. She has experienced panic attacks, anxiety, uncontrollable crying, insomnia, and nightmares following the attacks by the mob, and UCLA's and the police's failure to protect her. She no longer feels safe on UCLA's campus.

**Roe 4**

305.   Roe 4 is a PhD candidate at UCLA and teaches as a graduate assistant. Roe 4 is also active on campus, supporting many student organizations. He received his undergraduate degree from a UC, where he conducted research and was a member of Students for Justice in Palestine. At all relevant times, he was a resident of Los Angeles County.

306.   Roe 4 was present at the Palestine Solidarity Encampment starting on April 25, 2024. He experienced near-constant harassment, verbal abuse, and threats from the mob, and suffered numerous injuries as a result of UCLA's failure to protect its students against the mob and the actions of the police.

307.   On the night of Sunday, April 28, 2024, Nouri Mehdizadeh was harassing the encampment by blasting music used by Israelis for torture and brandishing a knife while attempting to cut through part of the safety barricades. When Mehdizadeh acknowledged that he had a knife, Roe 4 yelled for the help of UCLA private security stationed nearby and informed them Mehdizadeh had a weapon. UCLA private security refused to intervene or otherwise help protect those in the encampment.

308.   On the night of Tuesday, April 30, 2024, the mob sprayed him with chemical munitions, causing severe pain. For nearly an hour, the pain was so bad Roe 4 could not open his eyes.

309.   As Roe 4 was being treated by encampment medics, the mob shot fireworks into the encampment. Roe 4 heard the screams of people being attacked and began transporting injured members of the student encampment to the medic area. Throughout the attack, Roe 4 was hit with

- 50 -

FIRST AMENDED COMPLAINT

chemical munitions. Roe 4 suffered from lung pain and bronchitis for about eight weeks after being attacked with chemical munitions.

310.    During the police raid of the encampment in the early morning hours of May 2, 2024, Roe 4 was doing nothing to threaten anyone, and the police had no reason to think otherwise. Despite this, a police officer aimed their weapon directly at Roe 4. Roe 4 ducked to protect himself just before the officer fired their weapon and shot a person standing behind Roe 4.

311.    Roe 4 was present on June 10, 2024, for the anti-genocide protest on the UCLA campus. Roe 4 asked the police if he could leave, and the police told him he should exit on the other side of the protest, but UCLA private security blocked Roe 4 and others from exiting in that area. Despite this, police kept pushing the crowd of protesters back, and it was beginning to feel very dangerous. Roe 4 asked if he could speak to the commanding officer, and the police said he could not and to keep backing up to leave the area. Without giving a notification of dispersal, police officers then arrested Roe 4 while laughing and taunting him.

312.    Roe 4 continues to suffer psychologically and emotionally to the present day. Loud noises, such as fireworks and babies' screams, are extremely upsetting and disruptive to Roe 4's everyday life.

313.    Roe 4 and his family have suffered other injuries stemming from the attack. Roe 4 has received numerous hate emails and threats, and attempts to get him fired from his job. Roe 4's personal information was leaked along with his parents' and sister's information. His parents have received many harassing and threatening phone calls.

**Dr. Aaron Palmer**

314.    Dr. Aaron Palmer was an Assistant Adjunct Professor in the Mathematics Department at UCLA from 2021 to 2024. He graduated from UC Santa Cruz in 2010 with a dual degree in Math and Physics and received his PhD in Math from Cornell University in 2016. Aaron is also a current participant in the long program on non-commutative optimal transport with the Institute for Pure and Applied Math at UCLA. At all relevant times, he was a resident of Los Angeles County.

- 51 -

FIRST AMENDED COMPLAINT

315.    As an American Jew, Aaron was deeply offended by the weaponization of anti-semitism by the United States government and Israel to justify their genocide of the Palestinians and by UCLA to suppress pro-Palestinian speech and activism.

316.    On June 10, 2024, Aaron joined other students and faculty on campus to bear witness to over 46,000 Palestinians who had been martyred or buried under the rubble by Israel's genocidal assault on Gaza.

317.    As Aaron and other students and faculty congregated at Dodd Hall on the UCLA campus, police encircled the students and faculty, trapping them in place. Without issuing a dispersal order, police physically attacked Aaron and the other students and faculty present.

318.    Police beat Aaron with batons during his arrest and zip-tied him so tight that they left painful red marks on his wrists long after they were removed. At one point, Aaron asked an officer to loosen the zip-tie on one of his wrists that was causing the most pain. The officer refused.

319.    Aaron was scared to go to campus days later after being beaten by police and seeing other faculty, students, and community members being beaten. Combined with the lack of protection by UCLA, Aaron experiences feelings of isolation and fear each time he passes Dodd Hall because of the intimidation and violence he experienced on June 10.

**Mahmoud Alnaouq**

320.    Plaintiff Mahmoud Alnaouq is a Palestinian-American protester and a student at UCLA. Mahmoud has won numerous awards from UCLA for his service, leadership, and humanitarianism. At all relevant times, he was a resident of Los Angeles County.

321.    As a Palestinian, Mahmoud has lost family members and friends to Israel's genocide in Gaza. He was demoralized by the discrimination that Palestinians and those advocating for Palestinians experienced at UCLA.

322.    On June 10, Mahmoud was present for less than an hour at the funeral march, when police suddenly blocked everyone's exit, trapping him. Mahmoud never heard the police give a warning or dispersal order.

323.    As police backed Mahmoud and a group of protesters into a corner, police officers severely beat two men, one of whom was a colleague. Witnessing the escalating violence by police,

- 52 -

FIRST AMENDED COMPLAINT

Mahmoud appealed to Corporal Adams, the highest-ranking police officer there, to get the police under control. He warned that the police were going to cause serious injuries if they continued to use excessive force on this trapped crowd.

324. Sergeant Strawberry aggressively approached Mahmoud, who was peacefully protesting, and violently yanking his arm, causing immense pain. Strawberry also ripped a Palestinian flag off of Mahmoud's bracelet.

325. Mahmoud was then told for the first time that he was part of an illegal gathering and took him inside Dodd Hall. An officer cut the straps of Mahmoud's backpack and removed his wallet. After about two and a half hours of further detention, an officer finally cut his zip ties and released him. Mahmoud had painful red marks, cuts, and bruises on his wrists for days.

326. Mahmoud had serious pain in his right shoulder from when Sergeant Strawberry violently attacked him. Mahmoud sought treatment for his injuries. To this day, Mahmoud continues physical therapy exercises.

327. After being violently assaulted by police, Mahmoud did not feel safe living in his UCLA housing. He had nightmares of police raiding his home and did not feel comfortable being on campus. Mahmoud continues to suffer psychologically and emotionally to the present day.

**Joseph Murphy**

328. Plaintiff Joseph Murphy is a 2026 PhD candidate at UCLA working as a teaching assistant in the School of Sociology. At all relevant times, he was a resident of Los Angeles County.

329. As a member of UCLA's Graduate Student Union, Joseph was also opposed to the violent police raid on the Palestine Solidarity Encampment and UCLA's general mistreatment of pro-Palestinian protesters. Joseph felt compelled to help protect fellow students, knowing that UCLA had failed to do so previously, and instead had punished pro-Palestinian activism.

330. On June 10, 2024, police attacked protesters without giving any dispersal order in that area, trapping Joseph and everyone inside. People started to panic, and many tried to leave, but the police blocked them, yelled "Get back!" and physically pushed and crushed them inside.

331. Police kettled protesters, forcing them into a small space with no exit. While standing in place, shielding the small woman from the attacking police, a police officer grabbed Joseph by the

FIRST AMENDED COMPLAINT

legs from behind, forcing him violently to the ground. Joseph tried to catch his breath while an officer yelled at him to put his hands behind his back.

332.    Joseph did not resist. However, when the officer tried to force Joseph's left arm behind Joseph's back at an impossible angle, causing an immense amount of pain, Joseph readjusted his arm. Despite complying with the arrest, the police yelled at him to "Stop resisting!"

333.    Police put zip-ties on so tight it caused Joseph pain, and they later had to replace them. Joseph has scarring from his injuries that persist to this day. Joseph's hand was badly cut and had been bleeding for a while. An officer asked Joseph if he had HIV or syphilis and forced him to sit with his still-bleeding hand zip-tied behind his back.

334.    After processing Joseph, the police asked Joseph to sign his citation. He asked if he could have a glove or otherwise treat his bleeding hand. Police gave him a glove so he could sign his citation without getting blood on the pen.

**Roe 5**

335.    Plaintiff Roe 5 is a Professor at UCLA and earned her PhD from UC San Diego. Apart from being a teaching assistant, she organized with communities facing economic and social challenges. At all relevant times, she was a resident of Los Angeles County.

336.    Throughout her academic career, Roe 5 has participated in nonviolent protests at immigrant detention centers and actions in support of Black Lives Matter.

337.    Roe 5 was present at the encampment daily from April 25 to May 1, 2024. On April 25, 2024, Roe 5 arrived at the encampment around 7:00 AM, bringing breakfast but left to teach class afterward. When she returned that night, Roe 5 was part of a safety team to protect peaceful encampment members from Zionists threatening violence from entering the encampment.

338.    This group included Eli Tsives, a young mob member wearing an "Israeli Defense Forces" shirt. He aggressively approached her and attempted to intimidate her. She left the encampment around 10:00 PM that night.

339.    On April 28, 2024, Roe 5 arrived at the encampment around 8:00 AM. She attended de-escalation and know-your-rights training and agreed to join the group stationed by the Jumbotron set up by the increasingly violent counter protesters. Throughout the day, they insulted and taunted

- 54 -

FIRST AMENDED COMPLAINT

Roe 5 and others. Eventually, Roe 5 joined two other UCLA faculty members to de-escalate. A counter protester hit her with a wooden flagpole repeatedly and blasted a megaphone near her ears, a precursor to the violent attack that would occur on April 30. Roe 5 left the encampment that night around 2 hours after the Zionist rally ended.

340. On April 29, 2024, Roe 5 arrived at the encampment in the morning. She witnessed a student being violently arrested around 10:00 AM while on top of the scaffolding on the East end of Powell Library while attempting to place a Palestinian flag on the scaffolding. Witnessing the police attack a student was very traumatizing for Roe 5.

341. In response to the escalating violence by the counter protesters, Roe 5 agreed to serve as part of the safety team for the encampment. On April 30, 2024, she went to bed at home around 9:00 PM but was awakened at 11:00 PM by her partner, informing her that she needed to return immediately because a violent mob was attacking the encampment.

342. As Roe 5 arrived at the encampment sometime after 11:00 PM, she saw hordes of people descending on the campus and police helicopters hovering overhead. She joined the safety team next to the perimeter on the east side of the encampment where the mob was violently attacking.

343. Roe 5 spent hours at the perimeter trying to keep the mob from tearing down the safety barricades and trying to block projectiles thrown by the mob into the encampment. She witnessed the mob repeatedly smash Plaintiff Thistle Boosinger's hand. Witnessing this scene caused Roe 5 emotional trauma.

344. Before Roe 5 could determine if Thistle was safe, someone shouted "tear gas!" as the mob hit her with chemical munitions. She felt like she was suffocating and needed to vomit. The mob also sprayed chemical munitions in Roe 5's eye.

345. Eventually, Roe 5 joined other faculty outside of the encampment. As she attempted to de-escalate the attacks by the mob, the mob tried to spray her and other faculty members.

346. At 4:00 AM on May 1, Roe 5 took up her shift with the safety team inside the encampment. Despite the police presence, mob members were still trying to ram down the entrances to the encampment, climbing the scaffolding, and attempting to enter the encampment, while the

FIRST AMENDED COMPLAINT

jumbotron erected by the mob blasted extremely loud and annoying music, tormenting the encampment.

347.    Since the night of the mob attack, Roe 5 has dealt with serious medical issues that impact her life. Immediately following the mob attack, she canceled classes and could not go to campus. The sight of police and the sound of helicopters cause her terrible anxiety. She cannot be in places with a lot of people, and she cannot be near loud noises. She still finds it difficult to return to the UCLA campus and must take anxiety medication to sleep.

**Roe 11**

348.    Roe 11 was born to a Palestinian father who was ethnically cleansed from his ancestral home in Acre, Palestine, during the 1948 Nakba. Roe 11 grew up as a refugee in Lebanon before moving to the United Kingdom and eventually the United States. At all relevant times, she was a resident of Los Angeles County.

349.    Roe 11 has two daughters who attended UCLA. Her youngest daughter graduated in 2024 and was a member of the Palestine Solidarity Encampment.

350.    On April 25, Roe 11 was present when Jewish students hosted a Seder service in the encampment and educated other protesters on anti-Zionism. Roe 11 was surprised by the lack of protection of the encampment given the presence of outside Zionist agitators who were ripping down posters and threatening the encampment.

351.    On April 26, Roe 11 participated in more teach-ins at the encampment and was harassed and threatened by outside Zionist agitators.

352.    On April 27, Roe 11 arrived at the encampment around 11:30 PM. When she arrived, she was insulted by outside Zionist agitators who were screaming obscenities. They were blaring loud music—the same music that illegal Israeli settlers in the West Bank have used during their violent raids of Palestinian homes and the same music anti-Palestinian Israelis used when blocking humanitarian aid trucks from entering Gaza.

353.    Roe 11 returned to the encampment on April 30. She was sprayed with chemical munitions by the mob while UCLA private security stood by watched the violence, and allowed the

mob to continue their attack. Roe 11 called the UCLA Police Department and public safety several times to request help. When she called the UCLA Police Department, officials hung up on her.

354.    The mob relentlessly attacked the encampment that night. Roe 11 felt like she was in a war zone. She provided care to multiple injured encampment members. To this day, Roe 11 cannot get the terrifying sights and sounds out of her head of the young people in the encampment being attacked, and no one from UCLA or the police coming to help.

355.    On May 1, Roe 11 complained to the UCLA Police Department, informing them that her daughter was a UCLA student, that she left her daughter in UCLA's care, and that UCLA did nothing to protect her daughter while the outside Zionist agitators violently attacked the encampment for hours.

356.    Roe 11 returned to the encampment later in the day on May 1. When the police attacked the encampment with flash-bangs, she again felt like she was in a war zone, this time under attack from the militarized police. She heard nonstop screams, and it was terrifying. Knowing that she could no longer help, she left the encampment and helped get others to safety before the police could attack them.

357.    Roe 11 continues to suffer psychologically and emotionally to the present day.

**Lubna Hammad**

358.    Plaintiff Lubna Hammad is a Palestinian-American protester, and the founder of Yalla Indivisible, a vibrant community organization dedicated to the civic empowerment and active engagement of Black, Indigenous, and People of Color (BIPOC) communities. Yalla Indivisible has a strong commitment to uplifting Palestinian and Arab voices and a mission to foster a political and social environment where the diverse tapestry of its members can fully participate and be heard. At all relevant times, Lubna resided in Orange County, California.

359.    Lubna first stopped by the encampment on April 27. She arrived at the encampment around 11:30 PM and immediately encountered a tense situation, as counter protesters harassed encampment members and violently attempted to break into the encampment.

360.    Lubna returned to the encampment on April 30 to support her friend's daughter and other protesters, arriving around 11:30 PM. Chemical munitions burned her eyes as the mob attacked.

FIRST AMENDED COMPLAINT

Mob members screamed obscenities at her in accented Arabic like "bitch" and "slut," just as she has heard Israelis use those Arabic words to insult people in Palestine. One mob member called her a "terrorist." Another attacker looked at Lubna and threatened her, saying, "You don't stand a chance, old lady."

361.    Mob members threw a blunt item, hitting her left leg, destabilizing her knee, and causing pain and swelling. The pain lasted for months afterward, and her knee feels weaker and still tender to this day.

362.    The attackers at other points shined a red laser and flashlights in her eyes. Another time, the mob sprayed a viscous chemical munition that stuck in Lubna's hair. At first, she did not know what the substance was, and then the burning started all over her face and eyes. The pain was unending. Even after she received medical attention, the burning remained for a few hours and even came back around 6:00 AM.

363.    Lubna previously worked as a legal consultant for UNICEF and with Defense for Children International, where she witnessed horrific violence in Palestine firsthand. Her experience at the encampment, being attacked by the mob while authorities refused to intervene, immediately triggered images she experienced in Palestine, where the Israeli military often stands by, watching and allowing illegal Israeli settlers to attack Palestinians, refusing to protect them from such violence.

364.    In addition to her physical injuries, Lubna continues to suffer psychologically and emotionally to the present day.

**Roe 12**

365.    Plaintiff Roe 12 is a pro-Palestinian protester. He graduated from UCLA in 2024. At all relevant times, he was a resident of Los Angeles County.

366.    After seeing UCLA and the police fail to protect the encampment and pro-Palestinian protesters from the violent mob attack the night before, Roe 12 came to the encampment on May 1 to help support and protect the encampment.

367.    Roe 12 wore lab goggles to protect his eyes from chemical irritants used by the police during their raid. Around 4:30 AM, Roe 12's goggles were hanging around his neck when a police

FIRST AMENDED COMPLAINT

officer grabbed Roe 12's goggles and dragged him 5 to 6 feet along the ground, causing the strap of his goggles to dig into Roe 12's neck, cutting him and causing him to bleed. The force of the strangulation caused Roe 12 to stop breathing for several moments. After the shock of being strangled by the police wore off, fear began to set in. Despite his injuries, Roe 12 was not offered any medical attention by police until around 9:00 or 10:00 AM.

368.    As a result of being dragged and strangled by the police, Roe 12 experienced painful bruising and scabs on his neck for over a week. Roe 12 still suffers from psychological and emotional harm from the memory of the police raid and his arrest.

**Bharat Venkat**

369.    Plaintiff Dr. Bharat Venkat is an Associate Professor at UCLA with a joint appointment spanning the Institute for Society & Genetics, the Department of History, and the Department of Anthropology. He is also the director of the UCLA Heat Lab and is affiliated with the UCLA Center for India & South Asia, the Program in Digital Humanities, the Urban Humanities Initiative, and the Luskin Center for Innovation. Dr. Venkat's research focuses on a range of issues related to science, medicine, climate, race, and design. He has published widely including an award-winning book, and was awarded a National Science Foundation Grant. As a Faculty in Residence, Dr. Venkat lives in a UCLA student dorm and provides formal and informal resident-faculty interactions through programming, classes, individual and small-group advising, and casual association. He teaches over 200 UCLA students a year and in 2023 won both the Society for Medical Anthropology's Carole H. Browner Student Mentorship Award and UCLA's Life Sciences Excellence in Educational Innovation Award for his work with students. He is a Los Angeles County resident and resided therein at all relevant times in this complaint.

370.    On April 30, 2024, Dr. Venkat was on campus when he heard loud explosions coming from the area of the encampment, while simultaneously seeing fireworks being shot at the encampment on social media.

371.    The mob sprayed Dr. Venkat with chemical munitions multiple times. The first time it happened, he panicked and thought he might lose his eyesight. Dr. Venkat's eyes were burning intensely, and he could not see. At other times, he could not breathe or open his eyes without getting

- 59 -

FIRST AMENDED COMPLAINT

chemical munitions in his eyes and mouth. Dr. Venkat stayed until around 4:00 AM on May 1 helping injured and terrified students, until they felt safe and got the care they needed, before returning home exhausted to sleep.

372.    Dr. Venkat returned later that day on May 1 for a faculty press conference. At the press conference, a mob member screamed: "Go back to your country!" and yelled homophobic slurs at him. Dr. Venkat, who is gay, experienced additional psychological and emotional distress as a result of this.

373.    Dr. Venkat continues to suffer psychologically and emotionally to this day. He was unable to work for several months. Dr. Venkat had a book due soon after in 2023 but was put several months behind as a result of UCLA's failure to protect students and faculty.

374.    Dr. Venkat cried in fear in public spaces for months afterward. For an extended period, Dr. Venkat was not sleeping well. He would sit and stare at the food, unable to eat. Some of Dr. Venkat's Muslim students also stopped coming to class due to their fear of UCLA private security and UCPD, and fear that they would not be protected from additional mob violence.

**Roe 7**

375.    Roe 7 earned her bachelor's degree from UCLA in July 2024. At all relevant times, she was a resident of Los Angeles County.

376.    Roe 7 attended speeches in the encampment on May 1 over several hours that night, police raided the encampment in waves, each lasting roughly an hour. Police set off flashbangs and released chemical munitions that obscured her vision and caused her eyes to swell in immense pain. Roe 7's eyes were swollen for multiple days afterward.

377.    When the police broke into the encampment, Roe 7 watched, terrified, as police violently grabbed her friend and arrested him. The police appeared gleeful like they were happy to be brutalizing students. One officer broke from his formation and made a beeline for the Palestinian flag that was flying inside the encampment, enthusiastically ripping it down and flinging it to the ground.

378.    Eventually, police, including the one who ripped down the flag, pushed Roe 7 and other protesters back, kettling them toward the library. Roe 7 was not resisting or trying to run, yet police brutally beat her legs with their batons, causing bruises that remained for many days afterward.

FIRST AMENDED COMPLAINT

379.    Around 5:15 AM Roe 7 was arrested near the library. One officer zip-tied Roe 7's wrists in a painful position behind her back. Roe 7 repeatedly asked for her zip-ties to be loosened because they were so tight that her wrists were in pain and her fingers were swollen, but police ignored her. Roe 7 asked police several times why she was being arrested, but no police would answer her. Instead, police patted Roe 7 down and forced her to sit on the sidewalk for around an hour.

**Gina Viola Peake**

380.    Plaintiff Gina Viola Peake is a longtime local activist who organizes with White People for Black Lives (the Los Angeles chapter of Showing Up for Racial Justice). She is a UC alumna, graduating from the University of California, Riverside, and the mother of a current UC student. At all relevant times, she was a resident of Los Angeles County.

381.    Gina had participated in the movement for justice in Palestine for several years. Given her deep training and experience as a police liaison, a member of the Faculty for Justice in Palestine invited Gina to help with safety and de-escalation for the encampment.

382.    In the days before the April 30 mob attack, Gina was assaulted by counter protesters as they escalated, vulgarly insulting and threatening her: "Hope you get raped!", "Dirty whore!", "Go rape yourself with your mask!", "Go home and kill yourself!", and "Race traitor!", among other things.

383.    On April 28, Gina was present to help with de-escalation efforts and to keep students safe. Gina became increasingly concerned at the escalating violence and threats coming from the mob. One UCLA private security guard mentioned to her how "unhinged" the Zionist mob members were acting, and how calm the pro-Palestinian protesters were.

384.    Gina returned to UCLA around 11:00 PM on April 30. As she entered campus, Gina saw members of the mob harassing and threatening students. After Gina approached to help de-escalate the situation, the mob members terrified Gina, chasing them into the encampment.

385.    Gina then went to the front of the encampment to help protect it from the mob attacks. For the next hour, the mob attacked Gina and the encampment, throwing dangerous objects and shooting fireworks and chemical munitions into the encampment.

- 61 -

FIRST AMENDED COMPLAINT

386.    A mob member hit Gina with a wooden plank as the mob was attacking the wooden safety barricade. The mob attack also left her with an injured thumb for 6 months.

**Eric Wefald**

387.    Plaintiff Eric Wefald is a pro-Palestinian protester who had attended multiple protests leading up to the UCLA encampment. At all relevant times, she was a resident of Los Angeles County.

388.    After witnessing the mob attack the encampment on April 30, which was streamed live over social media, Eric went to help. Sometime around 3:00 AM on May 2, Eric was at the front of the line when police, began shooting flashbangs. As police approached, they hit Eric with their batons. Police pushed Eric, who is mixed race and was wearing a keffiyeh, so hard with their baton that he fell to the ground. As soon as he stood up, the police started hitting him again with their batons.

389.    Police then hit Eric so hard that he collapsed, falling to the ground. While lying face-down on the ground, police swung their batons and brutally beat him. Eric did not resist and kept screaming out that he was not resisting while police beat him. At this moment Eric thought they were going to kill him.

390.    Once the adrenaline and shock of being beaten up so badly by police wore off following his release, Eric felt intense pain in his back where police hit him with their batons. Eric had bruising down his side and a lot of pain and soreness in his back. Eric was treated for his back injuries, which helped to lessen the intensity of the pain, but his back pain continues to this day.

//

//

391.    Eric continues to suffer psychologically and emotionally to this day. Sleeping was difficult for many days. He has sought the help of a therapist after being beaten so severely by police. The sound of helicopters and the sight of police continue to cause him anxiety.

**Roe 13**

392.    Plaintiff Roe 13 was a second-year history student at UCLA at the time of the attack. At all relevant times, he was a resident of California.

- 62 -

FIRST AMENDED COMPLAINT

393.    On May 1, 2024, on the UCLA Campus, a violent mob sprayed Roe 13 with a dark yellow substance, which Roe 13 believes, upon information and belief, was a chemical munition, that severely damaged Roe 13 and required approximately one month of persistent treatment to alleviate the physical pain.

394.    Roe 13 is currently still receiving psychological treatment as a direct result of the attack.

395.    As a direct and proximate result of the attack and Defendants' reckless and negligent conduct, Roe 13 suffers from physical injuries, PTSD, and damages, the exact amount of which will be determined according to proof at trial.

**Nasiha Solakovic**

396.    Plaintiff Nasiha Solakovic is 36 years old. At all relevant times, she was a resident of Los Angeles County.

397.    On April 30, 22024, Ms. Solakovic attended the Palestine Solidarity Encampment near Royce Hall at UCLA, where she participated in the demonstration.

398.    At approximately 10:00 PM, a coordinated mob of over 100 masked individuals armed with bear mace, bottles, pipes, metal objects, and fireworks attacked the encampment.

399.    During the assault, a counter protestor threw a scooter in her direction in an attempt to cause her great bodily injury.

400.    Ms. Solakovic was struck on the left side of the head with a bottle.

401.    Another individual sprayed bear mace directly into her eyes and face, causing temporary blindness, severe burning, and respiratory distress, as well as chemical burns to her hands and face.

402.    She received treatment at the protest's medical tent for approximately an hour.

403.    Law enforcement and campus security were present, observed the violence, and failed to intervene or protect the protestors.

404.    As a result, Ms. Solakovic suffered trauma to her head, chemical burns, and ongoing pain, as well as emotional distress, panic attacks, and symptoms of post-traumatic stress disorder.

**Pseudonymous Plaintiffs**

- 63 -

FIRST AMENDED COMPLAINT

405.    Plaintiffs Roe 1 through Roe 15, and Plaintiff Mahmoud Alnaouq are pseudonyms for the actual names of some of the Plaintiffs.[13] These plaintiffs will seek leave of court to use these pseudonyms as soon as the defendants have all been served. The pseudonymous plaintiffs have all either suffered direct harm themselves or have witnessed harm inflicted upon others for voicing opposition to Israel's genocidal attack on Gaza and the legitimate national aspirations of the Palestinian people. Plaintiffs or people known to them have been threatened with violent harm, have been fired from their jobs, or have been subjected to online hate campaigns. The pseudonymous plaintiffs respectfully submit that their legitimate interest in security and privacy on balance outweighs the public's right to access court information. Once pseudonymous status is granted, these plaintiffs will seek an appropriate "Attorneys-Eyes Only" protective order so that defendants' counsel may know their identities without defendants themselves learning this information.

## THE DEFENDANTS

### Rioting Mob Defendants

406.    The following Defendants actively participated in a mob that staged brutal, hours.-long riot against the students and others who had peacefully assembled at the encampment. Each of these persons cooperated or worked in concert with at least two other persons to engage in violence or threaten violence for the purpose of intimidating or retaliating against journalists, protestors, and members of the encampment for exercising their civil or constitutional rights. The "Riot Defendants" identified also cooperated with and worked in concert with persons as yet unknown who helped organize, equip, or finance the riot. Those unknown persons are therefore names as Doe Defendants and Plaintiffs will amend this complaint as their identities become known.

407.    In doing these things, the Riot Defendants were motivated by, *inter alia*, the actual or perceived race, color, religion, ancestry, or national origin of the Plaintiffs or those whom they were among; or because of the actual or perceived race, color, religion, ancestry, or national origin, of those with whom the Plaintiffs associated.

---

[13] One pseudonymous plaintiff has chosen the name of Mahmoud Alnaouq to honor the memory of his friend who was a university student in Gaza, and was killed along with his entire family when Israel bombed their apartment building.

- 64 -

FIRST AMENDED COMPLAINT

408.    Isaac Bokhoor is a Beverly Hills resident and co-owner of Angel City Jewelers. Bokhoor is sued in his capacity. Bokhoor attacked Plaintiff Thistle Boosinger, repeatedly smashing her exposed hand with a metal rod-like object, breaking her hand and severing a nerve in her ring finger, causing Thistle excruciating pain.

409.    Matin Mehdizadeh is a Los Angeles resident who participated in the mob attack at UCLA, working in concert with other mob attackers to assault, batter, and violate the civil rights of Plaintiff Catherine Hamilton.

410.    Tom Bibiyan is a 45-year-old Los Angeles resident and local entrepreneur. Defendant Bibiyan attacked several protesters on the night of April 30, including Plaintiff Dolores Quintana. Bibiyan is seen on video attacking the encampment and conspiring with others to terrify them as part of the mob attack.

411.    Jared Rubin is a Los Angeles resident who participated in the mob attack at UCLA, working in concert with other mob attackers to assault, batter, and violate the civil rights of Plaintiffs Jimi Degen and Isabella Lee.

412.    Nouri Mehdizadeh is a Los Angeles resident who harassed and brandished a knife at the encampment on April 28 and who participated in the April 30 mob attack at UCLA, working in concert with other mob attackers to assault, batter, and violate the civil rights of Plaintiff Catherine Hamilton.

413.    Edan On is a 19-year-old Los Angeles resident who was arrested by Los Angeles Police for alleged assaults at UCLA during the encampment. On led mob attacks on the encampment, viciously beating protesters and terrorizing them throughout the night, including Plaintiff Dolores Quintana and Afnan Khawaja.

414.    Eyal Shalom is a Los Angeles resident and part of the mob attack on the Palestine Solidarity Encampment. In coordination with Defendant Anthony Prouzinin, Shalom sprayed Plaintiff Dolores Quintana in the eyes with a chemical munition as she stood peacefully filming the crowd as part of the mob's overall coordination to attack the encampment. Shalom also attacked Plaintiff Catherine Hamilton on April 30, 2024.

415.    Anthony Prouzinin is a Los Angeles resident who was present on the night of the mob attack. He is seen on camera blinding Plaintiff Dolores Quintana while co-Defendant Eyal Shalom sprays her with chemicals directly in the eyes. Upon information and belief, Prouzinin attacked protesters with chemical weapons, yelled racist epithets at pro-Palestinian protesters, and coordinated with others in the mob.

416.    Upon information and belief, Eliran Bismut attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights. Upon information and belief, Eliran Bismut blasted Plaintiff Angelica Jit in the head with a 2 X 4 wooden plank,

417.    Upon information and belief, Daniel Khalili attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights. Upon information and belief, Khalili worked in concert with other mob attackers to assault, batter, and violate the civil rights of Plaintiffs Jimi Degen and Isabella Lee.

418.    Upon information and belief, Rony Abishoor attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights, including Plaintiff Isabella Lee.

419.    Jonathan Yashar Kavian is a 35-year-old attorney who resides in or maintains an office in Laguna Beach, California. Upon information and belief, Yashar attacked protesters with chemical weapons, yelled racist epithets at pro-Palestinian protesters, and coordinated with others in the mob.

420.    David Merabi is an attorney for Culver Legal, LP, in the City of Los Angeles. Upon information and belief, Merabi attacked protesters with chemical weapons, yelled racist epithets at pro-Palestinian protesters, and coordinated with others in the mob.

421.    Roy Elbaz is a Los Angeles resident who participated in the mob attacks at UCLA on April 30, 2024. He is childhood friends with Edan On. Upon information and belief, Elbaz attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian

FIRST AMENDED COMPLAINT

protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

422.    Brad Hisle is a Los Angeles resident who brandished a large, bat-like weapon and attacked protesters during the mob attack at UCLA. Upon information and belief, Hisle attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

423.    Upon information and belief, Arlan Mitnick attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

424.    Edwin Kohen is a Los Angeles resident and owner of Eddie's Exotics and Wall Street Farms, LLC. Defendant Kohen is sued in his capacity. Upon information and belief, Kohen attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

425.    Upon information and belief, Malachi Joshua attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

426.    Upon information and belief, Ronald Mishiyev attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

427.    Upon information and belief, Marlan Librett attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

- 67 -

FIRST AMENDED COMPLAINT

428.    Upon information and belief, Alon Abishoor attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

429.    Upon information and belief, Shai Abishoor attacked protesters with chemical weapons, threw objects at protesters, yelled racist epithets at pro-Palestinian protesters, and coordinated with others to violently attack Plaintiffs and prevent them from exercising their civil rights.

430.    Upon information and belief, the violent attacks committed on April 30, 2024, by Defendants terrorized Plaintiffs, prevented them from further exercising their civil rights that night, and had a chilling effect on their willingness to exercise their civil rights in support of Palestinians to this day.

431.    Upon information and belief, the violent attacks committed by Defendants were coordinated with other Defendants to terrorize Plaintiffs, preventing them from further exercising their civil rights that night and having a chilling effect on their willingness to exercise their civil rights in support of Palestinians to this day.

**University of California and UCLA Defendants**

432.    Defendant Regents of the University of California is a public agency within the meaning of Cal. Gov't Code § 7920.525(a) and is empowered under the California Constitution, Article IX, Section 9, to administer the University of California, including UCLA and UCPD. As the governing body for the University of California system, the Board of Regents has "full powers of organization and government" under Article IX, Section 9, of the California Constitution. The Board of Regents has its principal place of operation in Oakland, California.

433.    Defendant Dr. Michael V. Drake is the current President of the University of California and has served in that position since August 2020. As President, Drake oversees and is responsible for the operations of the entire University of California system, which includes UCLA. Drake is sued in his official capacity. Drake resides in California.

- 68 -

FIRST AMENDED COMPLAINT

434.    At all times material hereto Defendant Dr. Gene D. Block was the Chancellor of UCLA. He served in that role from August 2007 to July 31, 2024. As Chancellor, Block was the highest-ranking university official at UCLA. Block's duties included establishing campus policies, goals, and strategy. He is sued in his personal capacity notwithstanding his former role, so he shall be described herein as one of the "UCLA Defendants".. On information and belief, Block resides in the County of Los Angeles.

435.    Dr. Julio Frenk is the current Chancellor of UCLA, and his duties include establishing campus policies, goals, and strategy. He is sued in his official capacity. Frenk works in the County of Los Angeles and, on information and belief, resides in the County as well.

436.    Defendant Dr. Darnell Hunt is the current Executive Vice Chancellor and Provost of UCLA and has served in that position since September 2022. Hunt works in the County of Los Angeles and, on information and belief, resides in the County as well.

437.    Defendant Michael J. Beck is the current Administrative Vice-Chancellor of UCLA and has served in that position since March 2016. Beck was in charge of the public safety operations of the school at all relevant times from October 7, 2023, through June 10, 2024. Beck works in the County of Los Angeles and, on information and belief, resides in the County as well.

438.    Defendant Monroe Gorden, Jr., is the current Vice Chancellor, Student Affairs, of UCLA and has served in that position since April 2018. Gorden works in the County of Los Angeles, and on information and belief, resides in the County as well.

439.    Defendant Rick Braziel is the Associate Vice Chancellor for Campus Safety at UCLA. In this role, Braziel serves as the head of the newly created Office of Campus Safety at UCLA, which, as of May 5, 2024, oversees the UCLA Police Department ("UCPD"). Braziel works in the County of Los Angeles and, on information and belief, resides in the County as well.

440.    UCPD is directly under the control of its interim Chief, Scott Scheffler. Scheffler reports to Rick Braziel and, ultimately, to the Chancellor, both of whom have ultimate decision-making authority over it.

- 69 -
FIRST AMENDED COMPLAINT

**Defendants Generally**

441.    Upon information and belief, Plaintiffs allege that each of the individually named defendants and each Doe Defendant was the agent, servant, employee, or co-conspirator of all other defendants.

442.    Defendant Does 1-5, each of them a private business or government entity, the identity of which is presently unknown but participated in the tortious conduct described in this Complaint. When their identity does become known to the Plaintiffs, the Plaintiffs will seek leave of court to amend this complaint accordingly.

443.    Defendant Does 6-20 and each of them were contracted to or employed by the Regents, the City of Los Angeles, the California Highway Patrol, or Does 1-5, and participated in or were otherwise legally responsible for the tortious conduct described in this Complaint. When their identity does become known to the Plaintiffs, the Plaintiffs will seek leave of court to amend this complaint accordingly.

444.    Defendant Does 21-100, and each of them financed, organized, facilitated, encouraged, or otherwise aided the Riot Defendants, with the knowledge that the Riot Defendants would engage in the tortious conduct described in this Complaint. When their identity does become known to the Plaintiffs, the Plaintiffs will seek leave of court to amend this complaint accordingly.

445.    Defendants Do 101-125 were employees, agents, or contractors of the Defendant Regents and were willfully, deliberately, tortiously, or negligently responsible for the acts alleged herein and the resulting injuries to Plaintiffs.

//

//

//

//

**CLAIMS FOR RELIEF**

**FIRST CAUSE OF ACTION**

**For Interference with Civil Rights by Means of Threats, Intimidation, or Coercion
In Violation of Cal. Civ. Code § 52.1 Tom Bane Civil Rights Act**

FIRST AMENDED COMPLAINT

*By Plaintiffs Shandra Campbell, Jakob Johnson, Binyamin Moryosef, Joseph Murphy, Aaron Palmer, Gina Viola Peake, Faraaz Qureshi*
*Eric Wefald, Mahmoud Elnaouq, Nasiha Solakovic, and Roes 1, 2, 3, 4, 6, 7, 8, 9, 10, 12, 13, 14 Against the University of California, Dr. Michael Drake, and all UCLA Defendants and Does 98-125*

446. Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

447. California Civil Code 52.1 prohibits any "person or persons, whether or not acting under color of law" from interfering "by threat, intimidation or coercion" with the "exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution of laws of this state." Civ. Code. § 52.1.

448. Art. I, §2 of the California Constitution guarantees Plaintiffs the same rights as "[E]very person [to] freely speak, write and publish his or her sentiments on all subjects. . ." and demands that "A law may not restrain or abridge liberty of speech or press."

449. Defendants knowingly and deliberately interfered by threat, intimidation, or coercion with Plaintiffs' exercise or enjoyment of their speech, expression, and associational rights guaranteed by the Constitution of the State of California and the United States when Defendants decided to impermissibly shut down Plaintiffs' protected activities at the Palestine Solidarity Encampment.

450. In doing these things, the UCLA Defendants were motivated by, inter alia, the actual or perceived race, color, religion, ancestry, or national origin of the Plaintiffs or those whom they were among; or because of the actual or perceived race, color, religion, ancestry, or national origin, of those with whom the Plaintiffs associated.

451. This decision to shut down the Plaintiffs' protected activities at the encampment was without legal justification, especially because the Plaintiffs themselves did not violate any criminal law or university policy at any point during their participation and association with the encampment.

452. Nevertheless, in a message on the morning of May 1, Defendants threatened and intimidated Plaintiffs—and all other UC-affiliated personnel—with academic discipline if they remained at the site of the encampment.

- 71 -

FIRST AMENDED COMPLAINT

453.    Defendants then used threats, intimidation, and coercion, which forced Plaintiffs to vacate the premises through the illegal use of an unlawful assembly declaration. In so doing, they employed actual threats and coercion by declaring the site of the encampment an unlawful assembly and threatening to arrest, and causing the arrest of, anyone who did not disperse.

454.    All Plaintiffs listed herein reasonably believed that one or more of the above-named defendants or their agents would direct the commission of violence or commit violence against them if they continued to exercise their civil rights and liberties to prevent Plaintiffs from exercising their civil rights and liberties and that each of the defendants had the apparent ability to cause such threats to be carried out.

455.    All Plaintiffs listed herein reasonably believed that they would be subjected to academic discipline as students and/or labor discipline as faculty or staff if they continued to exercise their civil rights and liberties, and that each of the defendants had the apparent ability to cause such threats to be carried out.

456.    As a direct and legal result of Defendants' actions, Plaintiffs have suffered mental and emotional distress, have lost income and the ability to earn future income, and have incurred related expenses. The amount of general and compensatory damages shall be proven at trial.

457.    In doing the things hereinabove alleged Defendants Drake, Block, Hunt, Beck, Scheffler, Gorden, and Braziel, and Does 1-20, and each of them, treated Plaintiffs in a differential manner from counter protesters and others based on the political content of Plaintiffs' speech, demonstrating malicious discrimination and deliberate indifference to Plaintiffs' civil rights, with Defendants acting with the specific intent to facilitate violence against Plaintiffs because of their political beliefs and perceived ethnic identity.

458.    This pattern of conduct demonstrates deliberate indifference to Plaintiffs' constitutional rights and physical safety, with Defendants acting with malicious intent to facilitate and cover up violence against Plaintiffs based on their political expression.

459.    Following the violent attacks on the encampment, Defendants Block, Hunt, Beck, and Drake engaged in a coordinated campaign of fraudulent misrepresentations to conceal their deliberate facilitation of violence against Plaintiffs.

- 72 -

FIRST AMENDED COMPLAINT

460.    These material misrepresentations were made with knowledge of their falsity and with the specific intent to justify the planned arrest of student victims while shielding the actual perpetrators from accountability, demonstrating fraud in the concealment of Defendants' own misconduct and deliberate facilitation of violence against Plaintiffs.

461.    Defendants thus acted with deliberate disregard of the rights and safety of Plaintiffs, and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct.

462.    The Plaintiffs intend to continue attending and participating in demonstrations but fear further assault and other retaliation.

### SECOND CAUSE OF ACTION

**For Interference with Civil Rights by Means of Violence
In Violation of Cal. Civ. Code § 52.1 Tom Bane Civil Rights Act**

***By Plaintiffs Faraaz Qureshi, Shandra Campbell, Roe 12, Jakob Johnson, Binyamin Moryosef, Joseph Murphy, Aaron Palmer, Gina Viola Peake, Eric Wefald, Mahmoud Elnaouq, Nasiha Solakovic and Roes 1, 2, 4, 6, 7, 8, 9, and 10, and 12.***
***Against the University of California, Dr. Michael Drake, and all UCLA Defendants and Does 98-125***

463.    Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

464.    On June 10, 2024, as alleged in Paragraphs 75-83, *supra*, each of the Plaintiffs named herein was violently attacked by agents of the defendants sued in this cause of action.  The attack was ordered and directed by said defendants to prevent Plaintiffs from exercising their civil rights and civil liberties or to retaliate against them for doing so.

//

465.    In doing the acts hereinabove alleged, the agents of the government entity defendants who attacked one or more Plaintiffs did not do so in the course of exercising reasonable force to effect a lawful arrest, but in fact did so to prevent Plaintiffs from exercising their civil rights, or to retaliate against them for doing so.

- 73 -
FIRST AMENDED COMPLAINT

466.    In doing these things, the UCLA Defendants were motivated by, inter alia, the actual or perceived race, color, religion, ancestry, or national origin of the Plaintiffs or those whom they were among; or because of the actual or perceived race, color, religion, ancestry, or national origin, of those with whom the Plaintiffs associated.

467.    As a direct and legal result of this violence, Plaintiffs suffered physical injuries, mental and emotional distress; have lost income and future earning capacity; and have incurred medical expenses.  The conduct of defendants sued in this cause of action was a substantial factor in causing such harm, entitling Plaintiffs to special damages and general compensatory damages in an amount to be proven at trial.

468.    In doing the things hereinabove alleged Defendants Drake, Block, Hunt, Beck, Scheffler, Gorden, and Braziel, and Does 1-20, and each of them, treated Plaintiffs in a differential manner from counterprotesters and others based on the political content of Plaintiffs' speech, demonstrating malicious discrimination and deliberate indifference to Plaintiffs' civil rights, with Defendants acting with the specific intent to facilitate violence against Plaintiffs because of their political beliefs and perceived ethnic identity.

469.    This pattern of conduct demonstrates deliberate indifference to Plaintiffs' constitutional rights and physical safety, with Defendants acting with malicious intent to facilitate and cover up violence against Plaintiffs based on their political expression.

470.    Following the violent attacks on the encampment, Defendants Block, Hunt, Beck, and Drake engaged in a coordinated campaign of fraudulent misrepresentations to conceal their deliberate facilitation of violence against Plaintiffs.

471.    These material misrepresentations were made with knowledge of their falsity and with the specific intent to justify the planned arrest of student victims while shielding the actual perpetrators from accountability, demonstrating fraud in the concealment of Defendants' own misconduct and deliberate facilitation of violence against Plaintiffs.

472.    In doing the things hereinabove alleged Defendants Drake, Block, Hunt, Beck, Gordon, and Braziel, and Does 1-20, and each of them, acted with deliberate disregard of the rights

- 74 -

FIRST AMENDED COMPLAINT

and safety of Plaintiffs, and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct.

473.    Plaintiffs intend to continue attending and participating in demonstrations but fear further assault and other retaliation.

**THIRD CAUSE OF ACTION**

**For Interference with Civil Rights by Means of Threats, Intimidation, or Coercion, and Overt Violence in Violation of Cal. Civ. Code § 52.1 Tom Bane Civil Rights Act**

*By Plaintiffs Thistle Boosinger, Shandra Campbell, James (Jimi) Peric Degen, Catherine Hamilton, Jakob Johnson, Isabella Lee , Binyamin Moryosef, Dolores Quintana, Bharat Venkat, Angela Jit, Afnan Khawaja, and Roes 1, 3, 4, 5, 6, 7, 8, 9,  10, 11, 12, 13,14, and 15
Against All Riot Defendants and Does 55-97*

474.    Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

475.    California Civil Code 52.1 prohibits any "person or persons, whether or not acting under color of law" from interfering "by threat, intimidation or coercion" with the "exercise or enjoyment by any individual or individuals of rights secured by the Constitution of laws of the United States, or of the rights secured by the Constitution of laws of this state." Civ. Code. § 52.1.

476.    Art. I, §2 of the California Constitution guarantees Plaintiffs the same rights as "[E]very person [to] freely speak, write and publish his or her sentiments on all subjects."

477.    Defendants threatened immediate physical violence and harm, made intimidating gestures, charged Plaintiffs, and assaulted them with fists, clubs, incendiary and explosive devices, and toxic chemicals. These violent attacks—whether experienced or witnessed by Plaintiffs—intimidated, threatened, and coerced Plaintiffs and interfered with Plaintiffs' exercise or enjoyment of their speech, expression, associational rights, and newsgathering guaranteed by the Constitution of the State of California and the United States Constitution.

478.    Defendants attacked Plaintiffs both inside and outside of the Palestine Solidarity Encampment to punish Plaintiffs for exercising their constitutional rights, including speech, expression, associational rights, and newsgathering, and to attempt to shut down Plaintiffs' protected activities.

- 75 -

479.    There was no lawful justification for the RIOT DEFENDANTs to commit violence against and threaten violence against the Plaintiffs because of their perceived political affiliation while the Plaintiffs were engaged in First Amendment activity or because of their perceived membership in or association with persons of a particular race, national origin, religion, or ethnic affiliation, or because of their newsgathering activities.

480.    All Plaintiffs listed herein reasonably believed that one or more of the above-named defendants or their agents would direct the commission of violence or commit violence against them to prevent Plaintiffs from exercising their civil rights and liberties and that each of the defendants had the apparent ability to carry out such threats. Many of the Plaintiffs named herein were the direct victims of such violence.

481.    As a direct and legal result of Defendants' actions, Plaintiffs have suffered physical harm and mental and emotional distress, have lost income and the ability to earn future income, and have incurred medical and related expenses. The amount of general and compensatory damages shall be proven at trial.

482.    In doing the things hereinabove alleged, RIOT DEFENDANTs and Does 21-100, and each of them, acted with deliberate disregard of the rights and safety of Plaintiffs and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct.

483.    Plaintiffs intend to continue attending and participating in demonstrations but fear further assault and other retaliation.

//

//

//

//

## FOURTH CAUSE OF ACTION

### For Violation of the Ralph Civil Rights Act of 1976, (Cal. Civil Code § 51.7)

*By Thistle Boosinger, Shandra Campbell, James (Jimi) Peric Degen, Catherine Hamilton, Jakob Johnson, Isabella Lee, Binyamin Moryosef, Dolores Quintana, Bharat Venkat, Angela Jit, Afnan Khawaja, Nasiha Solakovic and Roes 1, 3, 4, 5, 6, 7, 8, 9,  10, 11, 12, 13, 14, and 15.*

- 76 -

***Against All Riot Defendants and Does 55-97***

484.    Plaintiffs repeat and replead each of the allegations in the preceding paragraphs and incorporate them by reference as though fully set forth herein.

485.    Plaintiffs in this cause of action bring this cause of action against all RIOT DEFENDANTs and Does 21-97.

486.    All RIOT DEFENDANTs, and each of them, sued herein were engaged in at least some of the following acts: wielding makeshift clubs, boards, or other hard objects, charging at and/or striking kicking, or attempting to blind Plaintiffs or persons near to Plaintiffs, spraying toxic chemicals, hurling explosive or incendiary materials into the Palestine Solidarity Encampment, hurling hard objects into the Palestine Solidarity Encampment, intending to cause harmful or offensive contact.

487.    In doing the things hereinabove alleged, the RIOT DEFENDANTs caused Plaintiffs to reasonably fear that they would be hurt by being beaten, kicked, clubbed, sprayed, blinded, struck by thrown objects, or hurt by burning or exploding objects.

488.    In doing the things hereinabove alleged the RIOT DEFENDANTS were at least partly motivated by the actual or perceived race, color, religion, ancestry, or national origin, of the Plaintiffs or those whom they were among; or because of the actual or perceived race, color, religion, ancestry, or national origin, of those with whom the Plaintiffs associated.

489.    As a direct and legal result of the aforementioned acts or omissions, the Plaintiffs named in this cause of action sustained and incurred damages, including pain, suffering, and emotional injury.

490.    In doing the things hereinabove alleged, RIOT DEFENDANTS and Does 55-97, and each of them, acted with deliberate disregard of the rights and safety of Plaintiffs and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct. All Defendants, and each of them, by doing and/or causing the acts complained of in this entire Complaint, assaulted, battered, and intimidated Plaintiffs with threats of violence because of Plaintiffs' perceived political affiliation and/or political beliefs, and in retaliation

- 77 -

for Plaintiffs' exercising their constitutional rights, or because of Plaintiffs' perceived membership in or association with persons of a particular race, national origin, religion, or ethnic affiliation.

491. There was no lawful justification for the RIOT DEFENDANTs to commit violence against and threaten violence against the Plaintiffs because of their perceived political affiliation while Plaintiffs were engaged in First Amendment activity or because of their perceived membership in or association with persons of a particular race, national origin, religion, or ethnic affiliation or because of their newsgathering activity.

492. As a legal result of the Defendants' unlawful conduct, the Plaintiffs have suffered emotional distress, physical injury, loss of income and loss of future earning capacity, and pain and suffering and are entitled to monetary damages.

493. In doing the things alleged above, the defendants sued in this cause of action, and each of them acted with deliberate disregard of the rights and safety of the Plaintiffs and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein defendants and to deter future similar misconduct.

494. Plaintiffs intend to continue attending and participating in demonstrations but fear further assault and other retaliation.

**FIFTH CAUSE OF ACTION**

**For Assault**

*By Thistle Boosinger, Shandra Campbell, James (Jimi) Peric Degen, Catherine Hamilton, Jakob Johnson, Isabella Lee, Binyamin Moryosef, Dolores Quintana, Bharat Venkat, Angela Jit, Afnan Khawaja, Nasiha Solakovic and Roes 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15. Against All Riot Defendants and Does 55-97*

495. Plaintiffs repeat and replead each of the allegations in the preceding paragraphs and incorporate them by reference as though fully set forth herein.

496. Plaintiffs bring this cause of action against all RIOT DEFENDANTs and Does 21-97.

497. All RIOT DEFENDANTs, and each of them, sued herein were engaged in at least some of the following acts: wielding makeshift clubs, boards, or other hard objects, charging at Plaintiffs or persons near to Plaintiffs, spraying toxic chemicals, hurling explosive or incendiary materials into the Palestine Solidarity Encampment, hurling hard objects into the Palestine Solidarity

FIRST AMENDED COMPLAINT

Encampment.  Each of these acts was intended to cause harmful or offensive contact or make the plaintiffs fearful that they would be so harmed.

498.    In doing the things hereinabove alleged, the RIOT DEFENDANTs caused Plaintiffs to reasonably fear that they would be hurt by being beaten, clubbed, sprayed, struck by thrown objects, or hurt by burning or exploding objects.

499.    As a direct and legal result of the aforementioned acts or omissions, the Plaintiffs named in this cause of action sustained and incurred damages, including pain, suffering, and emotional injury.

500.    In doing the things hereinabove alleged, the RIOT DEFENDANTs and Does 21-100, and each of them, acted with deliberate disregard of the rights and safety of Plaintiffs and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct.

### SIXTH CAUSE OF ACTION

### For Battery

*By Thistle Boosinger, Shandra Campbell, James (Jimi) Peric Degen, Catherine Hamilton, Isabella Lee , Dolores Quintana, Roe 11, Bharat Venkat, Angela Jit, Afnan Khawaja, Nasiha Solakovic and Roes 1, 3, 5, 6, 8, 9, 10, 12, 13, 14, and 15*
*Against All Riot Defendants and Does 55-97*

501.    Plaintiffs repeat and replead each of the allegations in the preceding paragraphs and incorporate them by reference as though fully set forth herein.

502.    Plaintiffs bring this cause of action against all RIOT DEFENDANTs and Does 21-197.

//

503.    All RIOT DEFENDANTs, and each of them, sued herein were engaged in at least some of the following acts: striking Plaintiffs with makeshift clubs, boards, or other hard objects, spraying toxic chemicals, hurling explosive or incendiary materials into the Palestine Solidarity Encampment, hurling hard objects into the Palestine Solidarity Encampment, and otherwise intending to cause harmful or offensive contact.

504.    In doing the things hereinabove alleged, the RIOT DEFENDANTs and Does 55-97 harmed Plaintiffs.

505.    As a direct and legal result of the aforementioned acts or omissions, the Plaintiffs named in this cause of action sustained and incurred damages, including pain, suffering, and emotional injury.

506.    In doing the things hereinabove alleged, the RIOT DEFENDANTs and Does 21- 100, and each of them, acted with deliberate disregard of the rights and safety of Plaintiffs and are therefore liable for punitive damages in amounts sufficient to punish the defendants sued herein and to deter future similar misconduct.

### SEVENTH CAUSE OF ACTION

### For Negligent Failure to Perform a Mandatory Duty

### In Violation of Government Code § 815.6

*By Plaintiffs Thistle Boosinger, Shandra Campbell, James (Jimi) Peric Degen, Catherine Hamilton,  Jakob Johnson, Isabella Lee , Binyamin Moryosef, Dolores Quintana, Bharat Venkat, Angela Jit, Afnan Khawaja, Nasiha Solakovic and Roes 1, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15*
*Against the Regents of the University of California*

507.    Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

508.    California Government Code §11135 imposes upon the Regents a mandatory duty to take reasonable steps to ensure that no person is unlawfully subjected to discrimination under any program that is funded directly by the state or receives any financial assistance from the state and that no person is denied full and equal access to benefits.

//

509.    Plaintiffs were subjected to discrimination or denied full and equal access to benefits based on their actual or perceived race or color. Religion, ancestry, national origin, ethnic group identification, or because of their association with persons falling into one or more of those actual or perceived protected classes.

510.    The Regents' failure (or refusal) to perform their mandatory duty under Government Code §815.6 was a direct and legal cause of the Plaintiffs suffering mental and emotional distress, losing income and the ability to earn future income, and incurring medical and related expenses. The amount of general and compensatory damages shall be proven at trial.

511.    As a direct and legal result of the aforementioned acts or omissions, the Plaintiffs named in this cause of action sustained and incurred damages, including pain, suffering, and emotional injury.

### EIGHTH CAUSE OF ACTION

### For Negligence

*By Plaintiffs James (Jimi) Peric Degen, Catherine Hamilton, Jakob Johnson, Isabella Lee , Binyamin Moryosef, Bharat Venkat,  Nasiha Solakovic and Roes 1, 3, 5, 6, 8, 9, 10, 12, 13, 14, 15 Against Michael v. Drake, Eugene "Gene" Block, Darnell Hunt, Michael J. Beck, Monroe Gorden, Jr., Richard "Rick" Braziel, Does 1-20, and the Regents of the University of California*

512.    Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

513.    At all times material hereto, each of the individual defendants sued in this cause of action was working and acting entirely within the course and scope of their respective roles as officials employed by the Regents of the University of California.

514.    Beginning on the first day of the Palestine Solidarity Encampment and continuing through the brutal mob assault on the night of April 30, 2024, each of the individual defendants sued in this cause of action was repeatedly warned of escalating threats and violent acts carried out against encampment members.

515.    Despite (or perhaps because of) the mounting risk of grave harm to students, faculty, and staff inside of the Solidarity Encampment, and other students who were nearby as reporters for UCLA's student newspaper, the individual defendants turned their backs on the Plaintiffs and took no reasonable steps to protect them from the dangers they faced despite a mandatory duty to do so pursuant to Government Code §815.6.

516.    In doing the things hereinabove alleged, the Individual Defendants and Does 1-20 harmed Plaintiffs.

- 81 -

FIRST AMENDED COMPLAINT

517. As a direct and legal result of the aforementioned acts or omissions, the Plaintiffs named in this cause of action sustained and incurred damages, including pain, suffering, and emotional injury.

518. Pursuant to Government Code §815.2, the Regents are vicariously liable for the injuries caused by their employees and agents.

## NINTH CAUSE OF ACTION

### For False Arrest in Violation of Article I, §13 of the California Constitution

***By Plaintiffs Joseph Murphy, Aaron Palmer, Eric Wefald, Mahmoud Elnaouq, and Roes 1, 4, 6, 8, 9, 10, and 11.***
***Against the Regents of the University of California, the California Highway Patrol, and The City Of Los Angeles***

519. Plaintiffs repeat and replead the allegations of the preceding paragraphs and incorporate them as though fully set forth herein.

520. Defendants UCPD, LAPD, and CHP unlawfully and without legal justification caused the arrests of Plaintiffs Eric Wefald, and Roes 6, 7, 8, 9, 10, and 12 on May 2, 2024

521. Defendants UCPD, LAPD, and CHP unlawfully and without legal justification caused the arrests of Plaintiffs  Joseph Murphy, Aaron Palmer, Mahmoud Elnaouq, and Roes 1 and 4 on June 10, 2024.

522. On both May 2, 2024, and June 10, 2024, Defendants caused Plaintiffs' arrest without warrant or probable cause.

523. Defendants lacked probable cause to arrest or cause the arrests of Plaintiffs on either May 2, 2024, or June 10, 2024, because there was no underlying criminal offense that could justify the unlawful assembly declaration, which was based solely on violations of university policy, not any criminal offense, violence, imminent threat of danger, as required by California law. *See In re Brown*, 9 Cal. 3d at 624 ("An unlawful act within the meaning of section 407 . . . means criminal conduct prohibited by state law.").

524. Because the unlawful assembly declaration was itself unlawful, there was no probable cause to arrest for failure to disperse under California Penal Code section 409, which applies only when an individual has been "lawfully warned to disperse."

- 82 -
FIRST AMENDED COMPLAINT

525.    Moreover, when Defendants arrested Plaintiffs, they failed to make any effort to distinguish between the participants in any unlawful activity and innocent bystanders, as required to carry out a lawful arrest for failure to disperse under Penal Code section 409. *See Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 967 (9th Cir. 2001).

526.    Defendants acted in the performance of their official duties when they directed, caused, and effectuated the arrest of Plaintiffs.

527.    As a direct and legal cause of Defendants' actions and omissions, Plaintiffs were arrested without probable cause and in violation of Article 1, Section 13 of the California Constitution.

528.    As a direct and legal result of Defendants' actions, Plaintiffs have suffered physical harm and mental and emotional distress, have lost income and the ability to earn future income, and have incurred medical and related expenses. The amount of general and compensatory damages shall be proven at trial.

529.    As a direct and legal result of the Defendants' actions, the Plaintiffs who were students have faced unwarranted disciplinary action merely because of their false and unlawful arrests, interrupting their education and depriving them of graduation, academic, and employment opportunities.

## TENTH CAUSE OF ACTION

### For Unlawful Police Shooting

***By Jakob Johnson***
***Against the Regents of the University of California, the Los Angeles Police Department, and Doe 99***

530.    Plaintiff repeats and repleads each of the allegations in preceding and subsequent paragraphs and incorporates the same as though fully set forth herein.

531.    On June 10, 2024, one or more of the named defendants, by the actions of its public employee, Doe 99, injured Johnson by shooting him with a kinetic impact weapon to disperse a public assembly without lawful justification, resulting in bodily injury to Johnson.

532.    As a direct and proximate result of the aforementioned acts or omissions, Johnson sustained and incurred damages including physical injuries and pain and suffering.

- 83 -

FIRST AMENDED COMPLAINT

533.    Defendants, and each of them had no objectively reasonable basis to believe that Johnson posed a threat to life or a threat to serious bodily injury.

534.    California Penal Code §13652 imposes a mandatory duty upon each of the defendants sued in this cause of action to refrain from shooting people  such as Johnson unless there is an objectively reasonable basis to believe that at the time Johnson was shot he posed a threat to life or a threat of serious bodily injury.

535.    In doing the things hereinabove alleged Defendant Doe 99 acted intentionally, recklessly, wantonly, or are guilty of negligence *per se*, in violation of Government Code §815.6

536.    Government Defendants sued herein are liable to Johnson for the acts of its public employees for conduct and/or omissions herein alleged, pursuant to the doctrine of respondeat superior, codified at California Government Code § 815.2.

537.    In doing the things hereinabove alleged Doe 99 acted with deliberate disregard of the rights and safety of Johnson and is therefore liable for punitive damages in amounts sufficient to punish the defendant and to deter future similar misconduct.

## ELEVENTH CAUSE OF ACTION

### For Unlawful Police Shooting

*By Roe 2 and Faraaz Qureshi*

*Against the State of California, Regents of the University of California, the City of*

*Los Angeles, and Does 98 and 100*

538.    Plaintiffs repeat and replead each of the allegations in preceding and subsequent paragraphs and incorporate the same as though fully set forth herein.

539.    On May 1, 2024, government defendants sued herein, by the actions of its public employee, Doe 98, an officer of the government defendants, injured Roe 2 by shooting him with a kinetic impact weapon to disperse a public assembly without lawful justification, resulting in bodily injury to Roe 2.

540.    On May 1, 2024, government defendants sued herein, by the actions of its public employee, Doe 100, an officer of the government defendants, injured Faraaz Qureshi by shooting him

- 84 -

FIRST AMENDED COMPLAINT

with a kinetic impact weapon to disperse a public assembly without lawful justification, resulting in bodily injury to Faraaz Qureshi.

541.    As a direct and proximate result of the aforementioned acts or omissions, Roe 2 and Faraaz Qureshi sustained and incurred damages including physical injuries and pain and suffering.

542.    Defendants, and each of them had no objectively reasonable basis to believe that Roes Number 2 and Faraaz Qureshi posed a threat to life or a threat to serious bodily injury.

543.    California Penal Code §13652 imposes a mandatory duty upon each of the defendants sued in this cause of action to refrain from shooting people  such as Roe Number 2 or Faraaz Qureshi unless there is an objectively reasonable basis to believe that at the time Johnson was shot he posed a threat to life or a threat of serious bodily injury.

544.    In doing the things hereinabove alleged Defendant Does 98 and 100 acted intentionally, recklessly, wantonly, or are guilty of negligence *per se*, in violation of Government Code §815.6.

545.    One or more of the Government Defendants' agencies are liable to Roe 2 and Faraaz Qureshi for the acts of its public employees for conduct and/or omissions herein alleged, pursuant to the doctrine of respondeat superior, codified at California Government Code § 815.2.

546.    In doing the things hereinabove alleged Does 98 and 100 acted with deliberate disregard of the rights and safety of Roe 2 and Faraaz Qureshi, and is therefore liable for punitive damages in amounts sufficient to punish the defendant and to deter future similar misconduct.

### TWELFTH CAUSE OF ACTION

**Taxpayer Suit for Declaratory and Injunctive Relief**
**Code of Civil Procedure § 526a**
*By All Plaintiffs*
*Against Defendants State of California and City of Los Angeles*

547.    Plaintiffs repeat and replead each of the allegations in the preceding and subsequent paragraphs and incorporate the same as though fully set forth herein.

548.    The State of California imposes a sales tax. The City of Los Angeles assesses a sales tax that is added to the basic state sales tax, in addition to other taxes. Plaintiffs have been assessed

- 85 -

FIRST AMENDED COMPLAINT

and are liable to pay taxes in and to the City of Los Angeles. Plaintiffs have suffered, and unless the Court restrains Defendants, will continue to suffer irreparable harm.

549.    Plaintiffs are informed and believe, and on that basis allege, that the conduct of Defendants, their employees, agents, and contractors, has been and, unless restrained, will continue to be deleterious to the constitutional and statutory rights of Plaintiffs and the general public. Plaintiffs thereby seek to enforce important rights affecting the public interest within the meaning of California Code of Civil Procedure § 1021.5.

550.    Plaintiffs have no adequate remedy at law.

551.    Defendants have expended public monies and threaten and will continue to spend such monies to implement and engage in the illegal conduct described herein.

552.    Pursuant to California Code of Civil Procedure §§ 526 and 526a, and the constitutional and statutory provisions set forth above, the Plaintiffs, as taxpayers and as injured parties entitled to relief, seek declaratory and injunctive relief and an accounting to prevent continued harm and to protect themselves and the public from the Defendants' unlawful policies and practices.

553.    Unless the Defendants are enjoined from continuing their unlawful course of conduct, Plaintiffs will suffer ongoing and irreparable injury to their rights. Plaintiffs seek injunctive relief pursuant to California Code of Civil Procedure § 526a and the substantive standards reflected in the claims stated above, for which injunctive and declaratory relief are appropriate remedies.

554.    It is necessary and appropriate for the Court to render a declaratory judgment that sets forth the parties' legal rights and obligations with respect to constitutionally protected assemblies and demonstrations.

## **PRAYER FOR RELIEF**

### **FOR THE FIRST, SECOND, AND THIRD CAUSES OF ACTION**
**Bane Act Violation**
*Against All Defendants*

1.    Compensatory damages;

FIRST AMENDED COMPLAINT

2.      Trebling of compensatory damages;

3.      Statutory damages of $25,000 per claim;

4.      Costs of litigation, including attorneys' fees

## FOR THE THIRD CAUSE OF ACTION
**Bane Act Violation**
*Against the Riot Defendants*

5.      Punitive damages against the individually named defendants;

## FOR THE FOURTH CAUSE OF ACTION
**Ralph Act Violation**
*Against the Riot Defendants*

6.      Compensatory damages;

7.      Trebling of compensatory damages;

8.      Statutory damages of $25,000 per claim;

9.      Punitive damages; and

10.     Costs of litigation, including attorneys' fees

## FOR THE FIFTH AND SIXTH CAUSES OF ACTION

**Assault, Battery**
*Against the Riot Defendants*

11.     Compensatory damages;

12.     Punitive damages; and

13.     Costs of litigation

## FOR THE SEVENTH CAUSE OF ACTION
**Violation of Gov. Code §815.6**
*Against the Regents of the University of California*

14.     Compensatory damages; and

15.     Costs of litigation

## FOR THE EIGHTH CAUSE OF ACTION
**Negligence**
*Against Michael V. Drake, Eugene "Gene" Block, Darnell Hunt, Michael J. Beck,  Monroe Gorden, Jr., Richard "Rick" Braziel, Does 1-20,
and the Regents of the University Of California*

16.     Compensatory damages; and

- 87 -

FIRST AMENDED COMPLAINT

17.    Costs of litigation;

## FOR THE NINTH CAUSE OF ACTION
**False Arrest**
**Article I, §13 of the California Constitution**
*Against the Regents of the University Of California, the California Highway Patrol, and the City Of Los Angeles*

18.    Compensatory damages; and

19.    Costs of litigation, including attorneys' fees;

## FOR THE TENTH AND ELEVENTH CAUSES OF ACTION

20.    Compensatory general and special damages; against the State of California, Regents of the University of California, and the City of Los Angeles;

21.    Punitive damages against Does Number 98, Number 99, and Number 100; and

22.    Costs of litigation against all Defendants sued in this Cause of Action;

## FOR THE FIRST, SECOND, SEVENTH, EIGHTH, AND NINTH CAUSES OF ACTION

Plaintiffs respectfully request that this Court hold a jury trial and:

23.    Enter a judgment declaring that Defendants' clearing of the Palestine Solidarity Encampment on May 1-2, 2024, and the resultant arrests violated Plaintiffs' rights under the California Constitution and applicable statutory law;

24.    Enter a declaratory judgment that the June 10 arrests of Plaintiffs violated their rights under the California Constitution and applicable statutory law;

25.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from initiating or pursuing any formal or informal disciplinary proceedings against Plaintiffs based on conduct at pro-Palestinian protest at UCLA;

26.    Order the Regents to rescind any sanctions or file entries imposed on Plaintiffs arising from pro-Palestine protest, and to expunge any arrest or citations or disciplinary records related to those events from University and law enforcement files;

27.    Enjoin the Regents and their subordinates, agents, employees, and any others acting in concert with them from publishing the names of protest arrestees, using California Penal Code 626

- 88 -

FIRST AMENDED COMPLAINT

to temporarily ban protesters, and using interim suspensions or exclusions as a result of campus protest;

28.    Enjoin the Regents and their subordinates, agents, employees, and any others acting in concert with them from requiring permits, pre-registration, or advance notice as a precondition to expressive activity in outdoor, generally open campus areas. Reasonable, content-neutral time, place, and manner rules narrowly tailored to specific, demonstrated operational needs may be used if consistent with this Order;

29.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from declaring any assembly "unlawful" absent actual violence against others, and from declaring an assembly "unlawful" based solely on alleged violations of University time, place, and manner regulations or other University policies;

30.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from dispersing any assembly with force, unless participants are engaged in criminal violence against others or there is an imminent threat of criminal violence against others, and less intrusive alternatives have been exhausted;

31.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from enforcement, disciplinary, or police action against Plaintiffs or others similarly situated based in part on the content or viewpoint of that expression;

32.    Enjoin the Regents, their subordinates, agents, employees, and any others acting in concert with them from authorizing or directing the use of surveillance, less-lethal munitions, batons, or any other force against demonstrators absent actual criminal violence against others or an imminent threat thereof;

33.    Order the Regents to adopt and publish protest safety protocols that prioritize non-police safety measures, including the creation of a non-police body of elected student workers, faculty, staff, that would be designated liaisons to communicate with protesters and oversee UCPD protest response;

34.    Order the Regents to establish and publish a transparent, content-neutral protocol for engaging with campus protest organizers, including (a) timely advance notice to designated protest

liaisons of any planned law enforcement intervention,  and (b) a prohibition on consultation with or adoption of directives from any external entity, governmental or non-governmental, regarding the suppression of campus speech;

35.    Enjoin the Regents from enforcing any portion of the amended Time, Place, and Manner restrictions that prohibit protesting, speech making, with or without amplified sound, creating non-permanent structures, the temporary impeding of sidewalks, pathways, and public areas; so long as the amplified sound does not result in a student or faculty filed complaint that it is actually interfering with scheduled classes or testing, and so long as the temporary impedance does not prevent entry or egress from at least one readily accessible point in any university building;

36.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from enacting any restrictions on expressive conduct or speech that are not narrowly tailored to demonstrable health/safety needs and implemented using a non-police safety team before any enforcement;

37.    Enjoin the Regents and their subordinates, agents, employees, and any others acting with them or on their behalf from requiring any and all students arrested to go through the student conduct process for protest-related arrests; and

38.    Order UCLA Defendants to:

   a.    reaffirm the right to student protest;

   b.    issue apologies to all students who were subject to the student conduct disciplinary process due to their protest of genocide in Palestine;

   c.    issue statements to all impacted students that any delays in degree conferral or graduation are due to University error;

   d.    declare that the Palestine Solidarity Encampment was not a "Jew exclusion zone" and that students, faculty, and community members did not engage in antisemitic behavior in their protest; and

   e.    declare that anti-Zionism is not antisemitism

**FOR ALL CAUSES OF ACTION**

39.    For attorneys' fees pursuant to Code of Civil Procedure §1021.5; and

- 90 -
FIRST AMENDED COMPLAINT

40. Such other and further relief as the Court may deem just or necessary.

Respectfully submitted,

**LAW OFFICES OF THOMAS B. HARVEY**

Dated: August 11, 2025

THOMAS B. HARVEY

**KLEIMAN/RAJARAM**

Dated: August 11, 2025

MARK KLEIMAN
Counsel for Plaintiffs

FIRST AMENDED COMPLAINT

**Attachment "A" – Additional Attorneys for Plaintiffs**

RAMSEY JUDAH (SBN 342300)
JUDAH LAW GROUP, LC
1026 W. Foothill Boulevard
Upland, California 91786-3730
Tel: (626) 899-7667
Email: ramsey@judahlawgroup.com

WADE MCMULLEN (*pro hac vice* forthcoming)
NYS Attorney # 5308747
1901 Pennsylvania Avenue NW, Suite 900
Washington, DC 20006
Tel: (202) 649-0080
Email: wademc@protonmail.com

EZRA RITCHIN (*pro hac vice* forthcoming)
NYS Attorney # 6085054
367 St. Marks Ave #1132
Brooklyn, NY 11238
(917) 725-0116
ritchinezra@gmail.com

AMR SHABAIK (SBN 288109)
DINA CHEHATA (SBN 295596)
COUNCIL ON AMERICAN-ISLAMIC RELATIONS, CALIFORNIA
2180 W. Crescent Ave., Suite F
Anaheim, CA 92801
Tel: (714) 776-1177

**KERMANI LLP**
Mohamad Ahmad (SBN. 275911)
ma@kermanillp.com
Ramin Kermani-Nejad (SBN. 268070)
rk@kermanillp.com
2719 Wilshire Blvd. Ste. 200
Santa Monica, CA 90403
T: (424) 253.4254 | F: (888) 959.8749

**SHEFMAN LAW GROUP**
Lenore Shefman (SBN 209485)
lenore@cyclistlaw.com
10940 Wilshire Blvd. Suite 900
Los Angeles, CA 90024
T: (310) 265.3834 | F: (512) 476.1500

- 92 -

FIRST AMENDED COMPLAINT

HH LAW FIRM
Hani Habbas, Esq. (SBN 337016)
7700 Irvine Center Dr., Suite 750
Irvine, CA 92618
P: (833) 359-6116
F: (866) 628-7863
E: hani@hhlawfirm.law

FOR PLAINTIFFS THISTLE BOOSINGER; ROE 1; ROE 2; FARAAZ QURESHI; JAKOB JOHNSON; JACK KEARNS; AFNAN KHAWAJA; DOLORES QUINTANA; CATHERINE HAMILTON; ROE 8; SHANDRA CAMPBELL; ROE 6; ANGELICA JIT; ROE 15: ROE 9; ROE 10; ROE 3; ROE 14; BINYAMIN MORYOSEF; JAMES (JIMI) PERIC DEGEN; ISABELLA LEE; ROE 4; AARON PALMER; MAHMOUD ALNAOUQ; JOSEPH MURPHY; ROE 5; ROE 11; LUBNA HAMMAD; ROE 12; BHARAT VENKAT; ROE 7; GINA VIOLA PEAKE; ERIC WEFALD; ROE 13; and NASIHA SOLAKOVIC.

FIRST AMENDED COMPLAINT

**PROOF OF SERVICE**

I, the undersigned, declare that I am employed in the County of Los Angeles, State of California. I am over the age of 18 and am not a party to this action. My business address is 2719 Wilshire Blvd. Ste. 250, Santa Monica, CA 90403. On the date below, I served the following document(s): **FIRST AMENDED COMPLAINT** on the following parties:

**MUNGER, TOLLES & OLSON LLP**
BRYAN H. HECKENLIVELY (SBN 279140) - bryan.heckenlively@mto.com
JULIANA M. YEE (SBN 304564) - juliana.yee@mto.com
ALISON A. DOYLE (SBN 332183) - alison.doyle@mto.com
560 Mission Street, Twenty-Seventh Floor
San Francisco, California 94105-2907

ANDRA LIM (SBN 336265) - andra.lim@mto.com
601 Massachusetts Avenue NW, Suite 500 E
Washington, D.C., 20001

ALEXIS CAMPBELL (SBN 352971) - alexis.campbell@mto.com
CHRISTOPHER A. MORILLO (SBN 356406) - chris.morillo@mto.com
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071

***Attorneys for Defendants Regents of the University of California, Michael V. Drake, Darnell Hunt, Michael Beck, Monroe Gorden, Jr., Rick Braziel, and Scott Scheffler***

ROB BONTA
Attorney General of California
ROHIT KODICAL - Rohit.Kodical@doj.ca.gov
Supervising Deputy Attorney General
1515 Clay Street, 20th Floor
P.O. Box 70550
Oakland, CA 94612-0550
***Attorneys for Defendant California Highway Patrol***

CHRISTIAN BOJORQUEZ - christian.bojorquez@lacity.org
Ofc City Attorney
200 N Main St, Ste 600 6th Floor, Los Angeles, CA 90012-4119.
***Attorney for Defendant Los Angeles Police Department***

X      **BY ELECTRONIC MAIL (E-MAIL)** I transmitted the above via electronic mail to the e-mail addresses above and there was no error in transmission.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on August 12, 2025.

_____
Chantelle Lategan

- 94 -
FIRST AMENDED COMPLAINT