1

2

3

4

5

6

7

8          UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF CALIFORNIA

10  MATTHEW WEINBERG et al.,           Case No. 2:25-cv-03714-MCS-JC

11          Plaintiffs,

12                                     **ORDER RE: MOTIONS TO DISMISS,
                                       MOTIONS TO STAY DISCOVERY,**
13          v.                         **AND APPLICATION TO SEAL (ECF
                                       NOS. 62, 64, 66, 69, 71, 74, 104–06, 110)**
14  NATIONAL STUDENTS FOR
15  JUSTICE IN PALESTINE et al.,

16          Defendants.

17

18

19

20

21

22

23

24

25

26

27

28

Defendants National Students for Justice in Palestine ("NSJP"); People's City Council ("PCC"); WESPAC Foundation; AJP Educational Foundation, Inc., doing business as American Muslims for Palestine ("AMP"); Dr. Hatem Bazian; and Dr. Osama Abuirshaid move to dismiss the first amended complaint of Plaintiffs Matthew Weinberg, Eli Tsives, Rabbi Dovid Gurevich, and Nir Hoftman. (NSJP Mot., ECF No. 74; PCC Mot., ECF No. 69; WESPAC Mot., ECF No. 71; AMP Mot., ECF No. 62-1; Bazian Mot., ECF No. 66-1; Abuirshaid Mot., ECF No. 64-1.) Plaintiffs filed a consolidated opposition brief, (Opp'n, ECF No. 81), and Defendants filed separate replies, (NSJP Reply, ECF No. 90; PCC Reply, ECF No. 88; WESPAC Reply, ECF No. 89; AMP Reply, ECF No. 87; Bazian Reply, ECF No. 86; Abuirshaid Reply, ECF No. 85).[1] The Court heard argument on the motions on December 15, 2025. (Mins., ECF No. 98.)

WESPAC, NSJP, and PCC filed motions to stay discovery pending resolution of their motions to dismiss. (WESPAC Mot. to Stay, ECF No. 104; NSJP Mot. to Stay, ECF No. 105; PCC Mot. to Stay, ECF No. 110.) The Court deems these motions appropriate for decision without oral argument or further briefing. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

## I.    BACKGROUND

According to the first amended complaint, in the wake of Hamas's October 7, 2023, terrorist attack on Israel and Israel's subsequent war in Gaza, a wave of protests and demonstrations swept the United States. (*See* FAC ¶¶ 79–80, ECF No. 54.) Defendant NSJP, a "nationwide membership association," launched the Popular University for Gaza movement, an initiative which involved a "coordinated pressure

---

[1] The Court exercises its discretion to considers NSJP and WESPAC's untimely reply briefs. (*See* Order Re: Ex Parte Appl. to Set Unified Resp. to Mots. to Dismiss, ECF No. 80.)

campaign against university administrations and trustees" through the establishment of "autonomous zones on . . . university campuses." (*Id.* ¶¶ 34, 92 (ellipsis in original) (internal quotation marks omitted).)

One such protest was at UCLA. (*Id.* ¶¶ 92–93.) On April 25, 2024, less than one week after NSJP launched the Popular University for Gaza movement, UCLA's chapter of NSJP "in collaboration with UC Divest . . . , People's City Council, and a host of similar organizations," created a "fortified encampment" near UCLA's Royce Quad. (*Id.* ¶¶ 93, 94(a).) According to an anonymous organizer, participants "amassed a large quantity of scrap wood and pallets to assemble barricades" and "erect[ed] a fortified camp out of the dust." (*Id.* ¶¶ 94(a), 106 (internal quotation marks omitted).) Protestors formed specialized teams dedicated to providing logistical support, medical care, and security, as well as interfacing with the media. (*Id.* ¶ 94(b).) Organizers "limited entry [into the encampment] to only two zones, and established a complex check-in, wristband, and vouching system" enforced by "teams of armed members of the encampment and 'human phalanxes.'" (*Id.* ¶ 13.) On April 28, protestors expanded the encampment's perimeter to purportedly "use the walls of the adjacent buildings to [their] advantage" and amplify the encampment's disruptive effect to the broader campus. (*Id.* ¶ 94(e) (alteration in original) (internal quotation marks omitted).)

The encampment and surrounding areas allegedly included a great deal of antisemitic imagery. (*See*, *e.g.*, *id.* ¶ 98–100 (detailing antisemitic imagery on and around the encampment, including a "van festooned with Swastikas" parked outside the encampment "blaring antisemitic propaganda").) There were also numerous reports of violence and threats of violence directed at Jewish members of the community throughout the duration of the encampment. (*Id.* ¶¶ 98, 116, 132.) Protestors also purportedly physically prevented Jews from entering the encampment. (*Id.* ¶¶ 13, 117, 145.)

After days of rising tensions, UCLA declared the encampment illegal on April 30. (*Id.* ¶ 14.) The following day, campus police announced their intent to clear the

encampment. (*Id.* ¶ 95(e).) In response, protestors "collected gas masks, handed out goggles and helmets, and prepared to hold [their] ground." (*Id.* (internal quotation marks omitted).) That night, when law enforcement attempted to clear the encampment, protestors and police clashed in a drawn-out confrontation. (*Id.* ¶ 14.) Eventually, in the early morning hours of May 2, law enforcement cleared the encampment. (*Id.*) Organizers attempted to reestablish the encampment several times, including on May 6 and June 10. (*Id.* ¶¶ 15–17.)

Plaintiffs are Jewish members of the UCLA community. (*See id.* ¶¶ 30–33.) Professor Hoftman is a professor at the medical school, Mr. Weinberg is a law student, Mr. Tsives is an undergraduate student, and Rabbi Gurevich is the rabbi of UCLA's Chabad House. (*Id.*) Each claims he was injured as a result of the encampment. Professor Hoftman alleges he was assaulted by members of the encampment's security team on April 29 because he was Jewish. (*Id.* ¶ 132–36.) Mr. Weinberg claims that he avoided the Royce Quad area for the duration of the encampment after hearing reports of violence and threats of violence aimed at Jews. (*Id.* ¶¶ 137–41.) Prior to the encampment, Mr. Weinberg "often would walk through the Quad." (*Id.* ¶ 140.) Mr. Tsives alleges that he would regularly show up to the encampment "dressed in a manner that made clear that he was Jewish, including wearing a visible Star of David necklace," and attempt to pass through one of the encampment's "checkpoints." (*Id.* ¶ 145.) Each time, he was either "physically blocked" at the point of entry by the encampment's security team or was "surrounded and forced out of the area by a 'human phalanx.'" (*Id.*) Eventually, Mr. Tsives had to take a longer route to get to his classes. (*Id.* ¶ 146.) Rabbi Gurevich claims he was verbally threatened on June 10 "[w]hen the same core of organizers attempted to reestablish an encampment near the UCLA law school." (*Id.* ¶ 142.) A member of the new encampment's security team "slapped Rabbi Gurevich's phone out of his hand." (*Id.*)

Based on these allegations, Plaintiffs assert claims for a civil rights conspiracy under the deprivation and hindrance clauses of 42 U.S.C. § 1985(3) against the

4

1    encampment's alleged organizers, including NSJP, PCC, WESPAC, and AMP.[2] (*Id.*

2    ¶¶ 149–63.) Plaintiffs also bring claims for failure to prevent a civil rights conspiracy

3    against Dr. Hatem Bazian and Dr. Osama Abuirshaid under 42 U.S.C. § 1986.[3] (*Id.*

4    ¶¶ 164–74.) Dr. Bazian is AMP's founder, president, CEO, and chairman of the board,

5    (*id.* ¶¶ 42–43), and Dr. Abuirshaid is AMP's executive director, (*id.* ¶ 43).

6

7    **II.    LEGAL STANDARDS**

8        **A.    Subject-Matter Jurisdiction**

9        Federal Rule of Civil Procedure 12(b)(1) authorizes a party to seek dismissal of

10    an action for lack of subject-matter jurisdiction. "Because standing and ripeness pertain

11    to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1)

12    motion to dismiss." *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122

13    (9th Cir. 2010). In the context of a Rule 12(b)(1) motion, the plaintiff bears the burden

14    of establishing Article III standing to assert the claims. *Id.*

15        Rule 12(b)(1) jurisdictional challenges can be either facial or factual. *Safe Air for*

16    *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). When a motion to dismiss

17    attacks subject-matter jurisdiction on the face of the complaint, the court assumes the

18    factual allegations in the complaint are true and draws all reasonable inferences in the

19    plaintiff's favor. *Doe v. Holy See*, 557 F.3d 1066, 1073 (9th Cir. 2009). Moreover, the

20    standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft*

21    *v. Iqbal*, 556 U.S. 662 (2009), apply with equal force to Article III standing when it is

22    being challenged on the face of the complaint. *See Terenkian v. Republic of Iraq*, 694

23    _____

24    [2] Plaintiffs also bring § 1985(3) claims against Faculty for Justice in Palestine Network,
UC Divest Coalition, and the President of the UCLA chapter of NSJP, John Doe #1.

25    Plaintiffs have dismissed their claims against John Doe #1. (Notice of Dismissal, ECF

26    No. 92.) UC Divest Coalition and Faculty for Justice in Palestine Network have not
been served or otherwise appeared in this action.

27    [3] The complaint also includes a § 1986 claim against John Doe #1, which Plaintiffs have

28    voluntarily dismissed. (Notice of Dismissal.)

F.3d 1122, 1131 (9th Cir. 2012) (applying *Iqbal*). Thus, in terms of Article III standing, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

### B.    Personal Jurisdiction

A defendant can move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The party asserting the existence of jurisdiction bears the burden of establishing it. *Mattel, Inc. v. Greiner & Hausser GmbH*, 354 F.3d 857, 862 (9th Cir. 2003). If the court does not require an evidentiary hearing, a plaintiff "need only make a prima facie showing of the jurisdictional facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008) (internal quotation marks omitted).

Uncontroverted allegations in the complaint must be taken as true, and "[c]onflicts between parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). Depending on the nature and extent of a defendant's contacts, if any, with a forum state, the appropriate exercise of personal jurisdiction may be either general—that is, the party is subject to any claims in that forum—or specific—that is, the party is subject only to claims arising out of its forum-related activities. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).

To establish personal jurisdiction over a defendant, a plaintiff must show both that a long-arm statute confers personal jurisdiction over an out-of-state defendant, and that the exercise of jurisdiction is consistent with federal due process requirements. *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154–55 (9th Cir. 2006). Constitutional due process requires that jurisdiction be exercised over a nonresident party only if that party has "minimum contacts" with the forum, such that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted); *accord*

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 464 (1985).

The Ninth Circuit employs a three-prong test to analyze due process:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;
>
> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and
>
> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802 (citation omitted). The plaintiff bears the burden of satisfying the first two prongs of the test. *Id.* The first prong may be satisfied with facts sufficient to show "either purposeful availment or purposeful direction, which, though often clustered together under a shared umbrella, 'are, in fact, two distinct concepts.'" *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (quoting *Pebble Beach*, 453 F.3d at 1155). Courts in the Ninth Circuit "generally apply the purposeful availment test when the underlying claims arise from a contract, and the purposeful direction test when they arise from alleged tortious conduct." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1142 (9th Cir. 2017).

## C.    Failure to State a Claim

Federal Rule of Civil Procedure 12(b)(6) allows an attack on the pleadings for "failure to state a claim upon which relief can be granted." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Generally, a court must accept the factual allegations in the pleadings as true and view them in the light most favorable to the plaintiff. *Park v. Thompson*, 851 F.3d 910, 918 (9th Cir. 2017); *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). But a court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

## III. DISCUSSION

### A. Standing

Because they pertain to the Court's subject-matter jurisdiction, the Court addresses NSJP and PCC's arguments regarding Plaintiffs' Article III standing first. *See Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 94–95 (1998). To support Article III standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). NSJP and PCC argue that Plaintiffs have not met the injury-in-fact and traceability prongs. (*See* NSJP Mot. 11–12; PCC Mot. 17–19.)

#### 1. Injury in Fact

To establish an injury in fact, a plaintiff must demonstrate that it suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "[U]nder Article III, an injury in law is not an injury in fact." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427 (2021).

8

1    NSJP and PCC argue that Mr. Weinberg has not pleaded sufficient facts to show
2    he suffered a concrete injury in fact to support Article III standing. (NSJP Mot. 11–12;
3    PCC Mot. 18.) Mr. Weinberg claims that he would "often walk through" Royce Quad,
4    but he chose to avoid the area for the duration of the encampment because he feared he
5    would experience violence or threats of violence if he tried to go near the encampment.
6    (FAC ¶¶ 138–40.) According to NSJP and PCC, this is a mere psychological injury that
7    is not cognizable. (NSJP Mot. 12; PCC Mot. 18.) It is generally true that a
8    "psychological consequence presumably produced by observation of conduct with
9    which one disagrees . . . is not an injury sufficient to confer standing under Art. III."
10   *Caldwell v. Caldwell*, 545 F.3d 1126, 1131 (9th Cir. 2008) (quoting *Valley Forge*
11   *Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464,
12   485–86 (1982)). But Mr. Weinberg has alleged more than a "psychological
13   consequence" like feeling upset, offended, or afraid of the encampment. He alleges that
14   he actually changed his route through campus and deliberately avoided Royce Quad, an
15   area that he previously traversed. (*See* FAC ¶ 140.)

16        Mr. Weinberg's allegations satisfy his obligation to plead a "personal injury
17   suffered . . . as a consequence of the alleged constitutional error." *Valley Forge*
18   *Christian Coll.*, 454 U.S. at 485 (emphasis removed). Choosing to avoid an area one
19   previously frequented based on a fear of experiencing violence is a personal, actual
20   injury sufficient to support Article III standing. *See Sealed Plaintiff 1 v. Patriot Front*,
21   No. 3:22-cv-00670, 2024 WL 1395477, at *12 (E.D. Va. Mar. 31, 2024) (finding an
22   adequately alleged an injury-in-fact where plaintiffs claimed they had "significantly
23   curtailed or even eliminated their access" to a public park near an ongoing protest and
24   had "experienced emotional harm," even though plaintiffs did not claim they had
25   directly observed the protest). The Court concludes that Mr. Weinberg has adequately
26   alleged a cognizable injury in fact.

27

28   ///

9

1

2              2.    Traceability

3        In order to confer Article III standing, a pleaded injury must "be fairly traceable

4  to the challenged action of the defendant, and not the result of some independent action

5  of some third party not before the court." *Lujan*, 504 U.S. at 560–61. "To survive a

6  motion to dismiss for lack of constitutional standing, plaintiffs must establish a 'line of

7  causation' between defendants' action and their alleged harm that is more than

8  'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070 (9th Cir. 2011) (footnote

9  omitted) (quoting *Allen v. Wright*, 468 U.S. 737, 757 (1984)). "A causal chain does not

10 fail simply because it has several links, provided those links are not hypothetical or

11 tenuous and remain plausible." *Id.* (cleaned up).

12       PCC argues that there are not sufficient allegations tying it or its members to the

13 specific injuries claimed by each Plaintiff. (PCC Mot. 17–19.) Professor Hoftman

14 claims to have been assaulted by several members of the encampment. (FAC ¶ 132.)

15 Mr. Tsives claims he was denied access on his usual route to class, (*id.* ¶¶ 145–46), and

16 Mr. Weinberg claims he changed his typical route through campus, (*id.* ¶ 140). Rabbi

17 Gurevich claims he was threatened by protesters on June 10. (*Id.* ¶ 142.) That Plaintiffs

18 do not allege that PCC members specifically were the individuals who assaulted them

19 or denied them access is not disqualifying. Plaintiffs allege that PCC was directly

20 involved in supporting, recruiting, and equipping members of the encampment. (*Id.*

21 ¶¶ 93, 103–04, 109, 111, 115.) For example, Plaintiffs allege that PCC "published lists

22 of supplies (including supplies like goggles and shields likely to be used by the

23 encampment's 'security teams') and issued statements purporting to be from the

24 encampment on its official letterhead and using its official logo." (*Id.* ¶ 111.) They also

25 allege PCC had multiple organizers on the ground at the encampment. (*Id.*)

26       Regardless of whether PCC exercised any control over the individual

27 perpetrators, the allegations raise an inference of reasonable foreseeability that violence

28 and exclusion would result from PCC's conduct in supporting and equipping the

encampment. Mr. Tsives, Mr. Weinberg, and Professor Hoftman's injuries are all fairly traceable to PCC because all stem from the initial encampment that PCC allegedly helped to support. As for Rabbi Gurevich, PCC points out that his assault took place on June 10, weeks after the encampment was removed. (PCC Mot. 18.) But even if Rabbi Gurevich was not harmed by the initial encampment, that does not necessarily mean that his injuries are not fairly traceable to PCC. Indeed, Rabbi Gurevich alleges that he was threatened and had his phone slapped out of his hand "[w]hen the same radical core of organizers attempted to reestablish an encampment near the UCLA law school." (FAC ¶ 142.) Fairly read, this alleges that the same organizers of the original encampment, which according to the complaint included PCC, were responsible for this new encampment. As pleaded, the injuries Rabbi Gurevich suffered on June 10 are thus fairly traceable to the encampment organizers, including PCC.

Plaintiffs have alleged sufficient facts to survive the standing challenges.

## B.    NSJP and PCC

Plaintiffs claim that NSJP and PCC entered into a civil rights conspiracy in violation of the deprivation clause and hindrance clause of 42 U.S.C. § 1985(3). (FAC ¶¶ 149–63.) Those clauses provide:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws . . . , the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or

11

1    more of the conspirators.

2    42 U.S.C. § 1985(3). The first clause is generally referred to as the "deprivation clause"

3    while the second is referred to as the "hindrance clause." *Nat'l Abortions Fed'n v.*

4    *Operation Rescue*, 8 F.3d 680, 682 (9th Cir. 1993). NSJP and PCC move to dismiss

5    both the deprivation clause and hindrance clause theories of the claim. (*See* NSJP Mot.

6    14–20; PCC Mot. 10–17.)

7

8                1.    <u>Deprivation Clause</u>

9    To make out a violation of § 1985(3)'s deprivation clause, a plaintiff must plead:

10       (1) a conspiracy; (2) for the purpose of depriving, either

11       directly or indirectly, any person or class of persons of the

12       equal protection of the laws, or of equal privileges and

13       immunities under the laws; and (3) an act in furtherance of

14       the conspiracy; (4) whereby a person is either injured in his

15       person or property or deprived of any right or privilege of a

16       citizen of the United States.

17   *United Bhd. of Carpenters & Joiners of Am., Loc. 610 v. Scott*, 463 U.S. 825, 828–29

18   (1983). "The language requiring intent to deprive of *equal* protection, or *equal*

19   privileges and immunities, means that there must be some racial, or perhaps otherwise

20   class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin*

21   *v. Breckenridge*, 403 U.S. 88, 102 (1971); *see also Operation Rescue*, 8 F.3d at 682.

22   Section 1985(3) claims extend beyond race "only when the class in question can show

23   that there has been a governmental determination that its members require and warrant

24   special federal assistance in protecting their civil rights." *Sever v. Alaska Pulp Corp.*,

25   978 F.2d 1529, 1536 (9th Cir. 1992) (internal quotation marks omitted). For § 1985(3)

26   to apply, the Ninth Circuit mandates "either that the courts have designated the class in

27   question a suspect or quasi-suspect classification requiring more exacting scrutiny or

28   that Congress has indicated through legislation that the class required special

1    protection." *Id.* (internal quotation marks omitted).

2                    a.    *Conspiracy*

3           NSJP and PCC raise a variety of arguments attacking Plaintiffs' deprivation

4    clause claim.[4] First, they argue that Plaintiffs have failed to plausibly allege that

5    Defendants entered into a conspiracy. (NSJP Mot. 15–17; PCC Mot. 10–12.) To

6    plausibly allege the existence of a conspiracy, a plaintiff must allege facts tending to

7    show a "meeting of the minds" between the alleged conspirators. *Gaetz v. City of*

8    *Riverside*, 722 F. Supp. 3d 1054, 1069 (C.D. Cal. 2024) (internal quotation marks

9    omitted); *see also Burns v. County of King*, 883 F.2d 819, 821 (9th Cir. 1989). A

10   "conspiracy may be inferred from conduct and need not be proven by evidence of an

11   express agreement." *Ward v. EEOC*, 719 F.2d 311, 314 (9th Cir. 1983); *see also Francis*

12   *v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (noting that for a complaint to

13   sufficiently allege a "meeting of the minds," it must contain enough facts for the court

14   to conclude, based on "its judicial experience and common sense," that an agreement

15   or meeting of the minds plausibly occurred). However, mere allegations of

16   "independent parallel behavior" are insufficient. *Gaetz*, 722 F. Supp. 3d at 1061

17   (internal quotation marks omitted).

18          Here, Plaintiffs have pleaded enough facts, which are accepted as true and

19

20   _____

21   [4] NSJP also argues that it cannot be held liable for the actions of its local chapters.
     (NSJP Mot. 8–9, 14; NSJP Reply 3–4.) NSJP relies on several labor union cases that

22   apply a common law agency test to determine if a national organization is responsible
     for the acts of a local chapter. (*See, e.g.*, NSJP Reply 3 (citing *Carbon Fuel Co. v. United*

23   *Mine Workers of Am.*, 444 U.S. 212, 216 (1979)).) The cases are unavailing because

24   labor unions are governed by a specific set of laws, including the Taft-Hartley Act, in
     which Congress expressly adopted a common-law agency test to determine the scope

25   of a union's liability. *Carbon Fuel*, 444 U.S. at 216–17 (interpreting 29 U.S.C.

26   §§ 301(b) and (e)). NSJP describes itself as a "national student group." (NSJP Mot. 1.)
     It has not offered a persuasive reason why the Court should treat its UCLA chapter as

27   an agent of the national organization, rather than simply as a subpart or department of

28   the organization itself.

construed in Plaintiffs' favor for purposes of the instant motion, to create an inference that NSJP and PCC entered into a conspiracy. (*See, e.g.*, FAC ¶ 63 (alleging that UCLA's chapter of NSJP "organized a campus encampment together with . . . People's City Council").) NSJP and PCC allegedly engaged in a "coordinated social media campaign," which involved joint social media posts from both organizations encouraging their followers to join the encampment. (*Id.* ¶¶ 14, 104, 115.) PCC and NSJP also allegedly issued several press statements and participated in numerous "media hits" to recruit and otherwise support the encampment. (*Id.* ¶ 115.) For example, PCC purportedly "published lists of supplies (including supplies like goggles and shields likely to be used by the encampment's 'security teams') and issued statements purporting to be from the encampment on its official letterhead and using its official logo." (*Id.* ¶ 111.) That NSJP and PCC were involved in joint public statements and social media posts supports an inference that they had entered into an agreement with each other with respect to supporting the encampment.

Moreover, the encampment and its participants were allegedly highly organized and disciplined. (*See id.* ¶¶ 94(b), 97.) The encampment itself was quickly built "out of the dust" less than a week after NSJP announced the Popular University for Gaza movement. (*Id.* ¶ 106.) Members of the encampment were purportedly "well organized; well supplied; in constant communication with numerous third-party groups . . . ; ready and able to use violence against their perceived enemies; and above else, eager to fight the Zionists and the police." (*Id.* ¶ 97 (cleaned up).) Indeed, Mr. Tsives alleges that he "observed that the encampment had a well-organized supply system supported by outside actors, who would drop off supplies at designated points for members of the encampment to collect and distribute." (*Id.* ¶ 144.) Individual organizers that PCC and NSJP allegedly had on the ground helping to lead the encampment plausibly facilitated this organizational and logistical sophistication. (*Id.* ¶¶ 92, 111.) Encampment organizers allegedly "equipped and trained 'human phalanxes' and 'organized self-defense teams' that were deployed at the 'front lines' of the encampment." (*Id.* ¶ 115.)

The encampment's high degree of organizational capacity, facilitated by NSJP and PCC's on-the-ground organizers, further supports an inference that NSJP and PCC entered into a conspiracy with each other.

While none of this is direct evidence of an agreement, direct evidence is not required, especially at the pleadings stage. *See Mendocino Env't Ctr. v. Mendocino County*, 192 F.3d 1283, 1302 (9th Cir. 1999) ("Direct evidence of . . . an agreement among the parties to violate a plaintiff's constitutional rights will only rarely be available."). The Court is satisfied that the complaint raises an inference that PCC and NSJP entered into a conspiracy.

### b.   *Intent to Deprive of Rights*

Next, NSJP and PCC argue that Plaintiffs have not adequately alleged that either party intended to infringe Plaintiffs' federal or constitutional rights. (NSJP Mot. 17–18; PCC Mot. 12–15.) Plaintiffs assert that the federal rights at issue are their rights "to be free from racial violence and . . . to be free from racially motivated deprivation of the use of public amenities." (*See* FAC ¶ 153.) The right to be free from racial violence and race-based exclusion from public accommodations, as secured by the Thirteenth Amendment, are rights that can be vindicated under § 1985(3). *Sines v. Kessler*, 324 F. Supp. 3d 765, 782 (D.W.V. 2018) (conspiracy to deprive plaintiffs of right to be free from racial violence actionable under § 1985(3)); *Patriot Front*, 2024 WL 1395477, at *24 (conspiracy to deprive plaintiffs of right to be free from racially motivated exclusion from a public accommodation actionable under § 1985(3)); *see also Great Am. Fed. Sav. & Loan Ass'n v. Novotny*, 442 U.S. 366, 383 (1979) (Stevens, J. concurring) ("Some privileges and immunities of citizenship, such as the right to engage in interstate travel and the right to be free of the badges of slavery, are protected by the Constitution against interference by private action, as well as impairment by state action. Private conspiracies to deprive individuals of these rights are . . . actionable

under § 1985(3) . . . .").[5]

NSJP and PCC argue that Plaintiffs have insufficiently alleged that Defendants intended to deprive Plaintiffs of their Thirteenth Amendment rights. (NSJP Mot. 17–18; PCC Mot. 12–15.) "[T]he 'intent to deprive of a right' requirement demands that the defendant do more than merely be aware of a deprivation of right that he causes, and more than merely accept it; he must act at least in part for the very purpose of producing it." *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 276 (1993). "The right must be 'aimed at'; its impairment must be a conscious objective of the enterprise." *Id.* at 275 (emphasis removed) (quoting *United Bhd. of Carpenters & Joiners, Loc. 610*, 463 U.S. at 833). "A conspiracy is not 'for the purpose' of denying equal protection simply because it has an effect upon a protected right." *Id.* (quoting *United Bhd. of Carpenters & Joiners, Loc. 610*, 463 U.S. at 833); *see also Operation Rescue*, 8 F.3d at 685 ("[W]here the *effect* of a demonstration, a parade, or picketing interferes with someone's rights, this would not be actionable unless that was the *purpose* of the conspiracy."). As with the conspiracy element discussed *supra*, direct evidence of an improper motive will rarely be available. *Mendocino Env't Ctr.*, 192 F.3d at 1302.

NSJP and PCC ask the Court to follow First Circuit's recent holding in *StandWithUs Center for Legal Justice v. Massachusetts Institute of Technology*, 158 F.4th 1 (1st Cir. 2025). There, like in the instant case, pro-Palestinian protestors "erected an encampment" on MIT's campus where they displayed signs with messages, such as "Zionism is a death cult," and chanted slogans, like "Palestine is free, Israel out." *Id.* at 8–10 (internal quotation marks omitted). Jewish members of the MIT community sued

---

[5] The Court assumes for the purposes of this Order that the law affords Jewish people the protections available to a racial group. *See United States v. Earnest*, 536 F. Supp. 3d 688, 718 (S.D. Cal. 2021) (collecting authorities "to support a finding that Jews were considered a distinct race when the Thirteenth Amendment was applied" (cleaned up)). *But see infra* note 6.

the school for failing to prevent a civil rights conspiracy among various student groups. *Id.* at 24. However, the plaintiffs failed to state an underlying § 1985(3) claim because they "failed to plead that the student activist groups conspired 'for the very purpose' of depriving plaintiffs of their constitutional right to be free from racial violence." *Id.* at 25 (quoting *Bray*, 506 U.S. at 276). The only  acts of violence against Jewish students alleged in the complaint were (1) that a protestor, who was not alleged to have been affiliated with the challenged student groups, raised a bike tire at a passing Jewish student; and (2) that an unnamed protestor shoved a Jewish student who was filming the protest. *Id.* Since there were only two alleged instances of anti-Jewish violence, it was implausible that the "conscious objective" of the protest, which was coordinated by multiple groups and dozens of students, was racially motivated violence. *Id.* (internal quotation marks omitted).

Here, Plaintiffs have alleged much more than two isolated incidents of anti-Jewish violence and exclusion. Encampment organizers "established a complex check-in, wristband, and vouching system to keep out Zionists," which was "enforced by teams of armed members of the encampment and human phalanxes." (FAC ¶ 13 (internal quotation marks omitted).) Indeed, Mr. Tsives alleges that when he would attempt to cross through the encampment, he was "either physically blocked by uniformed members of the encampment's 'security teams'" or "surrounded and forced out of the area by a 'human phalanx." (*Id.* ¶ 145.) According to Tsives, he "was denied entry after the 'security team' saw his Star of David necklace." (*Id.*) "First-hand accounts" also assert that "groups of violent nonstudents . . . would emerge from the encampment to chase out anyone who waived an Israeli flag or otherwise showed support for Jews and Israel." (*Id.* ¶ 117.) Moreover, on April 28, organizers expanded the encampment's footprint so as to "use the walls of the adjacent buildings to [their] advantage, limiting Zionist access to two sides." (*Id.* ¶ 94(e) (alteration in original) (internal quotation marks omitted).)

In addition to allegations of Jewish exclusion, the complaint contains several

allegations detailing separate acts of violence against Jews. (*See*, *e.g.*, *id.* ¶ 116 (describing three assaults against Jews).) Professor Hoftman alleges that, while he was conducting an interview and walking toward the encampment, "two or three individuals affiliated with the encampment" blocked his path. (*Id.* ¶ 132.) When he attempted to walk around them, "he was tackled." (*Id.*) According to the complaint, this violence was not unexpected, given allegations that PCC and NSJP's social media posts encouraging followers to show up to the encampment carried a "strong implication that new arrivals should be ready for a fight with 'Zionists,' 'the police,' or both." (*Id.* ¶ 104.) That PCC allegedly "published lists of supplies" including "goggles and shields likely to be used by the encampment's 'security teams,'" (*id.* ¶ 111), further shows that violence and exclusion were plausibly contemplated by the encampment's organizers.

The sheer volume of alleged incidents of exclusion and violence against Jews sets this case apart from the two isolated incidents of violence alleged in *StandWithUs*. The Court is satisfied that Plaintiffs allegations, accepted as true and construed in their favor, raise an inference that encampment organizers, including NSJP and PCC, acted with an intent to deprive Plaintiffs of their Thirteenth Amendment rights. PCC and NSJP point to other allegations in the complaint that tend to suggest a different purpose than depriving Plaintiffs of their federal rights. (*See* FAC ¶ 95(k) ("The purpose was to cost the university money, to physically disrupt, and to express mass oppositional power." (internal quotation marks omitted)).) However, the law is clear that a purpose of depriving Plaintiffs of their federal rights need not be Defendants' only purpose in order for Plaintiffs to have a valid § 1985(3) claim. *See Bray*, 506 U.S. at 276 (requiring a defendant to "act *at least in part* for the very purpose of" depriving a plaintiff of a federal right (emphasis added)). Based on the totality of their allegations, Plaintiffs have plausibly alleged that NSJP and PCC acted at least in part to deprive Plaintiffs of their Thirteenth Amendment rights to be free from race-based violence and exclusion.

### c.  *Discriminatory Animus*

Finally, NSJP and PCC argue that Plaintiffs have not plausibly alleged that they

acted with the requisite discriminatory animus. (NSJP Mot. 18–19; PCC Mot. 15.)[6] The Court disagrees. As discussed above, the complaint contains numerous allegations of exclusion and violence against Jews. (*See, e.g.*, FAC ¶ 145 (forceable exclusion of Mr. Tsives when encampment members saw his Star of David necklace); *id.* ¶ 132 (assault on Professor Hoftman).) Moreover, Plaintiffs allege that "[a]ntisemitic rhetoric and imagery on campus also intensified during the encampment." (*Id.* ¶ 99.) For example, a "van festooned with Swastikas" was parked outside the encampment "blaring antisemitic propaganda from a bullhorn and speaker system." (*Id.* ¶ 100.) After police removed the initial encampment, organizers allegedly "target[ed] buildings named after prominent Jews" when they attempted to erect a new encampment. (*Id.* ¶ 127.) That there were numerous incidents of violence and exclusion directed at Jews, that the encampment and surrounding areas were covered with antisemitic images and slogans, that organizers targeted buildings named after Jews when they tried to establish a new encampment, and that PCC and NSJP had organizers on the ground helping to lead the encampment, are all circumstantial allegations that raise an inference PCC and NSJP acted with a discriminatory animus toward Jews. *See Patriot Front*, No. 2024 WL 1395477, at *22 (concluding a complaint alleged enough circumstantial allegations to support an inference of discriminatory animus); *Tchatat v. City of New York*, No. 14 Civ. 2385 (LGS), 2015 WL 5091197, at *12 (S.D.N.Y. Aug. 28, 2015) (same). The Court is satisfied that Plaintiffs have pleaded sufficient facts to raise an inference that NSJP and PCC acted with the requisite discriminatory animus.

In sum, Plaintiffs have adequately pleaded a deprivation clause claim under

---

[6] In its reply brief, NSJP argues that, at most, Plaintiffs have alleged discriminatory animus against "Zionists" rather than "Jews." (NSJP Reply 6–7.) Zionists, according to NSJP, are not a class protected by § 1985(3). (*Id.*) The Court declines to consider this argument because NSJP did not raise it in its opening brief. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

§ 1985(3) against NSJP and PCC.

2.    Hindrance Clause

A claim under § 1985(3)'s hindrance clause shares many of the same elements as a claim under the deprivation clause. *See United Bhd. of Carpenters & Joiners, Loc. 610*, 463 U.S. at 828–29. The primary difference between the two claims is that, to succeed on a hindrance clause theory, the purpose of the conspiracy must "be to prevent or hinder the constituted state authorities from giving or securing to all persons within [a] state the equal protection of the laws." *Operation Rescue*, 8 F.3d at 685. Said another way, "the purpose must be to interfere with state law enforcement, not just to interfere with the persons seeking to exercise their legal rights." *Id.*

NSJP and PCC argue that Plaintiffs have not adequately pleaded that they acted with a purpose of hindering law enforcement. (NSJP Mot. 19–20; PCC Mot. 15–16.) But Plaintiffs allege that thwarting police efforts to disassemble the encampment was a motivating goal of organizers both before and throughout the encampment's duration. The complaint states that when deciding where to erect the encampment, organizers "chose a strategic hilltop location to avoid taking the low ground beneath Zionists *and police*." (FAC ¶ 94(a) (emphasis added) (internal quotation marks omitted).) One of the purposes behind the encampment's security team was to "prevent the university, *the police*, and local fascists from harming the community." (*Id.* ¶ 94(b) (emphasis added) (internal quotation marks omitted).) Eventually, members of the encampment were "radicaliz[ed] to the point of fighting the pigs [i.e., law enforcement] for 6 hours [when law enforcement attempted to clear the encampment on May 1 and May 2]." (*Id.* ¶ 94(d) (second alteration in original) (internal quotation marks omitted).) In anticipation of that conflict with police on the May 1 and May 2, encampment members "collected gas masks, handed out goggles and helmets, and prepared to hold [their] ground while the pigs slowly staged." (*Id.* ¶ 95(e) (internal quotation marks omitted).) PCC allegedly encouraged this conflict with police in a May 1 social media post reading "KETTLE

20

THE COPS CHALLENGE—LAPD F\*\*CK OFF." (*Id.* ¶ 122.) Read together, these allegations plausibly raise an inference that a desire to hinder law enforcement's ability to remove the encampment animated organizers, which allegedly included NSJP and PCC, throughout the encampment's existence. And since the complaint adequately alleges that organizers intended to interfere with Jewish community members' Thirteenth Amendment rights, it follows that their goal of hindering law enforcement's ability to disperse the encampment was, in effect, a goal of hindering law enforcement's ability to protect the rights of Jews.

This same reasoning leads the Court to conclude that Plaintiffs' claimed injuries are also plausibly tied to PCC and NSJP's efforts to hinder law enforcement. NSJP and PCC argue that Plaintiffs have not alleged that they were injured as a direct result of Defendants' efforts to hinder law enforcement. (NSJP Mot. 20; PCC Mot. 16–17.) They argue that the only actual interference with law enforcement alleged in the complaint is the prolonged confrontation with police on the night of May 1 into May 2, (*see* FAC ¶ 14), but no Plaintiff alleges he was anywhere near the encampment at that time, (*see id.* ¶¶ 132–47). But, as previously discussed, the complaint alleges that a desire to hinder law enforcement motivated encampment organizers from the very beginning. (*Id.* ¶ 94(a) (alleging that organizers strategically chose the encampment's location to better resist law enforcement).) Because of that, the Court is persuaded that any injuries allegedly suffered by Plaintiffs during the existence of the initial encampment are plausibly tied to the encampment's goal of hindering law enforcement. Had the encampment not been designed to hinder law enforcement from the onset, as may be inferred from Plaintiffs' allegations, law enforcement plausibly would have removed the encampment sooner than it did and thus prevented any injuries caused by the encampment. This means that Mr. Weinberg, Mr. Tsives, and Professor Hoftman, whose injuries all took place during the initial encampment, have stated a hindrance clause claim. Rabbi Gurevich, on the other hand, alleges he was threatened and assaulted on June 10 "[w]hen the same radical core of organizers attempted to

reestablish an encampment near the UCLA law school." (*Id.* ¶ 142.) Earlier that day, organizers "set up an unauthorized and unlawful encampment with tents, canopies, wooden shields, and water-filled barriers," which police quickly cleared. (*Id.* ¶ 17 (internal quotation marks omitted).) Organizers then relocated to a new encampment near the law school where Rabbi Gurevich claims to have been assaulted. (*Id.* ¶¶ 17, 142.) That the same alleged group of organizers apparently attempted to use the same tactics from the initial encampment and repeatedly tried to recreate an encampment despite police intervention raises an inference that Rabbi Gurevich's injuries are tied to organizers' attempts to interfere with law enforcement.

In all, the Court concludes that Plaintiffs have adequately stated a hindrance clause claim against NSJP and PCC.

### 3.    First Amendment

PCC raises an additional argument that Plaintiffs' § 1985(3) claim fails as a matter of law because it seeks to punish PCC for protected First Amendment activities. (PCC Mot. 5–10.) PCC contends that, at most, the complaint alleges that PCC expressed support for a protest, promoted it, and recruited for it, all of which are forms of speech and advocacy protected by the First Amendment. (*Id.* at 10.) Accepting the allegations as true, the Court is not persuaded.

Plaintiffs do not seek to hold PCC liable for protected speech or protest activities directly; instead, the complaint alleges that PCC conspired to deprive Plaintiffs of their Thirteenth Amendment rights to be free from racial violence and race-based exclusion from public accommodations. (*See generally* FAC ¶¶ 149–63.) Conspiring to deprive Jews of their Thirteenth Amendment rights is not a protected activity under the First Amendment. To be sure, the complaint does reference several of PCC's speech acts. (*See, e.g.*, FAC ¶ 122 (referencing a social media post reading "KETTLE THE COPS CHALLENGE—LAPD F\*\*CK OFF"); *id.* ¶ 111 (referencing a published list of supplies, including goggles and shields, as well as public statements on PCC

letterhead).) However, Plaintiffs are entitled to rely on PCC's speech acts as evidence tending to prove the elements of their § 1985(3) claims, such as whether PCC acted with an improper intent or was motivated by a discriminatory animus. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001) ("[W]e see no constitutional problem with using an employer's offensive speech as evidence of motive or intent . . . ."). Because the Court interprets the complaint as relying on PCC's alleged speech acts as evidence of PCC's intent or motive—which is permissible—the Court declines to determine whether any of these speech acts are properly construed as some form of unprotected speech, such as incitement. These interesting and complicated speech issues are better reserved for resolution after development of the record in discovery.

The Court rejects PCC's argument that Plaintiffs' § 1985(3) claims are barred by the First Amendment.

### C.    AMP

Defendant AMP "is a California nonprofit . . . that provides financial support and organizational capacity to various campus groups." (FAC ¶ 38.) It allegedly "works in broad-based coalitions and supports campus activism through SJP and its chapters and Muslim Student Associations." (*Id.*) AMP was "significantly involved" in NSJP's creation. (*Id.* ¶ 39.) In 2010, AMP took out a full-page advertisement that "call[ed] on Students for Justice in Palestine Chapters to come together as SJP National." (*Id.* (alteration in original) (internal quotation marks omitted).) The advertisement listed a contact email and a phone number, which matched the phone number listed on AMP's own filings with the Internal Revenue Service between 2014 and 2017. (*Id.* ¶ 39 & n.7.)

Plaintiffs allege that AMP was involved in the same § 1985(3) civil rights conspiracy as NSJP and PCC discussed above. While the Court concludes the complaint

1   adequately pleads a conspiracy claim against NSJP and PCC, the Court agrees with

2   AMP that there are no factual allegations raising an inference that AMP was involved

3   in that conspiracy. (AMP Mot. 5.) This is fatal to the claim against AMP. *See Burns*,

4   883 F.2d at 821 (requiring a plaintiff to "state specific facts to support the existence of

5   the claimed conspiracy"); *Miller v. Vega*, No. 2:25-cv-04268-HDV (MBKx), 2025 U.S.

6   Dist. LEXIS 149581, at *7–8 (C.D. Cal. Aug. 4, 2025) (same).

7          The only factual allegations that specifically pertain to AMP are that it helped

8   create NSJP years ago, (*id.* ¶¶ 38–39, 41), and that it "provided material and operational

9   support to SJP's national steering committee and individual SJP chapters before, during,

10  and after SJP launched the 'Popular University for Gaza' initiative of which the UCLA

11  encampment was part," (*id.* ¶ 114). Plaintiffs go on to allege that "[o]n information and

12  belief, at least some of that support related to the broader 'Popular University for Gaza'

13  and/or the UCLA encampment in particular." (*Id.*) There are no allegations about what,

14  if anything, AMP actually did relating to the UCLA protest. For example, while NSJP

15  and PCC purportedly collaborated on social media posts and issued joint public

16  statements about the encampment, (*id.* ¶¶ 14, 104, 115), there are no allegations that

17  AMP ever said anything about the UCLA encampment, let alone tried to recruit, train,

18  and equip participants. And while the complaint alleges that NSJP and PCC had

19  organizers on the ground helping lead the encampment, (*id.* ¶¶ 92, 111), there are no

20  allegations that anyone from AMP was anywhere near the protest. Plaintiff do allege

21  that Taher Herzallah, AMP's Associate Director of Outreach & Community

22  Organizing, "*would have been* responsible for coordinating AMP's support of SJP and

23  its initiative to build a nationwide coalition of 'Popular University for Gaza'

24  encampments on college campuses," including UCLA. (*Id.* ¶ 169 (emphasis added).)

25  But there is no allegation that Mr. Herzallah actually did anything with respect to the

26  Popular University for Gaza movement, let alone the UCLA encampment. Instead,

27  Plaintiffs' allegations are couched as hypotheticals. The complaint is entirely devoid of

28  any specific factual allegations that AMP or anyone at AMP had any involvement with

24

1    the UCLA encampment.

2         Without more detailed factual allegations describing AMP's involvement in the

3    alleged civil rights conspiracy, the Court cannot conclude that Plaintiffs have

4    adequately stated a § 1985(3) claim against AMP. The Court grants AMP's motion.

5

6         **D.    Dr. Bazian and Dr. Abuirshaid**

7         Dr. Bazian is AMP's founder, president, CEO, and chairman of the board, (*id.*

8    ¶ 42), and Dr. Abuirshaid is AMP's executive director, (*id.* ¶ 43). Plaintiffs allege that

9    they, as AMP's leaders, failed to prevent a civil rights conspiracy in violation of 28

10   U.S.C. § 1986. (*Id.* ¶¶ 164–74.) While the Ninth Circuit has not spoken to the elements

11   required to prove up a § 1986 claim, other circuits generally agree that a plaintiff must

12   show the following:

13              (1) the   defendant   had   actual   knowledge   of   a   § 1985

14              conspiracy, (2) the defendant had the power to prevent or aid

15              in preventing the commission of a § 1985 violation, (3) the

16              defendant   neglected   or   refused   to   prevent   a   § 1985

17              conspiracy, and (4) a wrongful act was committed.

18   *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). "A claim can be stated under

19   section 1986 only if the complaint contains a valid claim under section 1985." *Karim-*

20   *Panahi v. L.A. Police Dep't*, 839 F.2d 621, 626 (9th Cir. 1988).

21        Dr. Bazian and Dr. Abuirshaid argue that Plaintiffs fail to allege facts to support

22   these elements. (Bazian Mot. 3–6; Abuirshaid Mot. 9–11.) Here, the Court has already

23   concluded that the complaint contains a valid § 1985(3) conspiracy claim against NSJP

24   and PCC but not AMP. Given these findings, the complaint falls short of stating a valid

25   § 1986 claim against Dr. Bazian and Dr. Abuirshaid. While Plaintiffs allege that Dr.

26   Bazian "supervises and controls [AMP's] affairs and the activities of its officers," (FAC

27   ¶ 42), and Dr. Abuirshaid "works together with [Dr.] Bazian to exercise control over

28   AMP's operations, including its campus activism efforts," (*id.* ¶ 43), Plaintiffs do not

allege that either Defendant currently has any role within NSJP or PCC. If they were

not directly involved with NSJP or PCC, then it is not plausible that they had any control

over those organizations' operations. And if they had no control over those

organizations' operations, then they did not have "the power to prevent or aid in

preventing the commission" of those organizations' alleged § 1985 conspiracy. *Clark*,

20 F.3d at 1295. Indeed, at the hearing, Plaintiffs' counsel conceded that it would be

"much more difficult" to state a valid § 1986 claim against Dr. Bazian and Dr.

Abuirshaid if there were no valid § 1985(3) claim against AMP. (Hr'g Tr. 23:6, 21–22,

ECF No. 99.) Because the complaint states a valid § 1985(3) claim against only NSJP

and PCC, not AMP, and there are no allegations that Dr. Bazian or Dr. Abuirshaid had

any ability to control NSJP or PCC's actions, the § 1986 claim against them fail.

Dr. Bazian and Dr. Abuirshaid's motions are granted.[7]

## E.    WESPAC

WESPAC Foundation is a "fiscal sponsor" of NSJP, which, according to the

complaint, means that WESPAC "receives and administers donations on behalf of

[NSJP] for use on projects in the United States." (FAC ¶ 47 (internal quotation marks

omitted).) Plaintiffs allege that WESPAC has served as NSJP's fiscal sponsor since

---

[7] Dr. Abuirshaid separately argues that the Court lacks personal jurisdiction over him
because he resides in Virginia and does not regularly travel to California. (Abuirshaid
Mot. 6–9; *see also* Abuirshaid Decl. ¶¶ 5, 8–10, 13, ECF No. 64-3.) Because the Court
concludes that the complaint fails to state a valid § 1986 claim against him, the Court
declines to reach the personal jurisdiction argument. The Court notes, though, that
additional allegations tying Dr. Abuirshaid to the UCLA protest specifically might
suffice to show that he purposefully directed his conduct at California such that the
Court could fairly exercise specific personal jurisdiction over him. *See Briskin v.
Shopify, Inc.*, 135 F.4th 739, 751 (9th Cir. 2025) (citing *Brayton Purcell LLP v.
Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010)). Plaintiffs may offer such
allegations without obtaining further leave of court should they elect to amend their
claim against Dr. Abuirshaid.

1    2019 and throughout the duration of the encampment. (*Id.* ¶ 48.)

2          WESPAC asserts that the Court cannot exercise personal jurisdiction over it.

3    (WESPAC Mot. 10–17.) Plaintiffs do not offer facts suggesting the Court has general

4    personal jurisdiction over WESPAC, such as allegations that it is organized in

5    California. (*See* FAC ¶ 47 ("Defendant WESPAC Foundation is a New York nonprofit

6    organization . . . .").)

7          The complaint fails to raise an inference that WESPAC maintains sufficient

8    contacts with California such that the Court can exercise specific personal jurisdiction

9    over it. Plaintiffs do not allege that WESPAC, or any individual affiliated with

10   WESPAC, was involved with the UCLA encampment. The only plausible allegation

11   tying WESPAC to the UCLA encampment is the conclusory assertion, made on

12   information and belief, that "at least some of the donations WESPAC collected on SJP's

13   behalf were used to support . . . 'Popular University for Gaza,' of which the UCLA

14   encampment was part." (*Id.* ¶ 74.) WESPAC's Executive Director, Nada Khader,

15   submitted a declaration disputing these assertions: as "WESPAC's sole full-time

16   employee and the employee who effectuates transfers of funds" to NSJP, Ms. Khader

17   avers she "never provided funding to NSJP to be used in connection with the protest

18   and encampment at UCLA." (Khader Decl. ¶¶ 5–6, ECF No. 71-1.) She also represents

19   that she "never provided funding to NSJP knowing it would be used in support of the

20   Popular University for Gaza." (Khader Reply Decl. ¶ 3, ECF No. 89-1.) At the hearing,

21   Plaintiffs' counsel characterized Ms. Khader's declarations as "carefully worded,"

22   (Hr'g Tr. 4:23–5:10), but counsel did not raise a genuine dispute as to the factual basis

23   of her assertions. Given Ms. Khader's sworn declarations, the complaint's conclusory

24   allegations that WESPAC sent funds to NSJP to be used in conjunction with the UCLA

25   encampment do not support an exercise of personal jurisdiction over WESPAC. *See*

26   *Schwarzenegger*, 374 F.3d at 800; *see also Elliott Erwitt, LLC v. Sugar Factory, LLC*,

27   No. CV 23-0049 PA (MAAx), 2023 WL 12155595, at *4 (C.D. Cal. Aug. 25, 2023)

28   (dismissing complaint for lack of personal jurisdiction where defendant rebutted

conclusory jurisdictional allegations with a declaration, which Plaintiff then failed dispute); *Precision Transducer Sys. v. STFO Trading LLC*, No. CV 09-4245-JFW (PJWx), 2009 WL 10700319, at *4 (C.D. Cal. Oct. 15, 2009) ("[A]llegations based upon information and belief are insufficient to demonstrate personal jurisdiction.").

WESPAC's only other pleaded connection with California is its fiscal sponsorship of NSJP. (*See* FAC ¶¶ 47, 71–73.) WESPAC argues that the mere fact that it serves as NSJP's fiscal sponsor is not sufficient to subject it to the Court's personal jurisdiction. (WESPAC Mot. 10–17.) The Court agrees for the reasons persuasively explained in a recent decision from this district. *Helmann v. CodePink Women for Peace*, No. 2:24-cv-05704-SVW-PVC, 2025 WL 3030582, at *20–21 (C.D. Cal. June 13, 2025). To avoid this conclusion, Plaintiffs invoke IRS Revenue Ruling 68-489, which states that a fiscal sponsor "will not jeopardize its exemption under section 501(c)(3) of the Code, even though it distributes funds to nonexempt organizations, provided it retains control and discretion over use of the funds for section 501(c)(3) purposes." (*See* FAC ¶ 70 & n.14; Opp'n 29.) Because NSJP does not have 501(c)(3) exempt status and received funds from WESPAC, Plaintiffs assert that WESPAC therefore must exercise control and discretion over NSJP akin to an agency relationship. (*See* FAC ¶¶ 70–73, 111.) The IRS ruling "requires fiscal sponsors to retain 'control and discretion' over how donated funds are used, but only in order to preserve their tax-exempt status—not to create an agency relationship or vicarious liability." *Helmann*, 2025 WL 3030582, at *20. The Court has not found any authority embracing Plaintiff's fiscal sponsorship theory. And, in fact, the only other court that has addressed Plaintiffs' broad reading of the IRS ruling soundly rejected it. *See Manhart v. WESPAC Found., Inc.*, No. 24-cv-08209, 2025 WL 2257408, at *12 (N.D. Ill. Aug. 7, 2025) (finding allegations of fiscal sponsorship relationship under IRS rulings insufficient to establish a legal tort duty).

In their opposition brief, Plaintiffs argue that, instead of the fiscal sponsor relationship itself, the actual written fiscal sponsorship agreement creates an agency

relationship between WESPAC and NSJP. (*See* Opp'n 33–34.) Indeed, in the complaint, Plaintiffs speculate that the written fiscal sponsorship agreement contains terms that would create an agency relationship, including that WESPAC "has assumed responsibility to manage programs, events, revenue, grants, contributions, contracts and/or insurance programs." (FAC ¶ 49 (emphasis removed) (internal quotation marks omitted).) WESPAC provided a copy of the fiscal sponsorship agreement with its reply papers. (*See* Khader Reply Decl. Ex. A, ECF No. 89-1.) The document is just over one-page long and contains no term like the one hypothesized by Plaintiffs. (*See id.*) Nothing in the agreement purports to give WESPAC any control or management authority over NSJP. On this record, the Court concludes that the written fiscal sponsorship agreement does not create an agency relationship between WESPAC and NSJP that would allow the Court to exercise personal jurisdiction over WESPAC based solely on NSJP's conduct.

On balance, the Court concludes that Plaintiffs have not pleaded enough facts to support personal jurisdiction over WESPAC.

Plaintiffs ask for leave to conduct limited jurisdictional discovery "on the nature and scope of its fiscal sponsorship agreement with NSJP and the resulting agency relationship." (Opp'n 35–36.) "In order to obtain discovery on jurisdictional facts, the plaintiff must make a colorable showing that the Court can exercise jurisdiction over the defendant." *Mitan v. Feeney*, 497 F. Supp. 2d 1113, 1119 (C.D. Cal. 2007) (internal quotation marks omitted). Plaintiffs here have not made this showing. It is unclear what facts Plaintiffs hope to uncover through limited discovery. Their theory of personal jurisdiction over WESPAC appears to hinge on the terms in the written fiscal sponsorship agreement creating an agency relationship with NSJP. (*See* Opp'n 35–36.) However, WESPAC has already produced the relevant agreement, which contains no terms that could be read to establish an agency relationship with NSJP. (*See* Khader Reply Decl. Ex. A.) Therefore, Plaintiffs have not carried their burden to show why jurisdictional discovery is appropriate. *See Pat. Rts. Prot. Grp., LLC v. Video Gaming*

*Techs., Inc.*, 603 F.3d 1364, 1371 (Fed. Cir. 2010) ("[I]t is not an abuse of discretion to deny jurisdictional discovery . . . where the request for discovery is 'based on little more than a hunch that it might yield jurisdictionally relevant facts.'" (citation omitted) (quoting *Boschetto v. Hansing*, 539 F.3d 1011, 1020 (9th Cir. 2008))).

### F.    Leave to Amend

As a general rule, leave to amend a dismissed complaint should be freely granted unless it is clear the complaint could not be saved by any amendment. Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Some of the pleading defects appear to be readily curable upon amendment. For example, Plaintiffs could include additional specific factual allegations describing AMP's involvement with the UCLA encampment. Given the Ninth Circuit's policy of granting leave to amend with "extreme liberality," *Jensen v. Brown*, 131 F.4th 677, 701 (9th Cir. 2025) (internal quotation marks omitted), the Court grants Plaintiffs leave to amend.

### G.    Motions to Stay Discovery

The Court denies WESPAC, NSJP, and PCC's motions to stay discovery as moot. NSJP separately filed an application for leave to file certain documents in support of its motion to stay under seal. (NSJP Sealing Appl., ECF No. 106.) Plaintiffs filed a notice of non-opposition to the application. (Notice of Non-Opp'n, ECF No. 109.) Finding good cause to seal identifying information about witnesses who submitted declarations in support of a motion that argues public identification endangers them, *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1179–80 (9th Cir. 2006), the Court grants NSJP's application. NSJP shall file the unredacted documents under seal pursuant to Local Rule 79-5.2.2(c).

## IV.    CONCLUSION

NSJP and PCC's motions to dismiss are denied. WESPAC, AMP, Dr. Bazian,

30

and Dr. Abuirshaid's motions to dismiss are granted. The motions to stay discovery are denied as moot. Plaintiffs may file an amended complaint within 14 days—if they can do so consistent with Federal Rule of Civil Procedure 11(b) and this Order. Plaintiff shall attach to the amended complaint a "redline" version showing all additions and deletions of material. (Initial Standing Order § 13, ECF No. 28.) Leave to add new claims, theories of the claims, or parties must be sought by a separate, properly noticed motion. Failure to file a timely amended complaint will waive the right to do so. In the interest of conserving resources, the Court extends NSJP and PCC's deadline to answer the first amended complaint to 14 days after Plaintiffs' deadline to amend; if Plaintiffs amend, NSJP and PCC shall answer the second amended complaint pursuant to Federal Rule of Civil Procedure 15(a)(3).

**IT IS SO ORDERED.**


 Dated: January 20, 2026

_____
MARK C. SCARSI
UNITED STATES DISTRICT JUDGE