Dan Stormer, Esq. [S.B. # 101967]
Bina Ahmad, Esq. [S.B. # 329387]
Rebecca Brown, Esq. [S.B. #336638]
HADSELL STORMER RENICK & DAI LLP
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9600
Facsimile:  (626) 577-7079
Emails: dstormer@hadsellstormer.com
        bahmad@hadsellstormer.com
        rbrown@hadsellstormer.com

Attorneys for Defendant
PEOPLE'S CITY COUNCIL

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

MATTHEW WEINBERG,
RABBI DOVID GUREVICH,
NIR HOFTMAN,
ELI TSIVES,

      Plaintiffs,

      v.

NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, JOHN DOE #1, PRESIDENT OF THE UCLA CHAPTER OF SJP, AJP EDUCATIONAL FOUNDATION, INC., D/B/A AMERICAN MUSLIMS FOR PALESTINE, OSAMA ABURSHAID, HATEM AL-BAZIAN, FACULTY FOR JUSTICE IN PALESTINE NETWORK, UC DIVEST COALITION, WESPAC FOUNDATION, PEOPLE'S CITY COUNCIL,

      Defendants

Case No.: 2:25-cv-03714-MCS-JC

[Assigned to the Honorable Mark C. Scarsi – Courtroom 7C]

**DEFENDANT PEOPLE'S CITY COUNCIL'S OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEFENDANT PEOPLE'S CITY COUNCIL TO ANSWER INTERROGATORY NO. 7**

DISCOVERY MATTER

On Submission

Magistrate Judge:
Hon. A. Joel Richlin

DEFT PCC'S OPP TO PLTF'S MTC DEFT
PCC TO ANSWER ROG NO. 7

## I.     INTRODUCTION

Despite being informed that PCC did not expend any funding in connection to the UCLA encampment, Plaintiffs nonetheless are seeking to pry into PCC's funding sources in violation of PCC's First Amendment rights, the attorney client privilege, and the work product doctrine.

## II.     RELEVANT FACTUAL BACKGROUND

PCC advocates across a wide range of often divisive social and political issues. Sergienko Dec. ¶ 4. That last time PCC received any funding was in February 2022. Sergienko Dec. ¶ 5. It was not until over two years later, April 24, 2024, that PCC learned of the UCLA encampment. Sergienko Dec. ¶ 6. PCC did not expend any funds in connection with the UCLA encampment, or with what Plaintiffs characterize as efforts to reestablish the encampment, in any capacity. Sergienko Dec. ¶ 7. For example, PCC did not purchase supplies for the encampment, compensate people for time spent at the encampment or work done in connection with the encampment, or provide funding directly to the encampment or its participants, including organizational participants. Sergienko Dec. ¶ 8. PCC has always condemned antisemitism and has never accepted funds from any actor it knows to be antisemitic. Sergienko Dec. ¶ 9.

Plaintiffs claim that "PCC unquestionably solicited donations during the encampment." Dkt. 167 at 4:19-20. In reality, PCC shared UCLA SJP's fundraising link, but never solicited donations for itself. Sergienko Dec. ¶ 10. Plaintiffs claim with no support that "at least some [of PCC's] funding was surely required to maintain the encampment, and, more generally, to enable PCC to exist as an organization." This is simply untrue. Sergienko Dec. ¶ 11. Plaintiffs acknowledge that PCC claims that no PCC funds were used to support the encampment, but appear to accuse PCC of lying in its verified responses. *See* Dkt. 167 at 4:18-19 ("But, even if true"). PCC is entirely volunteer run. Sergienko Dec. ¶ 12. PCC did not purchase any items or pay for any services to support its operations at the time of the UCLA encampment. Sergienko Dec. ¶ 13. There is nothing for Plaintiffs to assess.

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7

1

## III.   ARGUMENT

**A. Information Regarding PCC's Sources of Funding is Not Relevant per Rule 26, Much Less Highly Relevant per *Perry***

"Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance." *Cooper v. Cnty. of San Luis Obispo*, 350 F.R.D. 625, 630 (C.D. Cal. 2025) (quotations omitted). "'Conclusory, unsupported arguments' as to why the issuing party believes they are entitled to an order compelling discovery are insufficient to establish relevancy." *Apple, Inc. v. Qualcomm, Inc.*, No. 3:17-cv-00108-GPC-MDD, 2018 U.S. Dist. LEXIS 137539, at *18 (S.D. Cal. Aug. 14, 2018) (citations omitted). Crucially, the relevance standard is heightened in matters involving First Amendment concerns where moving parties "must show that the information sought is *highly relevant* to the claims or defenses in the litigation – a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1)." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1161 (9th Cir. 2010) (emphasis added)[1]. To meet this heightened standard, Plaintiffs must "explain precisely what information is sought, to which specific issues in the case the evidence is relevant, and whether these issues are likely to be determinative of the case." *Adolph Coors Co. v. Wallace,* 570 F.Supp. 202, 209 (N.D. Cal. 1983). "Mere speculation that information might be useful will not suffice." *Id.* (quoting *Black Panther Party v. Smith*, 661 F.3d 1243, 1268 (D.C. Cir. 1981)). *Adolph Coors* aptly notes that "(t)his enhanced scrutiny is appropriate since civil lawsuits could be misused as coercive devices to cripple, or subdue, vocal opponents." *Id.*

**i.     PCC's funding sources are not relevant to the background of the alleged conspiracy**

As discussed above, PCC did not expend any funds in connection with the UCLA encampment or with efforts to reestablish the encampment in any capacity and has not raised any new funds at all since early 2022. Plaintiffs merely speculate, in conclusory

---

[1] Plaintiffs appear to argue that *Perry* does not support PCC's position because its holding is limited to "private, internal campaign communications concerning the formulation of campaign strategy and messages." *See Perry*, 591 F.3d at 1165 n. 12. However, any minor factual distinctions with *Perry* have no bearing on the applicability of the test and standards articulated in *Perry*.

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7

2

fashion, that "who funded PCC is relevant to how the encampment came about, who was involved in its establishment, and whether the various coconspirators were relying on the same funders or were funding each other." Dkt. 167 at 3:22-24. Plaintiffs do not offer *any* facts connecting PCC's funding to the UCLA encampment or to other groups involved in the encampments. This is because such a connection simply does not exist, even if characterized as "background information."

In fact, background information is, by definition, rarely ever relevant, much less highly relevant, as Plaintiffs' own cited cases illustrate. Plaintiffs cite *Grace v. Apple, Inc.* but neglect to mention that the *Grace* court excluded the evidence at issue under Rule 403, reasoning that it was "of minimum probative value because it merely constitutes 'background facts' that underlie the instant case." *Grace v. Apple*, Inc., 2020 WL 227404, at *2 (N.D. Cal. Jan. 15, 2020). The court explained that "because background evidence about ancillary matters has only marginal relevance, it is more susceptible to exclusion under Rule 403's balancing of prejudice and probative value." *Id.* at 908. Here, the identity of PCC's donors from over two years before PCC learned of the encampment and well before the encampment was likely ever considered, let alone planned, is exactly the kind of "ancillary matter," which at best "has only marginal relevance." *Id.*

Plaintiffs next quote a criminal marijuana trafficking case (*United States v. Jones*) out of context. The *Jones* court was not talking about "relevant evidence" in general as Plaintiffs represent, but "evidence of prior acts[,]" specifically the defendant's "involvement in previous marijuana smuggling operations." *Jones*, 982 F.2d at 382. This is not analogous to PCC's funding sources, whose motivations for donating to PCC are unknown. PCC's funding sources are not relevant nor highly relevant to the background of the alleged conspiracy.

**ii.    PCC's funding sources are not relevant to any alleged coordination between Defendants**

This relevance argument fails because Plaintiffs again rely on pure speculation instead of facts, claiming only that "[i]f PCC and its co-conspirators had common sources

---

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7

3

of funding, it is more likely that they acted in accordance with a common plan to establish and maintain the encampment." Dkt. 167 at 3:26-28. PCC advocates across a wide range of often divisive social and political issues. Sergienko Dec. ¶ 4. It would be pure speculation to assume that because someone donated to NSJP and PCC, they donated to PCC with the intent to fund Palestine solidarity activism years in the future. Plaintiffs' rationale would render any donations by anyone to any of the Defendants at any point in time subject to discovery. This limitless inquiry is completely untethered from the events giving rise to this case and thus not reasonably calculated to lead to the discovery of admissible evidence. Information about PCC's funding sources cannot possibly show coordination in support of the alleged conspiracy, which even Plaintiffs do not claim existed in 2022 or before.

**iii.    PCC's funding sources are not relevant to PCC's alleged animus**

As PCC did not expend any funds in connection with the UCLA encampment, its funding sources cannot reveal any information about its intent or animus behind any actions it took related to the encampment. Likewise, funding sources from over two years before the encampment cannot plausibly shed light on PCC's actions concerning the encampment. PCC has always condemned antisemitism and has never accepted funds from any actor it knows to be antisemitic. Sergienko Dec. ¶ 9.

Plaintiffs' attempt to analogize the relationship between PCC and its donors to that between an employee and his supervisor. But there is nothing comparable about a workplace supervisor, who holds power and control over an employee, and a donor to a collective, who has no authority to control the collective's actions. Furthermore, nowhere have Plaintiffs alleged that PCC was acting at the direction of a funding source.

Plaintiffs' reliance on *Canaan* fails. While the *Canaan* court allowed limited discovery into the defendant's financial relationship with Qatar because it was relevant to antisemitic bias, the defendant had a 24-year long relationship with Qatar, which hosted a satellite campus for defendant at its own expense, and the plaintiff proffered two contracts between the defendant and Qatar. *See Canaan v. Carnegie Mellon Univ.*, No. 23-2107,

2025 U.S. Dist. LEXIS 274216, at *5 (W.D. Pa. Feb. 17, 2026). Here, plaintiffs seek discovery into *all* of PCC's funding sources but do not offer any factual allegations concerning the relationship between PCC and any funding source that would take their argument from speculation into fact-based claims of relevance. Plaintiffs also cite *Council on American-Islamic Relations Texas Dallas Fort Worth, et al. v. Governor Greg Abbott, et al.,* No. 1:25-cv-01878-ADA, Dkt. 64 (W.D. Tex. May 6, 2026), which provides no guidance to the present dispute as the cited order contains no legal or factual analysis.

**B. PCC's Funding Sources and Related Information Are Privileged Per The First Amendment**

"It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective a restraint on freedom of association as forms of governmental action." *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958)[2]. The Supreme Court and lower courts have repeatedly recognized that "[i]t is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation. These are not insignificant burdens on individual rights." *Buckley v. Valeo*, 424 U.S. 1, 68 (1976); *see also Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616-17 (2021) ("The disclosure [of donors to charities] requirement creates an unnecessary risk of chilling in violation of the First Amendment . . . indiscriminately sweeping up the information of every major donor with reason to remain anonymous." (quotations and citation omitted)); *Bursey v. United States*,

---

[2] Plaintiffs attempt to distinguish *NAACP* by claiming that they are not seeking documents analogous to the list of names of members at issue in *NAACP*. However, the principles regarding the importance of the right to associate and the dangers of compelled disclosure of such information are applicable to the present dispute regardless of factual distinctions between the cases. In fact, the Ninth Circuit has held that "The First Amendment privilege, however, has never been limited to the disclosure of identities of rank-and-file members." *Perry*, 591 F.3d at 1162. The *Stromberg* court's holding that a conspiracy where speech is used is not protected from punishment by the First Amendment has no bearing on the applicability of *NAACP* as *Stromberg*, a criminal case, did not address the impact of alleged infringement on associational rights on discovery requests.

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7                    5

466 F.2d 1059, 1092 n. 21 (9th Cir. 1972) ("To require a member of an association, especially a dissident political party, to reveal the details of its funding is as effective a chilling device as is compulsory disclosure of its membership lists."); *Brown v. Socialist Workers '74 Campaign Comm. (Ohio),* 459 U.S. 87, 97-98 (1982) (holding disclosure of contributors to a minor political party, "whose connection with the party is solely financial," would make them "vulnerable to threats, harassment, and reprisals" and "Compelled disclosure of the names of such recipients of expenditures could therefore cripple a minor party's ability to operate effectively and thereby reduce 'the free circulation of ideas both within and without the political arena.'" (quoting *Buckley*, 424 U.S. at 71); *Adolph Coors,* 570 F.Supp. at 209 (denying discovery into defendant's sources of financial support on First Amendment grounds: "[Defendant], avowedly an unpopular, politically directed association is threatened with virtual extinction by exposure of its membership and donors to a powerful commercial adversary."); *Averill v. City of Seattle*, 325 F.Supp.2d 1173, 1178 (W.D. Wash. 2004) ("reasonable probability that the publication of contributors' identifying information will subject them to future threats, harassment, and reprisals"); *Tree of Life Christian, Sch. v. City of Upper Arlington*, 2012 U.S. Dist. LEXIS 32205, at *9-10, (S.D. Ohio Mar. 12, 2012) (disclosure of a donor's identity to litigants "will almost certainly put at least some strain on the relationship between [an organization] and its donor" and "has a reasonable possibility of a chilling effect").

Likewise, Supreme Court and lower court precedent makes clear that information concerning the mechanics of PCC's funding and internal decisions regarding funding allocation are privileged under the First Amendment. *See, e.g., AFL-CIO v. FEC,* 333 F.3d 168, 177 (D.C. Cir. 2003) (The "Supreme Court has concluded that extensive interference with political groups' internal operations and with their effectiveness does implicate significant First Amendment interests in associational autonomy." (citing *Eu v. S.F. Cnty. Democratic Cent. Comm.,* 489 U.S. 214 (1989))); *Republican Nat'l Comm. v. Pelosi*, 602 F. Supp. 3d 1, 33 (D.D.C. May 1, 2022) ("political advocacy organizations have a First

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7
6

Amendment interest in keeping confidential [their] internal, strategic materials pertaining to how [they] organize [themselves] and conducts [their] affairs."); *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 259 (S.D. Ohio 2019) ("Because the First Amendment protects the right to free association, campaign organizations have an interest in keeping their communications, sources, and uses of funds, and internal plans and deliberations confidential."); *see also Dole v. Serv. Emps. Union, AFL-CIO, Loc. 280*, 950 F.2d 1456 (9th Cir. 1991) (prima facie case of First Amendment privilege where union members stated they could no longer participate in meetings if minutes of meetings were disclosed).

Here, disclosure of PCC's funding sources, the mechanics of PCC's funding, and PCC financial allocation decisions would deter PCC from engaging others in its political organizing and encouraging others to engage in political actions, particularly around the polarizing topic of Palestine and Israel. Sergienko Dec. ¶ 14. According to member Ricci Sergienko, PCC has a practice of asking permission before publicly identifying someone as a supporter of PCC or publicly identifying a supporter's political beliefs, particularly around the political issues of Palestinian and Israel. Sergienko Dec. ¶ 15. This is because PCC and its members have been subjected to doxxing and harassment, including by elected officials, because of PCC's political advocacy work and unpopular political opinions. Sergienko Dec. ¶¶ 16-17. This is also PCC's practice because PCC has observed the violent and repressive attacks on people who publicly express support for Palestine and criticism of Israel's government, which include violence, doxxing, termination from employment, expulsion from school, targeting for arrest, meritless retaliatory lawsuits, and immigration enforcement action. Sergienko Dec. ¶ 18. PCC is gravely concerned about exposing its funders to these consequences. Sergienko Dec. ¶ 19. Disclosure of the fact that an individual or organization donated to PCC will identify that person or entity as being associated with PCC and its radical political beliefs, putting their safety and wellbeing at risk. Sergienko Dec. ¶ 21. If such disclosure occurs, PCC would no longer feel safe or comfortable to engage or organize with others regarding Palestine. *Id.*

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7

7

Likewise, PCC anticipates that disclosure would cause people to withdraw from supporting PCC and its work and dissuade others from supporting PCC for these same reasons. Sergienko Dec. ¶ 22.

Furthermore, if the mechanics of PCC's funding and PCC's internal decisions regarding its funding are disclosed, PCC's political organizing efforts will be significantly frustrated as its internal operations and strategies will have been revealed to its political opponents. Sergienko Dec. ¶ 23. This would force PCC to abandon these operations and strategies, essentially forcing PCC to shut down parts of its operations. *Id.*

The protective order does not revoke First Amendment protections, nor does it completely ameliorate privacy concerns. *See Perry*, 591 F.3d at 1164 ("A protective order limiting dissemination of this information will ameliorate but cannot eliminate these threatened [First Amendment] harms."). The Supreme Court has likewise recognized that "disclosure requirements can chill association even if there is no disclosure to the general public. While assurances of confidentiality may reduce the burden of disclosure to the State, they do not eliminate it.'" *Ams. for Prosperity*, 594 U.S. at 616 (citations omitted).

PCC's members assert that, despite the existence of a protective order, their First Amendment rights would still be infringed upon in the above-mentioned ways. Sergienko Dec. ¶¶ 24-33. Its funding sources would still be disclosed to PCC's political opponents, including Eli Tsives (who brought a weapon to the UCLA encampment, threatened to dox encampment participants[3], and attempted to instigate and engaged in violence against pro-Palestine activists) and the Brandeis Center (a politically-charged and virulently anti-Palestine organization that condemns any criticism of Israel's government). *Id.*; *see International Action Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002) ("It is the government itself that Plaintiffs fear, and therefore confining that information to government (as well as PIC) counsel will hardly assuage those fears or avoid the

---

[3] In April 2024, Plaintiff Eli Tsives confronted protestors at the UCLA encampment and told them: "Let's get a nice look at their faces. You can kiss your jobs goodbye." Will Alden, *Portrait of a Campus in Crisis,* Jewish Currents (October 31, 2025), https://jewishcurrents.org/portrait-of-a-campus-in-crisis.

intimidation that Plaintiffs fear might follow."). A protective order does not give Plaintiffs carte blanche to seek discovery into PCC's finances.

Plaintiffs cannot overcome this infringement on PCC's First Amendment rights to warrant compelled disclosure. As discussed above, information regarding PCC's funding sources is not rationally related to any purported compelling government interest in this case because it has no relevance to this litigation. Plaintiffs' generalized and circular assertion that the deterrent effects on PCC's First Amendment rights caused by disclosure are justified because they are suing PCC for allegedly engaging in a conspiracy to deprive them of their civil rights fails to establish a basis for disclosure. While "the importance of the litigation" "may [be] take[n] into account" when "balance[ing] the burdens imposed on individuals and associations against the significance of the interest in disclosure," it does not alone justify the deterrent effect on PCC's right of association. *Perry*, 591 F.3d 1161. Plaintiffs' position suggests that anyone who has ever contributed to PCC was automatically a part of the alleged antisemitic conspiracy or that PCC automatically adopts the views of its donors. Such inferences have been squarely rejected by the Supreme Court. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *see Bursey v. United States*, 466 F.2d 1059, 1092 n. 21 (9th Cir. 1972) (denying discovery where the relevance theory was premised upon "some kind of guilt by association.").

Furthermore, discovery into PCC's funding sources, including the identity of its funders, the mechanics of its funding, and its funding allocation decisions, is far from narrowly tailored, and seeks a plethora of information that sheds no light on PCC's involvement in the UCLA encampment. *See Perry*, 591 F.3d at 1161 ("The request must also be carefully tailored to avoid unnecessary interference with protected activities"). This discovery is not tailored in any manner, much less limited to "information about those individuals who, through their funding, are directly connected to PCC's alleged involvement in planning and executing an antisemitic conspiracy" or "the core objectives and means of effectuating the antisemitic conspiracy at issue and the individuals or entities involved." Dkt. 167 at 7:18-20, 6:18-19. In sum, Plaintiffs cannot

DEFT PCC'S OPP TO PLTFS' MTC DEFT
PCC TO ANSWER ROG NO. 7

9

establish that the information regarding PCC's funding sources is rationally related to a compelling government interest and meets the requirements of the second step of the *Perry* analysis.

**C. The Identity of the Personal Most Knowledgeable About PCC's Funding Sources is Protected by the Attorney-Client Privilege and the Work-Product Doctrine.**

As this Court discussed with the parties, disclosure of the information sought would reveal PCC's counsel's confidential communications with PCC about litigation strategy and PCC's counsel's mental impressions, conclusions, opinions, and legal theories regarding designating Rule 30(b)(6) deponents. *See United States v. Nobles*, 422 U.S. 225, 238 (1975) ("At its core, the work product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case."); *Hickman v. Taylor*, 329 U.S. 495, 512 (1947) (basing work product protection on attorney's need to "prepare his legal theories and plan his strategy without undue interference"); *Admiral Ins. Co. v. U.S. Dist. Court*, 881 F.2d 1486, 1494 (9th Cir. 1989) ("The conditional protections afforded by the work product rule prevent exploitation of party's efforts in preparing litigation."). Interrogatory No. 7 does not seek the identities of relevant fact witnesses as Plaintiffs appear to assert, but rather seeks privileged information regarding PCC's litigation strategy. There is no substantial need for this information as PCC did not expend any funds in relation to the UCLA student encampment. There is also no undue hardship on Plaintiffs as the identity of this individual(s) will be revealed at the 30(b)(6) deposition.

### IV.   CONCLUSION

For the foregoing reasons, Defendant People's City Council respectfully requests that the Court deny Plaintiffs' motion to compel Defendant People's City Council to answer interrogatory no.7.

Dated: June 5, 2026

Respectfully Submitted,
HADSELL STORMER RENICK & DAI LLP
By: /s/ Rebecca Brown
Rebecca Brown
Attorneys for Defendant People's City Council

DEFT PCC'S OPP TO PLTFS' MTC DEFT PCC TO ANSWER ROG NO. 7