**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MATTHEW WEINBERG, ET AL.,<br>Plaintiffs,<br>v.<br>NATIONAL STUDENTS FOR JUSTICE IN PALESTINE, ET AL.,<br>Defendants. | Case No. 2:25-cv-03714-MCS-AJR<br>**MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION TO COMPEL PEOPLE'S CITY COUNCIL TO ANSWER INTERROGATORY NO. 7 (DKT. 167)** |

## I.

## INTRODUCTION

The operative First Amended Complaint filed by Plaintiffs Matthew Weinberg, Rabbi David Gurevich, Nir Hoftman, and Eli Tsives (collectively "Plaintiffs") asserts civil rights claims under 42 U.S.C. § 1985(3) against Defendants National Students for Justice in Palestine, John Doe #1, President of UCLA SJP, AJP Educational Foundation, Inc., d/b/a American Muslims for Palestine, Faculty for Justice in Palestine Network, UC Divest Coalition, WESPAC Foundation, and People's City Council ("PCC"), as well as claims under 42 U.S.C. § 1986 against Defendants Doe #1, Osama Abuirshaid, and Hatem Bazian. (Dkt.

54.) The First Amended Complaint broadly alleges an antisemitic conspiracy to create and maintain an encampment on the campus of the University of California, Los Angeles ("UCLA") from April 25, 2024 through May 2, 2024 for the purpose of excluding Jewish students, faculty, and staff from public spaces using violence and threats of violence. (Id. at 3-12.)

Currently before the Court is Plaintiffs' Motion to Compel PCC to Answer Interrogatory No. 7 (the "Motion to Compel") filed on May 22, 2026. (Dkt. 167.) On June 5, 2026, PCC filed an Opposition to the Motion to Compel (the "Opposition"). (Dkt. 173.) On June 9, 2026, PCC filed a Corrected Declaration of Ricci Sergienko and Exhibits in Support of the Opposition (the "Sergienko Declaration"). (Dkt. 177.) The Court previously advised that it would take the matter under submission without hearing or a reply. (Dkt. 156 at 2); see Fed. R. Civ. P. 78(b); C.D. Cal. L.R. 7-15. For the reasons set forth below, the Court DENIES Plaintiffs' Motion to Compel. (Dkt. 167.)

## II.
## THE DISCOVERY AT ISSUE

Plaintiffs seek to compel further responses from PCC to Interrogatory No. 7. (Dkt. 167 at 4.) Interrogatory No. 7 states, "Identify the person employed by, affiliated with or acting on Your behalf who is most knowledgeable about Your sources of funds." (Id. at 3.) PCC objected to this interrogatory based on relevance, overbreadth, First Amendment privilege, the right to privacy under state and federal law, the attorney-client privilege, and the work-product doctrine. See Appendix to Plaintiffs' Request for Pre-Discovery Motion Conference at 96-99, May 11, 2026 Informal Discovery Conference ("Plaintiffs' App."); see also Dkt. 167 at 4.

## III.

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) governs the scope of discovery in federal cases and provides that parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Federal Rule of Evidence 401 provides that evidence is relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Relevance under Rule 26(b)(1) is defined broadly. See, e.g., Snipes v. United States, 334 F.R.D. 548, 550 (N.D. Cal. 2020); V5 Techs. v. Switch, Ltd., 334 F.R.D. 306, 309 (D. Nev. 2019) (noting that relevance for discovery purposes remains broad even after the 2015 amendments of the Federal Rules of Civil Procedure), aff'd sub nom., V5 Techs., LLC v. Switch, LTD., 2020 WL 1042515 (D. Nev. Mar. 3, 2020). In addition to relevance, Rule 26(b)(1) requires that discovery be proportional to the needs of the case. Proportionality is determined by a consideration of the following factors: "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. Proc. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." Id.

Under Rule 33, a party may serve on any other party interrogatories that relate to any matter that may be inquired into under Rule 26(b). Fed. R. Civ. P. 33(a). "An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time." Fed. R. Civ. P. 33(a)(2). "If the answer to an interrogatory may be determined by examining,

auditing, compiling, abstracting, or summarizing a party's business records (including electronically stored information), and if the burden of deriving or ascertaining the answer will be substantially the same for either party, the responding party may answer by . . . specifying the records that must be reviewed, in sufficient detail to enable the interrogating party to locate and identify them as readily as the responding party could." Fed. R. Civ. P. 33(d).

Where a party fails to comply with discovery requests, the requesting party may move to compel discovery. Fed. R. Civ. P. 37(a). "Upon a motion to compel discovery, the movant has the initial burden of demonstrating relevance." Nguyen v. Lotus by Johnny Dung Inc., 2019 WL 3064479, at *2 (C.D. Cal. June 5, 2019) (internal quotation marks omitted). "Thereafter, the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections." Garces v. Pickett, 2021 WL 978540, at *2 (E.D. Cal. Mar. 16, 2021). "The opposing party is required to carry a heavy burden of showing why discovery was denied." Id. (internal quotation marks omitted). Specifically, the party opposing discovery must show that the requested discovery is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive, the party seeking discovery has had ample opportunity to obtain the information by discovery in the action, or the proposed discovery is outside the scope permitted by Rule 26(b)(1). See Fed. R. Civ. P. 26(b)(2)(C). The opposing party must specifically detail the reason why the request is improper. See Beckman Indus., Inc. v. Int'l Ins. Co., 966 F.2d 470, 476 (9th Cir. 1992) ("Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." (internal quotation marks omitted)).

If a motion to compel is granted, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable

expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, the court must not order this payment if the movant filed the motion before attempting in good faith to obtain agreement from the opposing party without court action, the opposing party's position was substantially justified, or other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(a)(5)(A)(i)-(iii). By contrast, where a motion to compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). However, "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Id. Finally, if a motion to compel is granted in part and denied in part, the court "may, after giving an opportunity to be heard, apportion the reasonable expenses of the motion." Fed. R. Civ. P. 37(a)(5)(C).

## IV.
## DISCUSSION

As set forth below, the Court concludes that Plaintiffs have not met their initial burden to establish relevance. Thus, Plaintiffs' Motion to Compel should be denied on this basis alone. However, the Court also concludes in the alternative that even assuming the requested information had some marginal relevance, PCC has met its burden to show that the requested discovery should be denied. Thus, Plaintiff's Motion to Compel is also denied on this alternative basis.

### A. Plaintiffs Have Not Met Their Initial Burden To Establish Relevance.

The Court begins by considering whether the information sought by Interrogatory No. 7 is relevant to any party's claim or defense in the action. See Fed. R. Civ. P. 26(b)(1). Specifically, the interrogatory seeks the identification of the person most knowledgeable about PCC's sources of funds. (Dkt. 167 at 3.)

Plaintiffs contend that PCC's sources of funding are relevant to: (1) the background of the alleged conspiracy; (2) coordination between the defendants; and (3) whether any animus motivated the conspiracy. (Dkt. 167 at 6.) The Court will address each asserted bases of relevance in turn.

Plaintiffs first contend that PCC's sources of funds are relevant to the background of the alleged conspiracy. (Id.) Specifically, Plaintiffs contend that "[s]imply put, who funded PCC is relevant to how the encampment came about, who was involved in its establishment, and whether the various co-conspirators were relying on the same funders or were funding each other." (Id.) However, this argument is circular in that it assumes PCC's funds in some way contributed to the formation of the encampment. Indeed, PCC has provided a verified interrogatory response stating that PCC "did not expend any funds in connection with the UCLA Palestine solidarity encampment." Plaintiffs' App. at 96. PCC has also provided the declaration of Ricci Sergienko, one of the five members of PCC, that confirms "PCC did not expend any funds in connection with the UCLA encampment, or with what Plaintiffs characterize as efforts to reestablish the encampment, in any capacity." (Dkt. 177 at 2.) The declaration further explains that "PCC did not purchase supplies for the encampment, it did not compensate people for time spent at the encampment or work done in connection with the encampment, and it did not provide funding directly to the encampment or its participants, including organizational participants." (Id.) In light of the Sergienko Declaration, it is unclear to the Court how the sources of PCC's funds, none of which were used in connection with the encampment, could be relevant to the background of the alleged conspiracy.

Plaintiffs' second argument is that PCC's sources of funds are relevant to coordination between PCC and other alleged conspirators. (Dkt. 167 at 6.) Specifically, Plaintiffs posit that "[i]f PCC and its co-conspirators had common sources of funding, it is more likely that they acted in accordance with a common

plan to establish and maintain the encampment." (Id.) Once again, however, this argument is circular in that it assumes that the alleged co-conspirators did in fact have common sources of funding. But this argument is pure speculation, as Plaintiffs tacitly acknowledge by stating their argument as a hypothetical. (Id.) Moreover, the Sergienko Declaration states that the "last time PCC received any funding was in February 2022." (Dkt. 177 at 2.) Thus, even assuming PCC did in fact have common sources of funding with any of the alleged co-conspirators, it is not clear to the Court that any such common funding source would have any relevance to the alleged conspiracy at issue in this case that occurred more than two years after PCC received the funds in question.

Plaintiffs' third argument is that PCC's sources of funds are relevant to whether the encampment was motivated by antisemitic animus. (Dkt. 167 at 7.) Specifically, Plaintiffs posit that "[i]f PCC accepted funds from an antisemitic actor, that increases the likelihood that PCC's motivation in establishing the encampment was itself antisemitic." (Id.) But once again, this argument is circular in that it assumes that PCC knowingly accepted funds from an antisemitic actor that was in some way used to establish or support the encampment. This argument is also nothing more than speculation. (Id.) Regardless, the Sergienko Declaration states that PCC did not expend any funds in connection with the encampment in any capacity, did not purchase supplies for the encampment, did not compensate people for time spent at the encampment, did not provide funding directly to the encampment or its participants, did not raise any money at all since February of 2022, has always condemned antisemitism, and has never accepted funds from any actor that it knows to be antisemitic. (Dkt. 177 at 2.) In light of the Sergienko Declaration, it is unclear to the Court how the sources of PCC's funds, none of which were known to be antisemitic, and where no funds were accepted since February of 2022, could be relevant to whether the encampment established in April of 2024 was motivated by antisemitic animus.

Plaintiffs contend that even assuming PCC did not use any funds to support the encampment, PCC's sources of funds are still relevant because "PCC unquestionably solicited donations during the encampment, as evidenced by the documents PCC has produced." (Dkt. 167 at 7.) Plaintiffs do not provide the documents they are referring to or elaborate on what these documents purport to show, but the Sergienko Declaration states that "[d]uring the encampment, PCC shared UCLA SJP's fundraising link, but never solicited donations for itself." (Dkt. 177 at 2.) Plaintiffs further contend that "[w]hether or not particular funding can be attributed to the encampment can only be assessed once Plaintiffs are able to gather further information about the mechanics of PCC's funding, including whether funders earmarked funds for only certain purposes, and which of PCC's members made decisions about where funding was directed." (Dkt. 167 at 7-8.) Once again, however, the sources of PCC's funds could only possibly be relevant if any such funds were used in relation to the encampment. Thus, Plaintiffs may properly inquire about whether PCC used any funds in relation to the encampment, for example, by deposing Mr. Sargienko about his declaration, but unless and until Plaintiffs establish that PCC used any funds in relation to the encampment, it is unclear to the Court how the sources of PCC's funds are relevant to any claim or defense in the action.

In sum, the Court concludes that Plaintiffs have not met their initial burden to show that the sources of PCC's funds are relevant to any claim or defense in the action. See Nguyen, 2019 WL 3064479, at *2. Thus, the Court concludes that Plaintiffs' Motion to Compel should be DENIED. Regardless, the Court will move on to consider PCC's objections as an alternative basis to deny the Motion to Compel assuming some marginal relevance.

**B. Even Assuming Marginal Relevance, PCC Has Met Its Burden To Show That The Requested Discovery Should Be Denied.**

PCC primarily objects to identifying its sources of funds based on First

Amendment privilege. (Dkt. 173 at 6-11.) The "First Amendment protects political association as well as political expression, and the freedom to associate with others for the common advancement of political beliefs and ideas is protected by the First and Fourteenth Amendments." Perry v. Schwarzenegger, 591 F.3d 1126, 1139 (9th Cir. 2010) (internal quotation marks, citation, and ellipses omitted). "[T]he government must justify its actions not only when it imposes direct limitations on associational rights, but also when governmental action would have the practical effect of discouraging the exercise of constitutionally protected political rights. Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights. Accordingly, they must survive exacting scrutiny." Id. (internal quotation marks and citation omitted). "Disclosures of political affiliations and activities that have a deterrent effect on the exercise of First Amendment rights are therefore subject to this same exacting scrutiny. A party who objects to a discovery request as an infringement of the party's First Amendment rights is in essence asserting a First Amendment privilege." Id. at 1139-40 (internal quotation marks and citation omitted).

The Ninth Circuit "sets forth a two-part test for analyzing claims of first amendment privilege in a discovery dispute. First, the party asserting the privilege must make a *prima facie* showing of arguable [F]irst [A]mendment infringement. This *prima facie* showing requires a party to demonstrate that enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or chilling of, the members' associational rights. A *prima facie* showing turns not on the type of information sought, but on whether disclosure of the information will have a deterrent effect on the exercise of protected activities." Chevron Corp. v. Donziger, 2013 WL 1402727, at *2 (N.D. Cal. Apr. 5, 2013) (internal quotation marks, citations, and brackets omitted, italics added); accord In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 2025

WL 2405489, at *4 (N.D. Cal. Aug. 19, 2025), motion for relief from judgment denied, 2025 WL 4076605 (N.D. Cal. Dec. 9, 2025).

If the party asserting the privilege makes a *prima facie* showing of arguable First Amendment infringement, then the Ninth Circuit requires that courts "balance the burdens imposed on individuals and associations against the significance of the interest in disclosure, to determine whether the interest in disclosure outweighs the harm." Perry, 591 F.3d at 1140 (internal quotation marks, citation, and ellipses omitted). The Ninth Circuit has provided the following guidance on evaluating this balance:

> "This balancing may take into account, for example, the importance of the litigation; the centrality of the information sought to the issues in the case; the existence of less intrusive means of obtaining the information; and the substantiality of the First Amendment interests at stake. Importantly, the party seeking the discovery must show that the information sought is highly relevant to the claims or defenses in the litigation—a more demanding standard of relevance than that under Federal Rule of Civil Procedure 26(b)(1). The request must also be carefully tailored to avoid unnecessary interference with protected activities, and the information must be otherwise unavailable."

Id. at 1140-41 (internal quotation marks and citations omitted). In other words, "the second step of the analysis is meant to make discovery that impacts First Amendment associational rights available only after careful consideration of the need for such discovery, but not necessarily to preclude it. Id. at 1140.

Here, the Sergienko Declaration explains that "[d]isclosure of PCC's funding sources, the mechanics of PCC's funding, and PCC financial allocation decisions would deter PCC from engaging others in its political organizing and encouraging others to engage in political actions, particularly around the polarizing topic of Palestine and Israel." (Dkt. 177 at 3.) The declaration further states that "PCC has a

practice of always asking permission before publicly identifying someone as a supported or follower of PCC or publicly identifying a supporter or follower's political activity or political beliefs, particularly around the political issues of Palestine and Israel." (Id.) "This is because PCC and its members have been subjected to doxing and harassment, including by elected officials, because of PCC's political advocacy work and unpopular political opinions." (Id.) "Always asking permission before publicly identifying someone as a supporter or follower of PCC is also PCC's practice because PCC has observed the violent and repressive attacks on people who publicly express support for Palestine and criticism of Israel's government." (Id.)

The declaration goes on to state that "PCC is gravely concerned about exposing its funders to these consequences." (Id. at 4.) "Disclosure of the fact that an individual or organization donated to PCC will identify that person or entity as being associated with PCC and its radical political beliefs, putting their safety and wellbeing at risk." (Id.) "If such disclosure occurs, PCC would no longer feel safe or comfortable to engage or organize with others regarding Palestine going forward." (Id.) "PCC anticipates that disclosure would cause people to withdraw form supporting PCC and its work and dissuade others from supporting PCC for these same reasons." (Id.) "If the mechanics of PCC's funding and PCC's internal decisions regarding its funding are disclosed, PCC's political organizing efforts will be significantly frustrated as its internal operations and strategies will have been revealed to its political opponents." (Id.) "This would force PCC to abandon these operations and strategies, essentially forcing PCC to shut down parts of its operations." (Id.) "This would happen even if information regarding PCC's funding sources was disclosed only to Plaintiffs and their attorneys." (Id. at 5.) "Any disclosure of information regarding PCC's funding sources would chill PCC's operations, political activity, and good will amongst the community." (Id.)

The declaration further states that Mr. Sergienko is "informed, and PCC

reported, that at least one of the Plaintiffs, Eli Tsives, has repeatedly engaged in violence against pro-Palestine advocates." (Id.) "Tsives participated in the violent mob attack on the encampment on April 30, 2024, brought mace or pepper spray to the encampment, attempted to instigate violence at the encampment, and engaged in violence against a pro-Palestine demonstrator at a screening about the student encampments at UCLA on April 30, 2025. (Id.) Mr. Sergienko states that he is "afraid that revealing the identities of PCC's funding sources to Tsives will lead Tsives to engage in violence or harassment of those individuals and organizations." (Id.) Disclosing PCC's internal operations and strategies to Tsives, a well-connected activist who is a vehement political opponent of PCC's pro-Palestine activism, will also reveal PCC's operations and strategies directly to its political opponent." (Id.) "This would force PCC to abandon these operations and strategies, essentially forcing PCC to shut down part of its operations." (Id.)

The Court concludes that the Sergienko Declaration satisfies the two-part framework to establish a *prima facie* claim of First Amendment privilege. See Perry, 591 F.3d at 1140. Indeed, the Supreme Court has repeatedly recognized that compelled disclosure of donors to political causes represents a significant First Amendment intrusion. See, e.g., Buckley v. Valeo, 424 U.S. 1, 68 (1976) ("It is undoubtedly true that public disclosure of contributions to candidates and political parties will deter some individuals who otherwise might contribute. In some instances, disclosure may even expose contributors to harassment or retaliation."); Americans for Prosperity Found. v. Bonta, 594 U.S. 595, 616–17 (2021) ("The disclosure requirement creates an unnecessary risk of chilling in violation of the First Amendment, indiscriminately sweeping up the information of every major donor with reason to remain anonymous." (internal quotation marks and citation omitted)); Nat'l Ass'n for Advancement of Colored People v. State of Ala. ex rel. Patterson, 357 U.S. 449, 462 (1958) ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute as effective

a restraint on freedom of association as the forms of governmental action in the cases above were thought likely to produce upon the particular constitutional rights there involved.").

Thus, the Court must next "balance the burdens imposed on individuals and associations against the significance of the interest in disclosure, to determine whether the interest in disclosure outweighs the harm." Perry, 591 F.3d at 1140 (internal quotation marks, citation, and ellipses omitted). Here, the Court easily concludes that the significant burdens that would be imposed on First Amendment rights from compelled disclosure outweighs the Plaintiffs' interest in disclosure. That is because Plaintiffs simply have no interest in disclosure for the reasons set forth above. Plaintiffs contend that "[a]t bottom, [Interrogatory No. 7] seeks information about those individuals who, through their funding, are directly connected to PCC's alleged involvement in planning and executing an antisemitic conspiracy." (Dkt. 167 at 10.) But there are no individuals who, through their funding, are directly connected to PCC's alleged involvement in planning and executing an antisemitic conspiracy because PCC because PCC did not expend any funds in connection with the encampment in any capacity, did not purchase supplies for the encampment, did not compensate people for time spent at the encampment, did not provide funding directly to the encampment or its participants, did not raise any money at all since February of 2022, has always condemned antisemitism, and has never accepted funds from any actor that it knows to be antisemitic. (Dkt. 177 at 2.)

Even assuming some marginal relevance of the sources of PCC's funds in light of the Sergienko Declaration, the Court would still conclude that Plaintiffs' marginal interest in obtaining this information is greatly outweighed by the significant intrusion on First Amendment rights from compelling disclosure. The Court would similarly conclude that the significant intrusion on First Amendment rights from compelling disclosure of PCC's sources of funds is not proportional to

the needs of the case given Plaintiffs' limited, if any, need for the information. See Fed. R. Civ. P. 26(b)(2)(C). Given the Court's conclusions that Plaintiffs have not met their burden to establish the relevance of the information sought and that PCC has met its burden to show that the requested discovery should be denied based on First Amendment objections, the Court need not address PCC's other objections to Interrogatory No. 7.

## V.

## CONCLUSION

Consistent with the foregoing, the Court DENIES Plaintiffs' Motion to Compel. (Dkt. 167.) Finally, Rule 37 states that if a motion to compel is denied, the court "must, after giving an opportunity to be heard, require the movant, the attorney filing the motion, or both to pay the party . . . who opposed the motion its reasonable expenses incurred in opposing the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(B). However, "the court must not order this payment if the motion was substantially justified or other circumstances make an award of expenses unjust." Id. Here, the Court concludes that Plaintiffs' motion was substantially justified and that an award of expenses would be unjust because the Court denied the Motion to Compel in large part based on the Sergienko Declaration which Plaintiffs did not have when they filed the Motion to Compel. Accordingly, the Court concludes that it is not appropriate to award expense reimbursement related to the denial of the Motion to Compel.

IT IS SO ORDERED.

DATED: August 28, 2026

HON. A. JOEL RICHLIN
UNITED STATES MAGISTRATE JUDGE