William J. Brown, Jr. (SBN 192950)
bill@brownwegner.com
Evan Mark Simon (SBN 246455)
esimon@brownwegner.com
BROWN WEGNER LLP
2010 Main Street, Suite 1260
Irvine, California 92614
Telephone: 949.705.0080
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

Matthew Weinberg, et al.,

*Plaintiffs*,

v.

National Students for Justice in Palestine, et al.,

*Defendants*.

**Case No. 2:25-cv-03714-MCS-AJR**

**PLAINTIFFS' STATUS UPDATE RE: DOCKET 238**

Honorable Mark C. Scarsi
Magistrate Judge A. Joel Richlin

Informal Conference Date: October 29, 2026
Time: 10:00 a.m.

[Additional Counsel Cont. from previous page]
Thomas R. McCarthy (VA Bar No. 47154)*
Thomas A. Wilson (DC Bar No. 90019385)*
Julius Kairey (VA Bar No. 101216)*
Zachary P. Grouev (FL Bar No. 1038629)*
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
Telephone: (703) 243-9423
tom@consovoymccarthy.com
twilson@consovoymccarthy.com
julius@consovoymccarthy.com
zach@consovoymccarthy.com

Patrick Strawbridge (MA Bar No. 678274)*
CONSOVOY MCCARTHY PLLC
8th Floor South PMB #706
Boston, MA 02109
Telephone: (617) 227-0548
patrick@consovoymccarthy.com

Richard A. Rosen (NY Bar No. 1663830)*
Omer Wiczyk (NY Bar No. 4321600)*
Evan Gottstein (NY Bar No. 5749783)*
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW
1675 Broadway, 13th Floor
New York, NY 10019
Telephone: (877) 600-3532
rrosen@brandeiscenter.com
owiczyk@brandeiscenter.com
egottstein@brandeiscenter.com

* Admitted pro hac vice

*Attorneys for Plaintiffs*

Plaintiffs respectfully provide this update on Defendants' progress in completing the steps ordered by the Court following the October 19, 2026 informal discovery conference. *See* Dkt. 238.

**I. Status of NSJP Discovery**

At the October 19 Conference, the Court noted that although the hit-count report for Plaintiffs' search terms in NSJP's documents showed roughly 5,300 responsive documents, that number could likely be reduced by excluding documents already produced and engaging in standard de-duplication practices. *Id.* To aid this process and "assess whether modifications to the search strings were necessary and/or how to make them," the Court ordered Mr. Wallace to produce a hit-count frequency report broken down by specific terms. *Id.* at 2.

The parties agreed "to work together and work with Everlaw" to remove previously produced documents, obtain per-term hit-count reports, and request that Everlaw provide any available guidance on the total number of unique hits that Mr. Wallace would need to review after de-duplication. *Id.* at 1-2. Given the rapidly approaching close of discovery on December 14, the Court ordered Mr. Wallace to "provide this information to Plaintiffs and the Court as soon as it is available, but no later than October 28, 2026." *Id.* at 2.

Mr. Wallace's conduct since the October 19 conference suggests he does not intend to fulfill his clients' discovery obligations during the limited time remaining for fact discovery. To start, Mr. Wallace waited until the afternoon of October 26 to reach out to Plaintiffs at all. Exh. A. In that email, Mr. Wallace claimed that he had spoken with Everlaw (on a phone call in which Plaintiffs were not invited to participate) and learned that they "cannot produce" the court-ordered reports using Plaintiffs' existing search strings. *Id.* Mr. Wallace requested that Plaintiffs "separate each

search string individually" so that he could generate the reports. *Id*. Plaintiffs worked diligently and provided Mr. Wallace with disambiguated search strings for NSJP and FJPN later that day. *Id*.

Recognizing that fully disambiguated search strings would require Mr. Wallace and his team to enter a very large number of individual search terms and that most of the terms the Court discussed during the October 19 conference were located in the first halves of Plaintiffs' strings, Plaintiffs provided Mr. Wallace with search strings that disambiguated the first half of every string. Exhs. B-C. To illustrate, Plaintiffs originally provided search strings that searched for instances of terms ("A" OR "B" OR "C" ...) within 50 words of terms ("D" OR "E" OR "F" ...) so that Mr. Wallace could paste the entire string into Everlaw in a single motion. Plaintiffs' disambiguation of these strings took the form of individual strings that searched for instances of "A" (and so on) within 50 words of ("D" OR "E" OR "F" ...). *Id*.

Plaintiffs provided this form of disambiguated string with the expectation that searches for many first-string terms would result in very few hits, even when run against Plaintiffs' complete second string. In instances in which a given first-string term resulted in more than 100 hits when run against Plaintiffs' second-string terms, Plaintiffs were prepared to fully disambiguate the second-string terms for that first-string term in order to maximize the information available to the Court while minimizing the work required from Mr. Wallace and his team.

Rather than produce the hit-count frequency reports that the Court ordered using Plaintiffs' disambiguated search strings, Mr. Wallace responded to Plaintiffs on the afternoon of October 27 explaining his simultaneous beliefs that Plaintiffs' strings "would need to be disambiguated much more to produce any meaningful results" *and* that he and his team

did not "have the resources" to run hit-count frequency reports on further disambiguated strings even if Plaintiffs provided them. Exh. A. So instead of complying with the Court's orders, Mr. Wallace proposed that Plaintiffs either (1) agree to arbitrarily limit the number of documents that he would need to review to "about 2,000 documents" and eliminate certain terms as overbroad without any supporting data; (2) engage in quasi-summary-judgment briefing in order to justify his review of more than 2,000 documents; or (3) pay an attorney to enable him to satisfy his clients' discovery obligations. Exh. A.

Plaintiffs replied to Mr. Wallace explaining that they had intentionally disambiguated the first-string terms first to minimize the burden on his team, but needed him to run the court-ordered hit-count frequency reports for those searches to determine which first-string terms would benefit from further disambiguation. *Id*. They also reiterated their willingness to produce further disambiguated search strings even though Mr. Wallace had already told them he was refusing to run hit-count frequency reports on those further disambiguated strings. *Id*. And Plaintiffs renewed their request to be allowed to speak with Everlaw to attempt to help Mr. Wallace solve his apparently intractable technical difficulties. *Id*.[1]

At 5:41 PM on October 28—almost two full days after Plaintiffs provided Mr. Wallace with disambiguated search strings and a full day after they explained the reasoning behind searching the first-string terms first to enable further disambiguation—Mr. Wallace emailed Plaintiffs to

[1] As to Mr. Wallace's proposals, Plaintiffs respectfully declined his invitation to arbitrarily limit NSJP's and FJPN's discovery obligations to a certain number of documents or to engage in quasi-summary-judgment procedures to obtain the evidence necessary to prove their case. Plaintiffs also promised Mr. Wallace that they would discuss his proposal that Plaintiffs pay for an attorney to assist him in satisfying his clients' discovery obligations with their clients.

provide the first round of court-ordered hit-count frequency reports. Plaintiffs followed up Wednesday evening with further disambiguated search strings expanding the second-string terms into separate searches for every first-string term that generated more than 100 hits. As of the filing of this update, Plaintiffs have not heard from Mr. Wallace whether he has reconsidered his earlier refusal to produce hit-count reports using Plaintiffs' further disambiguated search strings.

Given Mr. Wallace's pattern of delaying (or outright ignoring) compliance with both this Court's orders and Plaintiffs' best efforts to assist him, Plaintiffs believe that setting a hard deadline for document review and production is the only avenue to ensure that Mr. Wallace's clients comply with their discovery obligations in the short time remaining before the close of fact discovery. And given Mr. Wallace's refusal to produce the further disambiguated hit-count frequency reports that would allow Plaintiffs to have an informed discussion about whether any search terms might need to be narrowed in a timely fashion, it is appropriate to order Mr. Wallace to review the universe of documents responsive to Plaintiffs' current search terms.

Mr. Wallace has repeatedly represented that he is unwilling to review more than 50 documents per day. But as the Court has explained in previous conferences, it is not uncommon or an undue burden for counsel in civil litigation to review several hundred documents per day. *See, e.g.*, *Brown v. Barnes & Noble, Inc.*, 474 F. Supp. 3d 637, 645 (S.D.N.Y. 2019) (explaining that the average rate of document review is 40-60 documents *per hour*).[2] At a conservative rate of 250 documents per business day, Plaintiffs propose

[2] To the extent that Mr. Wallace asserts that he cannot spend more than a single hour per business day reviewing documents in this case because of other engagements, that is a predicament born of Mr. Wallace's own volition. It is not a reason to excuse his clients in this case from compliance with their discovery obligations.

setting a deadline for Mr. Wallace of November 13, 2026 to review the first 2,650 potentially responsive documents from NSJP, and a deadline of November 30 to review the remaining documents.

**Plaintiffs' Responses to Mr. Wallace's Search Term Proposals:** Although Mr. Wallace never discussed them with Plaintiffs, his status update contains several proposals based on his reading of the hit-count reports for Plaintiffs' first-string disambiguated terms. Plaintiffs briefly respond to those proposals below.

**Methodology:** Plaintiffs first address what appears to be Mr. Wallace's misreading of the hit-count reports. Each of Mr. Wallace's arguments to exclude a string is based on the third column in the report ("Documents with hits, including attachment family members"). But Mr. Wallace is incorrect that eliminating the "NSJP" string, for example, would remove 1,803 documents from the responsive universe. Instead, as Plaintiffs explained during the October 19 conference, removing that term would only remove the 592 documents "exclusive to" the search, as displayed in the report's second column. Because Mr. Wallace would surely be dismayed by this misreading once he discovered it and proceed to request further exclusions, Plaintiffs disagree that the third column is relevant to determining the breadth of any given contested string.

Plaintiffs also note that, although they provided Mr. Wallace with further disambiguated search strings for first-string terms that produced over 100 hits this evening, as of this filing they have not received any indication that Mr. Wallace has produced hit-count reports for those more nuanced strings. Because each of Mr. Wallace's arguments assumes that a given first-string term is overbroad without further disambiguation, his proposals lack the empirical support needed to inform the necessary tailoring.

**NSJP:** Mr. Wallace claims that this string "is simply a way to gather all the organizations' ESI, as opposed to looking for relevant materials related to the claims of the case." Not so. To start, Plaintiffs are not searching for every instance of the term "NSJP," only those within 50 words of a second set of terms tailored to the facts and claims in this case. As an empirical matter, the string results in only 1,803 total hits out of NSJP's 32,214 in-universe documents, a hit rate of approximately 5.6%. And the string only produces 592 "unique" hits, an even lower hit rate of approximately 1.84%. Given that Mr. Wallace has placed NSJP's structure and relationship with its chapters squarely at issue, Plaintiffs' narrowly tailored search cannot be characterized as overbroad.

**PYM & Palestinian Youth Movement:** Aside from the methodological flaws described above, which persist here, Mr. Wallace's only argument to exclude these terms is that PYM is not a party and that he doesn't "believe the documents show any particular connection to UCLA or the encampment." Given the Court's decision to overrule NSJP's First Amendment objections as to GAZA002989-91 after identifying a sufficient nexus to UCLA and the encampment, Plaintiffs respectfully disagree.

**WESPAC:** Aside from the methodological flaws discussed above, which persist here, Mr. Wallace's only arguments to exclude these terms are that WESPAC is no longer a party, "withdrew their financial support of NSJP after being named in this and several other lawsuits," and that he does "not see WESPAC as having any significant connection to UCLA." Again, not so. WESPAC was NSJP's fiscal sponsor before, during, and after the UCLA encampment during the time period relevant to this case. To Plaintiffs' knowledge, every dollar that NSJP spent during this period, including any funds spent on the Popular University for Gaza and the UCLA Encampment, would have been routed through WESPAC. Regardless of

whether this Court has personal jurisdiction over claims *against* WESPAC, its fiscal sponsorship of NSJP during the relevant period is clearly relevant to Plaintiffs' claims that NSJP organized the Popular University for Gaza and the UCLA Encampment.

## II. Status of FJPN Discovery

During the October 19 conference, the Court directed Mr. Wallace to review the 211 responsive documents from FJPN surfaced using Plaintiffs' proposed search terms. *Id.* at 1. On October 28—eighteen months after Plaintiffs named FJPN as a Defendant and with just over a month until the close of discovery—Mr. Wallace produced the first documents on behalf of FJPN in this entire litigation. That production appears to consist of 15 PDFs, far fewer than the 211 responsive documents that the Court ordered Mr. Wallace to review after the last conference.

Mr. Wallace has not given Plaintiffs any indication of when he expects to be able to complete FJPN's production, and Plaintiffs are concerned that the paucity of documents may render their upcoming partial Rule 30(b)(6) deposition of FJPN less helpful than the Court intended. In light of the upcoming deposition, the relatively small universe of responsive documents, and Mr. Wallace's unexplained and unjustified delay, Plaintiffs respectfully request that the Court order production of any responsive documents from FJPN no later than November 6, 2026.

Respectfully submitted,

DATED: October 28, 2026

BROWN WEGNER LLP
CONSOVOY MCCARTHY PLLC
THE LOUIS D. BRANDEIS CENTER
FOR HUMAN RIGHTS UNDER LAW

By: /s/ Thomas R. McCarthy*
Thomas R. McCarthy*
Patrick Strawbridge*
Thomas A. Wilson*
Zachary P. Grouev*
Julius Kairey*
Richard A. Rosen*
Omer Wiczyk*
Evan Gottstein*

Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

The undersigned counsel of record for Plaintiffs certifies that a true and correct copy of the foregoing was electronically filed and served upon all counsel of record who have appeared in the case and are registered with the CM/ECF. Parties may access this filing through the Court's CM/ECF System.

Dated: October 28, 2026

/s/ Thomas R. McCarthy
Thomas R. McCarthy